1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                     Plaintiff,          Criminal Action
                                          No. 16-CR-10343-ADB
6    v.
                                          February 4, 2019
7    MICHAEL J. GURRY, RICHARD M.         Pages 1 to 242
     SIMON, SUNRISE LEE, JOSEPH A.
8    ROWAN, and JOHN KAPOOR,

9                     Defendants.

10   _____

11

12

13               TRANSCRIPT OF JURY TRIAL -- DAY 11
             BEFORE THE HONORABLE ALLISON D. BURROUGHS
14                  UNITED STATES DISTRICT COURT
                  JOHN J. MOAKLEY U.S. COURTHOUSE
15                       ONE COURTHOUSE WAY
                        BOSTON, MA  02210

16

17

18

19

20                 KELLY MORTELLITE, RMR, CRR
21                   JOAN M. DALY, RMR, CRR
                      Official Court Reporter
22                John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 5507
23                     Boston, MA  02210
                     joanmdaly62@gmail.com
24

25

```
 1    APPEARANCES:

 2
      FOR THE GOVERNMENT:
 3
              FRED WYSHAK
 4            K. NATHANIEL YEAGER
              DAVID G. LAZARUS
 5            Assistant U.S. Attorneys
              United States Attorney's Office
 6            John Joseph Moakley Federal Courthouse
              1 Courthouse Way
 7            Suite 9200
              Boston, Massachusetts 02210
 8            617.748.3100
              fred.wyshak@usdoj.gov
 9            nathaniel.yeager@usdoj.gov
              david.lazarus2@usdoj.gov
10

11    FOR THE DEFENDANT MICHAEL J. GURRY:

12            TRACY A. MINER
              MEGAN A. SIDDALL
13            Demeo LLP
              200 State Street
14            Boston, Massachusetts 02109
              617.263.2600
15            tminer@demeollp.com
              msiddall@demeollp.com
16

17    FOR THE DEFENDANT RICHARD M. SIMON:

18            STEVEN A. TYRRELL
              PATRICK J. O'TOOLE, JR.
19            Weil, Gotshal & Manges LLP
              100 Federal Street
20            Boston, Massachusetts 02110
              617.772.8365
21            patrick.otoole@weil.com
              steven.tyrrell@weil.com
22

23

24

25
```

1    APPEARANCES (continued):

2

3    FOR THE DEFENDANT SUNRISE LEE:

4            PETER C. HORSTMANN
             Law Offices of Peter Charles Horstmann
             450 Lexington Street
5            Suite 101
             Newton, Massachusetts 02466
6            617.723.1980
             pete@horstmannlaw.com
7

8    FOR THE DEFENDANT JOSEPH A. ROWAN:

9            MICHAEL KENDALL
             ALEXANDRA I. GLIGA
10           White & Case, LLP
             75 State Street
11           Boston, Massachusetts 02109
             617.939.9310
12           michael.kendall@whitecase.com
             alexandra.gliga@whitecase.com
13

14   FOR THE DEFENDANT JOHN KAPOOR:

15           BETH WILKINSON
             KOSTA S. STOJILKOVIC
16           Wilkinson Walsh Eskovitz
             2001 M Street NW
17           Washington, D.C. 20036
             202.847.4000
18           bwilkinson@wilkinsonwalsh.com
             kstojilkovic@wilkinsonwalsh.com
19
             AARON M. KATZ
20           BRIEN T. O'CONNOR
             Ropes & Gray
21           Prudential Tower
             800 Boylston Street
22           Boston, Massachusetts 02199
             617.951.7385
23           aaron.katz@ropesgray.com
             boconnor@ropesgray.com
24

25

P R O C E E D I N G S

1

2          THE COURT:  Mr. Lazarus, do you want to be heard on

3    this?

4          MR. LAZARUS:  I do, Your Honor.  Thank you.

5          So we're obviously opposed to the introduction --

6          THE COURT:  Shocked to hear.

7          MR. LAZARUS:  -- of the recordings.  There's a

8    couple things going on, Your Honor.

9          The bottom line is that they're inadmissible, and

10   they're, at the very least, inadmissible in the way that

11   counsel has proposed to introduce them today.

12         So basically what counsel has proposed is to

13   introduce his defense without having to put on a defense by

14   putting these tapes into evidence that are self-serving

15   hearsay.  We moved in limine, we filed a timely motion in

16   limine, and we brought to the court's attention that these

17   are not admissible -- not these in particular, but that

18   self-serving hearsay statements are inadmissible.

19         And so the court deferred judgment on that.  There

20   was an exhibit list.  These weren't on the exhibit list, so

21   now the matter is before Your Honor.

22         The defendant argues that the tapes are admissible

23   for state of mind of his clients and for verbal acts.  And so

24   that's just not the case.

25         For state of mind, it would be the impact of a

1    statement on the listener, not the speaker.  So the fact that

2    the defendant is saying these things to other people, his

3    state of mind is not the purpose of that hearsay exception.

4              THE COURT:  Let me ask you a question.  I do agree

5    on the verbal acts.

6              Let me just ask you a question because I've been

7    wrestling with this all weekend long.

8              If he -- what would your position be if he put his

9    client on the stand?

10             MR. LAZARUS:  So that's one my arguments, is it

11   would still be inadmissible if he put his client on the

12   stand.  It would then be perhaps a past statement recording,

13   and he would be arguing that he was consistent with his

14   testimony through that recording.  And so I think in any

15   event it's self-serving hearsay.

16             The fact that at a national sales meeting he said

17   things does not mean that the rest of the evidence of the

18   case is not accurate.  And so, then, there's cases, you know,

19   that address the idea that the exception to hearsay for

20   statement of future intent or state of mind, there's a

21   proximity requirement, a contemporaneous requirement, and so

22   this meeting, these meetings and the recordings that he wants

23   to introduce, they are classic examples of a situation where

24   one might be careful and one might paper the file.  And so

25   it's not the same as the testimony from other witnesses or

1    other documents or emails or information.

2              MR. WYSHAK:  If I may supplement the record, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. WYSHAK:  So the state of mind exception to the

6    hearsay rule really revolves around the defendant's

7    commission of a future act.  And if he said contemporaneously

8    or immediately prior to the commission of that act something

9    which shows his state of mind at the time he committed the

10   act, that's a basis for admissibility under state of mind

11   exception.

12             Also, I don't think that the witness can

13   authenticate.  I don't think he can even establish foundation

14   for the admissibility of a tape that the witness has never

15   heard or that the witness never made.  The witness doesn't

16   know who made it, how it was made, whether or not --

17             THE COURT:  He's not on any of these tapes?

18             MR. WYSHAK:  I don't know if he's on them, but even

19   if he is on them, he didn't make them, doesn't know if they

20   are a fair and accurate recording of whatever the event is,

21   whether they've been altered or not over the period of time,

22   or -- I just don't think he can even establish a foundation

23   for admissibility through this witness.

24             But even if he could, again, you know, the

25   defendant would have to essentially take the stand and say,

1    When I did X, you know, this is what I had said, this is what

2    I was thinking, and, you know, this tape corroborates that.

3              MR. KENDALL:  May I be heard, Your Honor?

4              THE COURT:  You may be heard, but let me just tell

5    you what I've been thinking.

6              I've given this a lot of thought this weekend.  I

7    don't think they're admissible in this way, through this

8    witness.  And I'm inclined to reserve on whether you get them

9    in if you put your own client on the stand because I don't

10   think that these are fair if the government can't

11   cross-examine.

12             MR. KENDALL:  I think respectfully, Your Honor,

13   you're absolutely wrong.

14             THE COURT:  Doesn't sound that respectful.

15             MR. KENDALL:  I'm sorry, but that's how strongly I

16   feel about the issue.  And it's not to be disrespectful to

17   the court.  There's several points to be made.

18             I look at it, first, there's an authenticity issue.

19   Are the tapes of the people, have they been doctored?  Did

20   they occur in the timeframe that's represented?  The

21   government's transmission letter deals with virtually all of

22   those letters.  Here is tapes made by Mia Guzman and Ray

23   Furchak of Joe Rowan and others, and I believe the tapes

24   often have the date and sometimes even the time.

25             THE COURT:  Language in a discovery letter does not

1   establish authenticity.

2           MR. KENDALL:  It's an admission by the government.

3           THE COURT:  It's not.  It's an identifier.

4           MR. KENDALL:  Is the government telling us, we gave

5   you false documents?  We gave you false statements?

6           THE COURT:  Putting it in a discovery letter does

7   not make it admissible or not inadmissible and it does not

8   authenticate it.

9           MR. KENDALL:  Then the next issue would be, we

10  could have testimony from Furchak and Guzman to come in and

11  authenticate the tapes.

12          MR. WYSHAK:  Well, yes.  If he wants to call these

13  witnesses --

14          MR. KENDALL:  If I can do it without being

15  interrupted, please.

16          THE COURT:  Let him finish, please.

17          MR. KENDALL:  I believe under the rules we can do

18  it several different ways.  We can get an affidavit from them

19  certifying the authenticity of the tapes.  If the court is

20  not satisfied with their affidavits, we can have a hearing

21  out of the presence of the jury this week or next where they

22  come in and testify and they can say the tapes are authentic,

23  and then we can put the tapes in.

24          They don't have to do the authentication in front

25  of the jury.  As long as they do it in front of you, you can

1   make the ruling without them.

2          And third, Your Honor, some of the speakers on

3   those tapes are going to testify at this trial.  Napoletano

4   is a speaker in one of those tapes.  I can certainly use his

5   tape in front of him.

6          THE COURT:  In front of him if --

7          MR. KENDALL:  With him.

8          THE COURT:  Well, with him, if he makes a statement

9   that's inconsistent you can impeach him, but the tape doesn't

10  come in through him.

11         MR. KENDALL:  I don't want to impeach him, Your

12  Honor.  I want to do just the opposite.  This is the

13  instruction you gave to the sales force.  You told the sales

14  force A, B and C.

15         Your Honor, the essence of what they're saying is

16  that my client agreed to join a conspiracy that lasted over a

17  five-year time period.  I have 13 tapes from a seven-month

18  period at the real heart of the time of the conspiracy in

19  which my client is repeatedly rejecting joining the

20  conspiracy because we have co-conspirators asking him to do

21  bad things and he's telling the co-conspirators, no, we don't

22  do that.  No, you shouldn't do that.  I, as your boss, am

23  telling you not to do it.  I, as a person, am saying, we

24  don't do that.

25         If somebody is alleging somebody agreed to a

1    conspiracy and there's evidence that they didn't.  That comes

2    in.  It's not hearsay.  It's a verbal act.

3           THE COURT:  No.  There might be pieces of it that

4    are a verbal act, but the whole tape is not a verbal act.

5    And you may have a way to get it in, I don't know, but I'm --

6    you may have to put your client on to get it in.

7           MR. KENDALL:  I don't think so, Your Honor.  I

8    think that's an unfair interference with the Fifth Amendment.

9           THE COURT:  Well, no, because there are certain

10   things, if you want them to come in, you have to call your

11   client.  That's not a Fifth Amendment violation.  That's just

12   a fact.

13          MR. KENDALL:  Your Honor, a simple example:  If a

14   person says, I'm going to rob a bank.  I want you to be my

15   driver.  Will you come drive with me and be the getaway

16   driver?  And the person says, No, I will not drive the car

17   and be your getaway driver, that certainly would be

18   admissible if they were indicted for conspiracy for bank

19   robbery.

20          These tapes, or at least excerpts and parts of

21   these tapes, are perfectly analogous to that.

22          THE COURT:  You might be right.  And the reason I

23   spent so much time thinking about it this weekend is that

24   there's something that bothers me about the fact that if the

25   tapes had been inculpatory, they could have played them.  But

1    the fact that they are perhaps, and I think there's more

2    ambiguity in those tapes than you think there is, but perhaps

3    they can't come in.  There's something unfair about that.

4          And I'm willing to sort of take that piece by

5    piece, but I don't see any basis for it coming in through

6    this witness.

7          MR. KENDALL:  Well, what I would like to do, Your

8    Honor, is two or three steps here.  I certainly would like to

9    ask Mr. Napoletano if he remembers what he said at one of the

10   national sales conferences and the presentation that he and

11   Mr. Burlakoff and Mr. Gurry made, and I think the tape should

12   come in just to have the best evidence of what was told to

13   the sales force, which is, basically, we're doing these

14   things in a compliant, legal way and here are your

15   instructions.

16         I mean, I can ask him if he did that.  I can ask

17   him if he remembers exactly what he said.  I assume he'll

18   have some failure of memory.  He's not going to remember

19   everything he said seven years ago, and the tape is the best

20   evidence of what was instructed to the sales force.

21         THE COURT:  You can ask him those questions, but I

22   don't think that gives you a basis for communications.

23         MR. WYSHAK:  I think the tape is just like any

24   prior statement.  Whether it's grand jury testimony or

25   deposition under oath, he can be cross-examined.  If his

1   testimony on the stand is inconsistent with the prior

2   statement and if he denies making the prior statement, he can

3   be confronted with it.  And if Mr. Kendall is able to

4   establish that foundation where the witness denies he made

5   that statement, I think the best way for Mr. Kendall to

6   handle it is to, if he has a transcript, read it to him and

7   see if the witness agrees at that point.

8            But, again, I think you have to get past those

9   hurdles before he can use the tape.

10           MR. KENDALL:  Your Honor, why is the tape any

11  different than an email?  It's just a different form of

12  communication.  An email is written, a tape is recorded.  But

13  it's the same thing.  It's a past communication that can be

14  admitted into evidence to see what people said to each other.

15           MR. WYSHAK:  If it falls within one of the

16  exceptions to the hearsay rule.

17           THE COURT:  That's right.

18           MR. WYSHAK:  We're admitting emails because they're

19  co-conspirator statements or statements of a party opponent.

20  That is the basis for admissibility, not just because it

21  exists.

22           MR. KENDALL:  I get the impression, Your Honor, I'm

23  not going to win the day in the next ten minutes.

24           THE COURT:  You're not.  I don't think you're going

25  to win the day in the next ten minutes unless I've missed

1    something, and I've spent not inconsiderable time thinking

2    about it this weekend.

3              I appreciate the position that you're in, that, you

4    know, I'm thinking about it because it seems like there's

5    some unfairness in the fact that they have the option of

6    playing it but you don't.  And if it was inculpatory, they

7    would play it, but the fact it was exculpatory makes it

8    potentially not -- I'm wrestling with that.  I don't think it

9    comes in through this witness.

10             MR. KENDALL:  So, Your Honor, so I can focus my

11   homework assignment, I'm going to supplement my brief to see

12   if I could get information helpful to the court.

13             THE COURT:  That's fine.

14             MR. KENDALL:  What is the exact issue I need to

15   focus on?

16             THE COURT:  You need a basis for admissibility.

17             MR. KENDALL:  Is it your position they're not a

18   verbal act?  I will not do that bad act, I will not join this

19   conspiracy, I will not do these things you've asked me to do?

20             THE COURT:  A verbal act, in my view, doesn't have

21   this aspect of coming in for the truth.

22             MR. KENDALL:  I'm not -- I don't know if I -- if I

23   disagree with you on that.

24             THE COURT:  You mean I'm not completely wrong this

25   time?  It was fine for you to say it.  It's funny when people

1    say "with all due respect," it's exactly the opposite of what

2    they mean.  You may be disrespectful, but you should not

3    couch it in the fact that --

4              MR. KENDALL:  No, I respect that, what I just

5    disagreed --

6              THE COURT:  I'm happy to be criticized, but it just

7    entertains me when it's guarded in those.

8              MR. KENDALL:  If somebody says, I want to commit

9    co-pay fraud in Medicare and do something about the $60

10   co-pay, how do I do it, boss?  And the boss says, You can't

11   do it.  That's wrong and illegal.  You can't do it.  Isn't

12   that a verbal act?  He's telling his person who reports to

13   him, Don't do that thing.  Do this thing.

14             THE COURT:  I don't think so.

15             MR. WYSHAK:  No, a verbal act is a statement made

16   by somebody that causes somebody to do something else.  It's

17   not admitted for the truth of what was said.  It's admitted

18   to provide context as to why or how or where the listener did

19   something.

20             MR. KENDALL:  So let's put Mr. Wyshak up --

21             THE COURT:  So I think -- Mr. Wyshak, I don't think

22   he's --

23             MR. KENDALL:  I'm in agreement with him.

24             THE COURT:  Okay.  I'm in agreement with him, too.

25             I think of a verbal act is when someone says, Shut

1   the door.  Right?  So the door gets shut or doesn't.  It's an
2   explanation for why someone shut the door, and the fact that,
3   the "shut the door," there's no aspect of veracity or falsity
4   to the statement.
5           MR. KENDALL:  Yes, Your Honor.  But if somebody
6   says, Shut the door and you say, I won't shut the door, I
7   think it just -- he's proposing, Let's do a criminal act, and
8   the person says, No, I'm your boss.  You cannot -- what
9   really is happening is Furchak says, I would like your
10  permission to shut the door.  And Rowan says, You don't have
11  my permission, you can't shut the door.  So it's an
12  instruction he's telling him what to do.  You cannot shut
13  that door.  I forbid you.  I'm your boss.  I won't let you do
14  it.
15          Is that something the court would think is --
16          THE COURT:  I mean, I --
17          MR. WYSHAK:  He's obviously offering it for the
18  truth, Your Honor.
19          THE COURT:  He's offering it for the truth, and
20  even if you were entitled, even if there was a verbal act
21  buried in there, you would be entitled just to that.
22          You don't get to put the tape in for the -- without
23  the government being able to cross-examine your client.
24          MR. KENDALL:  I'm not looking for the truth of
25  whether or not they paid the $60.  I'm just looking for the

1    fact that Rowan gave an instruction:  You can't do it.

2    Whether they did it or not is not the issue.  I don't care,

3    and I wouldn't argue that, but he gave an instruction.

4    That's what I'm looking for.  You cannot do it.

5              THE COURT:  I'm happy to keep thinking about it.  I

6    don't think it's an easy issue, but not through this witness.

7    I don't think you have any basis for it coming in through

8    this witness.

9              MR. KENDALL:  Your Honor, Mr. Horstmann leaves me

10   with a last thought.  I'm going to sit down after this and

11   come back to you with a brief.  There's also Rule 807,

12   residual exception.  This clearly is reliable evidence of

13   what this person was doing and thinking.

14             I think it falls within the exceptions we've given

15   you, but I think you do have a discretion that if it is

16   reliable, which it clearly is, these people were motivated to

17   make tapes as beneficial to the government as possible.

18   There's no evidence, and I don't think anybody has any

19   practical basis to think that the tapes were doctored or

20   altered.

21             So I would ask -- I will come back to you with a

22   brief, Your Honor, but also something to think of is the

23   residual exception.

24             MR. WYSHAK:  Just to keep complete the record on

25   residual exception, Your Honor, it's basically used when

1   there's no other way to get the evidence in.  In this case,

2   the defendant can call Mr. Furchak who made the tape, can

3   call his client, he can try to put it in on his case.

4   There's no reason to resort to the residual exception in this

5   matter.

6            MR. KENDALL:  Your Honor, if that's the

7   government's position, we can call Furchak and Guzman.  I'll

8   send the subpoenas out to them today and have them in the

9   government's case.

10           I think we may have rights to use it earlier than

11  that, but if that's the last position they're offering us, we

12  will certainly do at least that.

13           MR. WYSHAK:  I'm not making any concessions

14  regarding relevance or admissibility.  I'm just saying that

15  there are ways.  His client can certainly get on the witness

16  stand and testify to his own state of mind, and if he's

17  impeached on that, then perhaps this tape is a prior

18  consistent statement which would then be admissible.

19           I mean, there are ways to get this in.  I don't

20  know want to tell Mr. Kendall how to try his case, but the

21  residual exception wouldn't apply in this situation.

22           THE COURT:  So in the seven minutes we have, and we

23  can continue this discussion later, I also looked over what

24  I've been referring to as motion in limine 13 this weekend.

25  And I still, Mr. Yeager, I just don't agree with the theory

1    that every prescription that follows a kickback is bogus.  I

2    think that's a fair summation of your argument.  It seems to

3    me if you have individual patients and the prescription is

4    not medically necessary, that having anybody represent that

5    the prescription is legit is a half-truth or a false

6    statement.  But I don't think that every prescription is

7    bogus just because there was a kickback behind it, and I

8    don't think there's any obligation to disclose it.

9            I think to the extent that there is a half-truth or

10   a falsity, I guess I'm not quite buying that it's not a fraud

11   by omission theory.

12           MR. YEAGER:  So my understanding, because I think

13   this is relevant for two issues:  One is the jury

14   instruction, which I think we can wait on and I'd like to be

15   heard again to try to convince the court to agree with me,

16   but with regard to the motion, my memory, it's been -- I

17   didn't read it over the weekend -- they moved to prevent two

18   things.  Am I right about this?  The witnesses from

19   testifying about -- patients from testifying that they were

20   not told by their doctors -- or if they had been told by

21   their doctors, they would have not taken the prescription,

22   and then secondly, with regard to the IRC.

23           MR. STOJILKOVIC:  Yeah.  Mr. Yeager, and for the

24   court, from an evidentiary issue --

25           MR. YEAGER:  That's all I care about.  I just want

1   to make sure I'm not stepping --

2          THE COURT:  Can I attempt this?  And then we can --

3   so part of what he wants to keep out and you want in is the

4   materiality aspect.  And I don't think the question is, would

5   you have wanted to know that there were kickbacks?

6          Is that the jury here already?

7          THE CLERK:  Yes.

8          THE COURT:  I don't think the question is would you

9   have wanted to know that your doctor was taking kickbacks.  I

10  think it was more like, would you have wanted to know if the

11  prescription wasn't medically necessary.

12         You're entitled to the materiality, but I don't

13  think in quite the way that --

14         MR. YEAGER:  Understood, Your Honor.

15         THE COURT:  And in terms of the IRC, not every

16  prescription that necessarily went through there is evidence

17  of a crime.

18         MR. YEAGER:  Understood, Your Honor.

19         THE COURT:  Did I miss anything there?

20         MR. STOJILKOVIC:  And that's fair, Your Honor.

21  That's a fair representation of what we're trying to -- how

22  we want to want to restrict it.

23         MR. YEAGER:  Can I flag two issues before we call

24  Mr. Napoletano, just to avoid sidebars if possible.

25         THE COURT:  Yes.

1            MR. YEAGER:  One is, there seems to be some

2    disagreement about what I'm allowed to ask Mr. Napoletano

3    about what he observed of Mr. Kapoor and Susan Beisler.

4            THE COURT:  Yes.  I have rethought that one also

5    over the weekend, so let me clarify that.  Thank you.  I

6    don't want to forget that.

7            The motion in limine was -- I, at least, understood

8    it to go to sort of gratuitous, extracurricular affairs that

9    would besmirch his character in a way that wasn't related to

10   the commission of the offense.

11           But now the emails have come in, and the nature of

12   their relationship is relevant to how he might have viewed

13   those emails.  So I think that the evidence of the

14   relationship comes in.

15           MS. WILKINSON:  Your Honor, they're going to call

16   Sue Beisler.  She's, I think they told us, one of the next

17   witnesses.  So why do they need to elicit that from him in a

18   gratuitous way when he doesn't have any first-hand knowledge,

19   other than I think he observes them together at a party, when

20   they can ask her directly?

21           THE COURT:  But it corroborates her, and that is

22   first-hand knowledge of what he saw.  If you could not --

23           MR. YEAGER:  I don't intend to be gratuitous.

24           THE COURT:  I was just going to say, not gratuitous

25   and not unduly salacious.

1          MR. YEAGER:  If I can have a moment to talk to the

2     witness, because I've instructed him previously not to answer

3     that.  I want to make clear what it is.

4          THE COURT:  You're entitled to the fact that they

5     had a relationship that might explain why she was sending

6     emails like that to him in that tone and how he might have

7     received them, but you're not entitled to them in a way that

8     is aimed at a character assassination.

9          MR. YEAGER:  Understood.

10         THE COURT:  So you get it, but limit on the

11    salaciousness, please.  What he saw, he can describe.

12         MS. WILKINSON:  Can you -- and I know Mr. Yeager

13    has been trying to lay a foundation on the timing of those

14    kind of questions, but his memory, as we saw, is not always

15    so great about the timing, and that certainly does matter.

16         MR. YEAGER:  I certainly will try.

17         MS. WILKINSON:  I appreciate that.

18         THE COURT:  Yes.  Because when I think about it,

19    and I don't know the timing, but it seems to me there's a

20    difference between whether it happened, you know, with

21    respect to whether he was married or involved with somebody

22    else or whether it happens when he's, you know, baching it

23    up.

24         MS. WILKINSON:  He was not married at the time,

25    Your Honor.  His wife died in 2005 and there was -- he wasn't

1    married.

2              THE COURT:  That's why I don't think the timing is

3    fair for you to --

4              MS. WILKINSON:  I just don't want to have to

5    interrupt, because it's an awkward moment anyway, so I really

6    appreciate it if you -- even laying foundation, just, we

7    would rather not do in front of the jury if we don't have to.

8              MR. YEAGER:  I'd be happy to lay a foundation with

9    regard to timing to the best that the witness can remember.

10             THE COURT:  But be very clear about whether, you

11   know, pre- or post-2005 and whether -- close to 2005 or ten

12   years after 2005.

13             MR. YEAGER:  I'm confident it will be 2013-ish.

14             THE COURT:  Just be clear about that.  I think

15   they're entitled to that.

16             MR. YEAGER:  The next issue, which just came up in

17   motions limine, Your Honor, and I just want to mention it, is

18   that there's a doctor in Texas named Judson Somerville who

19   was one of the top prescribers in the company in 2013.  I

20   think he has more than 60 speaker programs between the

21   beginning of 2013 and the end of 2013.

22             And at the end of 2013, he loses his license to

23   prescribe Schedule II narcotics.  And this is something that

24   Mr. Somerville is aware of -- Mr. Napoletano is aware of, and

25   I was going to inquire of that and the impact of that within

1    -- within Insys Therapeutics.  It's part of the motion in

2    limine, and I wanted to flag the issue.

3                THE COURT:  So -- yes?

4                MR. TYRRELL:  Your Honor, I'm going to object to

5    that.  As I understood the government's position, they

6    intended to get into things like convictions or suspensions

7    or arrests.  If, in fact, the company continued to deal with

8    that health care provider after the event, and in this case

9    it's absolutely undisputed that my client actually reported,

10   I think on or about December 15th, that Dr. Somerville had

11   been suspended -- by the way, not for any activity related to

12   Subsys, it was other opioids, and then there were -- there

13   was a day or two back and forth between my client and Desiree

14   Hollandsworth who worked for Mr. Napoletano, legal advice was

15   sought, and then instructions were given that there would be

16   no further dealings with Dr. Somerville, and my client

17   communicated that to his subordinates.

18               So there was no further activity after he was --

19   after he was suspended.  And, frankly, I think to introduce

20   that fact to the jury I think will confuse things and be

21   prejudicial to my client.

22               THE COURT:  What is the testimony going to be?

23               MR. YEAGER:  The testimony is that towards the end

24   of 2013, he loses his license to prescribe Schedule IIs.

25   There is talk, I mean, his client is asking, can I please go

1    ahead and pay him, and the front office is saying no.  I

2    don't want to offer it really for that.

3            To me, and to Mr. Napoletano, during the course of

4    2013, you've heard testimony in this case about how he

5    complains to the board member Patrick Fourteau and says, Stop

6    the IOR analysis.  And they do, as far as he knows, as far as

7    his involvement, they stop speaker IOR analyis, but they

8    don't stop bribing doctors.

9            And an example of that is Somerville.  There's

10   regular conversations with Babich and others about exceeding

11   the cap for him.  There's a cap for speaker fees, and they do

12   exceed the cap, and at the end of the year, he loses his

13   license.  And they don't change, they actually double-down

14   and increase the budget.  He isn't prescribing anymore.  But

15   it goes to state of mind.

16           In 2014, after the government subpoena, after

17   Somerville lost -- one of their top speakers in the country

18   has lost the ability to prescribe Schedule IIs, and after

19   some other events, they double-down and continue to invest

20   huge amounts of money into the speaker program.  That's the

21   only reason I'm offering it.

22           MR. TYRRELL:  By the way, my client does not say,

23   Can we pay Dr. Somerville?  What he says is, We have two

24   speaker events scheduled.  What do we do about those?  And,

25   again, the instructions that he's given -- after legal advice

1    is sought by Mr. Napoletano and others, we have redacted

2    emails, we don't know what the advice was, but we assume it

3    was advice of some kind -- the instruction is given, No more

4    dealings with Dr. Somerville and it ceases.

5            And to go back, Dr. Somerville is not suspended

6    because of anything related to Insys or Subsys.

7            THE COURT:  Hold on.  Do they keep using him as a

8    speaker once his license is --

9            MR. YEAGER:  No, they do not.  They do not keep

10   using him as a speaker, Your Honor.

11           But the point is, there's debate throughout 2013

12   regarding him and Awerbuck, right?  And they both are -- have

13   their caps in place.  At some point they put caps in place to

14   say, You're not allowed to go beyond this amount of money.

15           As Somerville is writing more and more in 2013,

16   Napoletano has a conversation with Babich and Burlakoff

17   regarding these caps and he says -- he says, Look, Somerville

18   is about ready to reach his cap.  You can't go down this

19   road.  And they exceed the cap and then this happens.

20           So I'm saying it goes to state of mind for the

21   company thereafter.

22           THE COURT:  Well, I don't think that's right.  You

23   get all those emails about him exceeding the cap and all the

24   discussions about it, but I don't think you get beyond that

25   because I don't know what it shows about their state of mind.

1 | They stopped using him, and I'm not sure that you should be
2 | expecting them to have drawn up -- I mean, I don't know what
3 | the lesson would be that speakers that exceed their cap are
4 | likely to be indicted so they lose their license so you
5 | shouldn't use them.  I'm not sure what the evidentiary leap
6 | is between the two for the state of mind.
7 | MS. WILKINSON:  The government is trying to suggest
8 | because one doctor got in trouble they should have stopped
9 | dealing with other doctors.  In pharmaceutical companies,
10 | that happens all the time.  It's a totally improper
11 | inference.
12 | So they're trying to say, yes, you stopped dealing
13 | with Dr. Somerville, but that should have made you suspicious
14 | of everyone else.  And I think they said they should have
15 | shut down the speaker program, and that's an improper
16 | inference.
17 | THE COURT:  I don't think you get that, but you can
18 | have all the stuff about exceeding the cap and trying to make
19 | it work with him.  I think you're looking for the inference
20 | that greedy doctors do bad things and that should have been
21 | foreseeable, right?
22 | MR. YEAGER:  Well, I'm looking a little bit --
23 | close, but broader.  I'm saying there's multiple things going
24 | on informing the company of the wrongfulness of the speaker
25 | program and they're not doing anything.  That's the

1   double-down.

2           THE COURT:  I don't see how his losing his license

3   is evidence of the wrongful speaker program.  The fact

4   they're trying to exceed the caps and trying to manipulate

5   the speaker program, that has some relevance arguably.  I

6   mean, I don't know.  But depending on how it comes out, I see

7   that as being relevant.  But I don't see what inference they

8   should have been -- what relevant inference they should have

9   been expected to draw from the fact that he lost his license.

10          MR. YEAGER:  May I have two minutes to tell the

11  witness these two rulings before the jury is brought in?

12          THE COURT:  Yes.

13          MR. YEAGER:  Thank you.

14          THE COURT:  Are you ready, Mr. Yeager?

15          MR. YEAGER:  Yes, Your Honor.

16          THE COURT:  You can put him on the stand, and,

17  Karen, you can go get the jury, please.

18          (Jury enters the courtroom.)

19          THE COURT:  Good morning, everybody.  Thank you for

20  being here on time.  I wondered this morning after the game

21  last night, but I was very impressed.  I was just saying that

22  it may even be harder to get here tomorrow than today because

23  today traffic was kind of light but tomorrow we have the

24  parade.  But I do appreciate you getting here on time.  I'm

25  sure some of you were up late.

1          You sir, remain under oath, okay?

2          When you're ready, Mr. Yeager.

3          MR. YEAGER:  Thank you, Your Honor.

4   CONT. DIRECT EXAMINATION BY MR. YEAGER:

5   **Q.**  Good morning, sir.

6   **A.**  Good morning.

7   **Q.**  I want to pick back up where we left off on Friday.

8       Just, again, remind us what your name is?

9   **A.**  Matthew Napoletano.

10  **Q.**  And, Mr. Napoletano, you testified here Friday for some

11  time; is that correct?

12  **A.**  Correct.

13  **Q.**  Okay.  On Friday we talked a lot about the speaker

14  program.  Do you remember that?

15  **A.**  Yes.

16  **Q.**  And I want to continue talking today about the speaker

17  program, but I want to, before we get to that, I want to talk

18  about a couple of other issues that came up in 2012 and then

19  get back to the speaker program.

20  **A.**  Okay.

21          MR. YEAGER:  So if we could have 481.  I think it's

22  in for the witness.  Page 22, please.

23  **Q.**  Mr. Napoletano, you're familiar with the label; is that

24  correct?

25  **A.**  Yes.

1  **Q.**   And this is the label for Subsys?

2  **A.**   Correct.

3  **Q.**   That came out -- just to orient you, this is the first

4  label that came out, correct?

5  **A.**   Correct.

6  **Q.**   All right.  If you could read the first sentence of

7  that -- of this particular part of the label.

8  **A.**   "The efficacy of Subsys was demonstrated in a

9  double-blind placebo-controlled crossover study in

10  opioid-tolerant adult patients with cancer and breakthrough

11  pain."

12  **Q.**   So the study that they're referring to is what study?

13  **A.**   This is what we refer to as a pivotal study, or it's the

14  clinical trial that was used for the FDA to approve the drug.

15  **Q.**   And the study was, as it says there, for people with

16  cancer and breakthrough pain both, correct?

17  **A.**   Correct.

18         MR. YEAGER:  All right.  Now if we could go back to

19  the first page of 481.  If we could blow up the warnings box,

20  please.

21  **Q.**   In the top warning, if you could just read that:

22  "Warning:  Risk of respiratory depression, medical errors,

23  abuse potential."

24         This is in a box; is that correct?

25  **A.**   Correct.

1    Q.  All right.  If you could go four down, and I just want to

2    touch base on two things we talked about Friday, but I want

3    to make sure we go over a couple of more.

4            "When prescribing, do not convert patients"; is

5    that correct?

6    A.  Correct.

7    Q.  Can you read the rest for us, please?

8    A.  "When prescribing, do not convert patients on a

9    microgram-per-microgram basis from any other oral

10   transmucosal fentanyl product to Subsys."

11   Q.  If you go down to the second-to-last bullet, read that

12   for us, please.

13   A.  "Contains fentanyl, a Schedule II controlled substance

14   with abuse liability similar to other opioid analgesics."

15           MR. YEAGER:  Okay.  If we could just go back to the

16   front page of the document, please.  Thank you.

17   Q.  Directing your attention to March of 2012, back when the

18   drug launched, Mr. Napoletano.  Can you please describe the

19   message regarding dosage and titration?

20   A.  Yes, it was consistent with what was in the label here.

21   Q.  Meaning what?

22   A.  Meaning you start at the lowest available dose, in this

23   case it was 100 micrograms, and titrate according to the

24   schedule provided.

25           MR. YEAGER:  Exhibit 290, please.

1              Ms. Folan, I have this in, but I know we used the

2       exhibit with the jury, but is 290 in?

3              THE CLERK:  290?

4              MS. WILKINSON:  I believe it is.

5              THE COURT:  Yeah, I have it in.

6              MR. YEAGER:  Thank you.

7              With regard to 290, will you please show page 8 to

8       the jury, please.  If you could highlight the part there

9       where it says "Increased utilization of higher strengths."

10      **Q.**  Do you see that?  What is that referring to,

11      Mr. Napoletano?

12      **A.**  That means the longer a patient stays on a drug, they

13      build up a tolerance to it and then they increase the does.

14      **Q.**  When it says "key growth parameters," what is that

15      referring to?

16      **A.**  That means ways the business would grow.

17      **Q.**  Let's go through them.

18              The first one is, "Grow the number of prescribers,"

19      correct?

20      **A.**  Correct.

21      **Q.**  What is that referring to?

22      **A.**  That's means the number of people writing the

23      prescriptions.

24      **Q.**  "Grow TRX/Prescriber," what does that mean?

25      **A.**  That means the number of prescriptions being written goes

1    up.

2    **Q.**   And then "Grow units TRX," what does that mean?

3    **A.**   That means as prescriptions continue, the units per

4    prescription will increase.

5    **Q.**   So this is describing ways in which the company is going

6    to grow its business; is that correct?

7    **A.**   That is correct.

8    **Q.**   And then the last two deal with increasing the units and

9    increasing utilization; is that correct?

10   **A.**   That is correct.

11   **Q.**   Now, you're saying, I think you said before and I don't

12   want to put words in your mouth, but you talked about the

13   likelihood that what will happen when a patient is on a

14   long-acting opioid; is that correct?

15   **A.**   That is correct.

16   **Q.**   So what were you saying to us?

17   **A.**   As a patient is on a long-acting opioid, they increase

18   tolerance to the -- or build tolerance to the drug and the

19   dose increases.

20   **Q.**   All right.  Now, with regard to this message, this idea

21   that by its nature people become tolerant of opioid and it

22   increases, what's a budget meeting?

23   **A.**   A budget meeting is a meeting where we're talking about

24   what we're going to spend money on in terms of initiatives or

25   programs.

1    **Q.**  Did these occur at Insys Therapeutics?

2    **A.**  Yes, very frequently.

3    **Q.**  Directing your attention to an August 10th of 2012,

4    budget meeting.  Do you remember that meeting?

5    **A.**  I do.

6    **Q.**  And who was present for the meeting?

7    **A.**  John Kapoor, Mike Babich, myself and others.

8    **Q.**  Do you have a memory of who the others were?

9    **A.**  I believe Patrick Fourteau was on the phone.

10    **Q.**  Okay.  Anybody else?

11    **A.**  There were others.  I just don't remember.

12    **Q.**  Okay.  But you say you don't remember who they were; is

13    that fair to say?

14    **A.**  Yes.

15    **Q.**  Okay.  And with regard to the budget conversation related

16    to this issue, can you describe what happened during that

17    meeting?

18    **A.**  Yes.  John Kapoor said that we had to push the dose, that

19    these aren't the kind of things you get in trouble for.

20    **Q.**  And what was he referring to specifically when he said

21    that?

22    **A.**  He was specifically -- there were some patients that were

23    starting out and not achieving efficacy at lower doses, and

24    he was saying that you have to push them up and increase the

25    dose as, you know, as they are on it.  So you have to

1    increase the dose of these patients.

2    **Q.**   And with regard to getting in trouble, what did you

3    say -- what was -- did you talk during this meeting?

4    **A.**   Yes.  My position?  Is that what you're saying?

5    **Q.**   Yes.  What did you tell him?

6    **A.**   My position is in pharma we don't push dose; that this is

7    the kind of thing that Purdue got in trouble for.

8    **Q.**   And who is Purdue?

9    **A.**   Purdue was --

10           MR. KENDALL:  Objection, Your Honor.

11           THE COURT:  Basis?

12           MR. KENDALL:  Relevance, 401, 403.  It's a

13   different company, different issues.

14           THE COURT:  Well, if he's -- that's overruled.

15   BY MR. YEAGER:

16   **Q.**   Without getting into any great detail, I just want to

17   understand, who was Purdue?

18   **A.**   Purdue was a manufacturer of an opioid called OxyContin.

19           MS. WILKINSON:  Objection, Your Honor.

20           THE COURT:  That's sustained.

21   **Q.**   Did you have a conversation with Mr. Kapoor about trouble

22   that another pharmaceutical company had gotten into?

23           MS. WILKINSON:  Excuse me, Your Honor.  I would

24   also ask to move to strike, since he got it into the record.

25   No, the last statement.

1          THE COURT:  Okay.  He -- let me see you on sidebar,

2     please.

3     SIDEBAR:

4          THE COURT:  Another pharmaceutical got in trouble

5     for another opioid.  Stay away from Purdue.  Stay away the

6     name of the drug.  They're hot buttons, and I will instruct

7     the jury that the name of the company and name of drug are

8     not coming --

9          MS. WILKINSON:  Your Honor, could you go further?

10    I think it's so prejudicial.  Everyone knows that the name in

11    the paper that has caused the most concern for people is

12    OxyContin and Purdue.  He knows that.  They should be told

13    it's nothing to do with that.

14         MR. KENDALL:  It's a different drug.

15         MS. WILKINSON:  And not appropriate to even compare

16    the two.  I mean, it's so unfair and so prejudicial.

17         MR. YEAGER:  If I could be heard, Judge.  Kapoor

18    was told that repeatedly over the course of a year, You don't

19    do this.  This is a problem.  Purdue got in trouble for this.

20    And it goes directly to his state of mind.

21         THE COURT:  You can have that another company got

22    into trouble, but I think when you start to link it to

23    Purdue, that I at think --

24         So I am letting him testify about the fact that

25    there were conversations about another company that got in

1    trouble about another drug, and you will assign that

2    testimony whatever weight you think it merits at the end of

3    the day.  But the name of the company that got into the

4    trouble and the drug that was involved in the trouble are

5    completely irrelevant.  Okay?

6            Does that satisfy everybody?

7    (End of sidebar.)

8    BY MR. YEAGER:

9    **Q.**  Just so the record is clear, you informed Dr. Kapoor that

10   another pharmaceutical company had gotten in trouble for

11   pushing dose; is that correct?

12   **A.**  Correct.

13   **Q.**  Okay.  What happened after you informed him of that

14   information?  Describe the rest of the conversation, please.

15   **A.**  Yeah.

16           The point was that he said that these aren't the

17   kind of things that you get in trouble for when -- and

18   particularly his position was that he didn't want patients to

19   start on the 100 because he didn't believe it was going to

20   work.

21   **Q.**  Okay.  Do you remember any other parts of the

22   conversation?

23   **A.**  I don't.

24   **Q.**  Okay.  Directing your attention to the next day, what is

25   a regional sales meeting?

1  **A.**   A regional sales meeting is a meeting with the sales

2  management team and typically the VP of sales and typically

3  Mike Babich.

4  **Q.**   Do you remember the regional sales meeting on August 11,

5  2012, which you participated in?

6  **A.**   Yes.

7  **Q.**   And who was present for the meeting?

8  **A.**   The regional sales meeting -- the regional sales

9  managers, I know Mike Babich was.  And Patrick Fourteau, I

10  believe, was on the phone.

11  **Q.**   And describe the conversation regarding titration during

12  that RSM meeting.

13  **A.**   During the RSM meeting, it was discussed that, that --

14  couldn't we use physicians to tell other physicians how they

15  titrate and use the drug not necessarily consistent with the

16  label, and that we were -- I was questioning him personally

17  that if I explained that the speakers had to adhere to the

18  package insert and I was told that, well, if they're just

19  going to talk about the package insert, we don't need

20  speakers.

21  **Q.**   Go back.  Who said what?

22  **A.**   So I was talking to John Kapoor and myself, and John said

23  to me that if we're just going to have speakers go off the

24  package insert regarding titration, then we don't need

25  speakers.  And in particularly, I explained that all the

1    speakers are going to follow the label and the program is

2    consistent with and has to be consistent with the label.  And

3    I was questioned why, then, we have doctors in there that

4    aren't delivering the message we want.  And I specifically

5    said no, they are delivering the label approved message.

6    **Q.**   Did Mike Babich say anything?

7    **A.**   Yes.  Mike Babich said -- there was a question of one

8    physician in particular, Dr. Ruan, and him starting with the

9    100.  And there was a question that he said, Well, if he's

10    not delivering our message, why isn't he in there?  And Mike

11    Babich said, Well, that's because he's our number one writer.

12    **Q.**   And who is Dr. Ruan?

13    **A.**   Dr. Ruan was a pain physician in Mobile, Alabama.

14    **Q.**   During the course of the regional sales meeting, was the

15    message for titration resolved, the strategy in how you would

16    deal with titration resolved?

17    **A.**   During that call, no.  What happened was that John said

18    to take the messaging away from marketing, or me, and he told

19    Darin Fila and Alec Burlakoff to write the dosing or write a

20    dosing message.

21          MR. YEAGER:  May we please have 446 for the

22    witness.

23    **Q.**   Sir, do you see this email?

24    **A.**   Yes.

25    **Q.**   And who is it from and who is it going to?

1    **A.**   It's Alec Burlakoff to me on August 11, 2012.

2    **Q.**   Do you remember this email?

3    **A.**   Yes.

4            MR. YEAGER:  I'd offer it, Your Honor.

5            MS. WILKINSON:  No objection.

6            THE COURT:  What's the number again, please?

7            MR. YEAGER:  0466 Your Honor.

8            THE COURT:  466 admitted.

9            (Exhibit 466 admitted into evidence.)

10           MR. YEAGER:  Thank you.  May this be published,

11   please.

12   **Q.**   Sir, do you see the subject line there?

13   **A.**   The second line?

14   **Q.**   The subject.

15   **A.**   Oh, the subject line.

16           "Titration ideas.  Darin Fila and Alec Burlakoff."

17   **Q.**   Those are the two people you were talking about before?

18   **A.**   Yes.

19   **Q.**   And what is this email discussing, just generally?

20   **A.**   So it's discussing how -- the message around titration.

21           MR. YEAGER:  All right.  So if we could blow up the

22   sales message around the topic of titration that starts with,

23   "It is critical."

24   **Q.**   If you could read that out loud, please.

25   **A.**   "It is critical for the sales force to be very proactive

1  and almost aggressive in tackling this dosing issue.  I

2  believe the key is to provide the sales reps with a message

3  they can utilize that will guaranty they always address the

4  elephant in the room.  We have determined as of yesterday's

5  conference call that dosing is an enormous reason as to why

6  patients are not staying on Subsys.  I feel many of the

7  representatives are uncomfortable handling this subject, due

8  to the delicacy around the PI.  We need to make sure they do

9  not ignore the elephant but rather make sure it is addressed

10  on every single sales call for an indefinite period of time,

11  to be later determined by Mike and Dr. Kapoor, based on

12  market/customer research."

13  **Q.**  Thank you.

14        MR. YEAGER:  May I please have 0444 for the

15  witness.  Would you please blow up the header.  Thank you.

16  **Q.**  Do you recognize this email, Mr. Napoletano?

17  **A.**  Yes.

18        MR. YEAGER:  I'd offer it.

19        THE COURT:  Any objection?

20        MS. WILKINSON:  No objection, Your Honor.

21        THE COURT:  Admitted.

22        (Exhibit 444 admitted into evidence.)

23  BY MR. YEAGER:

24  **Q.**  So who is this email from, sir?

25  **A.**  Alec Burlakoff.

1  **Q.**   And who does it go to?

2  **A.**   To the sales team and Sean Yu, sales operations, with a

3  copy to Mike Babich, myself and Dr. Kapoor.

4  **Q.**   Go back.  This is just sales team southeast; is that

5  correct?

6  **A.**   Yes, that is correct.

7  **Q.**   So at this point Alec Burlakoff is the district manager

8  for the southeast; is that correct?

9  **A.**   Correct.

10         MR. YEAGER:  All right.  If we could blow up the

11  top paragraph.

12  **Q.**   And would you please read that into the record, please.

13  **A.**   "Effective immediately.  I need a reply similar to Abby's

14  each and every single time you receive a message from Sean

15  indicating you had a prescription written for less than 400

16  micrograms.  In addition, you must follow up with the

17  physician within 24 hours and provide specific details to the

18  conversation.  You should treat and react to this email with

19  the very same sense of urgency you do so when receiving

20  reversal emails.  In fact, based on the internal data, I

21  would have to say this requires an even greater sense of

22  urgency.  100 microgram and 200 micrograms of Subsys does not

23  work.  We would be better off having the doctor write a

24  prescription for one of our competitors rather than write for

25  100 microgram or 200 microgram of Subsys.  At least then we

1    could theoretically still have a chance of proving our drug

2    to be efficacious if and when we sell the doctor on effective

3    dosing."

4          MR. YEAGER:  If we could have the next paragraph,

5    please.

6    **A.**  "I am not being overly dramatic when I say this.  Think

7    about it.  You only have one chance to make a good first

8    impression.  I'd rather hold off than blow that critical

9    opportunity.  This is very serious.  Reversals oftentimes

10   work themselves out within a few days.  Conversely,

11   prescriptions for less than 400 microgram will almost always

12   destroy your chances of proving this drug to be efficacious

13   in any way, shape or form.  I do not know how I can stress

14   enough just how detrimental prescriptions for 200 microgram

15   and 100 microgram are to the company, patient and overall

16   state of business.  Anyone who ignores these instructions is

17   subject to immediate negative consequences."

18         MR. YEAGER:  Okay.  Now, Exhibit 4 -- 1488, I

19   believe, is in.

20         Strike that.  Yeah.  1488, is it in?

21         THE CLERK:  Yes.

22         MR. YEAGER:  May I please publish this to the

23   witness and the jury, please.

24   **Q.**  This is an email from Mike Babich to all the sales force;

25   is that correct?

1   **A.**   Yes.

2   **Q.**   Do you recognize the email?

3   **A.**   Yes.

4           MR. YEAGER:  All right.  Then if we could see the

5   body, just the first paragraph.  Very good.

6   **Q.**   What happened the next day on September 14?

7   **A.**   Do you want me to read this or just tell you?

8   **Q.**   Do you know what happened the next day?

9   **A.**   Alec Burlakoff was promoted to the vice president of

10  sales position.

11          MR. YEAGER:  May we please have 0445.

12          Ms. Folan, I apologize for testing you on this.  Is

13  this in?

14          THE CLERK:  This is in.

15  **Q.**   Do you recognize the email, sir?

16  **A.**   Yes.

17          MR. YEAGER:  If we could show the body of it.  If

18  we could blow up the top paragraph, please.

19  **Q.**   This is September 17, 2012, correct, three days after

20  Burlakoff is promoted?

21  **A.**   Correct.

22  **Q.**   Go ahead.  If you could read that, Mr. Napoletano.

23  **A.**   "Hello, Insys.  After today's conversation in the home

24  office, I felt it to be imperative that I send you an email

25  pertaining to the below correspondences you will be receiving

1    on a daily basis.  As you know by now, you will receive an

2    email, example below, each and every time a prescription in

3    your territory writes for a Subsys prescription at 100

4    microgram or 200 microgram.  Please utilize the attached

5    spreadsheet prepared by Darin Fila, a west regional sales

6    manager, to report back within 24 hours why the low dose was

7    used and how the doctor plans to titrate the patient to

8    effective dose.  You do not need to fill out every column,

9    but the responses we are receiving thus far are just much too

10   vague in order to allow us to formulate any worthy level of

11   understanding behind the clinician's action.  I fully

12   understand that a physician does what he or she wants to do

13   as it pertains to prescribing for their patients.  I am

14   thrilled to see you are all generating so many Subsys

15   prescriptions.  I know it is not at all easy to get a

16   physician to initiate a new habit, and this is exactly what

17   we are attempting to do."

18           MR. YEAGER:  Now if you could go to the paragraph

19   that begins "Each new Subsys patient."

20   Q.   He states there, "Each new Subsys patient should be

21   titrated 100 milligrams per package insert"; is that correct?

22   A.   Yes.

23   Q.   What's the next paragraph say?

24   A.   "To be clear, the last thing we want you to think is that

25   we are harassing you for generating sales.  What we are

1   attempting to do is help you to maintain these newly

2   generated Subsys patients by rapidly informing you of the

3   fact that they wrote for a dose and number of units that is

4   simply not effective.  We are 100 percent sure that those

5   patients whom are prescribed 60 units of 100 microgram do not

6   end up filling a prescription for Subsys the following month.

7   This is information that we feel obligated to share with you

8   as there is no good at all that comes out of withholding the

9   very data that will determine your quarterly bonus payouts.

10  We understand that you are not out here to just give away

11  free product.  We know that your goal is the same as ours.

12  The goal is to generate" --

13  **Q.**  Go ahead.  To generate what?

14  **A.**  I got lost.  Sorry.

15  **Q.**  Why don't we go back --

16  **A.**  Okay.  Thank you.

17          -- "to generate Subsys patients whom believe in the

18  safety and efficacy behind the product.  Hence, these

19  patients will continuously refill their monthly prescriptions

20  indefinitely.  This, of course, equates to residual income

21  for you.  This is how you reap the rewards of your

22  unsurpassed efforts in the field on a daily basis.  There is

23  nothing more frustrating to a sales person who makes a sales

24  only to learn that the sales was returned shortly then after.

25  This, in essence, is exactly what is happening with the

1    majority of all patients put on Subsys at 100 micrograms, 60

2    units."

3    **Q.**   And, Mr. Napoletano, can you describe your reaction to

4    receiving this email?

5              Not what you thought, but what you did.

6    **A.**   At the time I -- I don't recall at the time.

7    **Q.**   Was this issue discussed within Insys?

8    **A.**   Yes.

9    **Q.**   Would you describe those conversations, please?

10             MS. WILKINSON:  Objection, just timeframe.

11             MR. YEAGER:  Following these emails.

12             MS. WILKINSON:  Who is there?  Foundation.

13             THE COURT:  You can lay a foundation, please.

14   BY MR. YEAGER:

15   **Q.**   So going back, Mr. Napoletano, as part of the marketing

16   strategy, you talked about the marketing strategy in March of

17   2012, correct?

18   **A.**   Yeah.

19   **Q.**   Is this message consistent with that strategy?

20   **A.**   No, it was not consistent with what was put in all the

21   sales material and consistent with the marketing message.

22   **Q.**   And did you discuss the inconsistency at executive

23   meetings?

24   **A.**   Yes.

25   **Q.**   And when and where were those conversations?

1   **A.**   Frequently questions -- or I mean, what I did is I showed

2   the sales material, the approved sales material.

3            MS. WILKINSON:  Objection, foundation.

4   **Q.**   When and where did you have conversations about the new

5   marketing strategy with regard to titration and dosage?

6   **A.**   We went through medical-legal and regulatory review

7   process.  We brought in what we could and could not say and

8   put into writing --

9            MS. WILKINSON:  Objection, Your Honor.  He's not

10  answering question.

11           THE WITNESS:  Sorry.

12           THE COURT:  Hold on.

13           You need to say who was there, who you were having

14  the conversations with and, when you say "we," who you mean

15  by that.

16           MS. WILKINSON:  Your Honor --

17           MR. TYRRELL:  And when they occurred, Your Honor.

18           MS. WILKINSON:  -- can you instruct the witness to

19  answer those questions before he answers what the discussion

20  was.  I think that's the whole point of the foundation

21  objection.

22           THE COURT:  Listen to his questions.  He has to lay

23  a foundation before you can answer.  They're entitled to know

24  who, what, where and why before you say what was discussed.

25  BY MR. YEAGER:

1  **Q.**  I'm going to walk you through it slowly and then ask you

2  one or two questions.

3  **A.**  Okay.

4  **Q.**  Was the new marketing message that is described in this

5  particular exhibit discussed at executive meetings at Insys

6  Therapeutics?

7  **A.**  Yes.

8  **Q.**  All right.  When and with whom?

9  **A.**  So it was right after we had to put marketing materials

10  together, and John wanted to --

11          MS. WILKINSON:  Objection.

12  BY MR. YEAGER:

13  **Q.**  Hold on.  Right after you put marketing materials

14  together?

15  **A.**  Yes, afterwards.

16  **Q.**  When was that?

17  **A.**  Around this timeframe -- in September, after this, we

18  were asked to put marketing materials together around

19  effective dose.

20  **Q.**  Okay.  So it was right around the time of this email?

21  **A.**  Correct.

22  **Q.**  And who was present when you were asked that?

23  **A.**  John Kapoor, who asked it, and likely Mike Babich.

24  **Q.**  All right.  But do you have a memory of Mike Babich being

25  there?

1    **A.**   Mike was almost -- yes.  Well, Mike was almost always

2    there.  I didn't have one-on-ones with John, typically, so

3    yes.

4    **Q.**   All right.  And what was discussed with regard to the new

5    materials?

6    **A.**   John wanted effective dose messages rolled out and

7    program, formally it went into marketing pieces developed

8    around that.  So marketing worked on it with our ad agency,

9    and we put some pieces, marketing pieces, together.

10   **Q.**   Did you discuss how it had changed from the previous

11   label conversations to the new September 17 --

12   **A.**   Well, the marketing material was consistent with the

13   label.  This was not.  So this was -- the way that this is

14   written is not consistent with the marketing pieces.

15   **Q.**   Was that discussed during the meeting?

16   **A.**   Yes.

17   **Q.**   Can you describe the conversation?

18   **A.**   I was emphatic that you had to start on the lowest

19   effective dose, the label says you have to start at 100, and

20   I said if you have to start -- the mantra is start low, go

21   slow and titrate to effect and you have to start on the 100

22   dose.

23   **Q.**   And what happened when you said that?

24   **A.**   It was disregarded.

25   **Q.**   How do you know it was disregarded?

1   **A.**   Because of this -- obviously because this messaging that

2   was done outside of marketing.

3            MR. YEAGER:   If we could have 1501 for the witness,

4   please.

5   **Q.**   Do you recognize this slide, sir?

6   **A.**   Yes.

7   **Q.**   Do you recognize -- how do you recognize it?  Not what it

8   says, how do you recognize it?

9   **A.**   It was a slide I was asked to put together because I was

10  considered the PowerPoint expert.

11  **Q.**   Do you know the timeframe you put this slide together?

12  **A.**   It was after September, but I'm not sure when.

13           MR. YEAGER:   Okay.  I'd offer it, Your Honor.

14           MR. TYRRELL:   Your Honor, I'm going to object

15  unless we can establish a more specific timeframe.  After

16  September 2012?  That's pretty vague.

17           MS. WILKINSON:   I would also object, Your Honor.

18  There's no, unlike the other documents, identifying

19  information on it of date or who worked on it.

20           MR. YEAGER:   I'd like to be heard on date, Your

21  Honor, if the Court is going to rule on that.  But I can lay

22  a foundation as to why the --

23           THE COURT:   Yes, you can lay a foundation.

24  BY MR. YEAGER:

25  **Q.**   Sir, you said you helped prepare this; is that correct?

1    **A.**   Yes.  The visual, yes.

2    **Q.**   How is it that you would prepare this?

3    **A.**   I was -- I was looked to as the expert in PowerPoint.

4    **Q.**   So who asked you to prepare it; do you know?

5    **A.**   Sean Yu did the calculations, and I believe -- to the

6    best of my recollection, I believe Mike Babich would have

7    asked me to put it in a PowerPoint.

8              MS. WILKINSON:  Can I ask you a question?

9              (Discussion off the record.)

10             MS. WILKINSON:  Your Honor, can we go sidebar,

11   please.

12             THE COURT:  Yes.

13   **SIDEBAR:**

14             MS. WILKINSON:  Your Honor, my objection is, one,

15   that there's no foundation for this; but, two, he was talking

16   about marketing materials.  This is not marketing.  This is

17   for internal sales reps to show them the bonuses they would

18   pay.  It has nothing to do with what was just said.  It is

19   not marketing material.  It's for internal purposes only.

20   Note the bonus payout.

21             THE COURT:  Yeah, but that doesn't make it

22   inadmissible.

23             MS. WILKINSON:  Well, it questions foundation

24   because he was just following along leading by counsel and he

25   was saying that's what it was and he can't remember the date.

1   It is not what the document is.  It shows the lack of

2   foundation.

3           MR. YEAGER:  It absolutely has a foundation.  He

4   remembers making a document.  As far as marketing is

5   concerned, he's saying he prepared it for the sales force.

6   Secondly, it's already in evidence -- testified to this fact.

7           THE COURT:  The document comes in.  He's testified

8   that it was prepared after September.  If you can get in

9   range within which it was prepared, like, if it was after

10  September, but if you could get some kind of backstop on the

11  date and then you can have it.  Is there something --

12          MR. TYRRELL:  Without some sort of a date, it's

13  completely unreliable as evidence.

14          THE COURT:  But he remembered preparing it.  That

15  goes to the weight, not the admissibility.

16          MR. TYRRELL:  He could have prepared this in

17  2015 --

18          THE COURT:  As long as it's during the conspiracy

19  period, which is why I asked him to get the back date.

20          MS. WILKINSON:  I want to make the record complete.

21  It's not marketing.  Marketing is what you send out for sales

22  reps to use for the doctors.  This is internal to how they're

23  getting paid.

24          THE COURT:  It's still admissible.

25          MS. WILKINSON:  That describes it as wrong.

```
 1              THE COURT:  It's something he prepared that's
 2    during the period of conspiracy.  That's an adequate
 3    foundation.
 4    (End of sidebar.)
 5    BY MR. YEAGER:
 6    Q.  So, Mr. Napoletano, just to lay a little more foundation.
 7    How long did you work at Insys Therapeutics?
 8    A.  About two-and-three-quarters year.
 9    Q.  And you left when?
10    A.  August of 2014.
11    Q.  So August 2014?  Is that a "yes"?
12    A.  Yes.
13    Q.  And with regard to this particular document, when do you
14    think it was prepared?
15    A.  I believe it was in the -- I believe, to the best of my
16    recollection, in the spring of 2013, I believe.
17              MR. YEAGER:  And I'd offer it, Your Honor.
18              THE COURT:  It's admitted.
19              MR. YEAGER:  May it be published, please.
20              (Exhibit 1501 admitted into evidence.)
21    Q.  Now, this is an internal document, directing your
22    attention --
23              MS. WILKINSON:  Objection.
24              MR. YEAGER:  Fine.
25    Q.  The box there, do you see the box in the middle?
```

1    **A.**  Yes.

2    **Q.**  What are the first words there?

3    **A.**  It says "Your payment."

4    **Q.**  Your what?

5    **A.**  Your payment -- payout.

6    **Q.**  And to whom is it referring?

7    **A.**  This is referring to the sales force.

8    **Q.**  And what are the next series of numbers there?

9    **A.**  It has, at the top of the box, it has the dosing, 100

10  microgram, 200 microgram, 400, 600, 800, 1200 and 1600

11  microgram.

12  **Q.**  And what are the green numbers that follow in each one of

13  those dosages?

14  **A.**  The green underneath is what the sales rep gets paid out

15  for each dose.

16  **Q.**  With regard to the document at the bottom, there's a note

17  there.  Can you read it out loud for the record, please?

18  **A.**  Yes.  It says, "Note:  Ten percent bonus opt-out for 100

19  microgram to 800 microgram paid scripts."

20        Then it says, "12.5 percent bonus opt-out for 1200

21  microgram to 1600 microgram paid scripts."

22  **Q.**  Mr. Napoletano, at the time this information was

23  produced, did you have conversations internally about the

24  bonus difference between 10 percent and 12.5 percent?

25  **A.**  Yes.

1    **Q.**  Can you describe those conversations?  First about when

2    and where were you?

3    **A.**  Yes, after I learned of the higher dosing, I talked to

4    Mike Babich.

5         MS. WILKINSON:  Objection.  Foundation, timing,

6    answering the question.

7    **Q.**  Let me just be clear.  You talked to Mike Babich?

8    **A.**  I talked to Mike Babich.

9    **Q.**  Anybody else?

10   **A.**  Maybe.

11   **Q.**  Not maybe.

12   **A.**  Yeah.  At the time the one that I originally -- what I'm

13   recollecting is talking to Mike Babich.

14   **Q.**  Not what was said.  Do you know when it was?

15   **A.**  Yeah.  After I learned that there was a higher incentive

16   for the 1200 and 1600 micrograms.

17   **Q.**  Did you know when that was?

18   **A.**  As I said, I believe it was, to the best of my

19   recollection, it was early 2013.

20   **Q.**  And describe the conversation with Mr. Babich.

21   **A.**  I explained to Mike, again, that another company had

22   gotten in trouble for promoting high dose, and this is an

23   example of what I believe to be promoting high dose.

24        MR. YEAGER:  All right.  May we have 455 for the

25   jury, please -- for the witness.  Not for the jury.

1   **Q.**   Do you recognize this email, sir?

2   **A.**   Yes.

3                MR. YEAGER:  I'd offer it.

4                MS. WILKINSON:  I don't think I have any objection,

5   Your Honor.

6                MR. TYRRELL:  Your Honor, may we ask, since this

7   was shown to counsel, the court and witness initially, would

8   it be possible to show us some of the text before you move

9   for its admission, so -- just so we can see?  I think we'll

10  probably know what the document is once we see it.  Maybe it

11  would just be helpful rather than just to have it --

12               THE COURT:  Show it to him.

13               MR. YEAGER:  That's fine.

14               MR. TYRRELL:  Thank you.

15               MR. YEAGER:  May I proceed?

16               THE COURT:  Any objection?

17               MS. WILKINSON:  No, no objection.

18               MR. TYRRELL:  No objection.

19               THE COURT:  It's admitted.

20               (Exhibit 455 admitted into evidence.)

21               MR. YEAGER:  May it be published, please?

22  **Q.**   So, Mr. Napoletano, the first part of the email is an

23  email message.  Who is it from and to?

24  **A.**   It's from Sean Yu, sales operations, to Mike Babich and

25  Alec Burlakoff, with a copy to myself and Mike Gurry.

1    **Q.**   Do you see Mike Gurry here in the courtroom today?

2    **A.**   I do.

3    **Q.**   Could you point to him and describe how --

4    **A.**   Point to him and --

5    **Q.**   Describe the clothing he's wearing, sorry.

6    **A.**   A yellowish -- a mustard tie, a blue shirt.

7              MR. YEAGER:  May the record reflect that the

8    witness identified Mr. Gurry.

9              THE COURT:  Yes.

10   **Q.**   Mr. Napoletano, this is an email from March of 2013; is

11   that correct?

12   **A.**   That's correct.

13   **Q.**   And the subject is what?

14   **A.**   The subject is "Average strength per Rx," meaning

15   prescription, "increases as patients use more times of

16   Subsys."

17   **Q.**   I want to get to the second page in a second, but let's

18   just look at this.  Can you read out loud those three lines

19   there?

20   **A.**   "An almost perfect positive correlation.  The X axis, 1

21   through 19, patients on Subsys first, second and third and so

22   forth times to 19th time.  Y axis is average strength in

23   micrograms."

24              MR. YEAGER:  If we could see the second page of the

25   exhibit, please.

1   **Q.**   Just so we're oriented, which is the X axis and which is

2   the Y axis?

3   **A.**   The X axis is horizontal and the Y is vertical.

4   **Q.**   And what is this depicting?

5   **A.**   This is showing the number of times a patient gets a

6   prescription filled that the average dose continues to

7   naturally increase.

8   **Q.**   Mr. Napoletano, I want to talk to you about the IRC.

9           MR. YEAGER:  May we have 415 for the witness,

10  please.

11  **Q.**   If you want to take a look at the second page, you're

12  more than welcome to do that, Mr. Napoletano.  Do you

13  recognize this email, sir?

14  **A.**   Yes.

15          MR. YEAGER:  All right.  I'd offer it, Your Honor.

16          MS. WILKINSON:  No objection.

17          THE COURT:  It's admitted.

18          (Exhibit 415 admitted into evidence.)

19          MR. YEAGER:  So could we go back to the first page,

20  please.

21  **Q.**   This is an email from Mike Gurry to whom?

22  **A.**   To John Kapoor and Mike Babich with a copy to me.

23  **Q.**   And what's the subject?

24  **A.**   "Prior authorizations strategic plan."

25  **Q.**   For the record, it says, "Attached is the PA action plan

1   and target dates for completion."

2              Is it fair to say that "PA" is prior authorization?

3   **A.**   That's correct.

4   **Q.**   We've heard a little bit about the prior authorization.

5              What is PA?  What is prior authorization?

6   **A.**   Prior authorization is something that insurance companies

7   put in place that physicians need to justify the use of the

8   medication prior to filling the prescription.

9              MR. YEAGER:  Can I offer this to the jury to be

10  published?  Thank you.

11             Could we take a look at the second page of this,

12  please.

13  **Q.**   And what does the second page lay out?

14  **A.**   The action plan for prior authorization.

15  **Q.**   The tip of that is that the title is "Subsys prior

16  authorization action plan"?

17  **A.**   Correct.

18  **Q.**   So it lays out a series of phases; is that correct?

19  **A.**   That is correct.

20  **Q.**   What's phase one?

21             MR. YEAGER:  If you could go back up to phase one

22  right there.

23  **Q.**   What is phase one?

24  **A.**   "Phase one will consist of the prior authorization

25  training program being built.  This will be delivered on

1    9/21/12 at the sales meeting in Arizona.  The length will be

2    60 minutes presentation and 30 minutes Q and A.  Content will

3    include background, what is driving prior authorizations,

4    managed care dynamics."

5    **Q.**  Let me stop you there.  If you could go down to phase

6    two, what is phase two?

7    **A.**  "Phase two will consist of a market research/best

8    practices from target offices.  We will hold teleconferences

9    with select offices.  We will distribute a questionnaire in

10   advance of the calls and gather information from these events

11   and include outcome in our prior authorization toolkit to be

12   distributed to the field."

13   **Q.**  To who?  To sales staff; is that right?

14   **A.**  Yes.

15   **Q.**  All right.

16   **A.**  Yeah, for sales staff to use in offices to increase

17   pull-through of Subsys prescriptions.

18   **Q.**  Okay.  Phase three?

19   **A.**  "Phase three will consist of the creation of a prior

20   authorization kit for use by field sales staff.  It's content

21   will include the following."

22            Would you like me to read it?

23   **Q.**  No.  That's okay.  I just wanted to generally orient the

24   jury.

25            Go ahead.  It's in evidence.

1          If we could go to phase four, please.

2     **A.**   "Phase four will include the recruiting and hiring of a

3     prior authorization specialist to be based in the corporate

4     office.  This individual will assist offices with the prior

5     authorization process as it relates to Subsys and the

6     adjudication of prescriptions through insurance carriers."

7               MR. YEAGER:  All right.  Counsel, I'm going to look

8     at the email and exhibits attached.  So 399 is the email,

9     400, 401 and 402.

10              May we have 399 for the witness, please.

11    **Q.**   Mr. Napoletano, do you recognize this email?

12    **A.**   Yes.

13              MR. YEAGER:  I'd offer it, Your Honor.

14              MS. WILKINSON:  No objection.

15              MS. MINER:  No objection.

16              THE COURT:  It's admitted.

17              (Exhibit 399 admitted into evidence.)

18    BY MR. YEAGER:

19    **Q.**   Mr. Napoletano --

20              MR. YEAGER:  If we could go back up there for a

21    second there.  Thank you.

22    **Q.**   There are three attachments; is that correct?

23    **A.**   Yes.

24    **Q.**   The McKesson Specialty Health's Proposal.  Do you see

25    that there?

1    **A.**   Yes.

2    **Q.**   Proposal for Subsys Reimbursement Helpline?

3    **A.**   I do.

4    **Q.**   And Covance memo.  Do you see that?

5              Do you see that?

6    **A.**   I do.

7              MR. YEAGER:  I'd offer 400 through 402, please.

8              MS. MINER:  No objection.

9              THE COURT:  400 to 402.  They're admitted.

10             (Exhibit 400 admitted into evidence.)

11             (Exhibit 401 admitted into evidence.)

12             (Exhibit 402 admitted into evidence.)

13             MR. YEAGER:  If you go back to 399, top part of the

14   email.

15   **Q.**   This is from Mike Gurry, correct?

16   **A.**   Correct.

17   **Q.**   And to whom does it go?  Thank you.

18   **A.**   It goes to me, Alec Burlakoff, Mike Babich, John Kapoor,

19   copied to Vikram Malhorta, Larry Dillaha, Frank Koppenhagen.

20   **Q.**   All right.  If we could just read the first paragraph

21   into the record, please.

22   **A.**   "Attached are three of the five companies I have spoken

23   to regarding a PA program.  Triple Fin proposal is due on

24   10/8 and Lash went over their program and price quotes via

25   phone but has not sent a formal proposal to date.  Summary of

1   one-year costs are as follows.  I anticipate Triple Fin to be

2   the lowest when delivered on 10/10.  My recommendation based

3   on the costs is to continue to build out the internal PA

4   center.  An offer has been extended to Liz Gurrieri and

5   accepted.  Her anticipated start date is 10/22.  Target date

6   for Insys having an operational PA Hotline/Center For

7   Field/Physician Use is 10/29.

8   **Q.**  All right.  Now, when he talks about an internal prior

9   authorization unit, what is that referring to?

10  **A.**  It's referring to hiring people and bringing them

11  in-house to address reimbursement assistance or prior

12  authorization assistance.

13          MR. YEAGER:  Can we please have 413 for the

14  witness.

15  **Q.**  If you could look at the two headers there, the first one

16  at the top --

17  **A.**  It says "From Alec Burlakoff."

18  **Q.**  Wait, wait, not what it says.  It's not in yet,

19  Mr. Napoletano.  I'm asking you to orient yourself.

20  **A.**  Okay.  Excuse me.  One second, please.  Could you go up

21  top, just to orient.  Yes.

22          MR. YEAGER:  If you could go down to the email

23  below that, please.

24  **Q.**  All right.  So do you recognize this email?

25  **A.**  Yes.

1      MR. YEAGER:  I'd offer it, Your Honor.

2      MS. MINER:  No objection.

3      THE COURT:  It's admitted.

4      (Exhibit 413 admitted into evidence.)

5      MR. YEAGER:  So let's go back to the top.  If it

6  could be published, please.

7  **Q.**  So if you could just tell us what the top part is, what

8  it's referring to.

9  **A.**  This is referring -- it says, "SSPs needing to update and

10  provide PA information."

11      So every time a prescription was written, I

12  believe, this form needed to be completed regarding the prior

13  authorization and sent back to the home office.

14      MR. YEAGER:  All right.  If you could go down to

15  the bottom, please.  Just -- there you go, perfect.

16  **Q.**  This is an email from Alec Burlakoff to who?

17  **A.**  Alec Burlakoff to -- it looks like Colt Woods, Michelle

18  Breitenbach.  It looks like the sales force.

19  **Q.**  And if you could read it, "Good afternoon."  What does it

20  say?

21  **A.**  It says, "Good afternoon.  One of the strategic

22  imperatives Insys has undertaken over the last two months is

23  a prior authorization tracking program.  The intent of this

24  program is to provide specialty sales professionals with a

25  daily update on Rxs written utilizing 30 units pre or super

1    vouchers that will, in most cases, require a prior

2    authorization to be obtained.  Allowing Insys to track the

3    percentage of 30 units free and super vouchers that are

4    turned into commercial Rxs essential for driving the

5    commercial success of the company.  Provide you an

6    interactive tracking tool of HPS/Offices that have

7    outstanding transactions requiring a PA, with the end goal of

8    turning these transactions into commercial Rxs" -- excuse me.

9    "Outstanding transactions requiring a PA with the end goal of

10   turning these transactions into commercial Rxs."

11   **Q.**   So with your experience, what are we looking at with

12   regard to PA tracking program.  How does it work?  What is

13   it?

14   **A.**   So my understanding, every time a prescription -- if I'm

15   reading this correctly -- is written for a voucher, which is

16   a free product --

17   **Q.**   Hold on a second, Mr. Napoletano.

18           Do you have a memory of this PA tracking program?

19   **A.**   I remember this being rolled out, yes.

20   **Q.**   And what do you remember about it?

21   **A.**   Without the specifics, I remember that every time a

22   prescription was written on free product -- initially the

23   company offered free product, and any time a prescription was

24   written with free product, the representative had to notify

25   and fill out a form.  And I would need to see the form to

1    remember the details.

2    **Q.**  And with regard to the PA tracking, we talked before

3    about an internal unit that was being discussed.  Do you

4    remember that?

5    **A.**  Yes.

6    **Q.**  Do you remember when the Insys reimbursement center

7    launched?

8    **A.**  Shortly after Mike's email that was on -- maybe the

9    beginning of November --

10   **Q.**  All right.

11   **A.**  -- of 2012.

12           MR. YEAGER:  I'd offer Exhibit Number 220, please.

13   Just for the witness.

14           THE WITNESS:  I don't think this is the right one.

15           MR. YEAGER:  I'm sorry.  320, I apologize.  If you

16   could show the whole -- thank you.

17   **Q.**  Do you recognize this email?

18   **A.**  Yes.

19           MR. YEAGER:  I'd offer it, Your Honor.

20           MS. MINER:  No objection.

21           THE COURT:  It's admitted.

22           (Exhibit 320 admitted into evidence.)

23           MR. YEAGER:  So may this be published to the jury?

24           If we could blow up the top part above the blue box

25   I would appreciate it, Ms. Stein.  Thank you.

1    **Q.**   Did you notice when this email was?

2    **A.**   January 8, 2013, from Mike Gurry to John Kapoor, Mike

3    Babich, Alec Burlakoff, me -- and me.  And cc'd to sales

4    management.

5    **Q.**   All right.  And can you read the last bullet there?

6    **A.**   It says, "We have launched the internal reimbursement

7    center.  This is an additional tool SSPs can offer to their

8    health care providers, HCPs."

9            MR. YEAGER:  Now, if we could get out of that and

10   go to the top box there.  Top two boxes.  Sorry.

11   **Q.**   And does it say what the percentage of approvals from

12   prior authorizations are?

13   **A.**   Yes.

14           Prior authorization program -- approved program to

15   date, and it shows 49 percent.

16           MR. YEAGER:  All right.  I'd offer for the witness

17   only 412, please.

18   **Q.**   Do you recognize this document, sir?

19   **A.**   Can you blow it up?  Thank you.  Yes.

20   **Q.**   All right.  And just so we know, what is a management

21   meeting, though?  Because we're going to look at a few of

22   them, and I want to make sure we understand what they are.

23   **A.**   Yes.  This would have been a staff -- basically a staff

24   meeting at the home office where everybody was present.

25   **Q.**   When you say "everybody"?

1    **A.**   The staff was present.

2    **Q.**   Who was present?

3    **A.**   The staff.   In this case Mike or John Kapoor would come

4    in for the meeting and Mike Babich, myself, Alec Burlakoff,

5    Mike Gurry, Frank Koppenhagen, and Larry Dillaha and Darryl

6    Baker.

7    **Q.**   When you say "staff," you mean management staff?

8    **A.**   Management staff, executive staff.

9    **Q.**   So this is November 14.  This is before the previous

10   email we talked about January.  It was 3/20; is that correct?

11   **A.**   Correct.

12          MR. YEAGER:   If we could go down to the bottom of

13   the email where it says "Managed mitigating factors" --

14   managed care.

15   **Q.**   In November of 2012, what are the prior authorizations

16   approval rated at?

17   **A.**   30 -- could you highlight -- yeah.  "30 to 33 percent of

18   all transactions approved.  West region is doing the best.

19   50 percent of all transactions approved."

20   **Q.**   Now if we could go back to 320.

21          With regard to prior authorization program summary,

22   that's 49 percent, correct?

23   **A.**   49 percent, correct.

24   **Q.**   That's January; is that right?

25   **A.**   That is January, correct.

1          MR. YEAGER:  May we have 327, please.

2  **Q.**  Do you recognize this one?

3  **A.**  Yes.

4          MR. YEAGER:  I'd offer it.

5          MS. MINER:  No objection.

6          THE COURT:  It's admitted.

7          (Exhibit 327 admitted into evidence.)

8          MR. YEAGER:  May it be published, please, and if we

9  could go down to "Managed care."

10  **Q.**  What's the first bullet, please?

11  **A.**  "61 PAs approved last week, all-time high.  305 approved

12  to date.  61 percent approval rate.  35 percent in process.

13  Four percent fail."

14          MR. YEAGER:  May we please have 432 just for the

15  witness.

16  **Q.**  Do you recognize this email?

17  **A.**  Yes.

18          MR. YEAGER:  I'd offer it.

19          MS. MINER:  No objection.

20          THE COURT:  It's admitted.

21          (Exhibit 432 admitted into evidence.)

22          MR. YEAGER:  May it be published, please.

23          Can you go to the last part of the email chain,

24  April 27, 2013.  No.  First page, there you go.  Right there.

25  Thank you.  342.

1   **Q.**  Can you please read that to the jury?

2   **A.**  "Competitive" -- "Competitive intelligence is that Teva

3   has an escalated voucher dump initiative in place.  As we

4   know, they are unable to pull these scripts through as they

5   do not have an IRC program.  We are identifying these

6   targeted docs as they pop up and sending the troops in

7   immediately."

8   **Q.**  What are you talking about there, Mr. Napoletano?

9   **A.**  So there are two types of reimbursement centers.  There

10  is an external one and there's an internal reimbursement

11  center, and the competitor did not have an internal

12  reimbursement center like Insys where the -- where they have

13  the people in-house handling the prior authorization forms

14  and calling the offices directly or calling the insurance

15  companies directly.  And they were not getting their

16  prescriptions filled.

17          There were vouchers or free product being written

18  similar at Insys, but they weren't getting filled, is the

19  competitive intelligence, and we were saying that our people

20  could go in and maybe call on those doctors.

21          That's what we're saying.

22  **Q.**  So when you say -- just to be clear, when you say "as

23  they do not have an IRC program," who does not have an IRC

24  program?

25  **A.**  The competitor in this case, Teva.

1    **Q.**   And why is that relevant?  Why are you telling people

2    about that?

3    **A.**   Because they have a much lower approval rate in terms of

4    prior authorizations.

5             MR. YEAGER:  May we please have -- I'll just jump

6    to the end.  May I please have 354 for the witness.

7    **Q.**   Do you recognize this email?

8    **A.**   Yes.

9             MR. YEAGER:  I'd offer it.

10            MS. MINER:  No objection.

11            (Exhibit 354 admitted into evidence.)

12   **Q.**   Directing your attention just to the second email there.

13   No slides, just below talking points.

14            Do you see that first bullet point, number one?

15   **A.**   First bullet point says, "87 prior authorization approval

16   rate over 3500 PAs approved program to date."

17   **Q.**   What is the date of this email?

18   **A.**   November of 2013.

19            MR. YEAGER:  If we could have Thursday, December 5,

20   2013 -- sorry, strike that.  358.

21            THE COURT:  Mr. Yeager, I may have this wrong, but

22   I think you neglected to move in 412.

23            MR. YEAGER:  I'm sorry.  I would offer 412, please.

24            MS. MINER:  No objection.

25            MR. YEAGER:  Thank you, Your Honor.

1            (Exhibit 412 admitted into evidence.)

2   **Q.**  So have you had a chance to look at this, Mr. Napoletano?

3   **A.**  Yes.

4   **Q.**  All right.  Do you recognize it?

5   **A.**  Yes.

6            MR. YEAGER:  And I'd offer this in evidence, Your

7   Honor.

8            MS. MINER:  No objection.

9            THE COURT:  It's admitted.

10           (Exhibit 358 admitted into evidence. )

11           MR. YEAGER:  May it be published, please.

12  **Q.**  Mr. Napoletano, if you could walk us through.  There's

13  blue and black here.  What's going on with regard to the

14  email below?

15  **A.**  There are edits being made to -- it's an edit chain.  So

16  it was on email that was sent and there are edits and edits

17  being made on top of it.

18  **Q.**  And can you describe what you're doing here with regard

19  to the email?  What is the blue part?

20  **A.**  Yeah, I was adding additions or corrections and spelling

21  to it.

22  **Q.**  And if you could go to the second bullet there, "Fact

23  that nine out of ten?"

24  **A.**  So it says "Fact that nine out of ten prior

25  authorizations that are submitted to the IRC are approved."

1   **Q.**   Now, Mr. Napoletano, you worked at Cephalon prior to

2   this; is that correct?

3   **A.**   That's correct.

4   **Q.**   Describe -- when did you learn that Insys Therapeutics

5   was going to do an internal unit; in other words, have housed

6   inside the company?

7   **A.**   Right.  I learned about it in the fall of 2012.  It was

8   around the October timeframe when Mike Babich told me about

9   it.

10  **Q.**   Describe the conversations with Mr. Babich, please.

11  **A.**   Mike came into my office.  Mike Babich came into my

12  office, and he said he had a conversation with Dr. John

13  Kapoor and that they were going to bring the speaker or the

14  IRC program in-house and hire prior authorization assistance

15  or reimbursement assistance in-house.

16  **Q.**   What did you say?

17  **A.**   My response was, Mike, that's not a good idea.  You don't

18  do that.  The key in pharma is you want arm's length

19  separation.  I said, You just don't want to know.  It's just

20  too close.  You don't want to know what the patient --

21  there's HIPAA laws so that means some patient confidentiality

22  laws.  You don't want to know those specifics on patients.

23  You want to keep that at an arm's length.

24  **Q.**   In any event, the company started the IRC; is that

25  correct?

1    **A.**   Excuse me?

2    **Q.**   The company started the IRC despite that, correct?

3    **A.**   Correct.

4              MR. YEAGER:  Direct 419 just for the witness,

5    please.

6    **Q.**   Do you recognize that email?

7    **A.**   I do.

8    **Q.**   What is that?

9    **A.**   This is in July 21, 2014, an email from me to Christopher

10   Homrich, which was the chief operating officer at the time,

11   with a copy to Amber Turman, Alec Burlakoff, Mike Babich,

12   Mark Hein, Richard Simon, Brian Pipko, Mike Gurry and Nicole

13   Forman.

14   **Q.**   Do you recognize the email, Mr. Napoletano?

15   **A.**   I do.

16             MR. YEAGER:  I'd offer it.

17             MS. MINER:  No objection.

18             (Exhibit 419 admitted into evidence.)

19   **Q.**   Can you tell us what this is?

20             MR. YEAGER:  And may it be published, please.

21   **A.**   Yes.  This is a prior authorization opt-in form that was

22   used in the field.

23   **Q.**   What are you doing with regard to the form,

24   Mr. Napoletano?

25   **A.**   I was asked to make edits to make sure that the opioid

1    lists that are on the form are correct.

2    **Q.**   So tell us what you're doing here.   Give us an example.

3    **A.**   So what I would do is, in this case, current long-acting

4    opioids, change the title to "around-the-clock medication,

5    opioid medication," and list the following.

6          So I guess my suggestion there was call them

7    around-the-clock meds consistent with the label.   So they're

8    long-lasting, or around the clock.   A patient who is opioid

9    tolerant, make sure they're opioid tolerant.   And that was

10   already there, I believe, but this is all consistent with the

11   label.

12         But what I did is I added the classes of opioids,

13   the various classes of the opioids of around the clock or

14   long-acting opioids.   I just made sure they were the current

15   ones available and they were spelled correctly.

16         MR. YEAGER:   All right.   Thank you.   May we please

17   have 431 for the witness.

18   **Q.**   Do you recognize this email, sir?

19   **A.**   Yes.

20   **Q.**   If you could look at the attachment as well, sir.

21         Do you recognize the attachment?

22   **A.**   Yes.

23         MR. YEAGER:   I'd offer 431, Your Honor.

24         MS. MINER:   No objection.

25         THE COURT:   It's admitted.

1           (Exhibit 431 admitted into evidence.)

2           MR. YEAGER:  Thank you.  May this please be

3    published.

4    **Q.**  Mr. Napoletano, if you could read out loud what you say

5    there at the bottom?

6    **A.**  So Alec and Mike to me communicating to Alec Burlakoff

7    and Mike Gurry.  "Attached please find a draft revision to

8    the IRC form that attempts to capture Dr. Kapoor's comments

9    today.  Please provide any comments or feedback so it can be

10   submitted for legal review."

11   **Q.**  Now, with regard to Dr. Kapoor, he edited the opt-in

12   form?

13   **A.**  Yes.

14   **Q.**  And can you describe that conversation, please.

15   **A.**  I don't recall what he actually --

16           THE COURT:  Hold on.

17           MR. YEAGER:  I'll go back.  Fair enough.

18   **Q.**  Did you have a conversation with Dr. Kapoor regarding the

19   form?

20   **A.**  Yes.

21   **Q.**  And when and where was that conversation?

22   **A.**  It was at a group meeting, a staff meeting, and

23   Dr. Kapoor wanted the form updated, I guess -- actually, it

24   was compliance.  Compliance wanted to make sure the form --

25   compliance was involved at this time, and they were making

1    sure that the form was -- was accurate and -- yeah, it was

2    accurate.

3    **Q.**   And did Dr. Kapoor weigh in on that?

4    **A.**   Dr. Kapoor weighed in on it, yes.

5    **Q.**   What was the date of the particular email?

6    **A.**   July 31, 2014.

7    **Q.**   Thank you.  Now, remember last week on Friday we talked

8    about the speaker program?  Do you remember that?

9    **A.**   I do.

10   **Q.**   And with regard to that conversation --

11            MR. YEAGER:  May I please have 207.  Ms. Folan, is

12   that in evidence?

13            THE CLERK:  Yeah, that's already in.

14            MR. YEAGER:   Thank you.

15   **Q.**   Do you remember this document, the proposed marketing

16   budget proposed document?

17   **A.**   Yes.

18   **Q.**   All right.  If we could go through that to "Medical

19   communication," right there.  Do you see that?

20   **A.**   Yes.

21   **Q.**   This is -- what is this document, this part of the

22   document?  What is it?  Describe it for us, please.

23   **A.**   Let me -- may I have one second, please.

24            Okay.  This section of the document is laying out

25   what it would cost to do dinner meetings and GPBs, which are

1    group practice programs, which were the ones where they went

2    into the office, into the health care provider's office and

3    gave a program.  And it has the costs associated with what it

4    would cost, a cost estimate, a budget, and then at the bottom

5    it has it broken out by quarter.

6              MR. YEAGER:  If we could just orient the witness.

7    If we could go back to the first couple of -- so if we could

8    see 206 for a second.

9    **Q.**  Do you remember this document?

10   **A.**  Yes, I do.

11   **Q.**  What's the date on this?

12   **A.**  This is December 12, 2012.

13   **Q.**  All right.  And then the attachment is what?

14   **A.**  The attachment is the 2013 proposed marketing budget.

15   **Q.**  And it's to send to JK?

16   **A.**  It's for John Kapoor, correct.

17             MR. YEAGER:  Now if we could go back to 207,

18   please.

19   **Q.**  So this is that document, correct?

20   **A.**  This is that document, correct.

21   **Q.**  When you talk about the medication -- medical

22   communication, are you referring to ISPs?

23   **A.**  That is correct.

24   **Q.**  So what are you proposing the budget be for 2013 for the

25   Insys speaker program?

1    **A.**   Including ad boards and everything, $3.3 million.

2                MR. YEAGER:  Now, if we could go down to the next

3    couple of pages.  Scroll down.

4    **Q.**   This next one, what is the speaker bureau assessment?

5    What is this one?  We talked about it this Friday, right?

6    **A.**   Yes.

7    **Q.**   What is the bureau assessment?

8    **A.**   The bureau assessment was a response to Dr. Kapoor

9    wanting every speaker to write.

10               MR. YEAGER:  Okay.  And if we could scroll down,

11   please.

12   **Q.**   Speaker ROI, we talked about that previously, correct?

13   **A.**   That is correct.

14               MR. YEAGER:  If you go down to the last full

15   bullet, I think it was there, 7.5.  Sorry, my bad.  That is

16   the last bullet.  If you go back up to ROI assessment.  There

17   you go.

18   **Q.**   What is 7.5 to one ROI -- describe what that means.

19   **A.**   So that means that for every dollar spent on an honorary,

20   meaning payment to a -- to doctors in aggregate, there

21   were -- the return was 7.5 times more in revenue generated.

22   So payment to revenue.

23   **Q.**   I'm sorry?

24   **A.**   Payment to revenue.  Payment to a physician and compared

25   to revenue.

1          MR. YEAGER:  Okay.  And if you could go down to the

2     next page after speaker ROI, please.

3     **Q.**   What is speaker ROI management?

4     **A.**   Speaker ROI management was the proposed use of the

5     information from the return-on-investment analysis.

6     **Q.**   All right.  And if we could do the first bullet there.

7     **A.**   "Flagged all speakers with ROI less than 2 to 1,

8     identified.  Speakers to put temporary hold on programming.

9     Identify candidates to consider to soft delete."

10    **Q.**   What are you referring to there?

11    **A.**   So Dr. Kapoor wanted a positive return on investment on

12    the speakers, and so it was a speaker ROI.  I'm used to doing

13    the attendee ROI, and when I do it, I look at a 2 to 1

14    ratio -- in other words, for every dollar spent, you want to

15    at least get a return of 2 to 1.  So anybody that was under a

16    2 to 1 ratio was flagged to not give them programs.  And then

17    anybody that was not giving talks at all would be soft

18    deleted and/or -- not -- no product experience and no talks.

19    So no prescriptions and no talks would be soft deleted.

20    **Q.**   And I asked you on Friday whether you had agreed to

21    commit a crime.  Do you remember that?

22    **A.**   I did.  I do, I mean.  Excuse me.

23    **Q.**   And what was the crime that you agreed to commit?

24    **A.**   I provided the information that was requested of me to

25    give doctors programs who were writing scripts and to take

1   away payments to doctors who were not writing -- or not

2   writing prescriptions.

3   **Q.**   Now, do you remember testifying on Friday about a series

4   of conversations with Dr. Kapoor over the fall of 2012?

5   **A.**   I do.

6   **Q.**   Did you express your concern regarding these -- doing

7   this particular activity?

8   **A.**   Yes.

9   **Q.**   How many times?

10  **A.**   Multiple.

11  **Q.**   And at this point you're doing it, despite the fact of

12  that you objected; is that correct?

13  **A.**   That's correct.

14  **Q.**   Why?

15  **A.**   For a -- again, for fear of losing my job at the time.

16            MR. YEAGER:   Okay.  Now, if we could have 197 for

17  the witness.  With the Court's permission I want to approach

18  the witness.

19            THE COURT:   That's fine.

20            MR. YEAGER:   I've given a copy of the printout,

21  Your Honor.  I just think it's easier to read.  I'd offer the

22  paper copy for the jury so they can have it in the jury room.

23  If we could mark it 197A.

24            THE COURT:   You've already admitted 197, right?

25            MR. YEAGER:   This is 197.  It's already in.

```
1              THE COURT:  Just a paper copy?
2              MR. YEAGER:  Right.  But it's easier to read.
3              THE COURT:  That's fine.
4              (Exhibit 197A admitted into evidence.)
5              MR. YEAGER:  Thank you.
6              MS. WILKINSON:  Mr. Yeager --
7              (Discussion off the record.)
8    BY MR. YEAGER:
9    Q.  You have a copy of 197 there, correct?
10   A.  Correct.
11   Q.  Now, this document, when did you prepare it?
12   A.  So this was the information that was used in that budget
13   presentation.  So right prior to that, that budget
14   presentation.
15   Q.  And did you provide it to anyone at Insys Therapeutics?
16   A.  Yes.
17   Q.  To whom did you provide it?
18   A.  To Mike Babich at first.
19   Q.  Okay.  Anyone else?
20   A.  Then it was -- I said, Is this what -- Is this what John
21   is asking?  And then after that, it went into the program and
22   it got presented to everybody on that attachment.
23   Q.  Who is "everybody," including John Kapoor?
24   A.  Including John Kapoor.  Yeah, it was for John Kapoor.
25   Q.  So you have 197 there.  Do you see that?
```

1    **A.**   Yes.

2    **Q.**   And if we could go three pages in.

3              MR. YEAGER:  If I might have the Elmo.

4              MS. WILKINSON:  Are you referring to 197 or 197A?

5              MR. YEAGER:  197.

6              MR. TYRRELL:  Your Honor, there were two questions

7    that I think went to everybody on that attachment.  Who is

8    everybody, and then he said before he answered the question,

9    he said, did it go to John Kapoor.  Can we --

10             THE COURT:  You can do it at sidebar or make an

11   objection about foundation, okay.

12             MR. TYRRELL:  Sure.

13             MR. YEAGER:  May we please have 206 up, please.

14             MS. WILKINSON:  Your Honor, I -- I'm sorry.  I do

15   have the same objection because he's referring to two

16   different documents and one, I believe, went to Dr. Kapoor

17   and one did not.

18             THE COURT:  Cut the speeches, please.

19             MS. WILKINSON:  That's it.

20             MR. YEAGER:  May I please have 206 up for the jury,

21   please.  I believe it's in evidence.

22             THE COURT:  Is 206 in evidence, Karen?

23             THE CLERK:  Yes.

24             THE COURT:  Okay.

25   BY MR. YEAGER:

1    **Q.**  Mr. Napoletano, to whom did you send this particular

2    email?

3    **A.**  To Mike Babich and I copied Vikram Malhorta, Darryl

4    Baker, which was the chief financial officer, Lindsey Clancy

5    in marketing, and Desiree Hollandsworth in marketing as well.

6    **Q.**  The bottom part where it says, "To send to JK," do you

7    see that?

8    **A.**  Yes.

9    **Q.**  And the attachments, what is the attachment?  2013

10   proposed marketing budget; is that correct?

11   **A.**  That's correct.

12           MR. YEAGER:  May we please see 207, please.

13   **Q.**  Is that the attachment to the previous email?

14   **A.**  Yes.

15   **Q.**  All right.  Now, with regard to 197, I'm marking it 197A,

16   the paper document that's in front of you.  Do you see that?

17   **A.**  Yes.

18   **Q.**  All right.  That document is what?

19   **A.**  This document is the information that was used to

20   generate this PowerPoint.

21   **Q.**  "This PowerPoint" being 207?

22   **A.**  207, correct.

23   **Q.**  With regard to 197A, to whom did you give this particular

24   document to?

25   **A.**  197A, who did this go to?

1    **Q.**   Yes.

2    **A.**   That was Mike Babich.

3    **Q.**   All right.  But then you used the information for 207; is

4    that correct?

5    **A.**   Yes, yes.

6         MR. YEAGER:  Now if we can have the Elmo, please.

7    **Q.**   Mr. Napoletano, if we could go to the fourth page in.

8    It's called sheet one.

9         MR. YEAGER:  May I approach the witness, Your

10   Honor?

11        THE COURT:  Yes.

12   **Q.**   With regard to that, do you recognize that?

13   **A.**   Yes.

14   **Q.**   All right.  Now, I'm going to try to focus in.

15        All right.  So the top part of the document, it has

16   a banner; is that correct?

17   **A.**   That is correct.

18   **Q.**   And it identifies each one of the columns, correct?

19   **A.**   Correct.

20   **Q.**   So when you see "last name," whose last names are printed

21   there?

22   **A.**   Last name of the speaker.

23   **Q.**   So, for instance, if we go all the way down here, above

24   my finger, that's Gavin Awerbuck; is that correct?

25   **A.**   That's correct.

1   **Q.**   And when it says RSM territory, what is that?

2   **A.**   That's a regional sales team's territory.

3   **Q.**   All right.  Now I'm going to try to do this better than I

4   did Friday.

5            All right.  So trying to follow that across the

6   different columns, to the last four columns I want to take

7   you.  Okay?  So follow it along.  What are the last four

8   columns on the top there?

9            Actually, give me a second.

10  **A.**   Okay.  So one, two, three, four -- market share.  So

11  that's what percentage of the market, in terms of the Subsys

12  prescriptions, how much revenue is being generated from those

13  prescriptions, launch to date, how much has been paid in

14  honorary to the speaker, and then a return-on-investment

15  ratio of those two divided.  You take what was paid, divided

16  by what was paid.

17  **Q.**   All right.  Then there's a "Comments" section; is that

18  correct?

19  **A.**   That's correct.

20  **Q.**   So I just want to go back.  One other column I want to

21  point out is, what is the -- "Total ISP year-to-date 12/6."

22  What does that mean?

23  **A.**   That's how many speaker programs that were delivered to

24  date.

25  **Q.**   And how many completed year to date?

1   **A.**   So wait a minute.  I don't know if that's -- looks like

2   the same.  It would be the same.

3   **Q.**   So four speaker programs?

4   **A.**   Yes, correct.

5   **Q.**   And then that would be for the first witness -- for the

6   first physician; is that correct?

7   **A.**   Correct.

8   **Q.**   And you just follow it down, you can tell how many

9   programs --

10  **A.**   That's correct.

11  **Q.**   -- is that correct?

12  **A.**   Correct.

13  **Q.**   So let me ask you this.  What, in your experience, is

14  soft delete?

15  **A.**   Soft delete, in my experience, is at a given period of

16  time you look at whether if a speaker is actively speaking,

17  where you say he's productive, he's out giving talks.  And if

18  they were not giving talks within a given timeframe, you

19  would consider removing them from the speaker bureau, but you

20  didn't tell them because they only had one-year agreements

21  anyway to speak with them.

22          So you -- soft delete was, you didn't give them any

23  more programs.  You kind of moved them out of the speaker

24  bureau silently.

25  **Q.**   All right.  So let me just go back.  When you train a

1    speaker, you take them for a training, correct?

2    **A.**   Yes.

3    **Q.**   Do they get paid for that?

4    **A.**   They do.

5    **Q.**   And what happens after they're trained for speaking if

6    they don't speak?

7    **A.**   Yeah.  The representative has the responsibility to go

8    out and generate speaking engagements and have that speaker

9    speak because you don't want to -- you don't want to pay a

10   physician to hear about your product and then not go out and

11   speak.

12   **Q.**   Why is that?

13   **A.**   Well, it would look like you're paying them to detail

14   them, to give them a background on your product.

15   **Q.**   Okay.  With regard to soft deletes, does the honorarium

16   paid, the ratio of honorarium paid, does that have anything

17   to do with whether or not the person should be deleted or not

18   deleted?

19   **A.**   It shouldn't.

20   **Q.**   Why?

21   **A.**   Because, again, that would look like -- that would be a

22   kickback.

23   **Q.**   All right.  Now, with regard to these notes down here on

24   the side, do you see those?  Sorry.

25   **A.**   Yes.

1   **Q.**   Who put those notes there?

2   **A.**   I did.

3   **Q.**   And if we could go through -- this person is ROI to date

4   of .6.  All right?  It's the one, two, three, four -- five

5   down.  See that, "soft delete"?

6   **A.**   Yeah.

7   **Q.**   Why did you say "soft delete" to the person with 0.6?

8   **A.**   Because that individual did not have, you know, a

9   positive ROI; meaning, you know, typically 2 to 1 or better.

10  And it was -- it was -- you know, ROI-based, not what I was

11  talking about.  You know, utilization-based.

12  **Q.**   All right.  So on that note, that same person, if you

13  follow it over, they've done four speaker programs, correct?

14  **A.**   Yeah.

15  **Q.**   So would they fall into your general understanding of

16  when to use a soft delete?

17  **A.**   No.

18  **Q.**   Why not?

19  **A.**   Because they were actually out talking on the product.

20  **Q.**   But you put down .6 ROI which is less than two, correct?

21  **A.**   Correct.

22  **Q.**   And you put down "soft delete question mark"; is that

23  correct?

24  **A.**   Yes, that's correct.

25  **Q.**   Why did you do that?

1    **A.**   Again, to be the -- the objective was, again, to give

2    programs to doctors that were writing and to take away

3    programs for doctors that were not writing.  That doctor was

4    not writing enough.

5    **Q.**   Now, Mr. Napoletano we talked before --

6              MR. YEAGER:  If we could take down the Elmo and put

7    up the -- thank you.

8    **Q.**   With regard to the speaker program, you talked to us

9    about how you objected to it but went ahead with it anyway.

10              What was it like to work there after you told

11   people not to do what they had done?  What was it like

12   working there in fall of 2013?

13   **A.**   Horrible.  I felt terrible.  I felt, you know, angry and

14   you know, depressed, and you know, really not a good mental

15   state.

16   **Q.**   Directing your attention to the winter of 2013.  At some

17   point did you have occasion to speak to someone named Larry

18   Dillaha?

19   **A.**   Yes.

20   **Q.**   Who is Larry Dillaha?

21   **A.**   Larry Dillaha was the chief medical officer at the time.

22   **Q.**   Where did you talk to Mr. Dillaha?  Not what you said.

23   Where.

24   **A.**   Excuse me?

25   **Q.**   Where did you talk to him?

1  **A.**  At Mr. -- or Dr. Dillaha's house.

2  **Q.**  Why did you go there?

3  **A.**  To -- basically to talk to him because I was quite upset.

4  **Q.**  All right.  What happened after your conversation with

5  him?

6  **A.**  So when I -- after the conversation?

7  **Q.**  After the conversation.

8  **A.**  After the conversation, I, at Dr. Dillaha's request, I

9  spoke to a board member, Patrick Fourteau, at a national --

10  at an Insys board of advisors meeting in February, and I sat

11  next to Patrick Fourteau and I explained to him that we were

12  being requested to do return on investment.  And his response

13  to me was that you shouldn't be doing that, and then I asked

14  him to help get it stopped.  And he acknowledged that he

15  would.

16  **Q.**  After that conversation, after the board meeting where

17  you spoke to Mr. Fourteau, what happened with regard to the

18  ROI?

19  **A.**  Shortly thereafter, Mike Babich came into the room, into

20  my room and in my office and said that we did not have to

21  prepare the ROI report, sales operations and marketing did

22  not have to prepare the report.  He also went into Desiree

23  Hollandsworth's office because she notified me as well and

24  said, Let's pop the champagne.  We don't have to do this

25  report anymore.

1    **Q.**   So at that point you don't have to prepare 197 or the

2    speaker ROIs; is that correct?

3    **A.**   Correct.

4    **Q.**   Directing your attention to the same time period, the

5    winter of 2013.  What are you focused on beyond the ROI?

6    What are you working on monthly?

7    **A.**   Winter of --

8    **Q.**   2012 into 2013.  Let me ask it this way:  Who is Mark

9    Hein?

10   **A.**   So I was working on recruiting.  I got approval to

11   recruit somebody to be a Subsys senior product director.

12   **Q.**   What does that mean, "Subsys senior product director"?

13   **A.**   That would be somebody to run -- a marketing person with

14   experience in the industry who could take the lead role in

15   marketing Subsys.

16   **Q.**   And did you participate in the hiring decision of

17   Mr. Hein?

18   **A.**   I did.  I recruited Mark Hein.  This is somebody I knew

19   historically in the industry years ago, worked together

20   briefly.  But the reason that I recruited Mark Hein was that

21   he had experience working for another opioid company and

22   understood scheduled products and how to do it appropriately,

23   and that that company was also under what's called a

24   corporate integrity agreement like I worked under when I was

25   at Cephalon.  So I knew he would understand how to do things

1    correctly.

2    **Q.**   So did you hire him?

3    **A.**   I did.

4    **Q.**   What is a compliance officer?

5    **A.**   A compliance officer is typically a legal person that

6    knows the regulations and tries to work with the company and

7    ensure that the company stays within regulations, legal and

8    -- regulations.

9    **Q.**   Now, with regard to Insys in the winter or spring of

10   2013, who is Leslie Zacks?  Not what you said, but who.

11   **A.**   Leslie Zacks was a contract compliance officer for the

12   company.

13   **Q.**   When you say "contract," contract with who?

14   **A.**   Contract with Insys.

15   **Q.**   And did you have conversation -- was he hired basically

16   to work with you?

17   **A.**   Yes.  Prior to that, but, yes, he was.

18   **Q.**   When was he hired?

19   **A.**   I believe he was hired in 2012.  Yeah, 2012.

20   **Q.**   All right.  Did you have occasion to talk with him in

21   your role as VP of marketing?

22   **A.**   I did on occasions.

23   **Q.**   All right.  So now let's -- just to go through it.

24   You've complained about ROI to Patrick Fourteau, Mr. Zacks

25   has been hired.  Is this idea of using the speaker program to

1    get doctors to write in exchange for the speaker honorarium,

2    has that changed?

3    **A.**  No.

4    **Q.**  How do you know?

5    **A.**  The reason I know is because there was an additional pool

6    of money.  Dr. Kapoor said it as if -- as if -- if the

7    program does well, he would allocate more money.  And the

8    program was taking off, and he allocated $100,000 and --

9    **Q.**  When was this?  When did Dr. Kapoor allocate --

10   **A.**  I believe it was the April timeframe, 2013.

11   **Q.**  All right.  So let's try to lay this down.  So there's a

12   budget that's approved; is that correct?

13   **A.**  Yeah, there was a budget -- yeah, it was approved prior.

14   **Q.**  How much was the budget?  We saw the budget before but --

15   **A.**  Yeah, we saw the budget before.

16   **Q.**  -- how much of that budget was approved?

17   **A.**  Well, what it was, even if the budget was talked about,

18   not the whole thing.  Not the whole thing.  So it was pulsed

19   out.

20   **Q.**  So not the whole thing, what?

21   **A.**  Not the whole budget was approved.

22   **Q.**  When you say "pulsed out," what do you mean?

23   **A.**  Based on the program, he would allocate more money.

24   **Q.**  Who is "he"?

25   **A.**  Dr. Kapoor would allocate more money.

1    **Q.**   And did that happen?

2    **A.**   Yes.

3    **Q.**   And describe that, please.

4    **A.**   Mike Babich called Alec and I -- or into an office and

5    Mike said if Dr. Kapoor gave -- if I gave $100,000, how would

6    you allocate this?

7                And I said, you know, obviously by a regional

8    basis.  We can see which regions are doing better than other

9    regions if we want to do that, but regional basis is how you

10   typically allocate that money.

11               And Alec Burlakoff said, If I'm in control, I would

12   give it to one or two individuals.  And he mentioned

13   Dr. Gavin Awerbuch and another name, Judson Somerville.

14   **Q.**   And what happened after that meeting?

15   **A.**   I told them during the meeting, You can't do that and

16   there are statutes.  And I went -- I walked out and I went to

17   Desiree's office and I vented.

18   **Q.**   At some point was the money allocated?

19   **A.**   It was.

20   **Q.**   And how was it allocated?

21   **A.**   The money that was allocated was -- I worked with

22   Desiree, and we did it regional, but I explicitly -- Mike

23   agreed that Alec could have his 100,000 to do as he wanted.

24   **Q.**   So I don't understand.  This sounds like he got both.

25   How does that work?

1     **A.**   Well, I took the other money -- the additional 100,000

2     was given to Alec Burlakoff to use as he see fit.

3     **Q.**   And the remaining budget that had already been

4     allocated --

5     **A.**   Desiree and I worked on distributing it regionally.

6     **Q.**   Mr. Napoletano, so Alec Burlakoff was given $100,000 to

7     do what he wanted with it.  What did he do with it?

8     **A.**   I believe that he gave it to high-prescribing doctors or

9     doctors with the potential to prescribe.

10    **Q.**   Now, why do you believe that?

11    **A.**   Because we -- the number of programs that were allocated

12    to -- for instance, the one he mentioned, Dr. Awerbuch, were

13    exponentially higher or considerably higher than anybody

14    else, an outlier.

15    **Q.**   All right.  Now, with regard to running a speaker

16    program, what is a speaker budget cap?

17    **A.**   So a speaker budget cap is what pharmaceutical companies,

18    especially under a corporate integrity agreement, will put in

19    place and say the maximum amount of money in any given year

20    that can be paid in honorarium to a given speaker needs to be

21    limited.

22    **Q.**   And was there a cap in place at Insys Therapeutics?

23    **A.**   Desiree and I --

24    **Q.**   I'm just asking.  I'm just --

25    **A.**   Yes, yes --

1   **Q.**   I'm sorry, what?

2   **A.**   Yes, in theory.  Yes.

3   **Q.**   What do you mean "in theory"?

4   **A.**   In theory, Desiree and I wrote an SOP where we put 100K

5   being the cap.

6   **Q.**   And when was that?

7   **A.**   In the end of 2012, I think.

8   **Q.**   Okay.  So directing your attention to 2013, with regard

9   to Judson Somerville, was there a cap in place at the time

10  within Insys Therapeutics for the amount of money that was --

11  that a speaker was permitted to be paid?

12  **A.**   Yes, there was.

13  **Q.**   And did something happen with regard to that cap?

14  **A.**   Yes.  The cap was set at 100,000.  And so many programs

15  were given to Judson Somerville that he went up against the

16  cap and reached the cap.  And then Alec Burlakoff requested

17  that we increase the cap, and Desiree and I were not

18  comfortable with that, with increasing it.  He wanted to

19  raise it to 150.

20          At that time Desiree and I had contracted with an

21  outside compliance group, compliance integrated services, and

22  we asked them what is reasonable for a cap, and they

23  explained that that 150 is on the high end.  You can do it,

24  but it's on the high end.

25          But we -- Mike agreed that he would raise it, and

1    he raised it to 120 -- Mike Babich, to 125,000.

2    **Q.**  And did Judson Somerville receive the benefit of that cap

3    increase?

4    **A.**  Yes.

5    **Q.**  Now, Mr. Napoletano, during your time there, I want to

6    talk to you about your own behavior.  You talked before about

7    what it was like to work there despite your objections.

8             What was going on with regard to you in terms of

9    how you dealt with your concerns at the time personally?

10   **A.**  Personally, not well.  I think it wreaked havoc on my

11   health and definitely my mental state, and it deteriorated my

12   home life for sure.

13   **Q.**  When you say it deteriorated your home life, did you have

14   relationships with people that worked at Insys Therapeutics?

15   **A.**  Yes, I did.

16   **Q.**  With who?

17   **A.**  With a representative that was in the process of leaving

18   the company, Lacy Fortenberry, and then after that another

19   one that was in California, a manager Tiffany Krummard.

20   **Q.**  With regard to that, did you have supervisory authority

21   for either of those persons?

22   **A.**  No, there was no line to marketing.

23   **Q.**  All right.  So as you get into 2013, what is a national

24   speaker program?

25            I'm sorry.  What is a national sales meeting, NSM?

1    **A.**   A national sales meeting is when you bring in the entire

2    sales force together and you give them educational programs

3    and they get a chance to practice the material and learn the

4    plan of action.

5    **Q.**   What was your role with regard to national sales

6    meetings?  Did you play a role in those?

7    **A.**   Yes.  From the marketing perspective, yes, I did.

8              Typically, if there are any programs that were

9    being rolled out in the company, I would give typically a

10   talk on it.  I would explain the market, how -- what the

11   market share is and what programs and initiatives were being

12   rolled out from the marketing department.

13   **Q.**   Now, directing your attention to the end of 2013,

14   Mr. Napoletano.  At some point -- and just to avoid the issue

15   that was raised before, Your Honor -- at some point did Insys

16   Therapeutics receive a subpoena?

17   **A.**   Yes.

18   **Q.**   Roughly, when was that?

19   **A.**   Beginning of December.

20   **Q.**   What happened after Insys was subpoenaed?

21   **A.**   Internally there was a lot of anxiety.

22   **Q.**   All right.  At some point was a budget proposed for 2014?

23   **A.**   Yes.

24   **Q.**   And describe how that budget was assembled?

25   **A.**   The budget is, at this point Mike Babich controlled the

1    budget for the most part.  They worked with marketing and

2    worked with the various departments, and we put together a

3    budget proposal for 2014.

4    **Q.**   When you say "controlled," who made the decisions about

5    how to spend the money?

6    **A.**   That was all Mike -- Mike Babich for the most part, and

7    John Kapoor controlled -- what I would say controlled the

8    purse strings.  So he pulsed it out to Mike.

9    **Q.**   So -- all right.  So go through that.

10            When you say Mike Babich controlled the budget but

11   John Kapoor controlled the purse strings, it sounds like

12   you're saying the same thing?

13   **A.**   So there was a budget put together, but it wasn't -- even

14   though that was a budget on the paper, the actual spend, I

15   should say, was controlled by John.

16   **Q.**   All right.  We talked about --

17   **A.**   To the best of my understanding.

18            MS. WILKINSON:  Can we --

19   So with regard to the --

20            MS. WILKINSON:  Can I just object?  Is that in this

21   timeframe, you're saying the end of 2013?

22   BY MR. YEAGER:

23   **Q.**   What's the foundation with regard to the budgeting in

24   2013 --

25            MS. WILKINSON:  In 2014.

1    BY MR. YEAGER:

2    **Q.**   -- going into 2014?  Who was responsible for compiling

3    the budget?

4    **A.**   Marketing would have worked with Mike Babich.  Mike

5    Babich had responsibilities.

6    **Q.**   Who had ultimate control over where the money was spent?

7    **A.**   To the best of my knowledge, that was still John Kapoor.

8    **Q.**   All right.  Now, with regard to the budget for 2014,

9    after the subpoena came down, did the investment that Insys

10   was making in the speaker program decrease or increase?

11   **A.**   Increased.

12   **Q.**   By how much?

13   **A.**   Significantly.  I don't remember the exact number, but it

14   significantly increased.

15   **Q.**   Mr. Napoletano, with regard to 2014, did -- were there

16   any changes -- now you've got compliance.  Who is Danielle

17   Davis?

18   **A.**   Danielle Davis was a compliance personnel that was hired

19   after the subpoena in December.

20   **Q.**   All right.  So there was Leslie Zacks.  We talked about

21   him before, correct?

22   **A.**   Correct.

23   **Q.**   Then Danielle Davis was hired; is that correct?

24   **A.**   Not right away.  There was another person in between,

25   another contract person.  A full-time dedicated compliance

1    person.

2    **Q.**  Was that Steven Celestini?

3    **A.**  That's correct.

4    **Q.**  After Mr. Celestini, that's when Ms. Davis was hired?

5    **A.**  That's correct.

6    **Q.**  When was she hired?

7    **A.**  It was late winter, early spring of 2014.

8    **Q.**  And with regard to the hiring of the different compliance

9    people, first Mr. Zacks, then Mr. Celestini, then Ms. Davis,

10   did the use of the speaker program to award doctors for

11   writing prescriptions or take away from doctors who didn't

12   write them, did that change?

13   **A.**  No.

14   **Q.**  I want to talk to you about 2014.  When you say it didn't

15   change, how is it that you know it didn't change in 2014?

16   **A.**  The way I know it didn't change is because Desiree, the

17   marketing group, Desiree and myself worked with compliance

18   integrated services, this company, to generate the updated

19   SOPs.  And we had a meeting where we sat down -- we, with

20   marketing, with sales management, so it was Alec Burlakoff,

21   Rich Simon, I believe Darin Fila was in there, in the

22   meeting, and we had a meeting to go through how to do speaker

23   programs in a compliant fashion.

24            And during that meeting, Alec said, I don't care

25   what's done and what you guys did.  I had a call with

1    Dr. Kapoor and Mike Babich last night and we have a plan.

2    And he said that Dr. Kapoor said he won't be outbought by

3    Galena.

4    **Q.**   What is Galena?

5    **A.**   Galena was a competitor company that had a competitor

6    product to Insys in the same state, and at that time they

7    were putting marketing money around that product and there

8    was a lot of sensitivity or anxiety in and around Insys that

9    they were going to take market share away from Insys.

10   **Q.**   Mr. Napoletano, regarding that particular meeting, was

11   there an additional meeting that occurred in the days

12   following your meeting with --

13   **A.**   Right after that meeting in the days that followed, there

14   was a meeting where Mark -- that it was going on and it was

15   in progress, where Mike Babich called, and it was Mike Babich

16   and sales management, so I believe it was Rich Simon and

17   Darin Fila -- I believe Darin Fila was in it -- and called

18   down Mark Hein and myself to go over a list of speakers.

19   **Q.**   All right.  And when is this meeting, roughly?  What time

20   period?

21   **A.**   In the very beginning.  In the beginning of January,

22   early January.

23   **Q.**   January of what year?

24   **A.**   Of 2014.

25   **Q.**   All right.  And describe the meeting.

1    **A.**   In the meeting, there was a list of physicians and

2    they're going down the list of physicians and they were

3    identifying or stratifying or categorizing them, if you will,

4    based on --

5              MR. TYRRELL:  Objection.  Who is?  Identify them.

6              MR. YEAGER:  That's fine.

7    **Q.**   Do you see Rich Simon in the courtroom here today?

8    **A.**   Yes.

9    **Q.**   Could you please point to him and describe the clothing

10   he's wearing?

11   **A.**   Rich Simon is there.  He has, I believe it's a blue tie

12   and white shirt.

13   **Q.**   Can you describe who was detailing the list that you

14   talked about?  Who was going over the list?

15   **A.**   It was Mike Babich was running the meeting, and it was

16   Alec Burlakoff taking the lead on it going through the

17   speakers.

18   **Q.**   And who else was in the meeting?

19   **A.**   Rich Simon, Mark Hein, myself, and I believe maybe Darin

20   Fila.  I'm not sure about that.

21   **Q.**   What happened during this meeting?

22   **A.**   During the meeting it became apparent -- they called the

23   group, the top group ABC.  They called -- the top As were

24   physicians that they wanted to, what they said, cap out or

25   maximum the number of programs to those individuals, to those

1  doctors.  The next group --

2  **Q.**  Who said that?  Who wanted to cap out --

3  **A.**  Alec and Mike both.  It became apparent that that's what

4  they were doing.

5  **Q.**  How did it become apparent?

6  **A.**  Because they said they were identifying the doctors that

7  had the highest potential to write.  And they said, these are

8  the doctors that we're going to give all of our programs to,

9  make sure they reached a cap.

10  **Q.**  And what did you say?

11  **A.**  At that time I -- you know, I got up and I walked out.

12  When I knew what was going on, when I figured out what was

13  going on, I got up and walked out.  And so did Mark Hein.

14  And I called compliance.

15  **Q.**  And when you say you "called compliance," who in

16  compliance did you call?

17  **A.**  I called Steve Celestini at the time.

18  **Q.**  Mr. Napoletano, who is Susan Beisler?

19  **A.**  Susan Beisler was a sales representative in New Jersey.

20  **Q.**  All right.  And regarding Ms. Beisler, I direct your

21  attention to the national sales meeting.

22          Was there a time at which you saw Ms. Beisler at

23  Larry Dillaha's house?

24  **A.**  Yes, in and around.

25  **Q.**  Let me finish up.  When?  What year was this?

1    **A.**   To the best of my knowledge, or recollection, I believe

2    it was 2014.

3                 MR. YEAGER:  All right.

4                 MS. WILKINSON:  Objection.  I'd like to go to

5    sidebar.

6                 THE COURT:  How much more do you have left,

7    Mr. Yeager?

8                 MR. YEAGER:  Not much, but maybe ten minutes.

9                 MS. WILKINSON:  Maybe I can ask one question, Your

10   Honor?

11                THE COURT:  We're -- if we're going to have a long

12   sidebar on this, I'm going to let them go to lunch before we

13   do it.

14                (Discussion off the record.)

15                MR. YEAGER:  Why don't we take a break, Your Honor.

16                THE COURT:  Okay.  Why don't you guys go ahead and

17   take your lunch, quarter of 1:00.

18                (Jury exits the courtroom.)

19                MS. WILKINSON:  Your Honor, could we ask the

20   witness to step outside?

21                THE COURT:  Yes.  You're excused for lunch.  Come

22   back at quarter of 1:00.

23                MS. WILKINSON:  Your Honor, we raised this issue at

24   sidebar about his knowledge about Ms. Beisler, and he said it

25   was in 2014.  The emails the government introduced are in

```
 1    2013.
 2              We don't think he should be allowed to talk about
 3    their relationship after the fact.  It doesn't go to what
 4    kind of relationship they had when she was writing emails.
 5    And as I said, she's going to be here, from what I
 6    understand, for the government.
 7              And I raised that and Mr. Yeager was nice enough to
 8    stop right there, but he doesn't match up the time.
 9              MR. YEAGER:  To be honest with you, I don't see
10    that timing affects admissibility in any way.  He can
11    testify, Your Honor, about what he had -- reason there was an
12    ongoing relationship.
13              THE COURT:  I think that's right.
14              MR. WYSHAK:  Your Honor, I have the next witness
15    here, but if they're going to be all afternoon on cross of
16    this witness, I'd like to let her go.  I don't know what the
17    timing is.
18              THE COURT:  How much more do you have, Mr. Yeager?
19              MR. YEAGER:  I think maybe ten minutes, if that.
20              THE COURT:  So he'll be done with her by 1:00.
21    Will you guys finish -- I mean, we'll be done with him by
22    1:00.  Will you guys take the whole afternoon with him?  If
23    you don't know, that's fine.  If you're sure you will, let's
24    let the other witness go.  But if you don't know, I'm happy
25    to --
```

```
 1              MR. KENDALL:  We will take substantially most of
 2    it.  If we finish at 3:30 today or 9:30 or 10:30 tomorrow, I
 3    can't predict.  But we're going to take most of it because
 4    there's more than one of us and each one doesn't know exactly
 5    how long we're going to go.
 6              MR. WYSHAK:  I'll keep her here.  Maybe as we get
 7    further into the evidence --
 8              MR. KENDALL:  She certainly can take a break for
 9    two or three hours and come back at, like, 3:00 or 2:30.
10              THE COURT:  Just keep her on standby.  I don't mind
11    losing a few minutes, but I'd rather not lose half an hour.
12              All right.  See everyone after lunch.
13              (Recess taken 11:59 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    **** AFTERNOON SESSION ****
2              THE CLERK:  All rise for the jury.
3              (The jury enters the courtroom.)
4              THE CLERK:  Court is back in session.  Please be
5    seated.
6              THE COURT:  When you're ready, Mr. Yeager.
7              MR. YEAGER:  Thank you, Your Honor.
8    BY MR. YEAGER:
9    Q.  Mr. Napoletano, you're previously sworn.  You understand
10   that, right?
11   A.  Yes.
12   Q.  So we were talking about a party, Larry Dillaha -- well,
13   to go back, following the national sales meeting in 2014,
14   were you at Larry Dillaha's party?
15   A.  Yes.
16   Q.  Who is Susan Biesler?
17   A.  A sales rep in New Jersey.
18   Q.  Had you met her before that point?
19   A.  Yes.
20   Q.  At some point -- describe who was at the party.
21   A.  It was Larry Dillaha's house.  There was Susan Biesler,
22   Sonia Palermo, and others that I don't recall.
23   Q.  So who is Sonia Palermo?
24   A.  A representative in Long Island.  A sales representative
25   in Long Island.
```

1  **Q.**  Just to go back, Larry Dillaha is an executive, correct?

2  **A.**  Yes, he's an officer of the company.

3  **Q.**  With regard to Ms. Biesler, did something happen?

4  **A.**  Yes.

5  **Q.**  Describe that to the jury, please.

6  **A.**  I observed Susan Biesler on a patio furniture with

7  Dr. John Kapoor, embracing and kissing.

8  **Q.**  Directing your attention to 2014, May of 2014, was Subsys

9  the only drug that Insys had?

10  **A.**  It was the -- well, there was a generic drug, but there

11  were drugs in the pipeline.  But the only branded drug on the

12  market.

13  **Q.**  Was Subsys?

14  **A.**  Was Subsys.

15  **Q.**  When you say there was drugs in the pipeline, did any

16  involve epilepsy?

17  **A.**  Yes.

18  **Q.**  We talked before what is an advisory board.  Very

19  basically, what is an advisory board?

20  **A.**  An advisory board, in this case when you bring together

21  healthcare providers, experts, to glean to get information

22  out of them in terms of whatever the topic is.

23  **Q.**  Directing your attention to May of 2014, at some point

24  was there an advisory board regarding the epilepsy drug?

25  **A.**  Yes.

1    **Q.**   Who attended that advisory board?

2    **A.**   Dr. Kapoor, Mike Babich, Larry Dillaha, and somebody from

3    his staff.  Another doctor, I forget her name, from his

4    staff, and the doctors that came in to participate in the ad

5    board.  There were a few others from Insys that I don't

6    recall.

7    **Q.**   What is Roka?

8    **A.**   Roka is -- Roka Akor, it is a restaurant in Scottsdale,

9    owned by Dr. John Kapoor.

10   **Q.**   Directing your attention to after the epilepsy advisory

11   board, did something happen with regard to Roka?

12   **A.**   Yes.

13   **Q.**   Can you describe that for the jury, please?

14   **A.**   Yes.  Immediately after the advisory board, we went over

15   to Roka for dinner.

16   **Q.**   Who is we?

17   **A.**   I went over to Roka for dinner, and Dr. John Kapoor was

18   already there.

19   **Q.**   Was there anyone else there?

20   **A.**   Not at this time.  They didn't come over yet.

21   **Q.**   Describe what happened.

22   **A.**   I sat down with Dr. Kapoor for a little, and we talked

23   about Insys and compliance and if I had any concerns.  And I

24   said, yes, it's all around speakers.  My concern is doing it

25   the right way around speaker programs.  And I talked to him

1    about, you know, the ROI that he asked us to do.  And he

2    said, well, if I'm going to spend $5 million, I just want a

3    return on my investment.

4    **Q.**  And what did you say?

5    **A.**  You know, I said again that's what I think -- it was not

6    right, is not doing that.

7    **Q.**  This was May of 2014, correct?

8    **A.**  Correct.

9    **Q.**  Now, when did you tell us you left the company?

10   **A.**  In August of 2014.

11   **Q.**  At some point prior to leaving the company, describe

12   how -- strike that.

13             Describe how it is you came to leave the company.

14   **A.**  I continued to voice concerns when I wasn't comfortable

15   with something.  We kept on believing that the ship -- when I

16   say "we," marketing, kept on believing that things were going

17   to correct.  And they didn't.

18             And I originally went and complained.  In a

19   meeting, we had a meeting with Franc Del Fosse where we were

20   talking about speaker programs.  It was marketing, so it was

21   Desiree, Mark, and myself.  We complained about, we didn't

22   think -- we still were not comfortable with the way speaker

23   programs were being allocated, given the ABC targets from

24   earlier that year and the 20 doctors that identified to cap

25   out --

1  **Q.**  When you say "the ABC targets earlier that year," remind

2  us what you were referring to.

3  **A.**  In January when there was the meeting where Mike Babich

4  and Alec Burlakoff identified the top targets that they were

5  going to allocate the maximum amount of programs that they

6  could to.

7  Immediately after that, Alec Burlakoff had sent out

8  an email to his sales force saying, these are VIP targets and

9  these are the guys we're going to give all our programs to.

10  So I had voiced concerns and marketing had, Desiree

11  and Mark had, that they were still allocating programs to

12  those top doctors in return for prescriptions.

13  **Q.**  I think we -- what do you mean by "ABC"?

14  **A.**  That was when they identified the top doctor, A targets

15  being the ones that were going to get the most programs, that

16  they were going to maximize the maximum amount of programs;

17  and B getting the next amount; and C, I don't recall if that

18  was to delete them.  It may have been to delete them or not

19  give any.

20  **Q.**  Slow down.  "A" was what?

21  **A.**  "A" was to give the maximum number of programs.

22  **Q.**  What was B?

23  **A.**  B was to give the next highest number of programs.

24  BY MR. YEAGER:

25  **Q.**  And what was C?

1   **A.**   And I believe, but I'm not sure -- it's been a while, but

2   I believe C was to delete.

3   **Q.**   So now going forward to this meeting in August.  You were

4   talking to Franc Del Fosse?

5   **A.**   Yes.

6   **Q.**   You referenced this ABC meeting?

7   **A.**   Marketing, when we were talking about doing speakers --

8   programs in a compliant fashion, we said that we weren't

9   comfortable with it, and we still think that they were

10  giving -- sales was allocating a lot of the programs to the

11  high targets that they were trying to get a return on.

12  **Q.**   What happened after the meeting?

13  **A.**   After that meeting, I had done an ad board.  It was a

14  psychology ad board up here looking for additional drugs to

15  put in a spray under your tongue.  We were talking to

16  psychiatrists in Boston.

17          I came home and we had a meeting, typical generally

18  planned meetings where it's all the staff meetings with

19  Dr. Kapoor's morning meeting.  At that meeting, Dr. Kapoor

20  brought up the fact that we were spending way too much money

21  on honoraria at ad boards and looked at me in an accusatory

22  fashion.

23          And I immediately after that meeting, I went to

24  compliance and I said I'm not comfortable, and I laid out --

25  it was Danielle Davis.  And I laid out everything that was

1    not comfortable from A to Z with Danielle Davis in the

2    company.

3              And I said that was Dr. Kapoor and John -- and Mike

4    Babich wanted to have the maximum available fair -- it's

5    called fair market value for physicians around the time when

6    John said he wouldn't be out bought by Galena, and they

7    pushed to the maximum amount that Compliance Integrated

8    Systems said that the top end of the spectrum in the

9    industry.

10   **Q.**   You said a lot.

11   **A.**   Okay.

12   **Q.**   You went to Danielle Davis and you complained; is that

13   correct?

14   **A.**   That's correct.

15   **Q.**   You laid out the concerns which you've already expressed

16   to this jury today; is that right?

17   **A.**   That's correct.

18   **Q.**   Compliance Integrated Systems is the third-party

19   compliance office?

20   **A.**   Yes.

21   **Q.**   You told her about your concerns about that particular

22   unit?

23   **A.**   No.  I was explaining about the fair market value.  My

24   concerns -- John had -- in that meeting, John had said to me,

25   made it look like I set the fair market value when I didn't.

1    And I would say, no, him and Mike Babich were in control of

2    the fair market value, not me.

3    **Q.**   Okay.

4    **A.**   We were just implementing it.  So that was just -- I

5    wanted that for the record straight.

6            And then I went on and I told them the whole

7    history of the -- I told Danielle Davis the whole history of

8    everything I was concerned about from the company from the

9    speaker programs allocations, the ROI, the dosing, and the

10   high paying -- for the higher doses, paying salespeople a

11   higher amount for the doses.  I laid it all out and I said

12   "I'm uncomfortable," to Danielle Davis.

13   **Q.**   What happened after your meeting with Ms. Davis?

14   **A.**   I got a call the next day from Mike Babich.

15   **Q.**   Describe your conversation with Mike Babich.

16   **A.**   Mike pulled me into his office and questioned why I went

17   to compliance.  And I revealed the things that were still

18   bothering me that I didn't think corrected.

19           And his reply to me was, well, you and Alec just

20   need to get on the same board regarding -- he kept on saying

21   you two need to work together.  We're still a group.  We have

22   compliance now.  Stop trying to be compliance.  Marketing

23   needs to stop being compliance.  You and Alec need to work

24   together, get on the same page.

25           And my response was, I said, look, if he was even

1    remotely in bounds I could get on the same page, but he's

2    not.

3              Mike's next question was, then you don't want to be

4    here, do you?

5              I said, Mike, I just want to do things the right

6    way.  If we're not going to do things the right way, no.

7    **Q.**   What happened next?

8    **A.**   The next day, Franc Del Fosse and Danielle Davis showed

9    up in my office.  They repeated some of the things and

10   discussions that went on with Mike.  The gist of that meeting

11   was Franc Del Fosse asked me -- he said, you stated that you

12   didn't think things were corrected.

13             And I said, no, I didn't.

14             And he said, I take that as a personal offense.

15             I said, I'm sorry.  I'm not trying to personally

16   offend you, but I don't think we corrected things at this

17   company.

18             And we left it at that.  And then I went home and

19   went to see my mom, who was sick at the time, and I got a

20   phone call at home from Franc Del Fosse and from human

21   resources, and they asked for my resignation.

22             And I said, as long as it's duly noted that I

23   lodged a complaint.

24   **Q.**   You told them that you would leave under certain

25   conditions; is that correct?

1    **A.**   Yes.  I did say I'd leave under certain conditions.

2    **Q.**   Mr. Napoletano, while you were at Insys Therapeutics,

3    what was your salary?

4    **A.**   It was in the 200 range.  I don't know exactly.

5    **Q.**   $200,000 a year?

6    **A.**   200,000 range.  I don't know exactly.

7    **Q.**   Did you receive bonuses?

8    **A.**   Yes.

9    **Q.**   Approximately what amount of bonuses did you receive each

10   year?

11   **A.**   They varied.  One year it doubled.  It was a salary

12   double.  But they varied from year to year, the bonuses.

13   **Q.**   The company went public with an initial public offering

14   in April of 2013; is that correct?

15   **A.**   Correct.

16   **Q.**   And were you given stock options with regard to the

17   company?

18   **A.**   Yes.

19   **Q.**   Did any of those vest while you were there?

20   **A.**   Yes.  While I was there I would assume around 30 percent

21   of them, somewhere in that range.  Maybe a third vested.

22   **Q.**   I'm sorry?

23   **A.**   Maybe a third.

24   **Q.**   Tell us what that means.

25   **A.**   Vesting means that you have the right to exercise those

1    options, meaning that you can actually purchase them and own

2    that stock, 30 percent, at a certain price.  And then there's

3    a fair market price.  So that difference is what they're

4    worth.

5    **Q.**  And so approximately how much did you make worth of

6    vested stock options while you were at Insys?

7    **A.**  I don't know the exact amount, but I think it's in the

8    $3 million range.

9    **Q.**  By leaving, Mr. Napoletano, did you leave unvested stock

10   on the table?  In other words, you were not compensated for

11   that stock?

12   **A.**  Yes.

13   **Q.**  Approximately what value of the unvested stock did you

14   leave on the table by resigning?

15   **A.**  I would guess around the 5 to 7 million, depending on

16   what the stock price was, what that margin was.  It was

17   millions.

18   **Q.**  So, Mr. Napoletano, when you left, did you sign a

19   severance agreement?

20   **A.**  I did.

21   **Q.**  Can you describe the process of signing that severance

22   agreement?

23   **A.**  Yes.  The company asked me to sign an agreement that I

24   didn't see any order of business that I was concerned about.

25   **Q.**  Did you sign it?

1    **A.**   No.

2    **Q.**   What did you sign?

3    **A.**   I said I would only sign it if they said other than the

4    issues and things that I identified and conveyed to the

5    company.

6              MR. YEAGER:  Thank you.  Nothing further, Your

7    Honor.

8              MR. KENDALL:  Thank you, Your Honor.  If I could

9    take a moment to set up, please.

10             THE COURT:  If you all want to stand up and stretch

11   while they're switching places, go ahead.

12                         CROSS EXAMINATION

13   BY MR. KENDALL:

14   **Q.**   Good afternoon, Mr. Napoletano.

15   **A.**   Good afternoon.

16   **Q.**   My name is Mike Kendall.  I represent Joe Rowan.  Fair to

17   say we've never met before?

18   **A.**   Yes.

19   **Q.**   We've never spoken before?

20   **A.**   Yes.

21   **Q.**   You knew Joe from Cephalon; is that correct?

22   **A.**   Peripherally, yes.

23   **Q.**   You had minor contact.  He's not somebody you were

24   particularly close to or did a lot of work with?

25   **A.**   Correct.

1    **Q.**   That's because he was in sales and you were in marketing?

2    **A.**   Correct.

3    **Q.**   And actually Joe left a little bit before you did from

4    Cephalon, correct?  Are you aware he was at Sunovion?

5    **A.**   I was unaware.

6    **Q.**   But you interviewed him when he joined Insys in July

7    of 2012.  Do you remember that?

8    **A.**   I don't remember that, no.

9    **Q.**   Do you remember you had a phone call interview?

10   **A.**   Maybe.

11   **Q.**   You don't remember that coming up that he had a break and

12   was at Sunovion a couple of years?

13   **A.**   I don't remember it, but -- yeah, I don't remember it.

14   **Q.**   And at the time that you worked at Insys, you were based

15   in Arizona, correct?

16   **A.**   Correct.

17   **Q.**   Joe was in the panhandle in Florida?

18   **A.**   Correct.

19   **Q.**   That's about 1,800 miles, if you trust my Google search.

20   **A.**   I do.

21   **Q.**   Thank you.  And fair to say you'd occasionally see Joe,

22   but you didn't see him that often, correct?

23   **A.**   Direct.

24   **Q.**   Maybe once or twice a year at a national sales meeting or

25   some other event?

1   **A.**   Correct.

2   **Q.**   And then you might deal with him a little bit over email

3   or the telephone?

4   **A.**   Correct.

5   **Q.**   And then towards the end of that time at Insys, you

6   actually made a trip to do a speaker program at Duke

7   University medical school, correct?  Do you remember that,

8   with Ted Stanley?

9   **A.**   I remember a trip.  Yeah, it was an advisory --

10   **Q.**   Ad board.  Thank you.

11   **A.**   Yes.

12   **Q.**   We'll get to that later.  How would you describe Joe?

13   **A.**   A salesman with charisma.

14   **Q.**   Polite, respectful?

15   **A.**   Yes.  Very well spoken.  Yeah.  Ted Stanley liked him.

16   **Q.**   He'd always inquire about your son whenever he was with

17   you?

18   **A.**   Always.  Yes, always.

19   **Q.**   From a genuine way?

20   **A.**   Yes.  Very.  Yes.  I agree.

21   **Q.**   Fair to say you thought he was a likeable, genuine

22   person, correct?

23   **A.**   Yes.

24   **Q.**   It's one way that a person can be a very successful

25   salesperson, to have that likeable genuine personality?

1    **A.**   Yes.

2    **Q.**   Polite?

3    **A.**   Yes.

4    **Q.**   Respectful?

5    **A.**   Yeah.

6    **Q.**   Fair to say you never heard Joe in all of your

7    interactions ever propose any kind of improper speaker

8    program transactions with any doctor, correct?

9    **A.**   Correct.

10   **Q.**   I want to go back to the time period when you started at

11   Insys and you were just finishing up at Cephalon.  I'm pretty

12   much going to move through things chronologically just so you

13   know where I'm going.

14   **A.**   Okay.

15   **Q.**   You worked at Cephalon from -- was it 2006 to 2011?

16   **A.**   2005, August of 2005 to roughly October, November 2011.

17   **Q.**   And at that time, Cephalon had Actiq, correct?

18   **A.**   Yes.

19   **Q.**   And then it bought Fentora?

20   **A.**   It bought Fentora prior to my joining, yes.

21   **Q.**   It bought it prior to you joining?

22   **A.**   Yes.

23   **Q.**   Was there like a relaunch of Fentora or a sort of a new

24   marketing campaign for the acquisition?

25   **A.**   Yes.

1  **Q.**  So you worked on marketing for both of those drugs?

2  **A.**  At the tail end of Actiq.  I didn't work on Actiq very

3  long, very little on Actiq, but I worked extensively on

4  Fentora.  I was brought on to work for Fentora originally.

5  **Q.**  And Cephalon had Actiq, both branded and generic?

6  **A.**  Not at that time.  It was branded going to generic.  And

7  then as soon as it went generic, then they had a generic as

8  well.

9  **Q.**  Fair to say your work on both Fentora and Actiq was very

10  successful for Cephalon?

11  **A.**  Yes.

12  **Q.**  Bottom line is the numbers.  How was the market share

13  when you left for those two drugs in the TIRF REMS market?

14  **A.**  It was about a third of the prescriptions were Fentora.

15  **Q.**  And how much was Actiq?

16  **A.**  Well, it was generic.  So it was mostly generic Actiq.

17  Probably the lion's share was generic Actiq.

18  **Q.**  So for the branded drugs, you got about a third of the

19  branded.  Fair to say, though, that the generic sales were

20  bigger than all the branded competitors combined?

21  **A.**  The branded -- oh, yes.  In terms -- yeah.

22  **Q.**  Add them all together.

23  **A.**  In terms of value, yes.  Yes.

24  **Q.**  Actiq and Fentora, Cephalon had far more than 50 percent

25  of the market, correct?

1    **A.**   In value, yes.

2    **Q.**   And most of the sales that Cephalon had were off-label;

3    is that correct?

4    **A.**   Yes.

5    **Q.**   The numbers I've seen put the Cephalon sales as maybe

6    80 percent or more off-label.  Would you agree with that?

7    **A.**   Yes.  I would think.  Yeah.

8    **Q.**   There was off-label use in terms of it was being used for

9    breakthrough pain that was not cancer-related, correct?

10   **A.**   Correct.

11   **Q.**   And there was even some off-label use not even for

12   breakthrough pain but other types of pain?

13   **A.**   Yes.

14   **Q.**   And this is basically the doctor prescribing decisions?

15   **A.**   Yes.

16   **Q.**   But if we were to look at the group of doctors that were

17   using these TIRF drugs, there was a very strong movement

18   among those six or 7,000 TIRF drug doctors to move it into

19   primarily off-label uses, correct?

20   **A.**   There was a movement?  Could you --

21   **Q.**   Let me rephrase it.

22          Cephalon was not marketing it for off-label uses,

23   correct?

24   **A.**   Correct.

25   **Q.**   This was the doctor's own decisions and how they wanted

1    to use the drugs?

2    **A.**   Correct.

3    **Q.**   And the doctors making their own independent decisions

4    were basically going 80-90 percent for non-cancer uses?

5    **A.**   It was a large percentage.  I'm not sure of the amount,

6    but yes.

7    **Q.**   But in that range, 80 to 90 percent?

8    **A.**   Yes.  I can believe that.

9    **Q.**   And they were even using it for forms of pain that

10   weren't breakthrough pain, correct?

11   **A.**   Correct.

12   **Q.**   Now, when you were at Cephalon, you used a series of

13   techniques to gain information and to formulate the marketing

14   plan.  One of them was ad boards, correct?

15   **A.**   Correct.

16   **Q.**   An ad board is a very standard thing to do in

17   pharmaceutical marketing, correct?

18   **A.**   Correct.

19   **Q.**   You're basically talking to your most influential or your

20   most perceptive customers and finding out what they want?

21   **A.**   Correct.

22   **Q.**   We like Subsys because it acts faster than the other

23   drugs.  That's the kind of thing you'd learn in an ad board,

24   correct?

25   **A.**   Correct.

1   **Q.**  Or you might find out we like Subsys because the

2   sublingual spray is the easiest form of administration,

3   correct?

4   **A.**  Correct.

5   **Q.**  Or they might say if you want us to switch our patients

6   from Fentora and Actiq over to Subsys, we need to learn about

7   titration, we need to learn more about transferring.  They

8   tell you that kind of stuff, correct?

9   **A.**  Correct.

10  **Q.**  So you did ad boards at Cephalon.  You also had a very

11  strong speaker program at Cephalon, correct?

12  **A.**  Correct.

13  **Q.**  How many speakers did Cephalon have for either Actiq or

14  Fentora?

15  **A.**  I don't recall.  It was too long ago.  I don't remember.

16  I really don't.

17  **Q.**  A substantial number.  Fair to say?

18  **A.**  A number, yeah.  I would think -- I kind of think Fentora

19  had 300.

20  **Q.**  And Actiq had a different stable of speakers?

21  **A.**  They transitioned from Actiq to Fentora.

22  **Q.**  And Actiq and Fentora when you worked on them, they

23  weren't a new launch.  They were established drugs, correct?

24  **A.**  Fentora was -- Actiq was going generic, excuse me,

25  off-patent, and Fentora was being launched.

1  **Q.**  Actiq had been in the market for many years, correct?

2  **A.**  Correct.

3  **Q.**  Fentora had been bought from another company, correct?

4  **A.**  Correct.

5  **Q.**  Wasn't the drug approved when it was at the prior

6  company?

7  **A.**  No.

8  **Q.**  The FDA approval came when?

9  **A.**  It came in 2006.

10  **Q.**  And that was after the acquisition?

11  **A.**  Yes.

12  **Q.**  Thank you.  I appreciate that.  I didn't realize that.

13  The point being ad boards, a very robust speaker

14  program, those were conventional techniques you used at

15  Cephalon, correct?

16  **A.**  Correct.

17  **Q.**  You testified Cephalon had this very heightened level of

18  review what was called a CIA, a corporate integrity

19  agreement, correct?

20  **A.**  Correct.

21  **Q.**  Would you agree with me you're very proud of the way

22  Cephalon ran its speaker program?  Correct?

23  **A.**  Yes.

24  **Q.**  You thought it was squeaky clean?

25  **A.**  Yes.

1    **Q.**   And part of the task that you had when you came over to

2    Insys was you wanted to transfer the success and learning

3    that had made Cephalon's marketing so successful and bring it

4    to Insys?

5    **A.**   Yes.

6    **Q.**   You knew a lot of the doctors that were important in the

7    marketplace who were prescribing these drugs, correct?

8    **A.**   Yes.

9    **Q.**   You knew both the big practices and the sort of more

10   academic key opinion leaders, correct?

11   **A.**   Yes.

12   **Q.**   And you understood the dynamic of basically who's

13   prescribing what, who's doing what, and you wanted to just

14   get them to switch from Actiq and Fentora to the newer,

15   better drug, correct?

16   **A.**   The doctors, yes.

17   **Q.**   And that's what made part of the job so exciting, wasn't

18   it?

19   **A.**   Yes.

20   **Q.**   You had all this established knowledge that you were very

21   proud of, and you got to apply it to a better product; is

22   that correct?

23   **A.**   Yes.

24          MR. KENDALL:  Your Honor, I'd like to offer up what

25   initially is a chalk, a document marked as Defendant's

1    Exhibit 5495.  The government has seen it before.

2              MR. YEAGER:  No objection, Your Honor.

3              THE COURT:  No objection to it being admitted?

4              MR. KENDALL:  I'm going to ask the witness -- I

5    will offer it be admitted after I've spoken to the witness.

6    Right now I just want to show it.

7              MR. YEAGER:  There's no objection to it being

8    admitted.

9              THE COURT:  What's the number?

10             MR. KENDALL:  5495.

11             THE COURT:  He's not objecting to it being

12   admitted.

13             MR. KENDALL:  Thank you.

14             THE COURT:  It's admitted.

15                       (Defendant Exhibit No. 5495 admitted.)

16   BY MR. KENDALL:

17   **Q.**  If we take a look at the chart I put in front of you,

18   Mr. Napoletano, I've got on the left by the name of drug five

19   of the main products that were available in the TIRF market,

20   correct?

21   **A.**  Yes.

22   **Q.**  Subsys at the top, Cephalon's drug Fentora and Actiq at

23   the bottom, and then two other competitors, Abstral that was

24   sold by a company called Galena?

25   **A.**  Correct.

1    **Q.**   And then Lazanda.   Who sold Lazanda?

2    **A.**   It changed hands.   A company bought them and then another

3    company bought them.   I don't know.

4    **Q.**   And then you agree with me the year that's approved

5    there, those are correct?

6    **A.**   Yes.

7    **Q.**   They're all basically ways to deliver fentanyl for

8    breakthrough pain, correct?

9    **A.**   Correct.

10   **Q.**   If we look at label indication, they all have the same

11   exact label indication, breakthrough cancer pain?

12   **A.**   Correct.

13   **Q.**   But as you've testified, it's perfectly appropriate for

14   doctors to prescribe it off-label, and that's what happened

15   with most of the prescriptions of these drugs, correct?

16   **A.**   Correct.

17   **Q.**   And we see here under form of administration Subsys is

18   the only one that has the spray under the tongue, correct?

19   **A.**   Correct.

20   **Q.**   And that truly was a superior form of delivery, you'd

21   agree?

22   **A.**   I believe so.

23   **Q.**   Because it got into the body faster, and it was

24   circulated in to have pain relief faster, correct?

25   **A.**   Correct.

1    **Q.**   And you'd agree with me breakthrough cancer pain can be

2    horrible?

3    **A.**   Yes.

4    **Q.**   You actually saw it with your mother, didn't you?

5    **A.**   Yeah.

6    **Q.**   It pained you to see your mother go through it, I would

7    bet.

8    **A.**   Yes.

9    **Q.**   And a product that could get her relief 10 minutes faster

10   for multiple episodes that she might face during the day was

11   truly a wonderful improvement.  Wouldn't you agree?

12   **A.**   Yes.

13   **Q.**   And you were proud to be associated that you were

14   marketing the better product?

15   **A.**   Yes.

16   **Q.**   We see here under the time to pain relief the numbers of

17   what the label in the studies show is the expected or

18   reference point of how quickly the relief comes.  Those

19   numbers are correct.  Do you agree?

20   **A.**   Yes.  Based on blood levels, yes.

21   **Q.**   And finally where we have unique issues towards the right

22   over here.  Some of these products had problems when they

23   were administered to the patient, correct?

24   **A.**   Yes.

25   **Q.**   Fentora caused mouth and lip sores, correct?

1    **A.**   Correct.

2    **Q.**   As did Abstral?

3    **A.**   Correct.

4    **Q.**   Actiq was a lollipop.  Am I correct?

5    **A.**   Yes.

6    **Q.**   And it was heavily sugared?

7    **A.**   Yes.

8    **Q.**   So it would basically rot people's teeth?

9    **A.**   There were cases of that, yes.

10   **Q.**   And also people who were diabetic, there might be issues

11   of having that sugar?

12   **A.**   Yes.

13   **Q.**   In addition, there's a safety issue of having a sweet

14   sugared lollipop lying around the house if there are children

15   in the house --

16   **A.**   Correct.

17   **Q.**   -- or even pets?

18            And so when you had that interview with the Insys

19   folks about coming over from Cephalon, you laid out the

20   success and the techniques that you had used at Cephalon,

21   correct?

22   **A.**   Yes.

23   **Q.**   From your view, the main point of all of this was to get

24   patients to switch to the better drug, correct?

25   **A.**   To get doctors to switch.

1  **Q.**  That's a much better way to put it, and I appreciate the

2  correction.

3        It was to get the physicians to switch their

4  patients to the better drug.

5  **A.**  Yeah.  Either existing or future patients, to write this

6  instead of the other.

7  **Q.**  There were some things about Insys that made it more

8  exciting than working at a larger pharmaceutical company,

9  correct?

10 **A.**  Yes.

11 **Q.**  Cephalon was a somewhat larger company, but it had been

12 bought by Teva, correct?

13 **A.**  Correct.

14 **Q.**  Teva was a giant company?

15 **A.**  Correct.

16 **Q.**  A small start-up like Insys offered greater opportunities

17 for promotion and responsibility, correct?

18 **A.**  Correct.

19 **Q.**  And it's typical of start-up companies to often have low

20 cash salaries and to give more stock because it's a more

21 economical way for them to operate, correct?

22 **A.**  In general, yes.

23 **Q.**  And so you put together a marketing plan that had not

24 just the ad boards, but you testified earlier buying

25 prescriber data and looking at the deciles, correct?

**A.**   Correct.

**Q.**   That's also a standard pharmaceutical marketing technique, correct?

**A.**   Correct.

**Q.**   There's all these companies that exist to gather the data and to sell it for precisely that purpose, correct?

**A.**   Correct.

**Q.**   And the 80/20 rule, that the top 20 percent of the prescribers will be 80 percent of your sales, and sales and marketing should focus on that top 20 percent.  That's also a standard pharmaceutical marketing technique, correct?

**A.**   Correct.

**Q.**   And when you say "standard," you understand that to mean commonly used and perfectly ethical, correct?

**A.**   Yes.

**Q.**   And to you, some type of reimbursement assistance to pull through the insurance applications, that's also a standard technique that many pharmaceutical companies use?

**A.**   Yes.

**Q.**   So it would be fair to say that when Insys rolled out its marketing plan to the sales force, the techniques that Insys were adopting should all have been familiar and easily accepted by the sales team, correct?

**A.**   Yes.  If it was an experienced sales team, yes.

**Q.**   I want to show you -- so remind me again.  When did you

1    start working at Insys?

2    **A.**   When did I start?

3    **Q.**   Yeah.

4    **A.**   November of 2011.

5    **Q.**   And as soon as you got there, one of the things you

6    started to do was to recruit physicians to become part of ad

7    boards and eventually a speaker program; is that correct?

8    **A.**   Yes, that's correct.

9    **Q.**   I want to show you a document marked as Exhibit 5476.  Is

10   this, in fact, an email chain you were on with a doctor named

11   Dr. -- I don't know if I'm going to pronounce it correctly --

12   Xilu Ruan.  You know what I'm talking about, don't you?

13   **A.**   Yes.

14   **Q.**   Is this, in fact, an email you sent?

15   **A.**   Yes.

16          MR. KENDALL:  I'd like to offer that into evidence,

17   please, Your Honor.

18          MR. YEAGER:  No objection.

19          THE COURT:  Admitted.

20                 (Defendant Exhibit No. 5476 admitted.)

21   BY MR. KENDALL:

22   **Q.**   We take a look here, we see that there's a series of

23   emails that you had with Dr. Ruan.  I'm going to actually

24   start in the back and work my way forward.  So if we see

25   here, this is the first message you write.

1          "Dr. Ruan, it was nice seeing you in San Francisco

2     the other week."  I take it you had run into him at some type

3     of medical event?

4     **A.**   Yes.  It was a REMS speaker bureau program, yes.

5     **Q.**   And you told him you'd moved to Insys from Cephalon, and

6     then you wrote, "I valued our partnership throughout the

7     years and look forward to continuing our relationship on the

8     development and commercialization of the exciting Insys

9     pipeline."

10          So you had worked with Dr. Ruan when you were at

11     Cephalon, correct?

12     **A.**   Yes.

13     **Q.**   He was a person with a big pain practice, correct?

14     **A.**   Yes.

15     **Q.**   In Alabama?

16     **A.**   Yes.

17     **Q.**   And he's somebody you had respected and enjoyed working

18     with?

19     **A.**   Yes.  He's somebody that was recommended by our medical

20     scientist liaison group, yes.

21     **Q.**   And you invited him to join the Insys advisory board and

22     come to Phoenix for a meeting in December; is that correct?

23     **A.**   Correct.

24     **Q.**   Basically you fly out, you spend a day, and you fly back?

25     **A.**   Correct.

1   **Q.**  And the honorarium is $1,500, correct?

2   **A.**  Correct.

3   **Q.**  You'd agree with me that's fair market value?

4   **A.**  It's below, a little below.

5   **Q.**  It's actually below fair market value?

6   **A.**  Yeah.

7   **Q.**  The way to look at fair market value is if the doctor

8   spent all of that time in his office, would he generate more

9   revenue than you're paying him, correct?

10  **A.**  Yes.

11  **Q.**  You'd agree with me if a doctor spent eight or ten hours

12  in his office or she spent eight or ten hours in her office,

13  she's going to generate more than 150 bucks an hour?

14  **A.**  Yes.

15  **Q.**  And then Dr. Ruan gave you a very cordial and friendly

16  response.  "Thanks for the invitation.  I will attend.  And

17  congrats on your move," correct?

18  **A.**  Yes.

19  **Q.**  And in fact, Dr. Ruan was brought out and he did attend

20  the advisory board?

21  **A.**  Yes.

22  **Q.**  Now, are you familiar with Dr. Ruan's academic and

23  medical credentials?

24  **A.**  I don't know them off the top of my head, but yes, he was

25  very well credentialed.  Yes.

1      MR. KENDALL:  I'd like to offer next, Your Honor, a

2  resume that I pulled off of the Internet.  I'd like to show

3  it.

4      MR. YEAGER:  Objection.

5      MR. WYSHAK:  May we have a sidebar, Your Honor?

6      THE COURT:  Sure.  Someone bring up a copy, please.

7      (The following was held at sidebar.)

8      MR. WYSHAK:  Your Honor, when I responded to the

9  motion in limine on this issue about bringing up evidence of

10  convictions of some of these practitioners, I said that we

11  didn't intend to do it unless the defendants opened the door

12  by trying to represent to the jury that these were

13  well-credentialed, respected practitioners.  I'd just suggest

14  Mr. Kendall is about to walk through that door.

15      MR. KENDALL:  Your Honor, I don't think it opens

16  the door.  The issue whether somebody is convicted for some

17  event -- First of all, to bring in the conviction is a

18  *Crawford* issue, and I respectfully suggest if Mr. Wyshak

19  brings that up it's reversible error to bring in someone's

20  when they're not testifying.

21      Putting that aside, they recruited an ad board.

22  They asked Joe to come in and work with this guy.  I just

23  want to lay out Joe didn't pick this doctor.  He picked him,

24  and Joe was assigned to work with him.

25      THE COURT:  That's all fine.  You don't need the

1     resume to do that.

2              MR. KENDALL:  It just shows his credentials and why

3     he picked him.  How does a resume open up a conviction that

4     occurred years later?

5              THE COURT:  If you're portraying him as that he's

6     clean as the driven snow.

7              MR. KENDALL:  I'm not saying that he's clean as the

8     driven snow.

9              MS. WILKINSON:  Wouldn't it be at the time?

10             THE COURT:  That's the possible way.

11             MR. KENDALL:  At the time of 2012.

12             THE COURT:  What he knew at the time.

13             MR. KENDALL:  That's all I could do with this.

14             MR. YEAGER:  If I might, Your Honor, he already

15    told him that he respected him.  The guy's resume is not

16    relevant to his state of mind at this point.

17             MR. KENDALL:  I'll drop the resume.  I'll ask state

18    of mind.

19             THE COURT:  I think you're safer without the

20    resume.

21             MR. KENDALL:  Thank you.

22                                        (End of sidebar.)

23    BY MR. KENDALL:

24    Q.  Mr. Napoletano, can you tell us when you invited Dr. Ruan

25    to join the ad board, what was the reason for the invite?  I

1    want to know what you knew back then.

2    **A.**    Yeah.  I just know the reason he was identified by the

3    medical scientist liaison staff at Insys is that he had a lot

4    of board certifications.  He was very -- and he published

5    articles and in that case it was for injectable pain relief

6    kind of stuff.

7    **Q.**    Let's go to that.  Can you explain what a board

8    certification is?

9    **A.**    Yeah.  I'm not a physician.  But yeah, it's peers of

10   other medical doctors.  Peers, and they have to, after they

11   graduate medical school, pass their boards.  So they have to

12   become specialists in a specialty.

13   **Q.**    Thank you.

14          You take an exam administered by a professional

15   society of similar experts, a specialist, and they certify

16   you as a certain level of expertise; is that correct?

17   **A.**    Correct.

18   **Q.**    Like a cardiologist will be a board-certified

19   cardiologist, correct?

20   **A.**    Correct.

21   **Q.**    A pain specialist will be a board-certified pain -- might

22   be a board-certified pain specialist?

23   **A.**    Correct.

24   **Q.**    Board-certified anesthesiologists or board-certified

25   neurologists might also be having a pain practice, correct?

1   **A.**  Correct.

2   **Q.**  Dr. Ruan, in fact, had the highest number of board

3   certifications in the world, didn't he?

4   **A.**  Yes.

5   **Q.**  He was in the Guinness book of world records for having

6   eight certifications, board certifications?

7           MR. YEAGER:  Objection, Your Honor.

8           MR. KENDALL:  I'm asking if you knew that at the

9   time.

10          THE COURT:  Sustained.

11          MR. YEAGER:  Thank you.

12  BY MR. KENDALL:

13   **Q.**  You knew he had eight, correct?

14   **A.**  I didn't know the exact number.  He had many if not the

15   most board certifications, yes.

16   **Q.**  In fact, it -- as you started recruiting Dr. Ruan and

17   other people to be on ad boards and later speaker boards,

18   these are all relationships that get publicly disclosed on

19   the Internet, don't they?

20   **A.**  Now they do, yes.

21   **Q.**  Thank you for bringing that up.  Why don't you explain

22   your understanding of how the Sunshine Act worked and when

23   that came into being.

24   **A.**  Yes.  The Sunshine Act is part of the Medicare Medicaid

25   act, and it requires industry to disclose the amount of money

1    paid to healthcare providers I think it's annually.  I

2    believe it's annually.  I'm not sure of the time interval.

3    When did it come in?  Was that the question?

4    **Q.**  It was mid 2013?

5    **A.**  It was mid '13.

6    **Q.**  When the recording started?

7    **A.**  Correct.

8    **Q.**  Mid '13 forward, every ad board payment, every speaker

9    payment, even meals get disclosed, correct?

10   **A.**  Correct.

11   **Q.**  Anybody who wants to see that, including patients, can

12   look their doctor up and see who's giving them what, correct?

13   **A.**  Correct.

14   **Q.**  For other people you -- there were other people you

15   recruited for ad boards in that late 2011 and 2012 timeframe,

16   correct?

17   **A.**  Yes.

18   **Q.**  Dr. Bart Gatz was a person you recruited?

19   **A.**  Yes.

20   **Q.**  And obviously Alec Burlakoff had not been hired by Insys

21   until some time in later 2012, correct?

22   **A.**  Correct.

23   **Q.**  So all these people who -- doctors who were being

24   recruited, he has no role in their recruitment in this

25   earlier time period?

**A.**   Correct.

**Q.**   Now, at the time that you were getting the launch ready in early 2012, Dr. Ruan was actually suggesting that you hire certain people as sales reps, people that he liked, correct?

**A.**   Not me, no.  Not me, he wasn't.

**Q.**   You don't remember him sending you a suggestion that you should hire a man by the name of Mike Baker who is moving to Arizona?

**A.**   Maybe he did.  I don't remember.  You asked if I remember.  Maybe he did.

**Q.**   Can I show you a document to see if it refreshes your recollection?

**A.**   Sure.

          MR. KENDALL:  If I may approach, Your Honor.

          THE COURT:  Yes.

          MR. KENDALL:  I'm going to show the witness 5479 that's not in evidence.

BY MR. KENDALL:

**Q.**   Does this refresh your recollection that Dr. Ruan wrote to you and Mike Babich suggesting that you hire a friend of his?

          MR. YEAGER:  Objection.

          THE COURT:  That's sustained.

BY MR. KENDALL:

**Q.**   Does this refresh your recollection?

1   **A.**   Now that I am reading it, yes.  And it's -- Mike Babich

2   is responding to him.  He said Mike and Matt, and it's Mike

3   responding.

4   **Q.**   Who did Dr. Ruan send his email to?

5   **A.**   Michael Babich and myself.

6   **Q.**   Okay.  And basically he's suggesting that you hire a

7   person to be a sales rep for Insys?

8   **A.**   He's suggesting that -- yeah, I wasn't in -- let's be

9   distinct, I was only in charge of marketing, not sales.  He's

10  suggesting that Mike Babich hire this person, not marketing.

11          MR. KENDALL:  Your Honor, I'd like to offer

12  Exhibit 5479, please.

13          MR. YEAGER:  No objection.

14          THE COURT:  Admitted.

15                  (Defendant Exhibit No. 5479 admitted.)

16          MR. YEAGER:  We're not offering the highlighted

17  copy, are we, Mr. Kendall?

18          MR. KENDALL:  No.  I'm just going to use it to show

19  people.  It will be easier to follow.  It will be a

20  non-highlighted copy.

21  BY MR. KENDALL:

22  **Q.**   It says, "Here's Dr. Ruan.  It was great meeting you all

23  at the Insys launch meeting two weeks ago.  A very good

24  friend of mine, Mike Baker, will be relocating to your area

25  in a couple of weeks.  I have known Mike for over eight

1    years.  He have has been the top rep for Endo for quite a few

2    years."

3              What is Endo?

4    **A.**  A pharmaceutical company in pain management.

5    **Q.**  Okay.  And then Mike Babich writes back, "Thank you so

6    much for the referral.  It means a lot to us."  Correct?

7    **A.**  Correct.

8    **Q.**  Did Mike Baker ever get hired?

9    **A.**  I don't know.  It also went on to say that he passed it

10   on to Shawn Simon and Darin Fila.  I don't know if they hired

11   him or not.

12   **Q.**  And do you remember that Dr. Ruan made a second

13   recommendation for someone to get hired?

14   **A.**  Yes.

15   **Q.**  And that was Holly Johnson?

16   **A.**  Again I'd need to see it.  Yeah, I'd need to see it.

17             MR. KENDALL:  Your Honor, if we could show just to

18   the witness only Government's Exhibit 5478.  Excuse me.  Not

19   Government's Exhibit 5478.

20   BY MR. KENDALL:

21   **Q.**  Does this document refresh your recollection?

22   **A.**  I'm not on -- no.  Because I'm not on --

23   **Q.**  If you look at the top of it?

24   **A.**  Okay.  Yeah.

25             MR. KENDALL:  Your Honor, I'd like to offer 5478

1   into evidence.

2            THE COURT:  Any objection?

3            MR. YEAGER:  No objection.

4            THE COURT:  It's admitted.

5                    (Defendant Exhibit No. 5478 admitted.)

6   BY MR. KENDALL:

7   Q.  I'd like to read this email from the bottom up.

8            Mike Babich says, "Hi, Holly.  Welcome to Insys and

9   we are excited to have you join us.  I spent a lot of time

10  with Dr. Ruan while he was in town a few weeks ago, and I

11  know we primed him well.  Given your relationship with him

12  and others, we are excited to see you lead the field this

13  year."

14           Do you agree with me it's perfectly appropriate for

15  a company to hire reps that have existing positive

16  relationships with the doctors?

17  A.  I don't know of any statute that says you can't.

18  Q.  I'm just asking you from a business perspective and your

19  views of compliance, it's perfectly appropriate if somebody

20  has a good relationship?

21  A.  Yes.  I would run it by a compliance office or -- but

22  yes.

23  Q.  You didn't have to run this by a compliance officer, did

24  you?

25  A.  I don't believe that Mike or sales did, no.

1    **Q.**  And then we see -- she writes, "Thank you, Mr. Babich.

2    Dr. Ruan is a rare breed and luckily for you and Insys I

3    spent the last three years becoming his favorite rep.  I plan

4    to become a crucial member of the Insys team and help with

5    the successful launch of Subsys."

6            And when that was forwarded to you, your response

7    to Mr. Babich was, "Love it."

8            And you did love it, correct?

9    **A.**  Sure.  We needed a sales force.  So yeah.

10   **Q.**  You needed a sales force, and if you could get an

11   experienced salesperson that had a very positive relationship

12   with a prominent potential customer, that was a great thing?

13   **A.**  Yes.

14   **Q.**  Nothing wrong with it?

15   **A.**  No.

16   **Q.**  And in fact, you actually made trips to go down to

17   Alabama to meet both Dr. Ruan and Dr. Couch who was his

18   partner down there; is that correct?

19   **A.**  I made one trip when I was in a meeting in New Orleans.

20   I rode with -- Dr. Larry Dillaha and myself rode with the rep

21   and went to that office, yes.

22   **Q.**  Who was the rep?

23   **A.**  Lacy Fortenberry.

24   **Q.**  Who did the three of you go over to meet?

25   **A.**  Dr. Ruan and Dr. Couch.

1    **Q.**  Did you meet them?

2    **A.**  Yes.

3    **Q.**  Spend some time with them?

4    **A.**  Yes.  In the office, yeah.

5    **Q.**  Another important doctor that you were dealing with was a

6    Dr. Chun, correct?

7    **A.**  I know who Dr. Chun is, yes.

8    **Q.**  And he was also somebody that was a priority to establish

9    a positive relationship with, correct?

10   **A.**  Yes.

11        MR. KENDALL:  Your Honor, I want to offer

12   Government's Exhibit 642.

13        THE COURT:  You keep calling them government's

14   exhibits.

15        MR. KENDALL:  Excuse me.  Exhibit 642.  I'm sorry.

16        MR. YEAGER:  Your Honor, we have an agreement with

17   regard to the disclosure.  I have no objection to the

18   document coming in.  Before it's admitted to the public, we'd

19   like to talk to the Court about it.

20        THE COURT:  You're going to admit it, but it's not

21   going to be published?

22        MR. KENDALL:  Your Honor, I do want to publish it.

23   There's just a sticker on it that he would prefer not go into

24   evidence, which will redact later.  I can bend back the

25   corner of the page and deal with it.

1           THE COURT:  Why don't you cover it.

2   BY MR. KENDALL:

3   **Q.**  I want you to take a look at this Exhibit 642, which is a

4   March 27, 2012, email addressed to you.  Do you see that?

5   **A.**  Can you see who it's -- where do you want me to look?

6   **Q.**  Thank you for pointing that out.  Why don't we start at

7   the top.

8           THE COURT:  This exhibit is admitted, right, 642?

9   There's no objection, right?

10          MR. YEAGER:  No objection.

11          THE COURT:  It's admitted.

12                   (Defendant Exhibit No. 642 admitted.)

13  BY MR. KENDALL:

14  **Q.**  Do you see at the top, I've highlighted your name as the

15  "To" and the "From" is Shawn Simon, correct?

16  **A.**  Yes, correct.

17  **Q.**  It's dated March 27, 2012.  And he's reporting to you on

18  his contact with Dr. Chun, correct?

19  **A.**  Correct.

20  **Q.**  And Dr. Chun was met at a consultant meeting.  Is that an

21  ad board?

22  **A.**  Yes.

23  **Q.**  So there's another ad board in March of 2012.  Dr. Chun's

24  there.  And in fact, it looks like the consult meeting or add

25  board was actually held in Dr. Chun's office; is that

1    correct?

2    **A.**   Where are you reading?

3    **Q.**   Tell me how this should be interpreted.

4              "In Sarasota, Florida, today, Dr. Chun, a

5    consultant meeting attendee, gave Tracey Krane and I tours

6    within in his office over lunch with his nurse practitioner

7    and five nurses."

8    **A.**   Dr. Chun had previously attended a regional ad board that

9    we used to develop the messaging and everything on Subsys.

10   And it looks like -- it appears that this was a sales call,

11   separate and distinct sales call, by Tracy Kane [sic] and the

12   VP of sales at the time, Shawn Simon.

13   **Q.**   Is Dr. Chun, Dr. Ruan, Dr. Couch, these are all

14   high-decile prescribers, correct?

15   **A.**   Correct.

16   **Q.**   Of other drugs, not Subsys?

17   **A.**   Yeah.  Of pain drugs, yes.

18   **Q.**   Fentora, Actiq?

19   **A.**   Fentora, yes.

20   **Q.**   Because Subsys isn't even on the market yet?

21   **A.**   Correct.

22   **Q.**   So what we have here is Dr. Chun told Shawn Simon he

23   would take care of us with Subsys.  He repeated this about

24   three or four times.  And then he notes, "Oncology office

25   nurses totally impressed with Subsys."

1          Is that Dr. Chun's nurse or a separate office?

2   **A.**   I don't know.

3   **Q.**   Again, so here's another relationship with a very

4   high-decile prescriber that's being established before Joe

5   Rowan or even Alec Burlakoff are being hired, correct?

6   **A.**   Correct.

7   **Q.**   In fact, you went out in May of 2012 to see Dr. Ruan,

8   correct?

9   **A.**   Yes.

10  **Q.**   That was that drive from New Orleans in May?

11  **A.**   Yes.

12  **Q.**   And after that, Dr. Ruan even called you to ask for some

13  help because Subsys had just been put on the market and they

14  had a couple of reimbursement issues.  Do you remember that?

15  **A.**   I don't, but I have no reason to believe he wouldn't.

16          MR. KENDALL:  I'd like if we could just show the

17  witness, Your Honor.  I'd like to do Government Exhibit 54 --

18  excuse me -- Exhibit 5477 and ask if we could have the

19  witness look at that and tell us if that, in fact, is an

20  email he recalled getting.

21  **A.**   Yes.  I see it.

22          MR. KENDALL:  Liked to offer 5477 into evidence,

23  Your Honor.

24          MR. YEAGER:  No objection, Your Honor.

25          THE COURT:  Admitted.

1          (Defendant Exhibit No. 5477 admitted.)

2          MR. KENDALL:  If we could show the jury, please.

3    BY MR. KENDALL:

4    **Q.**  If we take a look at this email that Sonia Flynn sent to

5    you in May 18, she's referring to C&R Pharmacy has two

6    claims.  And she's asking you to help resolve two insurance

7    claims that are not being paid for the pharmacy that doctors

8    Couch and Ruan ran adjacent to their medical practice,

9    correct?

10   **A.**  That appears so, yes.

11   **Q.**  And you say -- the response is later that evening, "Will

12   follow up with Ruan."  Correct?

13   **A.**  Correct.

14   **Q.**  Because fair to say making sure that the high-decile

15   prescribers see that there are no hassles or problems with

16   the insurance is very important if we want them to switch

17   their patients over?

18   **A.**  Yes.  But I'm not sure -- I see on there the voucher

19   people copied.  And I think that's what -- I'm not sure if

20   that wasn't around the vouchers.  And they weren't getting

21   reimbursed for free product that they were dispensing.  They

22   have paid for it but weren't getting reimbursed, I think.

23   Because I see PSKW on that.  And when we say "Will follow

24   up," and the reason Lindsay Clancy is on there is because she

25   was dealing with that group, PSKW.  I think this is what it's

1    about.

2    **Q.**   I appreciate the clarification very much.  The point I'm

3    trying to make is people respond to Dr. Ruan's request

4    because that's how you treat high-decile prescribers,

5    correct?

6    **A.**   Yes.

7    **Q.**   Within reason and within ethical rules?

8    **A.**   Yes.  The anomaly is that he's involved with the

9    pharmacy.

10   **Q.**   Yeah.  And then by June of 2012, you had started to bring

11   out the speaker program for Insys, correct?

12   **A.**   Correct.

13   **Q.**   And in fact, that involved a process of recruiting

14   speakers, training them, making sure you've got the right

15   level of speakers, the right geographical diversity.  There's

16   a whole level of steps you take, correct?

17   **A.**   Correct.

18   **Q.**   Why don't you tell us what those are.

19   **A.**   Exactly.  That is, you want them geographically dispersed

20   for the most part.  The reason being is at launch especially,

21   Dr. Kapoor didn't want them to travel, the speakers to

22   travel.  So we wanted to get -- I mean long distances.  So we

23   wanted to get geographically -- this is normal in the

24   industry.  You want them geographically dispersed so there's

25   a little bit here, a little bit there throughout the country

1    to do programs.

2              It's clearly credentials, certifications.  Their CV

3    mean a lot, where they went to school, whether they're

4    published or not, whether they have experience -- TIRF

5    experience, whether they have experience with opioids.

6              And then eventually with the product, you want them

7    to have a little baseline clinical experience.  But there's a

8    myriad of things that you would look for for qualified.

9              And we also did what's called expert mapping

10   exercises where you would ask the physicians who do you look

11   to as the expert.

12   **Q.**   In June of 2012, who's the person that's overseeing the

13   selection and invitations for who will be a speaker?  Is that

14   you?

15   **A.**   Myself and working with a third party, yes.

16   **Q.**   Now, with respect to a speaker, there's a whole set of

17   criteria that you've listed.  Would you also agree with me

18   enthusiasm for the product is a very important criteria?

19   **A.**   Yes.

20   **Q.**   You want somebody who when they're speaking goes through

21   the preapproved slide deck but also radiates that they really

22   think this is the best product for the patient, correct?

23   **A.**   Yes.

24   **Q.**   You want them to speak with these two or three or four,

25   whatever, physicians that are in the room and give them a

1   sense like if you really care about your patients, this is a

2   drug you need to think about, correct?

3   **A.**   Yes.

4   **Q.**   So there's a lot of discussion about having doctors who

5   are experienced with the product.  That can be a very valid

6   concern, correct?

7   **A.**   Yes.

8   **Q.**   Because you want somebody who has actually treated a lot

9   of patients and knows how the product works, correct?

10   **A.**   Yes.

11   **Q.**   Because you want them to have a level of authority and

12   confidence that comes from experience when they do the

13   speaker program, correct?

14   **A.**   Yes.

15   **Q.**   You'd agree with me if one of the people in the audience

16   said to the speaker, so, are most of your patients on Subsys,

17   and they said, well, no, actually 80 percent of my patients

18   are on Fentora, that would be a disaster, correct?

19   **A.**   Depending on the circumstances.  Maybe insurance won't

20   let him.  I don't know.  I can tell you what was a disaster

21   historically is when they have no patients on.

22   **Q.**   Right.

23   **A.**   That can be.  Unless they're a thought leader and

24   everybody looks to them and they did the research on it.

25   Then, you know, you don't expect --

1    **Q.**  A clinical academic who had actually done published

2    medical studies would certainly be attractive regardless of

3    their prescriptions, correct?

4    **A.**  Yes.  Exactly.

5    **Q.**  But if you've got somebody who is really just a working

6    day doctor in a pain clinic and wants to sort of radiate

7    enthusiasm for the product, you'd be looking to have someone

8    who is using it at least 50 percent of the time, correct?

9    **A.**  I don't think that 50 -- no.  There's no stipulation on

10   the percentage.

11   **Q.**  I'm not saying stipulation.

12   **A.**  Yeah.

13   **Q.**  I'm just saying in your own mind if you're thinking, you

14   know, we want to have an enthusiastic person, you want

15   someone that has substantial experience with the product,

16   correct?

17   **A.**  Yes.  You want somebody who has experience in the

18   product.  And what we said and what we communicated is

19   baseline clinical experience, yes.

20          MR. KENDALL:  I'd like to show next Exhibit 166.

21   I'd like to offer that into evidence.

22          MR. YEAGER:  No objection.  Isn't it in evidence?

23   It might be in evidence.

24          MR. KENDALL:  It might already be in.  That could

25   be.

1        THE CLERK:  It's in.

2  BY MR. KENDALL:

3  **Q.**  Now, this is an email about the June 2012 speaker

4  targets.  We see on the bottom email it's from you to the

5  existing sales RSMs at the time, Mike Babich, Teresa Grasso.

6  She's the woman at SciMedica that's overseeing, the third

7  party?

8  **A.**  The third party, yes.

9  **Q.**  And who is Lindsay Clancy?

10 **A.**  She was a marketing communications manager in marketing.

11 **Q.**  It says, "Attached please find a list of targeted

12 speakers for the live Chicago training on July 13 and 14."

13        Who put this list together?

14 **A.**  Teresa Grasso and I.

15 **Q.**  And did you basically have consensus on every candidate?

16 If one didn't like him and one did, you wouldn't put him on

17 or her on?

18 **A.**  Yes.  I mean -- yeah, we were looking for people to join

19 the bureau, yeah.

20 **Q.**  I just highlighted some of the names that are listed.  A

21 Dr. Brownlow, is that someone you picked to go on?

22 **A.**  Yes.

23 **Q.**  Why did you pick Dr. Brownlow?

24 **A.**  Dr. Brownlow was an investigator on this drug, and he's a

25 prominent guy, a prominent physician, respected by his peers

1    in that mapping exercise.

2    **Q.**   He's in Atlanta?

3    **A.**   He is.

4    **Q.**   Just below that, Dr. Couch, that's Dr. Ruan's partner in

5    Alabama?

6    **A.**   Correct.

7    **Q.**   The person you drove out to see?

8    **A.**   Correct.

9    **Q.**   And then we have a Dr. Stuart Krost in Florida.  And who

10   is Stuart Krost?

11   **A.**   I don't recall.  I don't remember.

12   **Q.**   But somehow he met the criteria for selection, correct?

13   **A.**   Correct.

14   **Q.**   Now, you testified earlier that there was eventually a

15   limit on the amount of money that could be paid each year to

16   a speaker.  It was 100,000 and then it moved up to 125 --

17   **A.**   Correct.

18   **Q.**   -- several years later.  Cephalon had a limit on what it

19   would pay speakers, correct?

20   **A.**   Correct.

21   **Q.**   It was $100,000, wasn't it?

22   **A.**   Correct.

23   **Q.**   So when you start off with 100,000 limit on the Insys

24   speaker program, an experienced salesperson might say, hey,

25   that's the same as Cephalon authorized, and that was done

1   under the CIA and very rigorous conditions, correct?

2   **A.**  Correct.

3   **Q.**  And when you do these speaker programs, they're not big

4   lectures, correct?

5   **A.**  There's two kinds.  There's the dinner ones which are

6   intended to be bigger.  And then there's the group practice

7   ones, where, no, there's not.  The policy said that we put

8   together said two for that one, at least a minimum of two.

9   And for the dinner meetings the goal was a minimum of four.

10           MR. YEAGER:  I couldn't hear the witness.  I can't

11   hear the witness.  His voice dropped.

12   **A.**  Do you want me to repeat?

13           MR. YEAGER:  If you could pull the microphone

14   closer to you.

15   BY MR. KENDALL:

16   **Q.**  The point being, you want this sort of collegial,

17   somewhat intimate doctor-to-doctor conversation going on.

18   You have don't want some large, distant, aloof lecture,

19   correct?

20   **A.**  We've done it both ways.  But yeah, we've done it both

21   ways.

22   **Q.**  The dinner programs, those were meant to be smaller, more

23   intimate gatherings of a few doctors to sit and learn about

24   the product from a fellow physician?

25   **A.**  There were two kinds.  When we started originally, there

1    was marketing driven ones where we were trying to get a big

2    hall, and we just -- they were not effective and they were

3    very costly to put on.  So yeah, it became -- the dinner

4    meetings were, like I said, four-plus attendees is what we

5    anticipated.

6    Q.   And you switched to emphasize these dinner meetings

7    because the larger ones weren't very effective?

8    A.   It was difficult to recruit, yes.  And it was costly to

9    put them on.

10   Q.   And the audience for these speaker programs would include

11   anybody who's a TIRF-enrolled physician, correct?

12   A.   That was one criteria, yes, one target.

13   Q.   How many TIRF-enrolled physicians were there at the time?

14   A.   I don't recall.

15   Q.   Six to seven of those?

16   A.   That would be reasonable.

17   Q.   We'll have some documents we'll see to give you more

18   precision.

19   A.   Yeah.

20   Q.   Also nurses that would be dealing with the administration

21   or the monitoring of the TIRF controlled products, they'd be

22   appropriate?

23   A.   Yes.

24   Q.   Pharmacists would be appropriate, too, correct?

25   A.   Yes.

1  **Q.**  Because pharmacists often give instructions to the

2  patient on how to administer and use the medicine, correct?

3  **A.**  Correct.

4  **Q.**  So pharmacists need to know how to do it.  And there's

5  home care patients, patients that are bound to their home

6  that may be using these products, correct?

7  **A.**  Home care patients?

8  **Q.**  Patients who are in their homes with advanced cancer.

9  **A.**  Oh, I know what -- yes.  Yes.

10  **Q.**  Caregivers, home nurses, aides, or others that are

11  dealing with patients who are being assisted in their homes

12  or in other types of hospice settings, they also may need to

13  know how to use these drugs as well?

14  **A.**  Yes.  People that would be involved with administering

15  it.

16  **Q.**  And so from the doctor's perspective, who do these

17  drugs -- strike that.

18         From the doctor's perspective who writes

19  prescriptions on these drugs and will do a speaker program,

20  one motivation for them is to educate this whole group of

21  people we've just discussed, correct?

22  **A.**  Education, yes.

23  **Q.**  But also pain clinics and pain treatment is a very

24  specialized referral practice, correct?

25  **A.**  Yes.

1   **Q.**   Other physicians may not have interest or experience in

2   treating people with opioids and will refer their patients

3   out to a pain specialist?

4   **A.**   Yes.

5   **Q.**   A lot of oncologists do that, correct?

6   **A.**   Some do, yes.

7   **Q.**   So the issue is one part of the reason for the speaker to

8   be there is to educate people in how they can assist in the

9   care that involves these drugs.  Another one is to help

10   people identify a need for these drugs so they can refer them

11   out to a specialist that's enrolled in the TIRF program and

12   can actually administer them?

13   **A.**   Yes, kind of.  I mean, we put in the policy that it can't

14   be used to increase your referral business.  We did say that

15   in our policies and procedures.  So that was rolled out to

16   the sales force.  So it can't be used to build a practice,

17   let's say, for referrals.

18          But it can be to educate the oncologists, some of

19   which inevitably if they don't feel comfortable treating

20   themselves may refer to a pain doctor.  Or if the pain

21   becomes refractory, they may at some point refer it, too, if

22   it needs intervention.

23   **Q.**   If a speaker speaks to 15, 20, or 30 oncologists in the

24   course of a year, some of those oncologists are not going to

25   treat pain themselves and are really going to refer them out

1    to a pain specialist, correct?

2    **A.**   Some will.

3    **Q.**   That's just the nature of this practice, correct?

4    **A.**   Some will.

5    **Q.**   I want to show you a document marked as Exhibit 5394.

6           MR. KENDALL:  If we could just show this to the

7    witness, please.

8           You can tell us if you recognize that.

9           And if so, I'd like to offer it into evidence.

10   **Q.**   Do you recognize it?

11   **A.**   I do.

12   **Q.**   Is that an email you sent back in June of 2012?

13   **A.**   I did.

14          MR. KENDALL:  Your Honor, I'd like to offer that

15   into evidence.

16          MR. YEAGER:  No objection.

17          THE COURT:  Admitted.

18                   (Defendant Exhibit No. 5394 admitted.)

19   BY MR. KENDALL:

20   **Q.**   If we can take a look here.  The bottom email is from the

21   sales rep Lacy Fortenberry who is in Alabama, correct?

22   **A.**   Correct.

23   **Q.**   To Alec Burlakoff.  He's now just started as the regional

24   sales manager for the Florida/Alabama area, correct?

25   **A.**   Correct.

1   **Q.**  And she's telling Alec, John Couch can't make the

2   training to be a speaker because of a prior commitment, but

3   he wants to be able to do it over the web.  Do you see that?

4   **A.**  Yes.

5   **Q.**  Mr. Burlakoff forwards that to you and then you contact

6   Teresa Grasso at SciMedica, correct?

7   **A.**  Correct.

8   **Q.**  And you tell her, "Please make sure Dr. Couch gets

9   registered for the web today.  Love this guy and bumming that

10  he can't attend the live meeting.  May have to make a special

11  trip down there and train him myself as well."

12          One of the reasons you want to make sure he gets

13  trained is he's a very prominent pain physician.  He's in the

14  top decile, correct?

15  **A.**  Well, one reason is he has experience, yes.

16  **Q.**  Yeah.  And that's experience he has with not Insys' drug

17  but other companies' drugs, correct?

18  **A.**  That's correct.

19  **Q.**  And to get prominent pain physicians such as Ruan, Couch,

20  Chun or others to switch over to the new and better product

21  is a very high priority for Insys, correct?

22  **A.**  We targeted the top deciles in the beginning.  And those

23  speakers, those are the ones -- a certain percentage of the

24  speakers came from that group, and a certain came from the

25  mid, and a certain percentage came from the lower deciles.

1    And some had no decile.

2    **Q.**   The idea of having the high-decile people be your speaker

3    can be very effective because the medical community knows who

4    has the biggest practices, correct?

5    **A.**   I don't know.  I have would guess.

6           MR. YEAGER:  Objection as to what the medical

7    community knows.

8           THE COURT:  Sustained.

9           MR. KENDALL:  I'll rephrase, Your Honor.  Thank you

10   for the guidance.

11   BY MR. KENDALL:

12   **Q.**   In terms of your experience in marketing, board-certified

13   pain specialists are a smaller specialty group, correct?

14   **A.**   Correct.

15   **Q.**   There's a lot more cardiologists than pain specialists,

16   correct?

17   **A.**   Correct.

18   **Q.**   A lot more orthopedists than pain specialists?

19   **A.**   Correct.

20   **Q.**   In any particular geographic area, they all tend to know

21   of each other, at least, and sort of know each other's

22   reputations, correct?  Many of them do?

23   **A.**   I would say many of them.  I shouldn't say many.  The top

24   ones probably, yes.  And that's what we did is we surveyed,

25   and those names came up in a survey when we said who do you

1    look to as the expert.

2    **Q.**  And so it's very effective to have high-decile doctors as

3    the speaker to other pain physicians, correct?

4    **A.**  Yes.

5              MR. KENDALL:  I next would like to show the witness

6    Exhibit 5513, and I'll give a copy to the government before I

7    offer it.

8    **Q.**  Do you recognize this document?

9    **A.**  These were the contact information for speakers.

10   **Q.**  Is this a document that was created as part of

11   administering the speaker program?

12   **A.**  Yes.

13             MR. KENDALL:  Your Honor, I'd like to offer this

14   into evidence.

15             MR. YEAGER:  No objection, Your Honor.

16             THE COURT:  Admitted.

17                       (Defendant Exhibit No. 5513 admitted.)

18             MR. KENDALL:  If we could show it to the jury.  We

19   don't have to go through all the people who were on it.

20   BY MR. KENDALL:

21   **Q.**  This is dated July 14, 2012, correct?

22   **A.**  Correct.

23   **Q.**  And this is a group that you and Teresa Grasso decided

24   who would be invited for the training, correct?

25   **A.**  The core, yes.  And then we went to the field to help

1    recruit.

2    Q.   But you exercised the final say if the field suggested

3    someone, correct?

4    A.   With Teresa, yeah, we did.

5    Q.   So we have, for example, Gavin Awerbuch here from

6    Michigan.   Is he somebody you knew from Cephalon?

7    A.   I believe he was in the speaker bureau.   I don't remember

8    him, and I don't even -- yeah.   What I'm thinking is I don't

9    know if that's his picture, but, yeah, I knew he was in the

10   speaker bureau.   But I don't recall ever interacting with him

11   personally.

12   Q.   But you approved him being part of the first speaker

13   bureau, correct?

14   A.   Yes.

15   Q.   And then Dr. Brownlow is the gentleman from Georgia you

16   referred to earlier?

17   A.   Yes.   Again I didn't know Dr. Brownlow personally, but I

18   know of him from those surveys, and I knew that he was an

19   investigator in a study.

20   Q.   Lisa Banchik, did you know her?

21   A.   I didn't.

22   Q.   Now, when you had people in the speaker program at

23   Cephalon, they had obviously passed that screening you had

24   described that Cephalon did for its speakers.   Do you

25   remember that?   You checked to make sure they were currently

1   licensed?

2   **A.**   Background checks, yes.

3   **Q.**   They passed the background check, correct?

4   **A.**   Yes.

5   **Q.**   And all these people did, correct?

6   **A.**   Yes.

7   **Q.**   Would it be fair to say if anybody had been on that "do

8   not sell" list that Cephalon had, you would not have let them

9   become an Insys speaker, would you?

10   **A.**   Correct.   There was one individual that I believe that

11   had an alleged history of sexual misconduct that we allowed

12   on it.   That was of the only one.

13   **Q.**   And then Dr. Bart Gatz, is he somebody that you knew?

14   **A.**   I did.

15   **Q.**   I just want to go through a couple more entries here, and

16   then we'll be done.   Dr. Jerrold Rosenberg from Brown

17   University medical school in Providence.

18           Is that somebody you knew prior to him joining the

19   speaker group?

20   **A.**   I didn't know him personally, but I believe he was in the

21   speaker bureau at Cephalon.

22   **Q.**   And Dr. Ruan from Alabama, he was in this group as well,

23   correct?

24   **A.**   Yes.

25   **Q.**   Now I want to go to Exhibit 290, which I believe is

1    already in evidence.  This is a document that was presented

2    at the board of directors meeting in February 2013.  Do you

3    remember this?

4    **A.**  Yes.

5    **Q.**  And did you help draft parts of it?

6    **A.**  Parts of it.

7    **Q.**  And this document summarizes a lot of the historical

8    information from the marketing program and sales program

9    prior to February 2013, correct?

10   **A.**  Correct.

11   **Q.**  So I just want to go through some of the pages that have

12   these historical references.

13            MR. YEAGER:  Can I just have one moment?

14            THE COURT:  Yes.

15            MR. YEAGER:  Thank you, Your Honor.

16   BY MR. KENDALL:

17   **Q.**  Can we go to page 5 of that exhibit.  This is a graphic

18   description of who has market share in the REMS market,

19   correct?

20   **A.**  Correct.

21   **Q.**  And did you help prepare this document?

22   **A.**  Yes.

23   **Q.**  And if we take a look at it, as of November 2012, which

24   is about seven, eight months after launch, Subsys has got

25   10 percent.  Fentora's got 29 percent.

1          What does OTFC mean?

2   **A.**   Generic Actiq, oral transmucosal fentanyl citrate.

3   **Q.**   Is it mostly generic Actiq, or are there others mixed in

4   there?

5   **A.**   It's generic -- when I say generic Actiq, and other

6   generic companies, yeah.  They're all generic OTFC.

7   **Q.**   Was Actiq a more popular generic than the other generic?

8   **A.**   Oh, I don't know.

9   **Q.**   Do you know if Actiq had a bigger market share than the

10  other generics?

11  **A.**   I don't know that, no.

12  **Q.**   And would you agree with me the idea of a switch strategy

13  was to make green grow and red and blue shrink?

14  **A.**   A switch -- yes.  Yeah, I would say.

15  **Q.**   That's the main strategy for Subsys Insys is to switch,

16  right?

17  **A.**   To -- yes.  You want market share, yes.

18  **Q.**   Thank you.  That's a better way to say it.  You want to

19  increase your market share, which means the green increases

20  and the blue and the red shrink?

21  **A.**   Yes.

22  **Q.**   Okay.  If you also will take a look here it says TIRF

23  REMS where that arrow is and we see that's in a dip.

24  **A.**   Mm-hmm.

25  **Q.**   Is that when the TIRF REMS regulations came into place?

1    **A.**   Yes.

2    **Q.**   So fair to say a lot of the doctors had to register and

3    had to go through various procedural things before they could

4    keep on writing these drugs, correct?

5    **A.**   Yes.

6    **Q.**   And that caused a bit of a dip in sales when the new

7    regulations came into place, correct?

8    **A.**   Yes.

9                THE COURT:  Are you starting on a new topic?

10               MR. KENDALL:  I am, Your Honor.

11               THE COURT:  Good time for a break?

12               MR. KENDALL:  Perfect time.

13               THE CLERK:  All rise for the jury.

14               (The jury exits the courtroom.)

15               THE COURT:  2:30.

16               (Court recessed at 2:16 p.m.)

17               THE CLERK:  All rise for the jury.

18               (The jury enters the courtroom.)

19               THE CLERK:  Court is back in session.  Please be

20   seated.

21               THE COURT:  We have a super professional group of

22   lawyers in here.  But we're obviously having temperature

23   control issues in here today.  I see even Juror Number 1 has

24   taken her coat off.  I know it's getting warm in here.  I

25   told the lawyers that they're welcome to take off their

1   jackets, their outer layers if they want.  No sign of

2   disrespect, just a recognition of the fact that it's bloody

3   hot in here.  At ease, ladies and gentlemen.

4            MR. KENDALL:  I need the camouflage, Your Honor.

5   But thank you.

6            THE COURT:  If you wish to take it off, you may.

7   You don't have to.  I'm not dictating dress code.  I'm just

8   giving you options.

9   BY MR. KENDALL:

10  **Q.**  Mr. Napoletano, I'm going to continue with Exhibit 290,

11  that board of directors meetings.  Just so you can give the

12  jury a little background, who would attend the board of

13  directors meetings?

14  **A.**  The chairman, Dr. John Kapoor, and the other board

15  members, Patrick Fourteau.  I forget their names.  I forget

16  their names.  I'd need to see everybody's names.

17  **Q.**  The members of the board of directors --

18  **A.**  The members of the board of directors and the CEO mostly,

19  and then they would bring in people as they wanted.

20  **Q.**  The CEO is Mr. Babich?

21  **A.**  Mr. Babich.

22  **Q.**  Would Franc Del Fosse attend?

23  **A.**  When he was hired, yes.

24  **Q.**  He was the general counsel, correct?

25  **A.**  Yes.

1   **Q.**   Did you sometimes attend?

2   **A.**   Yes.  I would be brought in from time to time.

3   **Q.**   Did you attend for this February 5, 2013, meeting where

4   this Exhibit 290 was presented?

5   **A.**   For portions of it, yes.

6   **Q.**   I'd like to move over to page 6 of this document.  I've

7   got to move things a little bit over.  We see here to the

8   left the various products, Subsys, Fentora, Actiq, et al.

9   And then we see here that you're tracking the lost market

10  share by Fentora and Actiq and the gains for Subsys, correct?

11  **A.**   It appears so, yes.

12  **Q.**   That's part of tracking the success of the switch

13  program, correct?

14  **A.**   Of the capturing market share, yes.

15  **Q.**   Now I want to turn to page -- I can't read the page

16  because of the staple, but it's about midway through this

17  document.  And it says in the top here, "Product situation,

18  programming against top pain doctors."

19          Did you help prepare this slide?

20  **A.**   Yes.

21  **Q.**   What does this mean, "Product situation, programming

22  against top pain doctors"?

23  **A.**   So this is -- first, it's ad boards on the left, the very

24  first one that you mentioned prior.  And you bring a core

25  group of people in, the original ad board.  You develop

1    content for a regional consultant meeting.  And then with

2    that, you're really trying to get, like it says, educational

3    content and refining your message.

4              And then after that then you build your marketing

5    materials from that and your speaker deck.  Then you do a

6    speaker training, and then you start implementing speaker

7    programs.

8    Q.  Thank you.  I would like to go through each one of these

9    sections you've got here.  So there's an ad board with 12 key

10   opinion leaders.

11             What's the definition of a KOL?

12   A.  A key opinion leader is somebody that other people look

13   to as experts in the field or recognize them.

14   Q.  And they're the ones that help you decide what's really

15   going to meet the needs of the physicians and the patients,

16   what's going to appeal to them to make them writers of the

17   prescription?

18   A.  Yes.  They're going to give you advice on how to market

19   it and in some cases how to develop it if you're going to do

20   more studies and what resonates.  Yeah, they give you

21   information.

22   Q.  And among the 12 key opinion leaders is Dr. Ruan and

23   Dr. Gatz, correct?

24   A.  Correct.

25   Q.  And it says down here there's a steering commit of 10

1    core KOLs.  Were Ruan and Gatz among the core KOLs?

2    **A.**  They were.

3    **Q.**  Next you talk about regional consultant meetings.  There

4    were 200 held live plus about 100 on the web, correct?

5    **A.**  It was way short of that, but that was the target, yes.

6    **Q.**  How many physicians did you get involved in either live

7    or web consultant meetings?

8    **A.**  Somewhere between 150 and 200 I believe was the end

9    result, but I would need to see that.

10   **Q.**  Dr. Chun, that would be -- part of his meeting would fall

11   into this category?

12   **A.**  Yes.

13   **Q.**  And then we see speaker training.  The goal was to have

14   70 train live and 85 via the web, correct?

15   **A.**  Yes.  Originally at that time, yes.

16   **Q.**  And the idea was to prepare up to 155 physicians that you

17   call KOLs to do speaker programs, correct?

18   **A.**  Correct.

19   **Q.**  In fact, how many did you get recruited in the first

20   year, 2012?  Do you remember?

21   **A.**  The final number I do not recall.

22   **Q.**  And if we look at the final box here, speaker programs,

23   the goal was to have 120 dinner meetings in 2012, 250 in

24   2013, correct?

25   **A.**  Correct.

1   **Q.**   And then to have group practice briefings, 200 and then

2   550 the next year, correct?

3   **A.**   Correct.

4   **Q.**   That is, if I add that up, it's over a thousand meetings

5   and briefings, correct?

6   **A.**   Correct.

7   **Q.**   1,120, according to my notes.

8   **A.**   Okay.

9   **Q.**   If we look at the next page here, this is actually the

10   decile analysis, correct?

11   **A.**   Correct.

12   **Q.**   If we take a look at this pyramid, we see that there are

13   a total of about 6,649 doctors in the ROO market, correct?

14   **A.**   Correct.  At that time, yes.

15   **Q.**   This is for fourth quarter 2012, right?

16   **A.**   I can't see it, but yes.

17   **Q.**   Let me bring it down to you then.  Fourth quarter 2012,

18   correct?

19   **A.**   Correct.

20   **Q.**   So the top decile, the top -- let me rephrase that.

21          10 percent of that market is prescribed by 150

22   doctors, correct?

23   **A.**   That's actually 30 percent.  You're looking at decile 8

24   through 10.

25   **Q.**   Thank you.

1    **A.**   That's actually 30 percent of the market, yeah.

2    **Q.**   30 percent of the market is from 150 doctors.  What's 150

3    out of 6,649?  Less than 4 percent?

4    **A.**   Sorry.  Yeah.  Okay.

5    **Q.**   3-4 percent of the TIRF REMS registered doctors with the

6    government are writing 30 percent of the prescriptions,

7    correct?

8    **A.**   Correct.

9    **Q.**   Fair to say in terms of putting together a standard

10   ethical-appropriate marketing plan, pharmaceutical companies

11   usually direct their resources to the top of the pyramid?

12   **A.**   Correct.

13   **Q.**   Because those 150 doctors, you get more bang for your

14   buck by going after them, correct?

15   **A.**   Correct.

16   **Q.**   If I manufactured lawnmowers, I'd spend my time selling

17   to Home Depot and not the local hardware store, correct?

18   **A.**   Correct.

19   **Q.**   And that's what's there, correct?

20   **A.**   Correct.

21   **Q.**   And you also realize that because there was a new product

22   being launched that would have all sorts of managed care

23   issues in competition with the generic, that the sales reps

24   were going to have to spend a lot of time with these

25   high-decile targets?

1   **A.**   Correct.

2   **Q.**   Mr. Burlakoff, I think, had a -- you spent a lot of time

3   with Mr. Burlakoff, correct?

4   **A.**   In the home office we had meetings together, yes.

5   **Q.**   And he was at times kind of a coarse, aggressive person?

6   **A.**   Yes.

7   **Q.**   He would say things like "go live with your whale,"

8   correct?

9   **A.**   Correct.

10   **Q.**   But in fact, if we break that down, telling sales reps to

11   focus their time on the very few high-decile providers they

12   have in their territory is a very rational sales technique,

13   correct?

14   **A.**   Yes.  They should focus on high deciles and more.

15   **Q.**   And if we take a look at the box next door, we say --

16   could you tell me what this means, reach, reach number, 2012

17   hyper focus?

18   **A.**   Yeah.  Reach number would be -- it means 139 of the 150

19   doctors were called on, which is roughly 92 percent.  Well,

20   it is 92 percent.  And so only 11, the balance, was not

21   reached -- at least called on once by a sales representative.

22   **Q.**   But it says 2012 hyper focus.  That means the sales and

23   marketing plan wanted the reps to give a hyper focus to the

24   top 139 to 150 doctors in the top decile, correct?

25   **A.**   Yes.  In that year, yes.

1   **Q.**   And then in the next year, 2013, we're going to move

2   slightly down the pyramid to about 391, which would get us

3   partially through the second grouping on the pyramid,

4   correct?

5   **A.**   Yes, correct.

6   **Q.**   And if we take a look at page 30 of this, we see, in

7   fact, a focus on the "A" targets or the ones that are writing

8   the most, correct?  And that's the priority?

9   **A.**   Is there any way that I could read the heading of this?

10   **Q.**   Sure.  I'm sorry about that.  Let me pull it down a

11   little bit.  Subsys strategy, sales force execution:  Sizing

12   and routing.  Correct?

13   **A.**   Okay.

14   **Q.**   And then what it says is D 2-10 prescribers generate

15   90 percent of rapid on-site opioid transactions or

16   prescriptions.  That's 1,850, correct?

17   **A.**   Correct.

18   **Q.**   That's 1,850 out of that 6,600 number we just looked at?

19   **A.**   Correct.

20   **Q.**   So if we really are targeting it, we start with about a

21   little bit more than a 25 -- it says 28 percent of those

22   6,600 doctors, but when you're doing your initial launch for

23   the first year, you're focusing on just 150 out of that

24   1,850, correct?

25   **A.**   The way I understand it, that's your top priority, yes.

1  **Q.**  Yes.  And thank you.  That's I think a clearer way to say
2  it.  Okay.
3          I now want to move to the time period when Joe
4  Rowan got hired.  Do you recall that Joe came on to Insys in
5  mid July of 2012?
6  **A.**  I didn't remember the timeframe, but yes.
7  **Q.**  I represent that --
8  **A.**  I would, yes.
9  **Q.**  And do you recall that he came on part-time to work with
10 Dr. Ruan only?
11 **A.**  Yes, I do.
12 **Q.**  Joe had a prior relationship with Dr. Ruan when he was at
13 Cephalon, correct?
14 **A.**  That's my understanding, yes.
15 **Q.**  And Joe had been out of Cephalon a couple of years,
16 correct?
17 **A.**  Yes.
18 **Q.**  But he had a very good personal, warm relationship with
19 Dr. Ruan, correct?
20 **A.**  That's my understanding, yes.
21 **Q.**  And that was a relationship that developed under the
22 Cephalon squeaky clean speaker program, correct?
23 **A.**  I don't know when he started -- I mean, did it continue
24 under a corporate integrity agreement, the relationship, I'm
25 assuming.  I don't know when it started.

1   **Q.**  If you'll assume for the moment that Joe started working

2   with Dr. Ruan when he was at Cephalon, correct?

3   **A.**  That's correct, yeah.

4   **Q.**  If Joe developed a very good relationship under a company

5   that had a very ethical speaker program, correct?

6   **A.**  It did, yes.  Yes.  It depends on what timeframe.

7   **Q.**  When you were working there and running the speaker

8   program.

9   **A.**  When I worked on the speaker program, yes, we ran

10  everything by compliance.  But that is in the home office.  I

11  can't tell you about the field.

12  **Q.**  You certainly weren't aware of any problems, were you?

13  **A.**  No.

14  **Q.**  Because if you had, you wouldn't have invited those

15  doctors into Insys, correct?

16  **A.**  Compliance wouldn't allow it, correct.

17  **Q.**  You wouldn't have allowed it?

18  **A.**  I wouldn't allow it, yes.

19        MR. KENDALL:  I'd like to offer next, Your Honor,

20  Exhibit 5490.

21  **A.**  And I just want to note, if I can, too, medical

22  communications companies did that for us.  So we kept it

23  arm's length, too.

24        MR. YEAGER:  Could I ask for a foundation, please.

25        MR. KENDALL:  I believe he can recognize the

1    document and I want to discuss the concept with him.

2              MR. YEAGER:  I object.

3              MR. KENDALL:  It's a business record.

4              MR. YEAGER:  I object.

5              THE COURT:  You object to what?  He's just going to

6    show it to the witness at the moment.

7              MR. YEAGER:  He offered it, Your Honor.

8              MR. KENDALL:  Let me show it to the witness first.

9    BY MR. KENDALL:

10   **Q.**  If you could take a look at Exhibit 5490.  Do you

11   recognize that to be a standard type of email communication

12   that Insys used in 2012?

13   **A.**  It's an email from Mike Babich, yes.

14   **Q.**  And that's a standard type of communication the business

15   would use in keeping its records at the time?

16   **A.**  To communicate, yes.

17             MR. KENDALL:  Your Honor, I'd like to offer that

18   into evidence.

19             THE COURT:  Are you objecting?

20             MR. YEAGER:  I'm objecting.

21             THE COURT:  Sustained.

22   BY MR. KENDALL:

23   **Q.**  Was it the ordinary practice of Insys to communicate --

24             THE COURT:  It's not coming in as a business record

25   through this witness.  I don't think you can get there.

1        MR. KENDALL:  Okay.

2   BY MR. KENDALL:

3   **Q.**  Do you recall there were some problems that Holly Johnson

4   was not successful with Dr. Ruan?

5   **A.**  In reading this, yes.  But -- yeah, I didn't remember.

6   **Q.**  Does this document refresh your recollection?

7   **A.**  Yes.

8   **Q.**  When she came in, wouldn't it be fair to say that

9   Mr. Babich, Mr. Simon, Shawn Simon who was in sales and

10  yourself, all thought that she would have substantial success

11  getting Dr. Ruan to switch from the other products to Subsys,

12  correct?

13  **A.**  I would think so, yes.

14  **Q.**  And it didn't work out, correct?

15  **A.**  Evidently not.

16        MR. YEAGER:  Judge, if I could ask that the witness

17  testify from his memory and not the --

18        THE COURT:  Yes.  You can't testify from the

19  document.  It's not being admitted in evidence.  If it

20  refreshes your recollection, that's fine.  But otherwise, you

21  can only testify about what you know.

22        THE WITNESS:  Okay.

23        THE COURT:  When he says evidently not:  I'm going

24  to strike that.  He doesn't have any personal basis of

25  knowledge for that.

```
 1    BY MR. KENDALL:
 2    Q.  Do you have a recollection that Holly Johnson didn't work
 3    out or was not successful with Dr. Ruan?
 4    A.  I do now, yes.
 5    Q.  And in fact, did she leave the company?
 6    A.  Yes.
 7    Q.  And it was suggested that Joe Rowan come in and replace
 8    her on a part-time basis to work with Dr. Ruan, correct?
 9    A.  Yes.
10    Q.  We asked it a little bit earlier.  Do you have any better
11    memory of participating in a phone interview of Joe, coming
12    in that role?
13    A.  I don't, but I would believe it occurred.
14    Q.  And do you recall that Joe is working with a non-opioid
15    product at Sunovion at the time?  He had been away from the
16    opioid products for a couple of years?
17    A.  I believe so.  It's a rough recollection, yes, I guess.
18    Q.  So I want to show you a document marked as Exhibit 5472
19    and just ask you does that just refresh your recollection
20    that Joe was working in Insys on a part-time basis?
21              MR. YEAGER:  Objection.
22              THE COURT:  That's sustained.
23    BY MR. KENDALL:
24    Q.  Do you have a recollection of exactly when Joe started
25    work in this part-time basis?
```

1    **A.**  I don't.

2    **Q.**  Does this document refresh your recollection that it was

3    at least by a certain date?

4    **A.**  Yes.

5    **Q.**  And what's that certain date?

6    **A.**  I see July 19, 2012.

7                THE COURT:  Stop.  You can't do it that way.  If it

8    refreshes your recollection, if it was something that you

9    knew and the document reminds you of what you knew, you can

10   testify about it.  But you can't get information from the

11   document and then testify about it.

12               THE WITNESS:  Okay.

13               THE COURT:  If you don't know, say you don't.

14               THE WITNESS:  I didn't remember.

15   BY MR. KENDALL:

16   **Q.**  Is this a document that was sent to you?

17   **A.**  Yes.

18   **Q.**  After looking at this document, does it help you

19   remember?

20   **A.**  Yes.

21   **Q.**  What do you now remember was the date by which Joe had

22   started?

23   **A.**  He at least started by July of 2012.

24   **Q.**  July 19?

25   **A.**  July 19 of 2012.

1    **Q.**  I want to show you next Exhibit 168.

2            MR. KENDALL:  Is that in evidence?

3            THE CLERK:  Yes, that's in.

4    BY MR. KENDALL:

5    **Q.**  This is an email from Mr. Malhotra to various people

6    including yourself, correct?

7    **A.**  Correct.

8    **Q.**  Do you see it's dated August 1, 2012?

9    **A.**  I do.

10   **Q.**  And he reports that as of August 1, 2012, 155 doctors

11   have already been trained for speaker training, correct?

12   **A.**  Correct.

13   **Q.**  So that's pretty much the number that was the goal that

14   was in that board of directors document we looked at just a

15   few moments ago, correct?

16   **A.**  Correct.

17   **Q.**  And that was 300 physicians are now writing scripts.  Do

18   you see that?

19   **A.**  Yes.

20   **Q.**  So slightly over half of the people -- if we assume that

21   one is a subset of the other, and I realize it's not perfect,

22   but roughly half the doctors who are writing are speaking,

23   correct?

24   **A.**  I don't -- well, yeah.  Just by sheer number, but it's

25   not correlated.

1  **Q.**  It may not be a perfect correlation, but would you agree

2  there's a rough correlation?

3  **A.**  There's a correlation.

4  **Q.**  So there's roughly half the doctors who are writing are

5  speaking?

6  **A.**  I would need to see more data than that.  But yes.  The

7  sheer number is twice as much.

8         MR. KENDALL:  I'd next like to show Mr. Napoletano,

9  just for him, the document marked as Exhibit 5482.

10  **Q.**  If you could tell us if you recognize it, please?  That's

11  the first page of the document.  Do you recognize it?

12  **A.**  Does it have a date on it?  Just curious.

13  **Q.**  My version -- yes, I do have a Bates on it.  Would you

14  like me to give you your own paper copy because it's multiple

15  pages?

16  **A.**  Sure.

17         MR. KENDALL:  May I, Your Honor?

18         THE COURT:  Yes.

19         MR. KENDALL:  This has a Bates number on it and it

20  has everything you can flip through.

21  BY MR. KENDALL:

22  **Q.**  If you can take a look at it, please, and tell us if you

23  recognize the document.

24  **A.**  Yes, I do.

25  **Q.**  Do you recognize the document?

1   **A.**   Yes.

2   **Q.**   What is it?

3   **A.**   This is the speaker program rollout, Insys speaker

4   program rollout document to the field.

5   **Q.**   Did you help draft it?

6   **A.**   Yes.

7   **Q.**   And did you do this in about August of 2012?

8   **A.**   I was looking for the date.  Is there a date somewhere?

9   Yes.  As of 8/12/12, yes.

10  **Q.**   Thank you.  And so this is about a month, five weeks

11  after Joe's been hired on that part-time basis, correct?

12  **A.**   Correct.

13  **Q.**   I want to turn to -- the pages aren't numbered here.  I

14  apologize.  But you see we have on about page 4 or so,

15  speaker bureau, speaker selection criteria.  Did you help

16  draft this slide?

17  **A.**   Yes.

18  **Q.**   And the criteria is "skilled in the use of opioids,

19  specifically rapid-onset TIRFs; experience with Subsys."

20  Correct?

21  **A.**   Correct.

22  **Q.**   Now it says, "Pain community focus with mix of secondary

23  specialty -- some oncology and mid tiers."

24          That's basically the same doctor base that Cephalon

25  had been so successful with, correct?

1    **A.**   Correct.

2    **Q.**   And if we turn the page to the next page, we'll see here

3    the actual breakdown of who are the speakers.  You have 153

4    trained, correct?

5    **A.**   Correct.

6    **Q.**   Most are physicians, but there's about 10 or 12 or so

7    that are not, correct?

8    **A.**   Correct.

9    **Q.**   And if we look at under specialties, we see there's

10   only -- there's 142 pain physicians and two oncologists,

11   correct?

12   **A.**   Correct.

13   **Q.**   What's a mid level?

14   **A.**   A mid level is either a nurse practitioner or physician's

15   assistant.  In some states, in most states they have

16   prescribing authority, but they're an extender of the

17   physician.

18   **Q.**   And this is, fair to say, a speaker bureau strategy that

19   you designed with Teresa Grasso without any significant input

20   from Alec Burlakoff, correct?

21   **A.**   Correct.

22   **Q.**   And if we look at this, out of the 153, there's only two

23   oncologists, correct?

24   **A.**   That is correct.

25   **Q.**   Most of the scripts being written by these doctors are

1    off-label scripts, correct?

2    **A.**   Yes.

3    **Q.**   That was always the strategy for the switch strategy,

4    correct?

5    **A.**   The strategy was to promote it on-label.  Physicians can

6    write it however they want.

7    **Q.**   Right.  And the strategy was to go after physicians that

8    are mostly writing off-label?

9    **A.**   The strategy is to go after physicians that have the

10   opportunity to see pain patients -- excuse me -- cancer

11   patients.  But yes, knowing that a lot of them are written

12   off-label.

13   **Q.**   And the reality was for the 143 pain physicians, you knew

14   that for most of those pain physicians, most of those

15   patients were not cancer patients?

16   **A.**   That is correct.

17   **Q.**   That's just the reality of everybody in the market,

18   correct?

19   **A.**   Correct.

20            MR. KENDALL:  Your Honor, I forgot to move this

21   into evidence.  I'd like to offer in Exhibit 5482 and show

22   the jury.

23            MR. YEAGER:  No objection, Your Honor.

24            THE COURT:  Admitted.

25                      (Defendant Exhibit No. 5482 admitted.)

1          MR. KENDALL:  Thank you so much, Mr. Wilkinson.

2          MS. WILKINSON:  It was JJ.

3          MR. KENDALL:  Thank you, JJ.

4    BY MR. KENDALL:

5    **Q.**   If everybody could take a look here.  We see 153 trained.

6    143 of them are physicians.  The rest are Ph.D.'s, nurse

7    practitioners, physician assistants, correct?

8    **A.**   Correct.

9    **Q.**   And then under specialties, 142 pain physicians and two

10   oncologists, correct?

11   **A.**   Correct.

12   **Q.**   And with pain physicians, people have all sorts of

13   different board certifications, correct?

14   **A.**   Correct.

15   **Q.**   Anesthesiologist, pain medicine?

16   **A.**   Physical medicine and rehab or physiatry.

17   **Q.**   Physiatrist.  Thank you.

18          Neurologist?

19   **A.**   Psychiatrist.

20   **Q.**   PCP?

21   **A.**   Primary care physicians with a focus on pain, and

22   rheumatology with pain background.

23   **Q.**   And then two oncologists and then the mid levels, could

24   you explain what they are, what their role is?

25   **A.**   Yes.  I believe I have.  They're physician extenders.  In

1   other words, they work under a physician.  But in many states

2   they have prescribing authority as well.

3   **Q.**  Isn't it also part of the reality that you're dealing

4   with is that oncologists have a lot of cancer drugs that they

5   sell directly?  They're called buy-bill drugs?

6   **A.**  Oncologists?  I'm sorry.

7   **Q.**  A lot of the oncology drugs that oncologists administer

8   are actually sold by the oncologist's office.  You don't get

9   it from a pharmacy, you get it directly from the doctor?

10  **A.**  I believe you're referring to buy and bill.

11  **Q.**  Yes.

12  **A.**  I believe some are buy-and-bill practice.  I'm not

13  expert, but some are.

14  **Q.**  Subsys was not a buy-and-bill drug, correct?

15  **A.**  Correct.

16  **Q.**  So the oncologists are not going to make nearly as much

17  money with Subsys as they would with their own buy-and-bill

18  drugs, correct?

19  **A.**  Correct.

20  **Q.**  And so oncologists are more likely to end up being in the

21  audience of a speaker board than actually being a speaker,

22  correct?

23  **A.**  Yeah, correct.

24  **Q.**  And then we have the fair market value.  Could you

25  explain local, regional, national, what those mean, and how

1    the numbers were determined?

2    **A.**   Yes.  This is work with the medical communication

3    company, and a lot of it's adopted from work that's done on

4    surveys.  They do compliance surveys, too.

5           And what it is is your local speaker is just that,

6    is probably a community practitioner.  Your regional has a

7    little bit more prominence and is maybe known a little bit

8    outside the borders.  And national are people that came

9    across -- like I had talked about a survey that's done, that

10   they're recognized outside of their region.

11   **Q.**  And the amounts there, they're figured basically in

12   what's the type of revenue a doctor might be able to generate

13   if he spent his time doing other work and not speaking,

14   correct?

15   **A.**   Yes.  The honoraria paid to doctors by level.

16   **Q.**  Thank you for pointing that out.  When you pay the doctor

17   to do this work, they always call it an honorarium, correct?

18   **A.**   Correct.

19   **Q.**  The honorarium means the check?

20   **A.**   It is a payment for service.

21   **Q.**  We have in here the discussion of marketing-driven dinner

22   meetings versus rep-driven dinner meetings.  And is that what

23   you discussed earlier, that one wasn't so successful so you

24   ended up focusing more on the other?

25   **A.**   That is correct.

1  **Q.**  And it was the rep-driven dinner meetings that became the

2  focus?

3  **A.**  That and group practice meetings as well.

4  **Q.**  And what was the difference of the sales role in a

5  marketing-driven meeting versus a rep-driven meeting?

6  **A.**  Marketing-driven meeting is the venue was selected by the

7  third-party vendor, and recruitment, they helped recruit.  A

8  local sales representative could assist in recruitment as

9  well.  The other meeting is the local representative has the

10  sole responsibility of recruiting.

11  **Q.**  I want to show you the next page which is entitled

12  "Rep-Driven Dinner Meetings."  It's actually the second page

13  to bear that title "Rep-Driven Dinner Meetings."  This time

14  it says the target audience has a minimum of two target

15  attendees.  Why do some have two and some have four?

16  **A.**  I don't remember the differential.  Could you show me the

17  other one?

18  **Q.**  Sure.  It's the prior page.  And it says, "Insys approved

19  targets, minimum of four target attendees."  And it's a

20  rep-driven dinner meeting.

21  **A.**  Yes.  That's what I recall.  Now I'm confused what the

22  other one was.  Let's see the other one.

23  **Q.**  You have it in front of you, if you want to flip the

24  pages yourself.  That may help you focus better.

25  **A.**  Yes.  Okay.  One says four.  So I believe what it was,

1    was just a typo and it should be rep-driven group practice

2    was two and the dinner meetings were four, is what I

3    understand.  Yeah, because there's marketing and then there

4    was the rep-dinner driven and it's the group practice.  It

5    appears it has the wrong title.

6    **Q.**  So this should be group-practice dinner meetings, and for

7    those you could have just two?

8    **A.**  For those you could have two.

9    **Q.**  The two means the sales rep attends, the speaker attends,

10   and then two people in the audience?

11   **A.**  Correct.

12   **Q.**  And that can be from that range of people we discussed

13   from treating physicians, oncologists that have to identify

14   the pain and refer out the patients, nurses, pharmacists,

15   that sort of whole group involved in the care process?

16   **A.**  Yes.

17   **Q.**  So it's a number much larger than the 6,680 that we see

18   that are just TIRF REMS registered doctors?

19   **A.**  Correct.

20   **Q.**  And then this was what was told to people back in August

21   of 2012 that the goal was to have 920 programs in 2012 and

22   2013, correct?

23   **A.**  Correct.

24   **Q.**  This document you have, who was it distributed to?

25   **A.**  This is -- it looks internal executive management.  This

1    appears to be internal -- internal executive management, I

2    believe.  I don't recall who it was.

3    **Q.**  And it was you and Teresa who decided how to allocate

4    these programs throughout the regions.  The Northeast, the

5    Southeast got 40, Mid-Atlantic, Central, and West, correct?

6    **A.**  Yes.  I would have worked with Teresa on this.

7    **Q.**  Okay.  And you made the Southeast the highest number

8    because of what you saw in the top decile of physicians in

9    their locations, correct?

10   **A.**  I believe it's the number of representatives.  And you're

11   saying each representative gets four programs.  So I think

12   that's what the 10 is times 4, I think.

13   **Q.**  And then we have here SciMedica's role, correct?  That's

14   the third-party administrator?

15   **A.**  That is correct.

16   **Q.**  Even though this is 2012, people are already comparing

17   and looking to comply with the Sunshine Act reporting

18   requirements, correct?

19   **A.**  Correct.

20   **Q.**  That's what we discussed earlier when the numbers go up

21   on the Internet?

22   **A.**  Correct.

23   **Q.**  SciMedica is going to be providing compliance processes

24   and monitoring to oversee the program, correct?

25   **A.**  That is correct.

1  **Q.**  If we take a look here for the -- this is speaker program

2  compliance.  Did you help draft this?

3  **A.**  Yes.

4  **Q.**  It says right here they're conducted by trained speakers,

5  correct?

6  **A.**  Correct.

7  **Q.**  So everyone that wants to be a speaker has to show up to

8  training, correct?

9  **A.**  Correct.

10  **Q.**  They're going to get paid for that, for their time?

11  **A.**  The live ones, yes.

12  **Q.**  They're intended to promote Subsys.  That's the whole

13  point of the program, correct?

14  **A.**  Correct.

15  **Q.**  That's why we want enthusiastic people who want to spread

16  their enthusiasm for the product to the audience?

17  **A.**  Correct.

18  **Q.**  And then we have the reporting requirements.  I want to

19  look at this last bullet point.

20  　　　　　MR. YEAGER:  Counsel, what page are we on?  What

21  page?

22  　　　　　MR. KENDALL:  Same page.

23  　　　　　MR. YEAGER:  I don't know what page it is.  I can't

24  find it in the document, Counsel.

25  　　　　　MR. KENDALL:  Mine isn't numbered.  It's probably

1  about page 12 or 13, I'm guessing.  You can follow it on the
2  screen if you'd like.
3          THE COURT:  Do you have that, Mr. Yeager?
4          MR. YEAGER:  Yes.  Thank you, Your Honor.
5          THE COURT:  Go ahead, Mr. Kendall.
6  BY MR. KENDALL:
7  **Q.**  "Program attendees should include appropriate healthcare
8  providers who treat and manage patients with breakthrough
9  cancer pain."
10          Do you see that?
11 **A.**  Yes.
12 **Q.**  That's saying what the preference is, not the
13 prerequisite, correct?
14 **A.**  Correct.  Well, I mean, it should include, yes.
15 **Q.**  It doesn't say "must"?
16 **A.**  Right.
17 **Q.**  And it says should not consist entirely of.  It's just
18 you should have some of them in the audience, correct?
19 **A.**  I'm sorry.  Could you please repeat that?
20 **Q.**  "Program attendees should include the appropriate
21 healthcare providers who treat and manage patients with
22 breakthrough cancer pain."
23 **A.**  Correct.
24 **Q.**  That means you can have people who don't treat
25 breakthrough cancer pain in the audience, correct?

1    **A.**   It was not the intent.

2    **Q.**   You used the word "should."  You didn't say "must,"

3    correct?

4    **A.**   Correct.

5    **Q.**   And you didn't say "only"?

6    **A.**   Correct.

7              MR. WYSHAK:  Object.

8    BY MR. KENDALL:

9    **Q.**   Talking for the sales force to go into a marketplace

10   where you already know the existing usage for these products

11   is 80-90 percent more non-cancer driven, correct?

12   **A.**   Correct.

13   **Q.**   And this was all done without input by Mr. Burlakoff,

14   correct, or any significant input?

15   **A.**   Correct.  This is done with SciMedica, yeah.

16   **Q.**   This is you saying what you wanted to say, correct?

17   **A.**   This is us trying -- working with SciMedica to do a

18   compliant program, yes.

19   **Q.**   So this is you and SciMedica saying what the two of you

20   wanted to say?

21   **A.**   Yes.  Consistent with pharma code, yes.

22   **Q.**   And finally it says speaker programs, parameters.  Did

23   you help draft this page as well?

24   **A.**   Yes, I did.

25   **Q.**   And in it there are sign-in sheets, signatures with the

1    DEA or state license for all attendees, correct?

2    **A.**   Correct.

3    **Q.**   That's one of the main sort of compliance checks you have

4    on this program is every attendee who fits within that

5    appropriate description's got to sign their name, handwrite

6    their DEA number or registration number so you can track

7    attendance?

8    **A.**   Correct.

9    **Q.**   Now, shortly after this document was drafted, Insys had a

10   national sales call in October of 2012.  Do you remember

11   that?

12   **A.**   Not specifically.  But yes, there were national sales

13   calls, yes.

14   **Q.**   I want to specifically see if you remember in

15   October 2012 there was a national sales call where

16   Mr. Burlakoff started the discussion and then you and

17   Mr. Gurry participated to make certain statements to the

18   sales force.

19   **A.**   Okay.

20   **Q.**   Do you recall participating in that call?

21   **A.**   Yes, a little bit.  Yes, vaguely.

22   **Q.**   Do you recall what you said?

23   **A.**   I don't.

24   **Q.**   I'd like to show you Exhibit 5498 and ask if that

25   generally refreshes you as to what you said in that meeting.

1          MR. KENDALL:  If we could just show the witness,

2     please, Your Honor.

3     Q.  And if you could read that to yourself and tell us if

4     that refreshes what you said to the national sales force in

5     an October 2012 call.

6          MR. YEAGER:  Your Honor, may we be seen at sidebar?

7          THE COURT:  Yes.

8          (The following was held at sidebar.)

9          MR. KENDALL:  This is what I'm refreshing his

10    recollection with.  It's a verbatim transcript of the tape.

11         MR. YEAGER:  Keep your voice down.

12         THE COURT REPORTER:  I cannot hear you.

13         THE COURT:  I can't hear him either.

14         MR. YEAGER:  The way he's refreshing the witness,

15    every time I've objected and the court has instructed, he's

16    just gone through it.  He can't put this in.

17         THE COURT:  If it refreshes his recollection, it

18    refreshes his recollection.  If it doesn't, you can't use it.

19         MR. KENDALL:  I understand.

20         MR. YEAGER:  This PowerPoint is from August

21    of 2012.

22         MR. KENDALL:  It's not a PowerPoint.  This is

23    something I created.  The meeting was in October 2012.

24         MR. LAZARUS:  The PowerPoint you've been showing

25    him that you've linked now.  This is from August.  This is

1    October.

2              MR. KENDALL:  I think I said that in my question

3    there was a national sales meeting in October of 2012.

4              THE COURT:  I think he said that also.

5              (End of sidebar.)

6              THE COURT:  Just a reminder to the witness, when he

7    shows you something to refresh your recollection, either you

8    knew something and you got it and this reminds you or you

9    never knew it and it doesn't refresh your recollection.  You

10   can't read off a document in front of you unless it refreshes

11   your recollection.  You have to testify what's in your mind,

12   not what's on the paper.

13             THE WITNESS:  Okay.

14   BY MR. KENDALL:

15   Q.  Mr. Napoletano, if you need more time to look at Exhibit

16   5498, please take all the time you'd like.

17             If you've had enough time, my question is, does

18   reading that document refresh your recollection as to what

19   you generally told the sales force in the October 2012 call?

20   A.  I need time to read it.

21   Q.  Please take time to read it.

22   A.  It was removed.

23   Q.  Oh.  Are you reading it just off of the screen?

24   A.  Yes.

25   Q.  Let's see if I have a third copy.  I have it in a

1    different printout that will be easier to read.  Let me give

2    you your own copy of 5493.  Why don't you read that to

3    yourself and see if that refreshes your recollection as to

4    what you told the sales force.

5             MR. YEAGER:  Counsel, it's 5498.

6             MR. KENDALL:  Whatever number is on the document I

7    gave you.  Actually he has a different printed version that

8    has a different number on, but they're the same verbatim

9    version.  His may say 5498.

10            MR. YEAGER:  Thank you.

11            MR. KENDALL:  It's 5498.  Thank you, Nat.

12            THE WITNESS:  Just the first page or the second

13   page, too?

14   BY MR. KENDALL:

15   Q.  If there's two pages, they may just be two copies stapled

16   together.  Actually --

17   A.  Yes.  So you want me to read the second page, too.

18   Q.  No.  If you could, just read the first page of the

19   document in front of you and tell us if that refreshes your

20   recollection as to what you were saying in that national

21   sales call.

22   A.  Yes, it does.

23   Q.  One of the things -- can you tell us what do you recall

24   saying in that national sales call?

25            MR. YEAGER:  May they take it down?

1    THE COURT:  Take the document down, please.

2    BY MR. KENDALL:

3    Q.  And don't look at the document in front of you.  Flip it

4    over.  If you can, tell us what do you recall saying at the

5    national sales call?

6    A.  This was specifically regarding rolling out Dr. Kapoor's

7    brand-new initiated switch program, and we were talking about

8    the parameters of that program.

9    Q.  And what were the parameters that you remember telling

10   the sales team?

11   A.  That the patient will get a voucher or free product.  If

12   they're switching from Actiq to Subsys, the patient will get

13   free product.  And the prior authorization team will attempt

14   to get these approved, and they typically do.  At this time

15   they were typically getting approved.  But if they didn't, in

16   the event that they didn't, that Insys would continue to

17   provide free product.

18   Q.  For as long as the patient needed it?

19   A.  For as long as the patient needed it.

20   Q.  Now, do you also remember telling them that -- describing

21   that there was a PA or prior approval assistance program?

22   A.  Yes.

23   Q.  Fair to say you described all of this in a very positive,

24   enthusiastic way, correct?

25   A.  Correct.

1    **Q.**  Do you also recall telling the sales team that the group

2    that Mike Gurry was working with had a 90 percent success

3    rate in getting claims approved?

4    **A.**  Yes.

5    **Q.**  And did you also discuss taking appeals --

6          MR. YEAGER:  Your Honor, if we're going to go

7    through line by line --

8          MR. KENDALL:  We're not going through line by line.

9          MR. YEAGER:  That's what's happening now.  The

10   witness has a memory of it, if he does, that's fine.  This is

11   exactly what I objected to.

12         THE COURT:  Stop.  No speeches from you either.

13   The objection is sustained.  It either refreshes his

14   recollection or it didn't.

15   BY MR. KENDALL:

16   **Q.**  Does it refresh your recollection also that --

17         THE COURT:  No.  Is there anything else that you

18   talked about that you now recollect that conversation.

19         MR. KENDALL:  May I lead, Your Honor?

20         THE COURT:  You may lead but not by giving him

21   information from the document.

22   BY MR. KENDALL:

23   **Q.**  Do you recall discussing internal review boards?

24   **A.**  In that meeting particular, no.

25   **Q.**  Could you look at that document and read it and see if it

1    refreshes your recollection?  Actually use my copy which is a

2    longer version.  If you could look at it, read it, see if it

3    refreshes your recollection.  Then turn it down and stop

4    looking at it.  If you could look at the bottom half there

5    and see if that refreshes your recollection.

6    **A.**  Yes.

7    **Q.**  Okay.  Do you recall discussing external review boards?

8    **A.**  Yes.

9    **Q.**  What do you recall discussing?

10   **A.**  Explained that the external review board is -- I

11   explained -- in this meeting specifically?  Is that what

12   you're saying?

13   **Q.**  Talking all about this meeting.

14   **A.**   In this meeting that free product will be given up until

15   the prior authorization goes through an external review

16   board, which is a third party the insurers use to make a

17   judgment whether or not to approve a prior authorization.  So

18   we'll provide free product up until the prior "auth."

19          My recollection of the switch program is that we

20   continued to provide it in the event it was not approved.

21   **Q.**  Do you recall if you discussed anything about paperwork

22   for the prior approval process?

23   **A.**  I don't recall off -- oh, yes.  The PA -- the IRC group

24   would handle the paperwork maybe.  So yeah.

25   **Q.**  If you look at that document at the bottom, see if it

1    refreshes your recollection and then put it face down and

2    tell us what you remember.

3            MR. YEAGER:  The witness said he remembered.

4            THE COURT:  He says yes, so there's nothing to

5    refresh his recollection on.

6    BY MR. KENDALL:

7    **Q.**   Do you have any further recollection of what was said?

8    **A.**   About?

9    **Q.**   About the paperwork and gathering of it for the PA

10   process.

11   **A.**   That it would be handled by the prior authorization team.

12   **Q.**   Do you remember what Mr. Burlakoff said in that meeting?

13   **A.**   No, I do not.

14   **Q.**   Do you recall that Mr. Burlakoff spoke before you?

15   **A.**   I did not recall that.

16   **Q.**   Do you recall what topics -- do you have a memory of what

17   topics he said?

18   **A.**   I don't unless I would read.

19   **Q.**   Do you think a document could help refresh your

20   recollection as to what was said there?

21   **A.**   It may.

22   **Q.**   I'd like to show you Exhibit 5499.  I'll give you my copy

23   and ask if you can tell us -- read it, look at it, and if it

24   refreshes your recollection, please put it face down and tell

25   us what you remember Mr. Burlakoff told the national sales

1    team on that call.

2    **A.**  Okay.

3    **Q.**  Now that the document is put away, does that refresh your

4    recollection of the general statements that Mr. Burlakoff

5    told the sales team?

6    **A.**  Vaguely.  It seems like something he would say.

7    **Q.**  What do you remember that -- what is your memory of what

8    was said back then?

9    **A.**  I don't have any memory of what was said back then.

10   **Q.**  Next I want to show you a document marked as

11   Exhibit 5471.

12            MR. KENDALL:  If we could just show it to the

13   witness, please.

14   **Q.**  And tell us that's an email chain that you're a part of

15   and if you recognize it.  You don't have to go through all

16   the content.  Do you recognize this as an email that you got

17   when you were working at the company?

18   **A.**  Okay.  Yes.

19            MR. KENDALL:  Your Honor, I'd like to offer

20   Exhibit 5471 into evidence.

21            MR. YEAGER:  May I have one moment, Your Honor?

22            THE COURT:  Yes.

23            MR. YEAGER:  Can I talk with Mr. Kendall very

24   briefly, Your Honor?

25            THE COURT:  Yes.

1          MR. YEAGER:  No objection, Your Honor.

2          THE COURT:  Admitted.

3                    (Defendant Exhibit No. 5471 admitted.)

4          MR. KENDALL:  If you could show it to the jury.

5     I'd like to walk through it, please.

6     BY MR. KENDALL:

7     **Q.**  So we take a look at the bottom message.  It's an email

8     from you, correct, to Joe Rowan with a cc to Alec Burlakoff,

9     and the topic is "Speaker training," correct?

10    **A.**  Correct.

11    **Q.**  And if we take a look at the email higher up, we see that

12    the date is September 25, around the time of this

13    communication, correct?

14    **A.**  Correct.

15    **Q.**  And what it is, is, "Joe, as we discussed" --

16                    So that's referring to a conversation you and Joe

17    had, correct?

18    **A.**  Yes.

19    **Q.**  -- "here are the requirements for speaker training," and

20    then it goes onto the next page, "pre, during, and post

21    program.  Also here is the ISP rep evaluation form we

22    discussed.  Let me know if you have any questions.  Thanks,

23    Matt."

24                    Fair to say Joe contacted you to get some guidance

25    on the speaker program, correct?

1    **A.**   Yes.  It's fair to assume that.

2    **Q.**   Do you remember the phone conversation when he contacted

3    you?

4    **A.**   I don't specifically remember the phone conversation,

5    yes.

6    **Q.**   But we also see that after you sent that message, Joe

7    forwarded it to the Southeast sales team that he managed,

8    correct?

9    **A.**   Correct.

10   **Q.**   He also copied Mr. Burlakoff and yourself.  And it was,

11   "Here is some great information on how a program should be

12   run from start to finish."  And he further says, "Let's take

13   this opportunity to do it correctly.  Thanks for all your

14   continued hard work."  Correct?

15   **A.**   Correct.

16   **Q.**   Fair to say that message is typical about how Joe spoke

17   and did things?

18   **A.**   From my exposure?

19   **Q.**   Yes.

20   **A.**   From my exposure, yes.

21   **Q.**   I next want to show you a document numbered 5473.  And if

22   you could tell us if you recognize this, if we could take a

23   look.  It looks like a message being forwarded.  So if you

24   could take a look at the bottom and then read the email if

25   you recognize the part that was forwarded.

1    **A.**  Could I see top, the date?

2    **Q.**  Why don't I give you your own copy.  It will make life a

3    lot easier.  And I suggest you start at this point and then

4    look up here, how it might have been forwarded.

5    **A.**  Okay.  Okay.

6    **Q.**  Do you recognize the sort of bottom two-thirds of that

7    first page and what follows as being a message that you sent,

8    and it's in the form of a forwarded email at Insys?

9    **A.**  Yes.

10                MR. KENDALL:  Your Honor, I'd like it offer 5473.

11                MR. YEAGER:  No objection.

12                THE COURT:  It's admitted.

13                          (Defendant Exhibit No. 5473 admitted.)

14   BY MR. KENDALL:

15   **Q.**  Now, if we start from the top, we see Joe Rowan sends out

16   a message on October 9, 2012, to the sales team Southeast.

17                That was his territory, correct?

18   **A.**  Correct.

19   **Q.**  Florida, Alabama, maybe some of the surrounding areas?

20   **A.**  Correct.

21   **Q.**  Okay.  About speakers not used.  "Here is a message from

22   Matt.  Please advise me on what the scenario is with each of

23   these doctors that belong belongs to you.  Short and sweet

24   type synapse, not a paragraph.  Joe."

25                And then we go to the message that you had sent

1    Joe.  "Here's a list of Southeast speakers with no programs

2    completed or scheduled.  Please either have the reps schedule

3    a program (office or dinner) within the next four weeks or

4    explain why it's not possible.  If we need to soft delete a

5    speaker for any reason, please call me and explain."

6              That's the message, correct?

7    **A.**   Correct.

8    **Q.**   And there's a bunch of doctors who aren't talking -- not

9    giving speeches, correct?

10   **A.**   Correct.

11   **Q.**   Now, there are a variety of reasons to soft delete a

12   doctor, correct?

13   **A.**   Correct.

14   **Q.**   Let's first go to the term "soft delete."  I believe you

15   explained it in your direct testimony.  It's just you

16   wouldn't schedule him or her for any more appearances and

17   you'd let the contract run out, correct?

18   **A.**   Correct.

19   **Q.**   You did it that way to be less confrontational and not to

20   alienate the doctor?

21   **A.**   Yes.  One of the reasons, yes.

22   **Q.**   And one of the reasons why you'd soft delete somebody

23   would be they simply weren't doing speaking programs,

24   correct?

25   **A.**   Correct.

1   Q.  Another reason might be if they didn't use the product,

2   if they didn't have the Subsys experience?

3   A.  It wasn't a requirement, but yes.  That was Insys

4   practice.  That was not Cephalon practice, just for the

5   record.

6   Q.  But fair to say from your understanding it would be

7   perfectly appropriate to say they're not using the product,

8   they don't have enthusiasm, let's delete them.  You're just

9   not going to go out to them and say, hey, you've got to

10  increase the scripts to get more speaking fees?

11  A.  Yes, correct.

12  Q.  But just to say, you know, they're clearly not

13  enthusiastic, they're not using the product, that's not the

14  type of face we want to put out to the medical community,

15  correct?

16  A.  Correct.

17  Q.  I next want to show you a document marked as Exhibit 5470

18  and ask if you -- actually, I'm sorry.  I'm going to not do

19  that document.

20          I want to show you a document now marked as

21  Exhibit 182.

22          MR. KENDALL:  I don't know if 182 has been admitted

23  yet.  Has it?

24          THE CLERK:  No.

25          MR. KENDALL:  I'd like to offer Exhibit 182.  Any

1    objection, Matt?

2             MR. YEAGER:  Do you have a copy?

3             MR. KENDALL:  Sure.

4             MR. YEAGER:  No objection.

5             THE COURT:  It's admitted.

6                      (Defendant Exhibit No. 182 admitted.)

7             MR. KENDALL:  If we could show the jury, please.

8    BY MR. KENDALL:

9    **Q.**  This is a document you sent to Michael Babich and some

10   other people in Phoenix, correct?

11   **A.**  Correct.

12   **Q.**  And it's a 90-day action plan is what you called it?

13   **A.**  Correct.

14   **Q.**  And it's dated October 17, 2012?

15   **A.**  Correct.

16   **Q.**  Now, you say on the first line, "As we discussed, I

17   believe the overarching strategy set forth from the onset is

18   still correct:  Develop the position and messaging, target

19   the top ROO prescribers; develop thought leaders; build

20   product advocacy; establish peer-to-peer education programs;

21   provide free trial product for titration and to bridge the

22   prior approval gap."

23           That was the plan you put together in the beginning

24   and you're reaffirming it, correct?

25   **A.**  Correct.

1   **Q.**  And then you say further down in that paragraph, "My main

2   tactical focus is to facilitate the switch program, manage

3   the ISP/speaker bureau, and continue outreach to build

4   product advocacy and to build a sales force acumen."

5           The first thing you put there was "My main tactical

6   focus is to facilitate the switch program," correct?

7   **A.**  Right.  That was John's priority for us.

8   **Q.**  And Philly made perfect marketing sense, didn't it?

9   **A.**  Well, it was a nice program, I guess, if you mean they

10  were going to provide product if the patient didn't switch.

11  And one of the reasons we heard that patients -- that were on

12  a drug would not change a drug, and this came from ad boards,

13  one of the feedback was, well, we don't want to change

14  because if our patient changes, then they have to go through

15  the approval process again, and they may get denied.  So

16  that's what --

17  **Q.**  You're from Philadelphia, correct?

18  **A.**  Outside Philly, yeah.

19  **Q.**  Benjamin Franklin was one of the most famous people from

20  Philadelphia, correct?

21  **A.**  Correct.

22  **Q.**  You know he came from Boston?

23  **A.**  That is correct.

24  **Q.**  South End?

25  **A.**  That is correct, yeah.

1   **Q.**  He had a saying, if somebody builds a better mouse trap,

2   people will beat a path to their door.  Have you ever heard

3   of that saying?

4   **A.**  I have.

5   **Q.**  You'd agree with me that was an essential part of the

6   switch program.  It was a better mouse trap, correct?

7   **A.**  Subsys is the best-in-class product.  Is that what you're

8   asking?

9   **Q.**  Yes.

10  **A.**  I believe so.

11  **Q.**  You believed it back then, correct?

12  **A.**  Yes.

13  **Q.**  And you believed it throughout, correct?

14  **A.**  I do.

15  **Q.**  And we actually see that for the implementation the first

16  thing you talk is about upcoming Actiq switch ads boards to

17  gain critical market insights from KOLs, key opinion leaders,

18  correct?

19  **A.**  Correct.

20  **Q.**  You wanted to test the concept of the switch program with

21  some of the most significant doctors in the TIRF ROO's area,

22  correct?

23  **A.**  Correct.

24  **Q.**  You even want to focus up raising a second ad board.

25  When you say top performers, that means the top salespeople?

 1   **A.**   Correct.

 2   **Q.**   To get their input in that?

 3   **A.**   Correct.

 4   **Q.**   If we go to the second page of this exhibit, the 90-day

 5   action plan, the top target activity is track and manage

 6   activity against top targets, about 180 doctors, correct?

 7   **A.**   Yes.

 8   **Q.**   So we've expanded that group from 139 to 180, correct?

 9   **A.**   Yes, I guess.

10   **Q.**   That top section of the pyramid?

11   **A.**   Yes.

12         MR. KENDALL:  If I may have just one moment, Your

13   Honor.

14   **Q.**   I want to show you a document numbered 5380.  And tell us

15   if you recognize it as a email that you sent in January 2013.

16   **A.**   I do.

17         MR. KENDALL:  Your Honor, I'd like to offer 5380

18   into evidence, please.

19         MR. YEAGER:  No objection, Your Honor.

20         THE COURT:  It's admitted.

21               (Defendant Exhibit No. 5380 admitted.)

22   BY MR. KENDALL:

23   **Q.**   Okay.  Now, this is an email from you to Joe Rowan,

24   correct?

25   **A.**   Correct.

1   **Q.**  With copies to Mr. Burlakoff and a Marcus Seiferth,

2   correct?

3   **A.**  Correct.

4   **Q.**  Mr. Seiferth was the rep in Atlanta that reported to Joe,

5   correct?

6   **A.**  Correct.

7   **Q.**  And a BCC to Mike Babich?

8   **A.**  Correct.

9   **Q.**  And it says "Hotlanta."  Is that a typo or --

10  **A.**  Hotlanta.

11  **Q.**  Hot Atlanta?

12  **A.**  Hotlanta.

13  **Q.**  Meaning it was a hot marketplace or hot business?

14  **A.**  Hot, it's humid.

15  **Q.**  Humid in January?

16  **A.**  It's just who people call it.

17  **Q.**  I don't know, that's a nickname for Atlanta?

18  **A.**  Yeah.

19  **Q.**  Okay.  You're reporting on a trip that you had made with

20  a rep, Marcus, to visit with doctors down in Atlanta,

21  correct?

22  **A.**  That is correct.

23  **Q.**  And you summarized some of the things you observed and

24  concluded, correct?

25  **A.**  Correct.

1   **Q.**   Let's start.  It says Brownlow.  That's Dr. Brownlow who

2   we discussed earlier, correct?

3   **A.**   That is correct.

4   **Q.**   He's a key opinion leader?

5   **A.**   Correct.

6   **Q.**   Prominent pain physician?

7   **A.**   Correct.

8   **Q.**   And you said, "Assessed six month data and determined

9   only have 25 percent share."

10          So what you're reporting is you looked at the six

11  months prescribing data that these companies sell, and you

12  saw that Brownlow is only using Subsys for about 25 percent

13  of his patient need, correct?

14  **A.**   That's correct.

15  **Q.**   "If this is an "A" target in speaker, the goal needs to

16  be more than 50 percent, correct?

17  **A.**   Yes.  That's just a model that I would put together.

18  This is a sales model; this isn't marketing.  So I'm

19  educating him on sales and how I managed a territory when I

20  was in sales.

21  **Q.**   What you're saying is an "A" target is someone who is a

22  high priority target?

23  **A.**   I asked him what his targets were and he identified

24  Brownlow as a top target, yes.

25  **Q.**   So if this is a top target for the sales team and he's a

1    speaker, the goal for sales ought to be more than 50 percent,

2    correct?

3    **A.**   In this case, yes.  Yes, I was saying that should be a

4    target.

5    **Q.**   And it says, "Marcus believes this account is his

6    greatest opportunity as Brownlow is now the exclusive pain

7    doctor for the Atlanta Cancer Treatment Centers of America."

8    **A.**   Direct.

9    **Q.**   And then you say, "Great, but what about existing Actiq

10   patients."

11             So what you're saying, while there may be a good

12   opportunity for oncology patients, he's taking business away

13   or switching people out of the Actiq market is also an

14   important priority?

15   **A.**   Yes.  Regarding -- yeah.

16   **Q.**   And then said, "We met with Sherry, the registered nurse

17   who runs the joint" --

18             You're referring to Dr. Brownlow's office.  Am I

19   correct?

20   **A.**   Yes.

21   **Q.**   -- "and found out she does all prior approvals and hates

22   them."

23             Is that a familiar response you would find from

24   office staff of physicians, that they were all frustrated

25   with the prior approval process?

1   **A.**   Yes.

2   **Q.**   They want to treat patients.  They have don't want to do

3   insurance company paperwork, correct?

4   **A.**   Correct.

5   **Q.**   That was a huge impediment for the sales team, that to

6   get a doctor to adopt a better product and the doctor's

7   office was going to have to deal with all this paperwork?

8   **A.**   Correct.

9   **Q.**   The paperwork was more onerous for the better product

10  than it was for the inferior products?

11  **A.**   Like said, any time you switch a patient to a new

12  product, they're going to have to go through that prior

13  "auth."

14  **Q.**   That's a yes?

15  **A.**   Yes.

16  **Q.**   And then you said, "We explained the IRC program and gave

17  her opt-in forms.  We explained the Actiq conversion program

18  to both her and Brownlow and they said it sounds great.  And

19  Sherry said she knows who she's going to offer it to."

20          Fair to say when you were discussing the Actiq

21  switch program and the IRC, you were in good faith advocating

22  appropriate things for the doctor to participate in, correct?

23  **A.**   Yes.

24  **Q.**   You didn't think you were committing any insurance fraud

25  by advocating for them to participate?

1   **A.**   Not at that juncture, I don't think.  I'm looking at the

2   date, January of '13, no.

3   **Q.**   Then it says, "Action:  Follow up immediately on Actiq

4   switch and IRC.  Conduct Brownlow speaker program at Cancer

5   Centers of America.  Go mountain biking with Sherry's

6   husband."

7            Who was going to do the mountain biking?

8   **A.**   Marcus and her were talking.  They love mountain biking

9   and her husband goes all the time.  And he said they could go

10  mountain biking together.

11  **Q.**   That's a perfectly normal thing that salespeople do to

12  try to create friendly relationships with the people they are

13  detailing to, correct?

14  **A.**   Correct.

15  **Q.**   There's nothing wrong with the two of them riding their

16  mountain bikes up on the trail, correct?

17  **A.**   No.

18  **Q.**   Then you went to a Dr. Rosenfeld, correct?

19  **A.**   Correct.

20  **Q.**   And Rosenfeld told you he loves the Actiq program?

21  **A.**   Correct.

22  **Q.**   And he gave a patient on the spot, provided Subsys to a

23  patient, correct?

24  **A.**   Correct.

25  **Q.**   And then you wrote, "Provide an IRC opt-in form first

1    thing this a.m. and fax to Liz."  Correct?

2    **A.**   Correct.

3    **Q.**   Another person you're advocating the IRC program to?

4    **A.**   In January 2013, yes.

5    **Q.**   Then you saw a Dr. Stewart.  He told you he's a Cephalon

6    loyalist, correct?

7    **A.**   Correct.

8    **Q.**   That means he likes either Fentora or Actiq, correct?

9    **A.**   Yes.

10   **Q.**   Did you know Dr. Stewart from your Cephalon days?

11   **A.**   I may have, yeah.  I knew the name.  He was in the

12   speaker bureau.  So yes, I would say maybe.  It wasn't

13   somebody that I could really remember, but yeah.

14   **Q.**   Then you said, "He was surprised when we told him that

15   who's who in Atlanta is using Subsys and discussed market

16   share."

17          Do you see that?

18   **A.**   I do.

19   **Q.**   You did have to say that to him, correct?

20   **A.**   Yes.

21   **Q.**   Was he -- in fact, did he have a substantial pain

22   practice?

23   **A.**   I don't remember his -- I would think it's a prominent

24   pain practice, yes.

25   **Q.**   And then your action recommendation was, "Marcus has to

1    live there," correct?

2    **A.**   Yes.

3    **Q.**   That means Marcus has to give the doctor and his office

4    enough attention until they're comfortable with Subsys and

5    comfortable with the insurance process, correct?

6    **A.**   Correct.  Frequency of visit, yes.

7    **Q.**   Because to get someone to witch over from the Cephalon

8    products to Subsys, there are a lot of hurdles they had to go

9    over, correct?

10   **A.**   Correct.

11   **Q.**   Paperwork, correct?

12   **A.**   Correct.

13   **Q.**   There might be issues they have on dosing or titration

14   they need information on, correct?

15   **A.**   Correct.

16   **Q.**   And there's nothing inappropriate about saying Marcus has

17   to live there.  You're talking just metaphorically, correct?

18   **A.**   Correct.

19   **Q.**   He has to spend a lot of time at this target.  And then

20   you said, "Stewart wrote seven in September, according to

21   360."

22          What is 360?

23   **A.**   I don't recall, but it sounds like a data source.

24   **Q.**   There's all sorts of data entities that sell information

25   to pharmaceutical companies, correct?

1  **A.**  Direct.

2  **Q.**  And they get prescribing information from the pharmacies

3  or insurance companies, correct?

4  **A.**  I'm sorry.  Could you please repeat that?

5  **Q.**  They get prescribing information from either pharmacies

6  or insurance companies?

7  **A.**  Correct.

8  **Q.**  And then it said, "When I asked him what happened, he

9  said he thinks he prescribed too low of a dose, 100s."

10  Correct?

11  **A.**  Correct.

12  **Q.**  "There was obviously no follow up regarding titration.

13  Unexceptable."

14         I take it that's a typo.

15  **A.**  Yes, it is.

16  **Q.**  Unacceptable.  "We need to reactivate him."

17         So that's an example when a physician gives a

18  100-mic dose, it's really a bad patient experience?

19  **A.**  In this case it was.  But you have to, according to the

20  label, start with the lowest one.  But we know they're going

21  to titrate up.  So you need to follow up.

22  **Q.**  I'm not arguing with you what's on the label.  I

23  appreciate you reminding us of it.

24         I want to focus on the issue that it would happen

25  that doctors would note that if they put their patients at

1    100 mic, microgram, as a starting dose, they would not get

2    the pain relief that they needed?

3            MR. YEAGER:   Objection as to what doctors would

4    know, Your Honor.

5            THE COURT:   Sustained.

6    BY MR. KENDALL:

7    **Q.**   Here what you're referring to is a situation where the

8    doctor wrote a 100-microgram prescription and the patient

9    didn't get adequate pain relief?

10   **A.**   Yes.   It appears to be that, according to this, yes.

11   **Q.**   So we have the frustrating situation where the better

12   drug is giving a worse patient experience at this dose,

13   correct?

14   **A.**   I'm sorry.   The patient is having a worse experience?

15   **Q.**   The better drug is giving less pain relief for the

16   patient?

17   **A.**   I'm not clear on the question.

18   **Q.**   Because they're starting at 100-microgram dose, even

19   though Subsys is a better drug, it's not giving adequate pain

20   relief to the patient?

21   **A.**   That's correct.   In this case, yeah.

22   **Q.**   And then you write, "We need to target him for the switch

23   program should we expand the program beyond Actiq, which is

24   likely."

25            Is that meaning he was a Fentora user?

1    **A.**   Yes.  I'm assuming that.  Can you pull it up so I can

2    read the bottom, please?

3    **Q.**   I'm sorry.  Thank you.  And then you say, "Finally, Joe,

4    you need to take both Stewart and Rosenfeld to dinner ASAP."

5             There's nothing inappropriate for a sales

6    supervisor to take a couple of doctors to dinner, is there?

7    **A.**   No.

8    **Q.**   In fact, Joe is quite good at that because he has such a

9    pleasant personality, correct?

10   **A.**   Correct.

11   **Q.**   Now then you say "Taylor."  Is that Dr. Taylor?

12   **A.**   Correct.

13   **Q.**   Who is he or she?

14   **A.**   It's Donald Taylor.

15   **Q.**   Is he someone with a substantial pain practice in the

16   Atlanta area?

17   **A.**   Yes.

18   **Q.**   And then you say he is on board.  Meaning he is

19   supporting Subsys?

20   **A.**   Yes.

21   **Q.**   "We reiterated the Actiq switch and the prior approval

22   IRC program and that you can fight this all way to external

23   review."

24            Do you mean all the way to external review?

25   **A.**   Correct.

1    **Q.**   Is that correct?

2    **A.**   That's correct.  That's the program we talked about.

3    **Q.**   So what you're noting is that if the doctors believe in

4    the product, if they agree with you it's the better product

5    for their patient, they can keep filing the paperwork and

6    keep contesting the insurance company's decision all the way

7    up to the external review board, correct?

8    **A.**   Yes.

9    **Q.**   And what the insurance companies do is they have several

10   layers of appeals and requests to get approval, correct?

11   **A.**   Correct.

12   **Q.**   And you have to keep filing paperwork, wait for a

13   decision.  And then if you don't like it, you appeal to the

14   next level?

15   **A.**   Correct.

16   **Q.**   What's an external review board?  If you could explain

17   that to us?

18   **A.**   So that's the internal and the external review board.

19   And the internal review board is within the insurer itself,

20   within that company.  And it goes through their review

21   process internally, and it goes up the food chain.  If

22   there's no agreement, then it goes to an external review

23   board.

24           And that's what I was talking about before is if

25   you're persistent and go out to the external review board,

1    there's good chances it will get approved.

2    **Q.**   And so in some ways it's a bit of a marathon of

3    paperwork?

4    **A.**   Yes.

5    **Q.**   You file, you appeal, you file, you appeal, and

6    eventually if you stick with it long enough, an external

7    review board will often recognize the value of the

8    medication?

9    **A.**   Correct.

10   **Q.**   But fair to say whether it's intentional or not,

11   insurance companies save a lot of money because people give

12   up in this paperwork marathon and they settle for the cheaper

13   drug?

14   **A.**   Mm-hmm.

15   **Q.**   Is that correct?

16   **A.**   The patient will settle for the cheaper drug, yes, the

17   generic.

18   **Q.**   And insurance companies can save substantial amounts of

19   money just from the patients giving up and not going all the

20   way to the external review board?

21   **A.**   I'm sorry.  Could you repeat that again?

22   **Q.**   Based upon your experience in the pharmaceutical industry

23   for the last 15 or 20 years, would you agree that insurance

24   companies frequently can save a large amount of money by

25   having large numbers of patients give up and not follow all

1    the way through to the external review board?

2    **A.**   Correct.  Yes, correct.

3    **Q.**   In fact, you're aware it's actually a fairly significant

4    issue in the healthcare industry if the insurance companies

5    are being too aggressive?

6                MR. YEAGER:  Objection.

7                THE COURT:  Sustained.

8    BY MR. KENDALL:

9    **Q.**   Okay.  And then you write, "We reiterated the Actiq

10   switch and the prior approval IRC policeman" -- excuse me.

11   We did that.

12              "He identified a Fentora patient he would like to

13   switch but who has been hesitant as she's fearful she will

14   raise a flag with her insurer."

15              Do you see that?

16   **A.**   I do.

17   **Q.**   That actually was a problem with a lot of practices,

18   wasn't it?

19   **A.**   Correct.

20   **Q.**   The patient wants the better medicine, but they're scared

21   of what the insurance company might do?

22              MR. YEAGER:  Objection.

23              THE COURT:  Sustained.

24   BY MR. KENDALL:

25   **Q.**   You're communicating here that there was a patient who

1    wanted the medicine, but she was fearful of what her

2    insurance company would do?

3    **A.**   That's what was conveyed to me.

4    **Q.**   And then you wrote, "The patient is a perfect candidate

5    for the switch program, and we will make an exception since

6    she's Fentora and not Actiq as she will convert to 1600

7    micrograms times 180 units."

8    **A.**   Correct.

9    **Q.**   That's indicating to get her to go from generic -- strike

10   that.

11          To get someone to go from branded to branded was an

12   attractive thing, so you wanted to make her -- assisting her

13   priority, correct?

14   **A.**   Yes.   That was the holdup, yes.   The Actiq program was

15   originally -- the switch program was originally Actiq, not

16   Fentora.   Just note, though, that when a patient switched,

17   they had to go down -- until the label changed -- to the

18   lowest dose and titrate back up.

19   **Q.**   Yes.   You're noting she's on 1600 micrograms, correct?

20   **A.**   She's currently, yeah.   So it's convert from

21   1600 micrograms.

22   **Q.**   If she's getting 1600 micrograms, she's feeling a lot of

23   pain, correct?

24          MR. YEAGER:  Objection.

25          THE COURT:  Sustained.

1    BY MR. KENDALL:

2    **Q.**   A 1600-microgram dose is designed for patients that have

3    substantial pain, correct?

4    **A.**   Correct.

5    **Q.**   And so what's going to have to happen here is you're

6    taking a person that the physician has decided needs a high

7    dose of 1600 micrograms, you're going to drop them down to

8    100, correct?

9    **A.**   Correct.

10   **Q.**   That's not going to give the pain relief that this

11   patient needs, correct?

12              MR. YEAGER:  Objection.

13              THE COURT:  Sustained.

14   BY MR. KENDALL:

15   **Q.**   You're going to drop them down to 100 and then the

16   physician needs to titrate them back up to the appropriate

17   microgram dosage, correct?

18   **A.**   To the effective dose, yes.

19   **Q.**   To the effective dose, correct?

20   **A.**   Correct.

21   **Q.**   Nobody picks 100 micrograms as an effective pain --

22   strike that.

23              The label does not say that -- strike that.

24              For other than 4 or 5 percent of the people in the

25   study, the label does not say that 100 micrograms is an

1    effective therapeutic dose, does it?

2    **A.**   The label in 4 percent of the cancer patients from the

3    pivotal study, yes.

4    **Q.**   So for 96 percent, it's not an adequate therapeutic dose,

5    correct?

6              MR. WYSHAK:  Objection.  For cancer patients.

7    BY MR. KENDALL:

8    **Q.**   For cancer patients?

9              THE COURT:  Sustained.

10   BY MR. KENDALL:

11   **Q.**   And then your action recommendation was "follow up and

12   get that patient."  Correct?

13   **A.**   Yes.

14   **Q.**   Now I want to show you next a document marked as

15   Exhibit 5487.

16             THE COURT:  Hold on a second.  Do you want to hold

17   this until tomorrow?

18             MR. KENDALL:  Whatever you'd like, Your Honor,

19   because I've got a good bit more to do.

20             THE COURT:  All right.  We're going to recess for

21   the day then.  Keep an open mind.  No communications about

22   the case.  No homework.  Go out and enjoy yourself for the

23   day.  Thanks, everyone.

24             THE CLERK:  All rise for the jury.

25             (The jury exits the courtroom.)

1          MR. YEAGER:  Your Honor, if I might.

2          THE COURT:  Yes.

3          MR. YEAGER:  I apologize to the Court for the

4    speaking narrative.  I was frustrated because of what

5    happened at sidebar.

6          THE COURT:  You've hardly been the biggest

7    offender.  Everybody has and will no doubt have their

8    moments.

9          MR. YEAGER:  I will point out that I believe very

10   much that Mr. Kendall understands exactly what he's doing

11   with regard to refreshing a witness.  He can teach a law

12   school seminar on how to refresh a witness and he knows what

13   he's doing with this witness.

14         THE COURT:  You're excused for the day.

15         THE WITNESS:  Thank you.

16         MS. WILKINSON:  Can we sit down, Your Honor?

17         THE COURT:  Yes.  You can go.

18         MS. WILKINSON:  We were listening to Mr. Yeager.

19         THE COURT:  I think he's done.

20         MS. WILKINSON:  Are you done?

21         MR. YEAGER:  No, I'm not done.

22         MS. WILKINSON:  He's going to yell at me.

23         MR. YEAGER:  I'm not yelling at anyone.  Your Honor

24   has seen the limits that Mr. Napoletano has.  It's not an

25   accident that he's standing up there -- a transcript that he

```
 1   wrote like this -- and it's not okay.
 2            THE COURT:  I'm not saying that I disagree with
 3   you, but I've instructed the witness.  I've instructed
 4   Mr. Kendall.  I'm sustaining your objections when
 5   appropriate.
 6            MR. KENDALL:  Your Honor, I never met this witness.
 7   I haven't spent a moment with him.  They've had hours to show
 8   him stuff and go over stuff.  If I'm not following the rules,
 9   I ask you to instruct me and let me know, but I'm trying to
10   do the best I can.
11            THE COURT:  You're being very aggressive with the
12   concept of refreshing recollection.  I don't think that's
13   news to you.  I think this coming out of my mouth right now
14   is not the first that that concept has crossed your radar
15   screen.  You're close to the line.  When you're over, he'll
16   object and I'll sustain it.  When you're not, fine.  You know
17   how to refresh a witness' recollection.
18            MR. KENDALL:  I've been trying to do that.  I'll
19   try to be more focused on that.
20            THE COURT:  I'm not unhappy about it.  I'm not as
21   unhappy about it as Mr. Yeager is.  I'm just saying he's
22   making his objections, and I play the hand I'm dealt.
23   Anyway, he's right you're being very aggressive on the
24   concept of refreshing recollection.  Okay?
25            MR. KENDALL:  Thank you, Your Honor.
```

```
1              THE COURT:  See everyone tomorrow.

2              How much more do you have, Mr. Kendall?

3              MR. KENDALL:  I'm going to look at my notes.  More

4    than 20 minutes.  Whether that's 40 minutes or whatever, it's

5    30 to 60 minutes.  I want to cut some stuff out.

6              THE COURT:  It's not a good sign when your own team

7    wants to put a pencil through their temple.

8              MR. KATZ:  No.  I'm enjoying myself.

9              MS. WILKINSON:  Me, too.

10             MR. KATZ:  I really am.

11             THE COURT:  Of course you are, Mr. Katz.  What do

12   the rest of you think as followup?

13             MS. MINER:  Half an hour.

14             MR. TYRRELL:  Half an hour.

15             MR. HORSTMANN:  Five minutes.

16             THE COURT:  Attaboy.

17             MR. HORSTMANN:  You set me up.

18             MS. WILKINSON:  Longer, Your Honor.

19             THE COURT:  Before lunch with him or no?

20             MS. WILKINSON:  It just depends.  I have less to

21   cover, thanks to Mr. Kendall.

22             THE COURT:  I'm just trying to figure out where we

23   are.  I'm not pushing anybody.

24             MS. WILKINSON:  My guess from watching him is an

25   hour.  I never like to go longer than an hour.
```

1          THE COURT:  That's fine.  I'm really not pushing

2    anyone.  I'm just trying to figure out where we are.

3          MS. WILKINSON:  It could be longer.  I told the

4    government that I thought we would go until at least lunch

5    tomorrow because everybody wants to talk to this witness.

6          THE COURT:  All right.  See everyone tomorrow.

7          (Court recessed at 4:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                - - - - - - - - - - -

2                     CERTIFICATION

3

4        I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                February 4, 2019

11   /s/ Kelly Mortellite

12

13   _____        _____

14   Joan M. Daly, RMR, CRR          Date
     Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF WITNESSES

2       WITNESS                                           PAGE

3

4       MATTHEW NAPOLETANO

          Cont. Direct Examination By Mr. Yeager ............   28
5         Cross Examination By Mr. Kendall...................  120

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            E X H I B I T S

2

    Defendant Exhibit                                   Received

3
        182        ....................................     215
4
        197A       ....................................      82
5
        320        ....................................      66
6
        327        ....................................      69
7
        354        ....................................      71
8
        358        ....................................      72
9
        399        ....................................      61
10
        400        ....................................      62
11
        401        ....................................      62
12
        402        ....................................      62
13
        412        ....................................      72
14
        413        ....................................      64
15
        415        ....................................      58
16
        419        ....................................      74
17
        431        ....................................      76
18
        432        ....................................      69
19
        444        ....................................      40
20
        455        ....................................      56
21
        466        ....................................      39
22
        642        ....................................     150
23
        1501       ....................................      53
24
        5380       ....................................     218
25
        5394       ....................................     164

5471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

5473 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

5476 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

5477 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

5478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

5479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

5482 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

5495 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

5513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167