1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MASSACHUSETTS

3     _____

4     UNITED STATES OF AMERICA,

5                      Plaintiff,           Criminal Action
                                            No. 16-CR-10343-ADB
6     v.
                                            February 12, 2019
7     MICHAEL J. GURRY, RICHARD M.          Pages 1 to 169
      SIMON, SUNRISE LEE, JOSEPH A.
8     ROWAN, and JOHN KAPOOR,

9                      Defendants.

10    _____

11

12

                      TRANSCRIPT OF JURY TRIAL -- DAY 17
13           BEFORE THE HONORABLE ALLISON D. BURROUGHS
                       UNITED STATES DISTRICT COURT
14               JOHN J. MOAKLEY U.S. COURTHOUSE
                          ONE COURTHOUSE WAY
15                      BOSTON, MA   02210

16

17

18

19

20

21

22
                          JOAN M. DALY, RMR, CRR
23                       Official Court Reporter
                    John J. Moakley U.S. Courthouse
24                One Courthouse Way, Room 5507
                          Boston, MA   02210
25                    joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      FOR THE GOVERNMENT:
 3
              FRED WYSHAK
 4            K. NATHANIEL YEAGER
              DAVID G. LAZARUS
 5            Assistant U.S. Attorneys
              United States Attorney's Office
 6            John Joseph Moakley Federal Courthouse
              1 Courthouse Way
 7            Suite 9200
              Boston, Massachusetts 02210
 8            617.748.3100
              fred.wyshak@usdoj.gov
 9            nathaniel.yeager@usdoj.gov
              david.lazarus2@usdoj.gov
10

11    FOR THE DEFENDANT MICHAEL J. GURRY:

12            TRACY A. MINER
              MEGAN A. SIDDALL
13            Demeo LLP
              200 State Street
14            Boston, Massachusetts 02109
              617.263.2600
15            tminer@demeollp.com
              msiddall@demeollp.com
16

17    FOR THE DEFENDANT RICHARD M. SIMON:

18            STEVEN A. TYRRELL
              PATRICK J. O'TOOLE, JR.
19            Weil, Gotshal & Manges LLP
              100 Federal Street
20            Boston, Massachusetts 02110
              617.772.8365
21            steven.tyrrell@weil.com
              patrick.otoole@weil.com
22

23

24

25
```

1    APPEARANCES (continued):

2

3    FOR THE DEFENDANT SUNRISE LEE:

4            PETER C. HORSTMANN
             Law Offices of Peter Charles Horstmann
             450 Lexington Street
5            Suite 101
             Newton, Massachusetts 02466
6            617.723.1980
             pete@horstmannlaw.com
7

8    FOR THE DEFENDANT JOSEPH A. ROWAN:

9            MICHAEL KENDALL
             ALEXANDRA I. GLIGA
10           White & Case, LLP
             75 State Street
11           Boston, Massachusetts 02109
             617.939.9310
12           michael.kendall@whitecase.com
             alexandra.gliga@whitecase.com
13

14   FOR THE DEFENDANT JOHN KAPOOR:

15           BETH WILKINSON
             KOSTA S. STOJILKOVIC
16           Wilkinson Walsh Eskovitz
             2001 M Street NW
17           Washington, D.C. 20036
             202.847.4000
18           bwilkinson@wilkinsonwalsh.com
             kstojilkovic@wilkinsonwalsh.com
19
             AARON M. KATZ
20           BRIEN T. O'CONNOR
             Ropes & Gray
21           Prudential Tower
             800 Boylston Street
22           Boston, Massachusetts 02199
             617.951.7385
23           aaron.katz@ropesgray.com
             boconnor@ropesgray.com
24

25

```
1                     P R O C E E D I N G S
2              (The following proceedings were held in open court
3    before the Honorable Allison D. Burroughs, United States
4    District Judge, United States District Court, District of
5    Massachusetts, at the John J. Moakley United States
6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
7    February 12, 2019.)
8              THE COURT:  She handed me 6021.
9              MR. STOJILKOVIC:  Yes, Your Honor.  This is at my
10   request.  This is reraising an issue that we discussed at
11   sidebar yesterday with respect to Ms. Alfonso.  It is her
12   plea colloquy.  I renew the motion at this time on behalf of
13   all the defendants to present this to the jury and to cross
14   the witness on it, and I want to state some additional
15   reasons why.
16             THE COURT:  Okay.
17             MR. STOJILKOVIC:  It is not merely an issue of
18   Ms. Alfonso being there and her attorney being there.  It is
19   an issue of a statement of a party opponent, the Department
20   of Justice, which took a contrary actual position at
21   Ms. Alfonso's plea hearing as to her conduct and the position
22   that was presented on direct by the same Department of
23   Justice yesterday.
24             And as such, it is plainly admissible and
25   defendants have a right and an obligation to present to the
```

1    jury that the government has reinterpreted or changed its

2    view of the facts.

3          It is also exculpatory, and it is also impeachment

4    material because it suggests that at least as of 2015 the

5    government took a different approach, not just in terms of

6    the plea and the elements, but in terms of the factual

7    assertions in Ms. Alfonso's case than what they're proffering

8    now.

9          And my basis for that argument is page 36 of the

10   transcript where the presiding judge asks whether the

11   treatment, prescribed Subsys, was not medically necessary.

12   And the prosecutor on behalf of the Department of Justice

13   says, Judge, I'm glad you asked, that's not what we're

14   claiming, and then continues to clarify.  I think, Judge, the

15   way you would characterize it is that Ms. Alfonso is being

16   paid to prescribe Subsys effectively on what they call

17   off-label here for people who she thinks she's entitled to

18   prescribe it to, although Medicare won't pay for it.

19         Your Honor, I submit that is factually inconsistent

20   with the testimony the government presented through this

21   witness yesterday where she repeatedly said that she made

22   prescriptions outside the ordinary course of medicine and not

23   for a legitimate reason.

24         And I think it is a quintessential part of

25   cross-examination and the search for truth and the ability to

1    show inconsistencies in our opponent's position that I be

2    allowed to present that.  Mr. Lazarus was familiar with the

3    transcript.  He's the first one who raised it.  He was

4    certainly aware of it before he put the witness on.  If the

5    government has chosen to go in a different direction with the

6    witness, we should have a right to confront on that.

7              THE COURT:  Isn't what they're talking about what

8    they are prosecuting her for?  Which is not to say they

9    couldn't have prosecuted her for other things as well.

10             MR. STOJILKOVIC:  No, Your Honor.  I believe it

11   extends further than that.  Obviously the elements of the

12   Anti-Kickback Statute are different than the elements of the

13   offenses charged here.  We had a lot of briefing on that.

14   But it is one thing for the government to say in its

15   discretion we choose to prosecute this individual with this

16   charge and not some other higher charge.

17             But the government went further.  They are saying

18   they are not claiming that Subsys is medically necessary, and

19   then they affirmatively characterize that Ms. Alfonso is

20   being paid to prescribe Subsys, effectively on what they call

21   off-label here, for people who she thinks she's entitled to

22   prescribe it to.

23             The testimony offered yesterday was the opposite.

24   She broke her duty.  She should not have prescribed these.

25   These were bad-faith prescriptions.  I think that is far more

1    than just the recitation of the elements.

2             MR. LAZARUS:  Your Honor, if the Court would go up

3    to page 35, to the last line on the page previously, please.

4             The judge at the Rule 11 asked:

5             "THE COURT:  Okay, I'm glad you mentioned that.  I

6    take it it's correct that part of the government's proof at

7    trial would be that" -- "proof at trial would be that, first

8    of all, the treatment prescribed, the Subsys, was not

9    medically necessary."

10            And then they go into the discussion, Your Honor.

11   They're talking at the Rule 11, as the Court's well aware, of

12   what they would have to prove to a jury at trial to raise the

13   stakes of medical necessity in the context of what they would

14   have to prove at trial on a kickback case would be

15   heightening their burden.

16            The Court's well aware this is not the relevant

17   conduct at sentencing.  This is a different district in 2015

18   taking a plea on a kickback case.  And as the Court pointed

19   out yesterday on page 36 at line 17, the Court there

20   clarified and said:

21            "So even whether or not there's overutilization

22   here, the case is simply that she received remuneration in

23   exchange for prescribing Subsys to patients whose treatment

24   was paid for by the federal government."

25            And that's the elements of the Title 42 charge,

 1   Your Honor.

 2            And then Mr. Morabito for the government says

 3   that's correct.

 4            The Court then says, do you want to add anything?

 5            Ms. Alfonso's counsel says that's essentially what

 6   our understanding is.

 7            So they're cherry-picking pieces of this Rule 11

 8   transcript and taking it out of context.  They were talking

 9   about what they would prove at trial.  As the Court is well

10   aware, it's a sufficient factual basis for the Court to find

11   that there's a basis for the Court to take the plea.

12            And so that's what they were doing there, Your

13   Honor, and that's what the record says.

14            I would also just note that Ms. Levine, who took a

15   plea in Connecticut, at her change-of-plea hearing, they

16   asked about the restitution in that case, and they said that

17   her claims would be unnecessary to Medicare.

18            And so the idea that we're going to pick pieces out

19   of transcripts in Connecticut and hold that against the

20   district here, we're all one government, but it's not the

21   same team that's prosecuting this case.  We weren't there.

22   That was years ago before this indictment that we're here on

23   now in front of this jury took place.  So it's not an

24   inconsistent position, and the transcript just doesn't stand

25   for what they say it stands for, Your Honor.

1          MR. STOJILKOVIC:  Your Honor, if I may respond.

2    People smarter than I, the cross-examination is one of the

3    greatest vehicles for the search of truth.  But in order to

4    get to that search, we need to present information.

5          With respect to Mr. Lazarus, the fact that it was a

6    different part of the government, it's still the same

7    Department of Justice.

8          This goes beyond -- these are factual descriptions.

9    There's one or two explanations.  The government thought at

10   the time that Ms. Alfonso made medically illegitimate

11   prescriptions but chose not to inform the Court, or the

12   government did not think that to be the case.  Either of

13   those are vital lines of cross-examination.  Either they're

14   currying favor or they've changed their view of the case.

15         And, Your Honor, especially in light of the fact

16   that this witness after not mentioning it for 36 meetings was

17   allowed, based on a last-minute proffer, to estimate that

18   vast quantities of her prescriptions were medically

19   illegitimate, I think it is easily, easily within the bounds

20   of cross that I am allowed to confront her that that's not a

21   position the government took.

22         THE COURT:  Well, first of all, I'm not really sure

23   you need this.  You certainly made the point that you want to

24   make by using this.  You can cross-examine her on the fact

25   that she didn't plead to the fact that she was doing

1  medically unnecessary things, that the judge wasn't told she

2  was doing medically unnecessary things, but I don't think

3  that you can use it sort of beyond that.

4         If you want to get at this that this was a promised

5  reward and inducement that she was charged with less than she

6  could have been charged with, I think that's fair game.  But

7  to hold this against -- I don't think it's an admission by

8  her.  I don't think it's the admission of a party opponent.

9  It's just the woof and warp of a plea agreement.  So there

10 are things here you can use, but I'm not sure you can go

11 quite as far as you want to go.

12        MR. STOJILKOVIC:  I will try, Your Honor.

13        MR. LAZARUS:  Your Honor, I did have one issue I

14 wanted to raise on a different exhibit before the jury comes

15 in.

16        First of all, with respect to the Court's ruling

17 just now, it would seem to me that we went over that

18 yesterday.  I would ask that we not retread -- I don't mind

19 if there's questions on it; I just don't want to retread the

20 whole thing, is all, Your Honor.

21        I have a separate issue.

22        THE COURT:  If you want me to start sustaining

23 objections on things that are repetitive, this trial is going

24 to go considerably shorter than you're planning on because

25 there is a lot of repetition by both parties.

1          MR. LAZARUS:  I understand.

2          THE COURT:  I think it's fine if you want to make

3    your points, and what you want to emphasize you want to

4    emphasize.  But what's good for the goose is good for the

5    gander, and if I start sustaining your objections on that I'm

6    going to hold you to the same standard and I don't think

7    anybody's going to really like it.

8          MR. LAZARUS:  I understand, Your Honor.  Thank you.

9          So counsel was kind enough to provide me with

10   exhibits he intends to use this morning.  One of them is

11   a-one page document containing what looks like text messages.

12         My only objection to it -- I don't have an issue

13   with the content.  I don't have an issue with the text

14   messages.  I've offered that if the exhibit is corrected to

15   stipulate to introducing it without a witness later.

16         But the "To" column on this exhibit is blank.  I

17   just don't think it's fair to use it to impeach or refresh

18   this witness without all the information on.  And so I don't

19   have any issue with the information.

20         I think counsel is right that it is what he says it

21   is.  I don't think he's trying to pull one over on anybody.

22   I just don't think it's fair to put it in front of the

23   witness with this "To" column missing and ask her questions

24   about it.  So that's my objection.

25         THE COURT:  Are they all to her?

1       MR. LAZARUS:  Some of them are from her and some of

2   them are from her significant other.  I think they're back

3   and forth, but I don't know that.  She may look at it and

4   remember and say yes.  But other than that, to try to get her

5   to refresh her memory that this is that, it's just not fair

6   to the witness.  I don't object to the content or the

7   information.

8       MR. STOJILKOVIC:  Your Honor, I think this is

9   something we can clean up.  I'm frankly not even sure I'm

10  going to use it.  If I do, we can find a way to clean it up.

11      THE COURT:  You can handwrite it in if you want and

12  we can show it to the jury later.  However you want to do it

13  is fine.  I don't want to hold up his presentation.

14      MR. LAZARUS:  That's fine.  I don't want to keep

15  the information out.  I don't care.  I just want it to be

16  accurate for the witness.

17      MR. TYRRELL:  Your Honor, one quick question.  Was

18  the fisheries fellow sent home?

19      THE COURT:  Yes.  I'm afraid he's up there waiting

20  for 18.  He normally knocks on the door when they're all

21  here.  I'm afraid he's waiting for 18 because he has 17.

22      THE CLERK:  All rise for the jury.

23      (The jury enters the courtroom.)

24      THE CLERK:  Court is in session.  Please be seated.

25      THE COURT:  Good morning, everybody.  The day

1    before the storm.  You'll notice that one of your members is

2    missing today, back there, Number 11.  You are not to

3    speculate about it or wonder about it.  He's legitimately

4    excused.  Nor are you to think of it as an avenue for escape

5    for the duration.  He is no longer with us.  He's fine.  He's

6    healthy, but something came up that was unavoidable.  All

7    right?

8              When you're ready.  Excuse me.

9              You're still under oath.

10             THE WITNESS:  Yes, ma'am.

11             (HEATHER ALFONSO, previously sworn.)

12             CROSS EXAMINATION (resumed)

13   BY MR. STOJILKOVIC:

14   **Q.**  Ms. Alfonso, good morning.

15   **A.**  Good morning.

16   **Q.**  When you pled guilty in 2015, you did not plead guilty to

17   making medically illegitimate prescriptions, correct?

18   **A.**  Correct.

19   **Q.**  And when you appeared before the Court to enter that

20   guilty plea, the government did not claim at that time that

21   you were making medically illegitimate prescriptions?

22   **A.**  I don't believe so.

23   **Q.**  And if I represent to you that based on my review of what

24   you had told federal agents back in 2015, when you said your

25   memory was better, and I represent to you that you had not

1    told them at any point at that time that you made medically

2    illegitimate prescriptions, you would have no reason to

3    dispute that?

4              MR. LAZARUS:  Objection, Your Honor.  Form.

5              THE COURT:  Overruled.

6    **A.**  I don't think so.

7    BY MR. STOJILKOVIC:

8    **Q.**  I want to clear up one thing that you told us yesterday,

9    which is that you told us you started at Comprehensive Pain

10   in the spring of 2012.  Do you remember that testimony from

11   yesterday?

12   **A.**  Correct.

13   **Q.**  But you also told us that your memory from the events

14   from that time is not that great?

15   **A.**  Correct.

16   **Q.**  And your memory would have been better when you went into

17   the grand jury in 2015 because the events would have been

18   more fresh?

19   **A.**  That's true.

20   **Q.**  Okay.  Do you have your grand jury transcript there from

21   yesterday?

22   **A.**  Yes.

23   **Q.**  Can you please turn to page 9.  Directing your

24   attention -- I'm going to just read to you a question and

25   answer series, starting with the very last line, last line of

1  page 9.  Were you asked and did you answer as follows in the

2  grand jury:

3          "Okay.  And after you left St. Mary's, where did

4  you go?

5          "ANSWER:  To Comprehensive Pain & Headache

6  Treatment Center?

7          "QUESTION:  And is that in approximately May or

8  June of 2011?

9          "ANSWER:  Yes.  I started at the end of May

10  part-time because I was still with St. Mary's, and then in

11  June I started full-time."

12          Do you see that?

13  **A.**  I do see that.

14  **Q.**  So your testimony under oath in 2015 was that you had

15  started at Comprehensive Pain in 2011, correct?

16  **A.**  It appears that way, but I think that is an error on my

17  part.

18  **Q.**  You got a license to prescribe controlled substances

19  around the time that you went to work at Comprehensive Pain,

20  right?

21  **A.**  Yes.

22  **Q.**  Because that was part of your duties at Comprehensive

23  Pain, to prescribe medications including narcotics, correct?

24  **A.**  Correct.

25          MR. STOJILKOVIC:  Can we put up for the witness and

1     counsel what's been marked for identification as

2     Exhibit 6020.  If we can blow that up.

3     BY MR. STOJILKOVIC:

4     **Q.**  Ms. Alfonso, I'm showing just for you now and for counsel

5     a document from the State of Connecticut.  Is that your name

6     indicated there?

7     **A.**  Yes.

8     **Q.**  I don't want to read it out loud, but was that the

9     address associated with your license at the time?

10    **A.**  Yes.

11    **Q.**  Okay.  And this is a license for controlled substance

12    registration practitioner, right?

13    **A.**  Correct.

14    **Q.**  And it was issued on May 16, 2011, right?

15    **A.**  Yes.

16    **Q.**  Does that refresh your recollection that you began at

17    Comprehensive Pain in May of 2011 rather than 2012?

18    **A.**  I think I started in 2012.

19    **Q.**  You think you got a license to prescribe controlled

20    substances a full year before you started at Comprehensive

21    Pain?

22    **A.**  Yeah, I don't recall.  Because I didn't start working as

23    an APRN right away.

24    **Q.**  You never prescribed controlled substances before going

25    to Comprehensive Pain, correct?

1    **A.**   No.

2              MR. STOJILKOVIC:   I would move the admission of

3    6020.

4              MR. LAZARUS:   No objection.

5              THE COURT:   Admitted.

6              (Defendant Exhibit No. 6020 admitted.)

7              MR. STOJILKOVIC:   If we can publish it to the jury.

8    BY MR. STOJILKOVIC:

9    **Q.**   What we're talking about here, Ms. Alfonso, is the date

10   that you were issued the license that allowed you to

11   prescribe controlled substances such as Subsys, right?

12   **A.**   Correct.

13   **Q.**   The date that you were issued that license was in May of

14   2011, correct?

15   **A.**   Correct.

16             MR. STOJILKOVIC:   We can put that down.   Thank you,

17   Randall.

18   **Q.**   And before you joined the Insys speaker program, you had

19   been a speaker for Fentora, right?

20   **A.**   Correct.

21   **Q.**   Fentora is a competing product to Subsys?

22   **A.**   Yes.

23   **Q.**   They're both TIRFs, right?

24   **A.**   Correct.

25   **Q.**   Both fast-acting, rapid-onset fentanyl.

1   **A.**   Correct.

2   **Q.**   Different delivery mechanism, same active ingredient?

3   **A.**   Right.

4   **Q.**   You spoke for Fentora a fair amount of times, correct?

5   **A.**   I believe so.

6   **Q.**   Some of those times you spoke to larger audiences, right?

7   **A.**   Correct.

8   **Q.**   Nurse practitioner associates and oncology nurses at

9   times were in the audience, correct?

10  **A.**   Yes.

11  **Q.**   And there were also dinners for the Fentora speaker

12  program where you spoke, correct?

13  **A.**   Yes.

14  **Q.**   And in those presentations you used a slide deck, right?

15  **A.**   I did.

16  **Q.**   So those were not sham events that you did for Fentora?

17  **A.**   No.

18  **Q.**   And you were perfectly capable of delivering real speaker

19  events?

20  **A.**   Yes.

21  **Q.**   So if Jessica Crane last week told this jury that you

22  were not even capable of doing a 45- to 60-minute

23  professional presentation, she would be wrong about that?

24              MR. LAZARUS:  Objection.

25              THE COURT:  Sustained.

1    BY MR. STOJILKOVIC:

2    **Q.**  Ms. Alfonso, you were capable at the time of doing a 45-

3    to 60-minute professional presentation, correct?

4    **A.**  Correct.

5    **Q.**  And when you joined the Insys speaker program, you told

6    us you were trained on how to speak, right?

7    **A.**  Yes.

8    **Q.**  Trained on the content, right?

9    **A.**  Yes.

10   **Q.**  And that's not unusual, is it?

11   **A.**  No.

12   **Q.**  You were also trained for your speaking participation

13   with Fentora, right?

14   **A.**  Correct.

15   **Q.**  And if we can take a look at what's already in evidence

16   Exhibit 1836.  You were shown this on direct, and I just

17   wanted to follow up.  This is an email that you received from

18   Matt Napoletano in October of 2012.

19           Do you remember looking at this yesterday?

20   **A.**  Yes.

21   **Q.**  And this is an email where Mr. Napoletano thanked you for

22   your interest in participating in the Insys speaker bureau

23   program, right?

24   **A.**  Yes.

25   **Q.**  And gave you information about a training session by

1    Larry Dillaha, M.D., right?

2    **A.**   Correct.

3    **Q.**   And he also attached a slide deck for that training,

4    correct?

5    **A.**   Yes.

6              MR. STOJILKOVIC:  And if we look at 1836-02, also

7    in evidence, if we could display it, please.

8    **Q.**   This is the slide deck, correct?

9    **A.**   It appears to be, yes.

10   **Q.**   I'm not going to take you all the way through it, but if

11   we can just flip to the next page.  What it generally does,

12   it has the slide material such as this slide.  This is

13   something that would be presented by a speaker at an event,

14   correct?

15   **A.**   Correct.

16   **Q.**   And then if we go to the next page, it also has kind of

17   notations.  This is the training part.  This is part of the

18   education, the training that they're trying to give folks

19   like you so you have some talking points to go along with the

20   visual?

21   **A.**   Correct.

22   **Q.**   And if we go through this, it does that for every page.

23   Is that fair?

24   **A.**   Yes.

25             MR. STOJILKOVIC:  Okay.  We can put that down.

1  Thank you.  And if we can look at 1837 also in evidence.  Can

2  you scroll down.  I apologize.  I have the wrong number.  If

3  we can look at 571, which I believe is in evidence.

4  **Q.**  I think you looked at this yesterday, too, Ms. Alfonso.

5  It may have been under a different number.  This is just a

6  follow-on from this earlier email.  Do you see that?

7  **A.**  I do, yes.

8  **Q.**  So you were indicating to Matt that you couldn't be near

9  a computer, but you have the deck and you were going to call

10  in, right?

11  **A.**  Yes.

12  **Q.**  And he said that he was glad you can participate, right?

13  **A.**  Correct.

14  **Q.**  And you didn't tell Mr. Napoletano at this point in

15  October of 2012 that you intended to do sham speaker events,

16  did you?

17  **A.**  No, of course not.

18         MR. STOJILKOVIC:  If we can now just have for the

19  witness and counsel what's been marked for identification as

20  Exhibit 6027.

21  **Q.**  Do you recognize this as an email from Matt Napoletano to

22  you at one of your email addresses?

23  **A.**  Yes, I do.

24  **Q.**  And this is in November of 2012, correct?

25  **A.**  Correct.

1    **Q.**   And the subject is "Subsys update," correct?

2    **A.**   Yes.

3               MR. STOJILKOVIC:   Your Honor, I move for the

4    admission of 6027.

5               MR. LAZARUS:   No objection.

6               THE COURT:   Admitted.

7               (Defendant Exhibit No. 6027 admitted.)

8               MR. STOJILKOVIC:   If we could publish it, please.

9    BY MR. STOJILKOVIC:

10   **Q.**   So here Mr. Napoletano writes you again, and he says in

11   the first paragraph, second sentence, "We are proud to report

12   that with your input and guidance we were able to capture

13   25 percent of the branded rapid-onset opioid (ROO) or

14   transmucosal immediate-release fentanyl TIRF market as of the

15   week ending October 19, 2012."

16               Do you see that?

17   **A.**   I do.

18   **Q.**   Now, as of this time, you had not told Mr. Napoletano

19   that you were doing sham speaker events?

20   **A.**   I did not say that to him.

21   **Q.**   You never told him that?

22   **A.**   No.

23   **Q.**   And you never told him that you were prescribing more

24   Subsys because of the speaker payment money?

25   **A.**   Correct.

1    **Q.**  And if we scroll down, he also notes here in the second

2    paragraph, the first paragraph under the visual, "Also as

3    Insys Therapeutics continues to grow, so does the need for

4    continued service in the realm of medical communication.  To

5    that end, I would like to welcome Desiree Hollandsworth to

6    our team.  Many of you will be in direct communication with

7    Desiree as we continue to evolve our program around Subsys

8    and pipeline products."

9            Do you see that?

10   **A.**  I do.

11   **Q.**  And after this announcement, would you have occasional

12   interaction by email with Desiree Hollandsworth?

13   **A.**  I believe she would be one of the people that would email

14   me intermittently when there were speaker programs scheduled.

15   **Q.**  But you never told Desiree Hollandsworth about the sham

16   programs?

17   **A.**  No.

18   **Q.**  You never told her about the bribe?

19   **A.**  No.

20           MR. STOJILKOVIC:  Okay.  And if we could have for

21   the witness and counsel what's been marked for identification

22   as Exhibit 6026.

23           MR. LAZARUS:  No objection, Your Honor.

24           THE COURT:  Admitted.

25           (Defendant Exhibit No. 6026 admitted.)

```
 1              MR. STOJILKOVIC:  Thank you.  If we could publish
 2    it.
 3    BY MR. STOJILKOVIC:
 4    Q.   This is another email from Matt Napoletano to you,
 5    correct?
 6    A.   Correct.
 7    Q.   And there's some other folks cc'd, including Desiree
 8    Hollandsworth, correct?
 9    A.   Correct.
10    Q.   And this one is in March of 2013, right?
11    A.   Yes.
12    Q.   And Matt Napoletano writes, "Hi, Heather.  I just wanted
13    to touch base regarding the Insys speaker programs.  Thank
14    you for your participation to date.  We truly value your
15    partnership.  I know you have another program coming up, so
16    please let me know if you have any questions or feedback
17    regarding content you would like to share."
18              Do you see that?
19    A.   I do.
20    Q.   Continuing on, "We will be making some minor updates to
21    the slides within the next month, mainly two new slides.  One
22    on how to titrate and one explaining the availability of a
23    10-pack for titration, 100, 200, and 400 mics.  Additionally,
24    we will be looking to add supplemental slides on relevant
25    pain topics later this year.  If you have any ideas, please
```

1    let me know."

2              Do you see that?

3    **A.**   I do.

4    **Q.**   You didn't respond to this by telling Mr. Napoletano,

5    hey, I don't really give presentations, they're just social

6    events.  You didn't tell him anything like that?

7    **A.**   I did not respond at all, I don't think.

8    **Q.**   And whether or not by email or by phone, you didn't reach

9    out to him and say basically I'm not using the slide deck?

10   You didn't tell him you were not using the slide deck at

11   events?

12   **A.**   No.

13             MR. STOJILKOVIC:  Hold on, Randall, if you could,

14   please.

15   **Q.**   And he writes, "P.S., I'm pleased to report that as of

16   last week, we achieved a 35 percent branded TIRF ROO market

17   share, 17 percent including generics.  That means in just

18   10 months we've achieved a 1 to less than 2 Subsys to Fentora

19   prescription ratio."

20             Do you see that?

21   **A.**   I do.

22   **Q.**   And you knew that the company was trying to get

23   practitioners to switch patients from Fentora to Subsys.  You

24   knew that was one of the strategies of the company?

25   **A.**   Yes.

1   **Q.**  You didn't reach out at any time to Matt Napoletano and

2   say that you were prescribing Subsys for medically

3   illegitimate reasons?

4   **A.**  No, I did not reach out to Matt.

5   **Q.**  Thank you.  Now we can put that down.

6            You were also asked on direct about in-person

7   trainings, and you said you had about one a year, right?

8   **A.**  Correct.

9   **Q.**  And those trainings included substantive presentations by

10  doctors, correct?

11  **A.**  Yes.

12  **Q.**  And they included also presentations by certain Insys

13  executives?

14  **A.**  Correct.

15  **Q.**  Can we take a look at what's been marked for

16  identification as Exhibit 6000?

17            MR. LAZARUS:  No objection toe this.

18            THE COURT:  Admitted.

19            (Defendant Exhibit No. 6000 admitted.)

20  BY MR. STOJILKOVIC:

21  **Q.**  Ms. Alfonso, do you see this is a speaker training agenda

22  from October 2014?

23  **A.**  Yes.

24  **Q.**  And if we turn to the third page --

25            MR. STOJILKOVIC:  Court's indulgence.

1          MR. LAZARUS:  Your Honor, I'm just taking a look at

2     the additional pages.

3          MR. STOJILKOVIC:  It's my fault, Your Honor.

4          THE COURT:  That's fine.

5          MR. LAZARUS:  No objection, Your Honor.

6          MR. STOJILKOVIC:  If we could have the ELMO,

7     please.  It looks like I inadvertently cut off a page.

8     BY MR. STOJILKOVIC:

9     **Q.**  So this is the first page that we were just looking at,

10    correct?

11    **A.**  Yes.

12    **Q.**  And then if I turn to the third page, those same dates,

13    you're one of the participants in this event, right?

14    **A.**  Yes.

15    **Q.**  And this was one of the trainings you had in San Diego,

16    correct?

17    **A.**  Yes.

18    **Q.**  And if we go back to the first page, Mike Babich gave,

19    according to this agenda, an Insys corporate overview

20    presentation for about half an hour, right?

21    **A.**  Yes.

22    **Q.**  And then for an hour there was pharmaceutical compliance

23    training update by Danielle Davis, J.D.  Do you see that?

24    **A.**  I do.

25    **Q.**  And in that training, Ms. Davis did not say that it was

1    okay to have sham programs, did she?

2    **A.**   Of course not.

3    **Q.**   And then another presentation, a half an hour of Subsys

4    promotional slide deck review and Q & A; is that correct?

5    **A.**   Yes.

6    **Q.**   So this is a chance for participants to hear more about

7    the deck and to have an exchange with the presenter, correct?

8    **A.**   Yes.

9    **Q.**   Okay.  And then after lunch there's group sessions with

10   various M.D.'s.

11   **A.**   Yes.

12   **Q.**   And then turning to the next day -- this was a two-day

13   event, correct?

14   **A.**   Correct.

15   **Q.**   And so there's a presentation the next day by Joseph

16   Sherman, M.D., Managing chronic pain in cancer survivors:

17   Benefit/risk of long-term opioid therapy."  Correct?

18   **A.**   Yes.

19   **Q.**   And then another presentation by another doctor, TIRF

20   REMS access program, correct?

21   **A.**   Correct.

22   **Q.**   And then more group sessions with doctors, correct?

23   **A.**   Yes.

24   **Q.**   So these in-person trainings were substantive.  Fair to

25   say?

1    **A.**  Sometimes, yes.

2    **Q.**  Thank you.

3           MR. STOJILKOVIC:  We can switch off of the ELMO.

4    **Q.**  Of course, as you've testified on direct, the events that

5    you were paid for were mostly not substantive, the speaking

6    events, correct?

7    **A.**  Correct.

8    **Q.**  Fair to call them shams?

9    **A.**  I suppose, yes.

10   **Q.**  And you knew that Natalie Babich and Jessica Crane were

11   falsifying information about those events in what they were

12   submitting to the company?

13   **A.**  Yes.

14   **Q.**  You knew that at times they would falsify attendees,

15   correct?

16   **A.**  Correct.

17   **Q.**  And you knew that they would submit false evaluations

18   about the substance of your talk?

19   **A.**  Yes.

20   **Q.**  And one thing they would try to falsify is to not reveal

21   that your significant other at the time was in attendance in

22   a lot of these events, right?

23   **A.**  Correct.

24   **Q.**  Because you understood that under the rules he wasn't

25   supposed to be there?

1    **A.**   Correct.

2    **Q.**   And Jessica Crane also coordinated with you in advance of

3    a monitor coming to observe one of your events, right?

4    **A.**   Yes.

5    **Q.**   You testified about that, correct?

6    **A.**   Yes.

7    **Q.**   And first of all, she let you know in advance that it was

8    happening, right?

9    **A.**   Yes, she did.

10   **Q.**   And then she rounded up attendees for that event, right?

11   **A.**   Correct.

12   **Q.**   Because you didn't want to just have the usual attendees,

13   correct?

14   **A.**   I --

15   **Q.**   It's an inartful question.  Let me ask a better one.

16          Ms. Crane invited people to that event that were

17   different from the usual attendees for the sham events?

18   **A.**   Yes.

19   **Q.**   And you did speak at that event?

20   **A.**   I did.

21   **Q.**   And you said it was a little loud, that was an issue with

22   the venue, right?

23   **A.**   Correct.

24   **Q.**   But you were able to deliver a talk about Subsys?

25   **A.**   Yes.

1   **Q.**   Okay.  And afterwards you spoke with the monitor, right?

2   **A.**   Briefly.

3   **Q.**   Okay.  And his only complaint was that it was loud?

4   **A.**   Correct.  I didn't know that until after the event was

5   over.

6   **Q.**   Okay.  But he told you after the event was over?

7   **A.**   No.  I believe Jessica told me that after the event was

8   over, the following day or a few days later.

9   **Q.**   Can you take a look at what's in evidence as Exhibit 500.

10  This is already in evidence, Ms. Alfonso.  This is a series

11  of texts between Jessica Crane and you.  And I'll represent

12  that she's testified the wording in white is her and the

13  darkened areas are you.

14          So if we just go to say page 5.  So for instance,

15  if we can scroll down, "Submitted a new one today".  That's

16  something that you might have texted to Jessica Crane?

17  **A.**   Yes.

18  **Q.**   That would be in reference to a new Subsys?

19  **A.**   Correct.

20  **Q.**   She's got smiley faces saying she'll keep an eye out for

21  it.  That's typical of a response you'd get from her?

22  **A.**   Yes.

23  **Q.**   And if we go to the next page, then you write, "Any

24  feedback from Jonathan?  I talked to the monitor afterwards

25  and he said his only complaint was that the venue was noisy

1 because we weren't in the quiet back room.  He was impressed

2 that we started with the disclosures and stayed for the

3 entire dinner."

4    Do you see that?

5 **A.** Yes.

6 **Q.** Does that refresh your recollection that you spoke to the

7 monitor?

8 **A.** Yes.  I knew I spoke to him, but I don't recall what

9 exactly I said to him.

10 **Q.** Okay.

11 **A.** It was brief, as I said.

12 **Q.** In the bottom line --

13    MR. STOJILKOVIC:  You can take that down.  Thank

14 you.

15 **Q.** The bottom line is when the monitor came out, you and

16 Jessica organized things to look like a real speaker event?

17 **A.** I never organized the dinners.

18 **Q.** Okay.  Jessica organized it?

19 **A.** Yes.

20 **Q.** To have real qualifying attendees?

21 **A.** Correct.

22 **Q.** And you gave a real educational talk?

23 **A.** I did.

24 **Q.** And you guys did that because you wanted the monitor to

25 think that's what you were doing?

1    **A.**   Yes.

2    **Q.**   I want to turn now to some of the patients and patient

3    files that you talked about yesterday.  You reviewed those

4    files when you met with the government a little over a week

5    ago, right?

6    **A.**   That's correct.

7    **Q.**   And you didn't select those specific files from your full

8    set of Subsys patients, did you?

9    **A.**   No.

10   **Q.**   And you did not review before your testimony all of the

11   files for all of your Subsys prescriptions?

12   **A.**   No.

13   **Q.**   And you don't know how the government picked those

14   particular files for you to review?

15   **A.**   I have no idea.

16   **Q.**   Okay.  You can't say whether or not they're

17   representative of your Subsys patients generally?

18   **A.**   No, I can't say that.

19   **Q.**   Okay.  And one thing I want to clarify, because you were

20   asked to testify about it, and you did testify about six

21   particular Subsys patients.  You know that when you write

22   Subsys prescriptions, that information gets transmitted to

23   the TIRF REMS program?

24   **A.**   Yes.

25   **Q.**   And the same is true for other TIRF prescriptions like

1    Fentora?

2    **A.**   Correct.

3    **Q.**   And you also know there are other tracking programs that

4    allow companies as well as the government to track other

5    opioid prescriptions by practitioners?

6    **A.**   Yes.

7    **Q.**   And so I want to be clear.  Those six Subsys

8    prescriptions were not the only times you prescribed Subsys?

9    **A.**   Oh, no.

10   **Q.**   Okay.  And I'll represent to you that I've reviewed the

11   data, and from the time -- I'm just going to represent and

12   ask whether --

13           MR. LAZARUS:  Objection to him testifying.

14           THE COURT:  He hasn't asked the question yet.

15           MR. LAZARUS:  I understand.

16   BY MR. STOJILKOVIC:

17   **Q.**   Let me try to set this up.  I've taken a look at the

18   prescription data for you with respect to Subsys, with

19   respect to other TIRFs, and with respect to short-acting

20   opioids generally.

21           THE COURT:  That's not a question.

22           MR. STOJILKOVIC:  It's not.

23           THE COURT:  No.  So let's get to a question.

24           MR. STOJILKOVIC:  Okay.

25   BY MR. STOJILKOVIC:

1    **Q.**   Do you have any reason to dispute that during your time

2    in the Insys speaker program you averaged approximately 22

3    Subsys prescriptions per month?

4    **A.**   I don't know.  I've never seen that data.

5    **Q.**   Does that number seem ballpark reasonable, just based on

6    your recollection, if you can say?

7    **A.**   Honestly, I don't know.  I can't -- if I say yes or no

8    and you hold me to it, I'm not --

9    **Q.**   I'm only asking if you can say.  If you can't, you can't.

10   **A.**   I can't.

11   **Q.**   Are you able to say whether it sounds ballpark reasonable

12   that at the same time you were averaging 19 prescriptions per

13   month for the other TIRFs?

14   **A.**   Again, I don't really know.

15   **Q.**   And would you be able to say whether at the time you were

16   averaging 541 prescriptions per month for all short-acting

17   opioids?

18   **A.**   I don't know.

19   **Q.**   It's fair to say that you did not prescribe Subsys to a

20   majority of your patients?

21   **A.**   Correct.

22   **Q.**   So this is not the kind of situation where whoever came

23   in you're saying you gave them Subsys.  I just want to be

24   clear that's not what we're talking about.

25   **A.**   I am not really understanding your question, and I just

1    want to be clear.

2    **Q.**   I'll ask a different one.

3            Most of the patients you saw at Comprehensive Pain

4    you did not prescribe Subsys to?

5    **A.**   I would say that's correct.

6    **Q.**   Thank you.  So I want to follow up on a couple of the

7    patients you talked about yesterday.  The first is Michelle

8    Kamzyuk.  Do you remember talking about her?

9    **A.**   I do.

10   **Q.**   And I have also a kind of version of the patient files

11   that we'll put up and kind of go through the same way we did

12   yesterday, if that's okay.

13   **A.**   Okay.

14   **Q.**   So you testified yesterday that she came into the

15   practice in January 2012.  Fair?

16   **A.**   Okay.

17   **Q.**   I'm just going based on my notes of what you said

18   yesterday.

19   **A.**   Okay.

20   **Q.**   And you prescribed Subsys to her for the first time in

21   January 2014.  We can frame our discussion with that.

22   Ms. Kamzyuk had undergone a hysterectomy, correct?

23   **A.**   I don't recall.  But if you have it in front of you,

24   then --

25   **Q.**   I want to show it to you.

1          MR. STOJILKOVIC:  If we can show right now just for

2     the witness and for counsel Exhibit 6003.

3               And, Your Honor, what I would propose to do with

4     this is the same process as we did on direct, which is there

5     will be portions of this that I can preview with the witness

6     and maybe publish if they don't contain personal information,

7     but then we'll go back and clean it up.

8          THE COURT:  That's fine.

9          MR. STOJILKOVIC:  Thank you.

10              Randall, if you could go to page 10, please.  This

11    is right now just for witness and counsel.

12    BY MR. STOJILKOVIC:

13    **Q.**  These are notes of an office visit in January of 2014; is

14    that correct?

15    **A.**  Yes.

16    **Q.**  Okay.  And if we can scroll down and expand the paragraph

17    that's titled "HPI."

18              MR. STOJILKOVIC:  And may I publish just this

19    paragraph to the jury?

20              THE COURT:  We're going to assume that these are

21    all being moved in and there's no objection to them and

22    you'll work out exactly what's coming in later, Mr. Lazarus?

23              MR. LAZARUS:  That's fine, Your Honor.  Thank you.

24              MR. STOJILKOVIC:  Thank you, Your Honor.

25              (Defendant Exhibit No. 6003 admitted.)

```
 1   BY MR. STOJILKOVIC:
 2   Q.   It states here about halfway down, "She had a
 3   hysterectomy last year that was complicated by nonhealing of
 4   the wound and perforation of the gut."  Right?
 5   A.   Yes.
 6   Q.   And that was the cause of the pain that she was seeking
 7   treatment for.  Is that fair?  If you can't say based on
 8   this, I'll show you another little snippet.
 9   A.   I can't really say based on that because that was I think
10   from her first visit.
11   Q.   Okay.  If you look further down, it says here just on
12   this what we have blown up here, "Since the hysterectomy
13   surgery and complications thereof, she's been experiencing
14   numbness in the left and right anterior thighs and occasional
15   burning sensation as well."
16           Do you see that?
17   A.   I do.
18   Q.   And then if we could go down further, if we can get out
19   of the blow up.  Just the bottom of that page, do you see the
20   DOS, 1/24/2014?  Thank you.
21           Here it states, "Patient states that her primary
22   pain is related to postsurgical procedures from when she had
23   muscle flaps removed from her thighs and reattached to her
24   abdomen.  Her pain is primarily in her abdomen and her thighs
25   as a result."
```

1          Am I reading that correct that that's saying that

2    that is a source of pain for her?

3    **A.**  Oh, yes.

4    **Q.**  And then it goes on, "It is difficult for her to ambulate

5    upstairs."  That means walk upstairs, right?

6    **A.**  Correct.

7    **Q.**  "She shows me her abdomen" -- and then if we can

8    continue -- "which is scarred and firm to touch.  She can

9    ambulate."

10          That means she can walk for about one hour with

11   pain, right?

12   **A.**  Correct.

13   **Q.**  She can stand in one place, cooking for example, for

14   about two hours but reports that the pain is severe while

15   doing so, correct?

16   **A.**  Yes.

17   **Q.**  She is able to pick something up off the floor with

18   difficulty and needs to use support to return to a standing

19   position.  Right?

20   **A.**  Yes.

21   **Q.**  And she says her goal in pain management is to improve

22   her functionality to the point where she doesn't have the

23   severe pain when doing basic activities, right?

24   **A.**  Yes.

25          MR. STOJILKOVIC:  Okay.  We can put that down.  I'm

1    going to go to a different page in the document, first just

2    for the witness again if we could.

3    **Q.**   This patient, Ms. Kamzyuk, had been on opioids before she

4    even came to Comprehensive Pain?

5    **A.**   I don't know.

6    **Q.**   Fair enough.  It's a lot of records.  It's a lot to

7    remember.

8    **A.**   It is.

9    **Q.**   Let's take a look at page 63 of this document.  So this

10   is something called a patient RX history report.  Do you see

11   that?

12   **A.**   I do.

13          MR. STOJILKOVIC:  If we could publish this one.

14   **Q.**   If you see there, the third entry is dated 9/2/2011, and

15   it's for a fentanyl transdermal system 2.55 microgram patch,

16   right?

17   **A.**   It is, yes.

18   **Q.**   And so she was on fentanyl in 2011?

19   **A.**   Yes.

20   **Q.**   And that was based on the records before she came into

21   your practice?

22   **A.**   Yeah, mm-hmm.

23   **Q.**   Okay.  And then it also says, if we go to the fourth

24   record, there's another fentanyl transdermal system dated the

25   same day in a different quantity, right?

1    **A.**   That's true.

2    **Q.**   Okay.  So back in 2011 she was already on fentanyl.

3              And then let's turn to page 4 of the document.

4    This is the end of some notes.  Directing your attention to

5    the bottom.

6              Dan Feldman was one of the doctors who was

7    originally at Comprehensive Pain, right?

8    **A.**   Correct.

9    **Q.**   And he writes here in the "medication management"

10   field -- can we just do the medication management -- "patient

11   reports doing well on Duragesic patch, 25 plus 12 micrograms

12   per hour."

13             That's what we just saw in that prior prescription

14   record, right?

15   **A.**   I think so, yes.

16   **Q.**   "However, she states that she still experiences pain even

17   with medication.  I will increase Duragesic patch to

18   50 micrograms per hour to improve analgesia."  Right?

19   **A.**   Yes.

20   **Q.**   It looks like she's also on Dilaudid.  That's another

21   pain medication, right?

22   **A.**   Yes.

23   **Q.**   And now I want to turn to -- if we can go to page 31.  So

24   this is another patient history report.  This one looks at

25   2013 and 2014.

1           MR. STOJILKOVIC:  If we can just blow up the chart

2      portion of it, Randall.

3      **Q.**  Is this okay to read?  I know it's a little blurry.

4      **A.**  Yeah.

5      **Q.**  Okay.  And so it looks like, if I'm just reading from the

6      bottom up here, that in December of 2013 she was prescribed

7      oxycodone, correct?

8      **A.**  Yes.

9      **Q.**  And that is an opiate pain reliever?

10     **A.**  Yes.

11     **Q.**  And then she was not prescribed Subsys until -- according

12     to this, until January 2014.  Do you see that?

13     **A.**  I do.

14     **Q.**  So she had been with the practice for some time before

15     you prescribed Subsys to her.  Fair?

16     **A.**  Yes.

17     **Q.**  Okay.  Let's look at the notes of when you made that

18     prescription decision.  If we can turn to page 10.

19           So this is a follow-up office visit.  We've seen

20     this kind of form.  And if I direct your attention just to

21     the bottom of this page, it says "Signed by HA."

22           That would have been you, right?

23     **A.**  Yes.

24           MR. STOJILKOVIC:  Okay.  We can take that down.  We

25     don't need the date of birth, Randall, all of that.  Let's

1    take that down, please.

2    **Q.**  And I want to focus on the paragraph, carry-over

3    paragraph, date of service 1/24/2014.  Let's look at that

4    together.

5            So would you write these kind of notes if you're

6    the person who sees her on that day?

7    **A.**  Yes.

8    **Q.**  So you write, "Patient states that her primary pain is

9    related to postsurgical procedures from when she had muscle

10   flaps removed from her thighs and reattached to her abdomen.

11   Her pain is primarily in the abdomen and thighs as a result."

12           And this is some of the same language we've seen

13   before about ambulating and cooking.

14           But then if we go down to the bottom, near the

15   bottom, it says, "Will add Subsys and Fentora PRN to her

16   regimen."

17           Do you see that?

18   **A.**  I do.

19   **Q.**  And so you prescribed at this time Subsys and you also

20   prescribed Fentora, right?

21   **A.**  Correct.

22   **Q.**  And you testified on direct that you did that because

23   sometimes one would not get through insurance?

24   **A.**  I think that is why I did it.  I believe that's why.

25   **Q.**  You were certainly not bribed to prescribe the Fentora,

1    right?

2    **A.**   No.

3    **Q.**   And Fentora is a competitor drug to Subsys?

4    **A.**   It is.

5    **Q.**   And then if we look at page 15, the next time you saw

6    her, you noted that Subsys had a good effect.  Let me show

7    you this.  First if we can scroll down to the bottom of the

8    page.  That's you again, signed by HA, right?

9    **A.**   Yes.

10   **Q.**   If we go to the top, DOS 2/20/2014.  It says, "Was unable

11   to obtain Fentora due to exorbitant copal cost.  She has been

12   using the Subsys with good effect noted."  Right?

13   **A.**   Correct.

14   **Q.**   In fact, the effect was so good that she was able to take

15   a vacation with her husband for the first time in eight

16   years.  Do you remember that?

17   **A.**   No.

18   **Q.**   Let's look at page 19.  If we can scroll down.  That's

19   signed by HA.  That's you.  This is March of 2014, right?

20   **A.**   Correct.

21   **Q.**   Let's go to the DOS 3/21/2014.

22            You write, "Doing well with Subsys titration and

23   EnLyte addition.  Reports more energy and improved mood.  Has

24   not obtained the compound cream yet as not approved by her

25   insurance.  Will be going to Cancun with her husband in April

1    and it will be her first vacation in eight years.  Doing very

2    well with medication regimen."  Correct?

3    **A.**  Correct.

4    **Q.**  And you wrote that because that's what the patient told

5    you?

6    **A.**  Correct.

7    **Q.**  And then we'll turn to page 41 of the records.  This is

8    another history report.  Scroll all the way down.  Very last

9    entry.

10            She received another Subsys prescription in October

11   of 2014, correct?

12   **A.**  Correct.

13   **Q.**  And this Subsys prescription was given to her by one of

14   your colleagues at the practice.  Do you recall that?

15   **A.**  I can see it.

16   **Q.**  Okay.  Explain it to me because you know the records

17   better than I do.  How can you tell from this record that

18   this wasn't you prescribing the Subsys?

19   **A.**  Because where it says CHA, that's the prescriber and

20   that's not me.

21   **Q.**  Okay.  Who is that?

22   **A.**  I believe that --

23   **Q.**  Monica Chavez?

24   **A.**  Yes.

25   **Q.**  And Monica Chavez was not somebody who was doing speaker

1    programs for Insys, right?

2    **A.**   Correct.

3    **Q.**   You're not aware that she had any kind of inappropriate

4    financial incentive to prescribe Subsys?

5    **A.**   I am not.

6    **Q.**   And if we look at page 43 and go to the second entry from

7    top, another of your colleagues also prescribed Subsys to

8    Ms. Kamzyuk, and that was Jean Vulte, right?

9    **A.**   Yes.

10   **Q.**   Okay.  And she didn't get speaker payments from Insys?

11   **A.**   Not to my knowledge.

12   **Q.**   Now, I'd like to turn to -- Ms. Alfonso, you never

13   falsified diagnoses on the opt-in forms for Insys, did you?

14   **A.**   I did stretch the truth.

15   **Q.**   You never falsified diagnoses, did you?

16   **A.**   If stretching the truth is falsifying, then yes, I did.

17   **Q.**   If you could pick up your sworn testimony to the grand

18   jury from 2016 and turn to page 103.  Were you asked and did

19   you answer as follows, starting on line 12:

20            "With the prior auths, did you ever falsify any of

21   the diagnoses that were required to be put on that opt-in

22   form?

23            "No, I did not."

24   **A.**   What page are you on?  I'm sorry.  I didn't hear you.

25   **Q.**   103.

1    **A.**   Correct.  I did say that.

2    **Q.**   To be clear, when you go into the grand jury, it's a

3    prosecutor asking you these questions, right?

4    **A.**   Yes.

5    **Q.**   Somebody from the government, and you swear to tell the

6    truth to the best of your ability, correct?

7    **A.**   Correct.

8    **Q.**   Same as today?

9    **A.**   Of course.

10   **Q.**   And so your testimony at the time was that, no, you did

11   not falsify any of the diagnoses?

12   **A.**   Correct.

13   **Q.**   Has the government ever threatened you with prosecuting

14   you for that statement to the grand jury?

15   **A.**   No.  That statement was true to the best of my knowledge

16   at the time.  So no, they did not.

17   **Q.**   Okay.  I'd like to talk about one more patient, and this

18   is Sara Dawes.  Do you remember you testified some about her

19   yesterday?

20   **A.**   I do remember.

21   **Q.**   Okay.  And as we did with Ms. Kamzyuk, let's do this with

22   the record so that we're all looking at the same page.

23            MR. STOJILKOVIC:  For this I'm going to be using

24   what's been marked as Exhibit 6002.  So if we could have that

25   up just for counsel and the witness until we get to something

1    we can display.  If you look at the bottom of page 2, if we

2    can scroll to the bottom of page 2.

3    **Q.**   This patient is diagnosed -- we can blow up the diagnosis

4    and display that, just that part -- with trigeminal

5    neuralgia, right?

6    **A.**   Correct.

7    **Q.**   Did I say that right?

8    **A.**   Yes.

9    **Q.**   That's also known as the suicide disease, right?

10   **A.**   I'm not sure.

11   **Q.**   You haven't heard it referred to in that way?

12   **A.**   No, I haven't.

13   **Q.**   It is a painful condition of pain striking your face,

14   right?

15   **A.**   It is.

16          MR. STOJILKOVIC:  And if we look at page 1, history

17   of present illness, if we can expand that section and display

18   that.

19   **Q.**   This is kind of the portion of the forms where you get a

20   little bit of the patient's history and kind of how they came

21   to be in the situation they're in now?

22   **A.**   Correct.

23   **Q.**   And so it says, "This patient has been seen in the

24   practice since early 2001."

25          Do you see that?

1    **A.**   I do.

2    **Q.**   So this is a patient who had been with the practice at

3    least a decade before you joined?

4    **A.**   Correct.

5    **Q.**   And she presented with an acute episode of trigeminal

6    neuralgia, right, according to these notes?

7    **A.**   Correct.

8    **Q.**   If you skip then to the sentence beginning, "Since 2001."

9          "Since 2001, when she was seen by Dr. Kitaj, and

10   since that time the patient has undergone several

11   decompressive surgeries on the left side of her neck that

12   were done at Yale.  She states that despite maximal surgical

13   effort, it appears that she continues to have pain."

14         Do you see that?

15   **A.**   I do.

16   **Q.**   And that would happen with some patients.  Doctors would

17   try to address the pain issue with surgery, but they weren't

18   always successful?

19   **A.**   Correct.

20   **Q.**   And it says -- just patient relaying her own history, she

21   says that --

22         MR. STOJILKOVIC:  This is three lines down,

23   Randall.

24   **Q.**   She says that in the past she was tried on Percocet,

25   Vicodin, Kadian, and at one point even methadone.  Do you see

1   that?

2   **A.**   I do.

3   **Q.**   And the patient, at least according to this note, reports

4   that long-acting medications have caused excessive sedation

5   and she was not able to tolerate them, right?

6   **A.**   Yes.

7   **Q.**   And that is a reaction that some patients had to

8   long-acting medications?

9   **A.**   Yes.

10  **Q.**   And if we turn to page 3 of this.  If we look on this

11  page, it says that the treatment here, the doctor will

12  increase the amount of OxyContin that this patient is

13  getting.

14           Am I reading that correctly?

15  **A.**   Yes.

16  **Q.**   And also increasing oxycodone, correct?

17  **A.**   Correct.

18  **Q.**   So the doctor here has decided to increase two types of

19  opiates for this patient at this time?

20  **A.**   Yes.

21  **Q.**   If we turn to page 13.  If we can scroll down on page 13.

22  This is Daniel Feldman again, right, one of the doctors who

23  was there early part of your time.

24  **A.**   Correct.

25  **Q.**   What he writes -- yeah, that one -- "At the last visit, I

1    continued OxyContin and increased Roxicodone.  Today

2    reports" -- I guess that means the patient reports today --

3    "that OxyContin is not adequately covering her pain.  I

4    believe she needs to have opioid rotation at this time."

5            Do you see that?

6    **A.**  I do.

7    **Q.**  Opioid rotation is that when somebody has been a pain

8    patient for a long time, sometimes you need to change the

9    drugs they're on because the effectiveness of the old one is

10   not as strong because of certain ways the body reacts to it?

11   **A.**  Correct.

12   **Q.**  It says, "Previously she tried MS Contin and Duragesic

13   patch but was unable to tolerate it due to side effects."

14   Right?

15   **A.**  Yes.

16   **Q.**  The Duragesic patch, that's Fentanyl, right?

17   **A.**  Yes.

18   **Q.**  The doctor writes here, "I will try her on methadone,"

19   right?

20   **A.**  Yes.

21   **Q.**  And at one point this patient was even tried on Actiq.

22   Do you recall that?

23   **A.**  I do not.

24   **Q.**  Okay.  Let me see if I'm interpreting the records

25   correctly.  If we could turn to page 25.  This is another

1   follow-up office visit.  This one is dated September 2013,

2   right?

3   **A.**  Yes.

4   **Q.**  If we go down to the bottom, this one is signed by you,

5   right?

6   **A.**  Yes.

7   **Q.**  The bold area is medications tried, right?

8   **A.**  Correct.

9   **Q.**  And that's a typical thing that you include as part of

10  the paperwork so that there's a record of what has been tried

11  with the patient previously, right?

12  **A.**  Correct.

13  **Q.**  And one of the entries there, the last one is Actiq,

14  right?

15  **A.**  Correct.

16  **Q.**  And Actiq is another TIRF, that -- a competitor to

17  Subsys, right?

18  **A.**  Yes, sir.

19  **Q.**  Okay.  Now, I want to go to page 131.

20          MR. STOJILKOVIC:  If we go about halfway down, it

21  looks like -- if you could blow up the entries for oxycodone,

22  hydrochloride, and morphine sulfate.  They're in August.

23  Those two.  Thank you, Randall.

24  **Q.**  These are two pain prescriptions that you wrote for

25  Ms. Dawes in August of 2011, right?

1  **A.**  Oh, I see that.

2  **Q.**  Does that help refresh your recollection that you did

3  start at Comprehensive Pain in 2011?

4  **A.**  Yes, it does.

5  **Q.**  And these are both pain medicines that you prescribed?

6  **A.**  Yes.

7  **Q.**  And they're both opioids?

8  **A.**  Yes.

9  **Q.**  Now let's look at -- I'm just kind going through sequence

10  in time.  Let's look at page 4.  This is an entry date of

11  service November 2011?

12  **A.**  Yes.

13  **Q.**  This is after those two opioid prescriptions that you had

14  written in August, right?

15  **A.**  Correct.

16  **Q.**  If we can blow up just the chief complaint.

17       "The patient presents with a chief complaint of

18  left neck pain radiating across her face.  She rates the pain

19  anywhere from 6 to an 8/10 and describes it as burning and

20  shooting across the left face."  Right?

21  **A.**  Yes.

22  **Q.**  So she was still having the pain or reporting it, at

23  least, right?

24  **A.**  Correct.

25  **Q.**  And when you ask patients to rate the pain, it's on a

1   scale of 1 to 10, right?

2   **A.**   Yes.

3   **Q.**   10 being the highest, the most painful?

4   **A.**   Yes.

5   **Q.**   And you continued to see this patient -- I want to turn

6   to page 10.  You tried to relieve this patient's pain,

7   correct?

8   **A.**   Yes.

9   **Q.**   That was your job?

10  **A.**   Yes.

11  **Q.**   Okay, yes.  So we see this is signed by Shannon Barone

12  and Dan Feldman, but I want to focus on the medication.

13          "The following prescriptions were given to the

14  patient today and were signed by Heather Alfonso."

15          Do you see that?

16  **A.**   I do.

17  **Q.**   So another OxyContin and a Roxicodone was what you

18  prescribed in April of 2012, right?

19  **A.**   Okay.

20  **Q.**   This time you did not prescribe Subsys to this patient,

21  according to this record?

22  **A.**   Correct.

23  **Q.**   In fact, you didn't prescribe Subsys to her, according to

24  your direct testimony, until November of 2013.

25  **A.**   Okay.

1    **Q.**   Okay.  And you continued to see her between then.  And I

2    want to focus on a visit, she came and saw you in September

3    of 2013.  This is page 25.

4            Now, September of 2013, you had been getting the

5    speaker payments for some time by then, September of 2013,

6    right?

7    **A.**   I believe so.

8    **Q.**   And you had been giving the sham or doing the sham

9    dinners with folks like Natalie Babich and Jessica Crane,

10   right?

11   **A.**   Correct.

12   **Q.**   And if we scroll down, this is signed by you, right?

13   **A.**   Yes.

14   **Q.**   And if we look at date of service 9/11/2013.  You

15   reviewed results of drug metabolism testing showing that this

16   patient is an abnormal metabolizer of benzos and methadone.

17   She reports side effects from the methadone trial in the past

18   few months.  At this time we are discontinuing the methadone.

19   Will adjust medications to achieve better control.  Right?

20   **A.**   Yes.

21   **Q.**   It looks like you took her off methadone because of side

22   effects?

23   **A.**   Correct.

24   **Q.**   But you did not at this time in September of 2013

25   prescribe Subsys to her?

1    **A.**  I don't think so.

2    **Q.**  If we go to page 30, you prescribe the fentanyl patch.

3    I'm sorry.  Actually if we go back up.

4          You didn't begin prescribing Subsys to her until

5    November 18 of 2013, and that's what we're looking at here.

6    Okay?

7    **A.**  Okay.

8    **Q.**  So let's go to page 30 where we were.  This is another of

9    your records.  And if we look at that date of service that's

10   at the top of the page, the last sentence says, "At this

11   time, we will resume Duragesic patches to even out her pain

12   levels."

13         So she's on the fentanyl patch, right?  You're

14   putting her on or resuming it?

15   **A.**  Right.

16   **Q.**  And then for the resultant pain from her eye pressure,

17   you will begin Fentora and Subsys, right?

18   **A.**  Correct.

19   **Q.**  So you had seen this patient several times and she had

20   came to you complaining with pain, but you did not prescribe

21   Subsys until November of 2013, correct?

22   **A.**  Yes.

23   **Q.**  And at the same time you prescribed Fentora.  This is

24   another one of those instances where you weren't sure which

25   one was going to get through the insurer?

1    **A.**   Correct.

2    **Q.**   And you prescribed Fentora even though you had no

3    financial incentive to prescribe that drug?

4    **A.**   True.

5    **Q.**   And if we turn to page 33, if we can scroll down, the

6    patient reported -- this is another one of your notes -- that

7    she was doing extremely well with the addition of Subsys.

8    She has more ability to function and get things accomplished

9    during the day.  Reports that she continues with breakthrough

10   pain so we will titrate the Subsys today.

11          Do you see that?

12   **A.**   I do.

13   **Q.**   So the patient reported positive results, but there was

14   still breakthrough pain and so you titrated.  That means

15   increased the dose of Subsys?

16   **A.**   Correct.

17   **Q.**   And then if we can turn to page 40.  I'm sorry.  Page 77.

18          One of your colleagues also prescribed Subsys to

19   her later on.  Page 77, this is the entry for April 17, 2014.

20   Right there.

21          And that's a Subsys prescription, 800 micrograms,

22   and that's one of the other APRNs at the practice, right?

23   **A.**   Correct.

24   **Q.**   So she agreed with your decision to treat this patient

25   with Subsys?

1          MR. LAZARUS:  Objection.  Foundation.

2     **A.**  I don't know.

3          THE COURT:  Sustained.

4     BY MR. STOJILKOVIC:

5     **Q.**  Is it fair to infer from the fact that APRN Vulte

6     prescribed Subsys to this patient that she agreed with your

7     prior decision to prescribe Subsys?

8          MR. LAZARUS:  Objection.

9          THE COURT:  Sustained.

10    BY MR. STOJILKOVIC:

11    **Q.**  Ms. Vulte didn't take her off of Subsys at this time, did

12    she?

13    **A.**  I don't know.  I don't think so.

14    **Q.**  In fact, according to this record, Ms. Vulte prescribed

15    Subsys to the patient?

16    **A.**  She signed the prescription.

17    **Q.**  Okay.  And then there came a time that Ms. Dawes started

18    to do better.  Do you remember that?

19    **A.**  No.

20    **Q.**  Let's take a look and see if we can recall together what

21    happened.  Let's look at page 42.  There is another set of

22    notes, if we can scroll to the bottom.

23          These are your notes, signed by HA, right?

24    **A.**  Correct.

25    **Q.**  Let's look at the very last date.  This is now

1    November 2014.  This is almost a year to the day of when you

2    started her on Subsys.

3              You write, "Patient with chronic facial pain and

4    head pain secondary to trigeminal neuralgia.  Reviewed

5    medication regimen.  Discussed decreasing her total daily

6    opioid dosage.  She reports that with the decrease in Subsys

7    she noticed that she needed to take 30 milligrams of

8    Oxycodone whereas previously she had been trying to use only

9    15 milligrams."

10             Do you see that?

11   **A.**  I do.

12   **Q.**  Okay.  So by this time the patient's dose of Subsys was

13   decreased, and you're discussing managing the other meds as a

14   result.  Fair?

15   **A.**  It appears that way.

16   **Q.**  And she continued to try to make other changes, the

17   patient did in her life, to try to reduce her dependence on

18   pain medications.  If we can go to page 47.  And if we can

19   look again, this is your notes.  The last entry January 2015.

20             Starting midway through, "Patient states that since

21   the last appointment she has made several change in her

22   everyday life to help her accept that she is dealing with

23   chronic pain such as cognitive therapy and medication.  She

24   states that her pain is 4 out of 10 with medication and these

25   other modalities.  She is agreeable to decrease Subsys by

1    50 percent today with the goal of discontinuation."

2              Do you see that?

3    **A.**   I do.

4    **Q.**   So this is January 2015.  Despite your arrangement with

5    Natalie Babich and Jessica Crane, you were discussing

6    decreasing Subsys with this patient at this time, correct?

7    **A.**   Correct.

8    **Q.**   With the goal of discontinuation?

9    **A.**   Correct.

10   **Q.**   Thank you.

11             MR. TYRRELL:  May I, Your Honor?

12             THE COURT:  Of course.

13                          CROSS EXAMINATION

14   BY MR. TYRRELL:

15   **Q.**   Good morning, Ms. Alfonso.

16   **A.**   Good morning.

17   **Q.**   My name is Steven Tyrrell, and I represent Rich Simon.

18   **A.**   Okay.

19   **Q.**   You and I have never met before, have we?

20   **A.**   No, we have not.

21   **Q.**   I just have a few questions for you, so we shouldn't be

22   very long.  We can have you on your way shortly.

23             MR. TYRRELL:  Could we pull up, Randall, please,

24   1836, and publish it to the jury.  I believe this is in

25   evidence.

1    **Q.**  Ms. Alfonso, yesterday you were shown this document by

2    the prosecutors and asked about some of the names on that.

3    Do you remember that?

4    **A.**  I do.

5    **Q.**  And you recognized some of them but not others, correct?

6    **A.**  That's correct.

7    **Q.**  I want to ask you specifically about my client,

8    Mr. Simon.  You said, if I recall correctly, that you didn't

9    recognize his name, correct?

10   **A.**  That is correct.

11   **Q.**  And is it fair to say that you've never met Mr. Simon?

12   **A.**  I don't know who he is, and I --

13   **Q.**  He never came to your office to talk about Subsys with

14   you?

15   **A.**  I don't think I could point him out right now.  Is he the

16   man sitting next to you?

17   **Q.**  He's the man sitting next to me.

18   **A.**  Okay.  I don't recall seeing him ever before this trial.

19   Okay.

20   **Q.**  So he never came to your office to talk to you about

21   Subsys?

22   **A.**  Not to my knowledge.  If he did, it was clearly

23   unmemorable, but I honestly don't think so.

24   **Q.**  He never came to any of the events you've told us about

25   that were arranged by Natalie Babich and Jessica Crane?

1    **A.**  I don't think so.

2    **Q.**  Never met Joe?

3    **A.**  Joe?  No, I don't think so.  You'd have to ask him, but I

4    don't believe so.

5    **Q.**  Never told you it was okay to have speaker events where

6    you didn't provide educational content?

7    **A.**  I never had a conversation with him.

8    **Q.**  Okay.  And he certainly never told you it was okay to

9    take $600 in cash from Jessica Crane?

10    **A.**  Of course not.

11          MR. TYRRELL:  All right.  Can we pull up 1906,

12    please.  Again I think this is in evidence, so if we could

13    publish it.

14    **Q.**  Do you remember seeing this document yesterday?

15    **A.**  Yes.

16    **Q.**  And you were asked some questions about it by

17    Mr. Lazarus.  Do you remember that?

18    **A.**  Yes.

19    **Q.**  I'd like to direct your attention to the second and third

20    message there from you to -- I think you said it was to

21    Ms. Crane, correct?

22    **A.**  Yes, sir.

23    **Q.**  And the second one you say, "Days just keep getting

24    crappier.  FYI, feds at one of my patient's homes today

25    asking questions about me and Subsys."  Correct?

1    **A.**   That's correct.

2    **Q.**   And then you ask Jessica, "Did you let corporate know

3    about that?"

4    **A.**   Yes.  Yes.

5    **Q.**   Yesterday you said that you didn't remember -- you said

6    you didn't recall getting a response to that text, correct?

7    **A.**   Correct.

8    **Q.**   Or remember what she said in response to the question?

9    **A.**   I believe I saw -- I think I said that I saw her after

10   the fact in person, and she said that they know that there's

11   an investigation.

12   **Q.**   She never told you the name of anyone she spoke with?

13   **A.**   No.  And I didn't ask.

14   **Q.**   This is the same Jessica that you told us was falsifying

15   paperwork relating to the events that you were at?

16   **A.**   Yes, sir.

17   **Q.**   She was lying in these forms over and over and over

18   again, correct?

19   **A.**   It appeared that way, yes.

20   **Q.**   So as you sit here today, would it be fair to say that

21   you don't know whether she was lying to you or not about

22   whether she told anyone at corporate?

23   **A.**   That's certainly the case, yeah.

24            MR. TYRRELL:  If I may have a moment, Your Honor?

25            THE COURT:  Yes.

```
1              MR. TYRRELL:  Thank you.  I have nothing further.
2              THE WITNESS:  Thank you.
3              THE COURT:  Anybody else?
4              MR. KENDALL:  No, Your Honor.
5              MR. HORSTMANN:  No, Your Honor.
6              THE COURT:  Redirect?
7              MR. LAZARUS:  Thank you, Your Honor.
8                      REDIRECT EXAMINATION
9     BY MR. LAZARUS:
10    Q.  Good morning, Ms. Alfonso.
11    A.  Good morning.
12             MR. LAZARUS:  Ms. Folan, if I could have the ELMO,
13    please.
14    Q.  I'm going to show you a couple of documents that were
15    discussed on cross-examination.  Exhibit 6000.  Do you see
16    this?
17    A.  I can.
18    Q.  It's the speaker training that Mr. Stojilkovic showed
19    you?
20    A.  Yes.
21    Q.  He asked about some presentations by Mr. Babich and some
22    other people?
23    A.  Correct.
24    Q.  Look down at the bottom where it's highlighted.  Did Mike
25    Gurry also give a presentation?
```

1    **A.**   It appears he did.

2    **Q.**   This was in October of 2014?

3    **A.**   Yes.

4    **Q.**   That was presentation on discussions of Insys

5    reimbursement program and third-party charitable program for

6    Medicare patients?

7    **A.**   It appears that that's what it was.

8    **Q.**   Just a few questions for you about medical records.

9         You were asked on cross-examination about a number

10   of your patients, and you were asked about prescriptions by

11   Ms. Chavez and Ms. Vulte.  Do you remember those questions

12   generally?

13   **A.**   I do.

14   **Q.**   Who are they?

15   **A.**   Those were both APRNs that worked in the practice.

16   **Q.**   If you know, could they prescribe medications?

17   **A.**   Yes, they were able to prescribe medications.

18   **Q.**   I believe you testified on direct and a little bit of

19   cross-examination about something called medication visits?

20   **A.**   Correct.  What would happen is that the patients would

21   call their medications that they needed, call into the

22   prescription line.  The medical assistant would then print

23   out all of these medications for all of these patients, and

24   there would be a stack of prescriptions.  And whoever was the

25   APRN -- typically it was the APRN because the doctors saw

1    more patients when they were there -- would be responsible

2    for going through all of these prescriptions and signing

3    them.

4    **Q.**   And what kind of review would the APRN make on these

5    medication visits of those prescriptions?

6    **A.**   Practically none.

7    **Q.**   Was there a difference between -- you talked about the

8    initial visit that Dr. Thimineur or Dr. Feldman would do with

9    the patient.  And then you talked about follow-up visits of

10   the kind that you would perform.  And then you've also talked

11   about medication visits, right, just to clarify?

12   **A.**   Yes.

13   **Q.**   So that's essentially three different types of visits?

14   **A.**   Yes.

15   **Q.**   So what's the difference between the follow-up visits you

16   did where we heard that you prescribed Subsys for the first

17   time or other things and these medication visits?

18   **A.**   So at the medication visits, no medication changes were

19   to be done.  They were to get the medications that were

20   previously prescribed that were due to be refilled timewise.

21   And that was it.  There were no changes made.

22            And the medical assistant is the one that would see

23   them and, like I said, do the blood pressure and possibly a

24   urine drug screen.

25   **Q.**   So in other words, you testified about because of the

1    nature of the pain medicines you wouldn't give refills to

2    patients.  Your practice at Comprehensive Pain is that the

3    patient had to come in after a certain period of time,

4    usually 30 days or so, right?

5    **A.**   Correct.  Because they would bill that to insurance as a

6    low-level visit.

7    **Q.**   Different types of visits cost different money?

8    **A.**   Correct.

9    **Q.**   And so the patient would come back in?

10   **A.**   Yes.

11   **Q.**   And these are these medication visits?

12   **A.**   Yes.

13   **Q.**   But if you made the choice to prescribe Subsys on a

14   follow-up visit, it was assumed that when they'd come in on

15   this medication visit, they were going to get that renewed?

16   **A.**   Yes.

17   **Q.**   I just want to show you -- just a few more questions on

18   the medical records and I'm going to move on.

19             So you were asked questions about Sara Dawes, one

20   of your patients.  Do you remember that?

21   **A.**   Yes.

22   **Q.**   You were asked questions about decreasing her Subsys over

23   time?

24   **A.**   Correct.

25   **Q.**   I'm going to show you page 47 of Exhibit 6002.  And you

1    were asked about decreasing her dosage.

2              Do you see up here on the date of service before

3    the one you were asked about, 9/23/2014?

4    **A.**   Yes.

5    **Q.**   Can you read where I pointed here, reports?

6    **A.**   "Reports she would like to decrease the Subsys somewhat

7    as she is feeling quite dependent on it."

8    **Q.**   Thank you.  According to this record, what is your

9    understanding of what motivated you to eventually start

10   decreasing her Subsys dosage?

11   **A.**   Well, I believe it was twofold.  I believe according to

12   the record it states that she indicated she wanted to

13   decrease it.  But I also know that in that practice around

14   about that time the doctor had mandated that we try to

15   decrease all of the patients' total opioid doses, and he had

16   also told me to avoid prescribing Subsys due to the legal

17   situation and to separate the practice from the company.

18   **Q.**   So in other words, by fall of 2014, the doctor had some

19   concerns?

20   **A.**   Was that 2014 or 2015?

21   **Q.**   When do you remember the doctor having these concerns?

22   I'm going to go back to that page in the records.

23   **A.**   I don't recall exactly, but I believe it was shortly

24   after the period when -- I believe it was shortly after the

25   period that we first were notified or found out that the

1    government was asking questions to patients.

2    **Q.**  Do you remember about when that was?

3    **A.**  I don't, but I think that would be -- I'm not good with

4    dates, obviously, but I believe that would be indicated on

5    that text message maybe to Jessica when I asked her to

6    check -- to let corporate know, I think.  It was either

7    around that time -- it was certainly in 2015.

8    **Q.**  So by 2015, your memory is that the practice had concerns

9    that the feds, as you said in your text, were looking at the

10    Subsys prescriptions?

11    **A.**  And all -- yes.  Subsys prescriptions as well as all

12    large-dose opioid regimens.

13    **Q.**  So you've talked about Jean Vulte a little bit.  She was

14    one of the people who had refilled the Subsys on one of the

15    exhibits you were shown by Mr. Stojilkovic?

16    **A.**  Yes.

17    **Q.**  Did she attend any of the dinners that you were paid to

18    attend by Insys?

19    **A.**  Yes, she did.

20    **Q.**  About how many?

21    **A.**  She attended quite a few.

22    **Q.**  Did she attend the ones that were educational components

23    or social events?

24    **A.**  Social events.

25    **Q.**  You were asked a lot of questions on cross-examination

1    about prescribing this fentanyl, the fentanyl patch, the

2    Duragesic.  Do you remember those questions?

3    **A.**   Yes.

4    **Q.**   What's the fentanyl patch?  What kind of medication is

5    that?

6    **A.**   That's a long-acting medication.  It's a patch that goes

7    on your skin.  The patient will put it on, and it stays on

8    for 72 hours is what it's supposed to be, but some patients

9    had it on for only two days and would change it.  It's a

10   fentanyl.  So it goes released over time.

11   **Q.**   And is that different than the delivery mechanism for

12   fentanyl in Subsys or Fentora or Actiq?

13   **A.**   The delivery method is different.  The drug itself, I

14   believe, is the same.  It's a fentanyl.

15   **Q.**   So they all have fentanyl, those drugs.

16   **A.**   Yeah.

17   **Q.**   Is there one that gets into your system faster and a more

18   potent fashion?

19   **A.**   The TIRF medications like the Fentora and the Subsys are

20   going to act quicker.  They may not stay in your system as

21   long, but they act much faster.

22   **Q.**   And the Duragesic is not that kind of medicine?

23   **A.**   No.

24   **Q.**   That acts in a long-acting fashion, right?

25   **A.**   Corrects.  That's long-acting, slow release.

1  **Q.**  Two totally different things?

2  **A.**  In some ways, yeah.

3  **Q.**  You've also talked about short-acting opioid medications.

4  Is that different than the Duragesic patch?

5  **A.**  Yes.  Short-acting -- well, there's really no

6  short-acting in that class, fentanyl.  But short-acting

7  medicines like a Percocet, Oxycodone, Dilaudid, they're going

8  to act faster than a long-acting, but they'll be maybe giving

9  about four hours of relief or effect typically.

10 **Q.**  You were asked on cross-examination yesterday and today

11 about speaking with the government.  Mr. Stojilkovic made

12 this chart over here, right, the cooperation chart?

13 **A.**  Yes.

14 **Q.**  You met with the government, you spoke with the

15 government on numerous occasions, right?

16 **A.**  I did.

17 **Q.**  When you met with the government, you talked to

18 prosecutors in Connecticut?

19 **A.**  Yes.

20 **Q.**  In New York?

21 **A.**  Yes.

22 **Q.**  Here in Massachusetts?

23 **A.**  Yes.

24 **Q.**  And when you spoke with the prosecutors and the agents

25 and the investigators in these different jurisdictions, were

1    you talking to all of them about Subsys or about other things

2    as well?

3    **A.**   Oh, when I was -- actually I talked a lot about -- so in

4    the very beginning especially, I really wasn't aware that

5    this was a bigger case than -- I thought the practice I

6    worked for was also under investigation, so I talked a lot

7    about the practice and the different things at the practice.

8    **Q.**   Why did you think that, in other words, that the practice

9    was under investigation?  Were you being asked questions

10   about the practice by investigators?

11   **A.**   Yes.

12   **Q.**   So were you asked about Dr. Thimineur?

13   **A.**   I was.  I was asked about Dr. Thimineur, the medication

14   visits, billing.

15   **Q.**   Were you asked about pain pumps?

16   **A.**   I was.

17   **Q.**   And about a certain type of compound cream, a certain

18   type of medication not Subsys or fentanyl?

19   **A.**   Oh, yeah.  And I talked to some people in Connecticut,

20   and I can't remember who they were, about Medimix, which is

21   compound creams.

22   **Q.**   Were you asked questions about something called neurostim

23   devices?

24   **A.**   Oh, yes.

25   **Q.**   On some of these occasions that Mr. Stojilkovic put up on

```
 1    the board here, were some of those talking entirely about
 2    things other than Subsys?  So like on the Medimix interview,
 3    for example?
 4    A.   Yeah.  That had nothing to do with Subsys whatsoever.
 5    Q.   And on some of the times you were talking about Subsys,
 6    right?
 7    A.   Yes.
 8    Q.   But is it accurate to say you were interviewed 36 times
 9    about this case and these defendants here?
10    A.   Well, no.  That would not be accurate, then, about this
11    case per se.  Because in the beginning this wasn't a case.
12    Q.   In fact, after you were first approached by law
13    enforcement, did you agree to proactively cooperate with
14    them?
15    A.   Yes.  I agreed to cooperate before I pleaded guilty.
16    Q.   And did you take any steps to like physically cooperate
17    with them besides giving information?
18    A.   Oh, yes.  I wore a wire, and I made phone calls that were
19    recorded with them present.
20    Q.   And was that during some of these interactions that you
21    had with law enforcement?
22    A.   Well, I don't know which ones he's talking about, but
23    yes, those were interactions with law enforcement that I had
24    in the past several years.
25    Q.   Do you remember the first time you were interviewed by
```

1    somebody from the Boston team?

2    **A.**  Vaguely.

3    **Q.**  Do you recall in terms of time was it close to when you

4    came and testified in the grand jury?

5    **A.**  I don't remember.

6    **Q.**  So at some point you were asked to look at a number of

7    patient files, right, the actual full patient files from

8    Comprehensive Pain, and you were asked to look through those

9    and explain your medical decision-making?

10   **A.**  Here for this case?

11   **Q.**  Yes.

12   **A.**  Yes.  I've also looked at files for the State of

13   Connecticut as well, different files.

14   **Q.**  Were those files for the State of Connecticut related to

15   Subsys?

16   **A.**  They were related to high opioid prescribing, and I don't

17   recall whether Subsys was prescribed or not.

18   **Q.**  So when you say that, were you interviewed by the State

19   of Connecticut about opioid prescribing at Comprehensive

20   Pain & Headache in general?

21   **A.**  Yes.

22   **Q.**  So is that when you were asked to look at some examples

23   of patient files for those individuals?

24   **A.**  Yes.

25   **Q.**  In terms of here for this case, when is the first time

1    you were given the stack of medical records that you reviewed

2    on direct and you were asked to look through those and

3    comment on your medical decision-making?

4    **A.**   The other day or last week, sometime when I was here.

5    **Q.**   So prior to that, had you been asked at times specific

6    questions about certain patients, like why things were

7    written in the file or why they were written on the opt-in

8    form or directed questions like that?

9    **A.**   I think so.

10   **Q.**   But the first time you sat down with the agents and the

11   stack of files that you were shown and you were asked to look

12   through those was recently, right?

13   **A.**   Yes.

14   **Q.**   And you were asked on cross-examination a long series of

15   questions about prescribing, and you were asked a lot about

16   your testimony about the medical necessity of your

17   prescriptions.  Do you remember that?

18   **A.**   I do.

19   **Q.**   And so you were asked a lot of times -- well, you never

20   told them the scripts weren't necessary, right?  Do you

21   remember that?

22   **A.**   I never told who?

23   **Q.**   Mr. Stojilkovic asked you a lot of times that in all of

24   the meetings you had with the government up until the one

25   where you reviewed the files, you never told them that your

1    prescriptions were medically unnecessary.  Do you remember

2    those lines of questioning generally?

3    **A.**   Oh, when he asked me, yeah, that I had never stated that

4    to the government?

5    **Q.**   That's right.

6    **A.**   Correct.

7    **Q.**   So in each of those meetings where you met with the

8    government, did they ask you about those meetings about the

9    medical necessity in your decision-making?

10   **A.**   No.

11   **Q.**   Did you admit in the grand jury that the bribe money made

12   you prescribe more Subsys than you otherwise would have?

13   **A.**   I think so.

14   **Q.**   Do you have the grand jury in front of you?

15   **A.**   I do.

16   **Q.**   Take a look at page 89, please, lines 1 through 17.  Take

17   your time.  Read through those 17 lines and let us know,

18   please.

19   **A.**   Yes.  I've read it.

20   **Q.**   Did you admit in the grand jury that the bribe money made

21   you prescribe more Subsys than you otherwise would have?

22   **A.**   Yes.  It made me prescribe more because I had an interest

23   in it.  I mean --

24   **Q.**   Did the bribe money change your prescribing habits?

25   **A.**   Yes.

1    **Q.**   How did the money change your prescribing habits over

2    time?

3    **A.**   The fact that I was getting paid and getting more speaker

4    programs, I was more inclined to choose Subsys as my drug of

5    choice for prescribing versus other medications.

6    **Q.**   And you testified about first looking for cancer

7    patients, then looking for patients with a history of cancer,

8    and then looking for other places you could prescribe the

9    Subsys.  Do you remember those questions generally?

10   **A.**   I do.

11   **Q.**   So over time did you become less selective in your

12   prescription of Subsys?

13   **A.**   Yes, I did.

14   **Q.**   Why?

15   **A.**   Because they were getting approved by insurance, and I

16   was getting more speaker programs.  I think if you look at

17   the number of speaker programs that I was getting, after a

18   while it became once a week.

19   **Q.**   So did you do it because you were getting paid?

20   **A.**   Ultimately, yes.

21   **Q.**   You prescribed it for the money?

22   **A.**   Yes.

23          MR. LAZARUS:  Your Honor, may I have one brief

24   moment to confer with counsel?

25          THE COURT:  Yes.

BY MR. LAZARUS:

Q.   When you gave information in Connecticut, did you also
give information about Natalie Levine?

A.   Yes.

Q.   And do you know whether she's been charged?

        MR. STOJILKOVIC:   Objection.

        MR. LAZARUS:   I'll withdraw it.

        MR. STOJILKOVIC:   This is a testifying witness.

BY MR. LAZARUS:

Q.   In those meetings you also provided information on
Natalie Levine and other individuals?

A.   I did.

Q.   By the way, when you were completing your medical records
and your notes, in terms of how you chose what information
you were putting in there, you were shown an example where
you put the word "cancer" in all caps, right?

A.   Correct.

Q.   So when you were completing those medical records, what
understanding, if any, did you have that people could be
reviewing them and looking at your decision-making?

A.   So those notes would be sent to the prior authorization
people who would then submit them to the insurance company.
So as I understood it, if my note indicated the cancer, if
there was any, whether it be a history or what, that standing
out would be more likely to get approved.

1    **Q.**  So you chose things to write based on what would happen

2    with those notes afterwards?

3    **A.**  Yes.

4          MR. LAZARUS:  Nothing further, Your Honor.  Thank

5    you.

6          MR. STOJILKOVIC:  Your Honor, very briefly.

7          THE COURT:  That's fine.

8                    RECROSS-EXAMINATION

9    BY MR. STOJILKOVIC:

10   **Q.**  Ms. Alfonso, you mentioned that when you started

11   cooperating with the government you did some wire recorded

12   calls, right?

13   **A.**  Yes.

14   **Q.**  Not with any of the defendants in this case, though?

15   **A.**  No.

16   **Q.**  You had a wire call with Jessica Crane?

17   **A.**  I don't know.

18   **Q.**  I just want to clear up a couple of things about

19   Ms. Dawes.

20          MR. STOJILKOVIC:  If we can have 6002 back up.

21   **Q.**  You were asked about the different kinds of office

22   visits.  I just want to take a look at page 37.  This is Sara

23   Dawes.  This is a follow-up office visit entry, right?  This

24   is not just medication management, is it, right?

25   **A.**  Correct.

1    **Q.**   Okay.  And if we scroll down here, this is JV.  That's

2    Jean Vulte?

3    **A.**   Correct.

4    **Q.**   And if we scroll to the next page, she continues,

5    Ms. Dawes, on her prescribed medications including Subsys,

6    right?

7    **A.**   I can't tell.  You'd have to scroll down.

8    **Q.**   Do you see the Subsys --

9    **A.**   That says "Current medications."  That doesn't say what

10   she prescribed.

11   **Q.**   Okay.  If you go up to the top.  It says the patient is

12   managing pain on the prescribed medication regimen, correct?

13   **A.**   It does, yes.

14   **Q.**   You have no reason to believe that at this time Ms. Vulte

15   took her off Subsys?

16   **A.**   Well, we would know, I think, if we went down further.

17   But I have no reason to believe it, based on that note.

18   **Q.**   And you testified that you texted with Jessica Crane in

19   February, starting in February of 2015, about concerns

20   because the feds were asking around?

21   **A.**   Yes.

22   **Q.**   But I want to look at the page counsel showed you,

23   page 47 of the records of Ms. Dawes.  So I'm still on 6002,

24   page 47.  Counsel had directed you to an entry in September

25   of 2014.  And the patient explored with you decreasing

1    Subsys, and you said you would decrease it to 400, right?

2    **A.**   That's what it says, yes.

3    **Q.**   That is about five months before the feds started asking

4    your patients -- questions of your patients, going off of the

5    text with Jessica?

6    **A.**   Going off of the text, yes.

7            MR. STOJILKOVIC:  Nothing further.  Thank you.

8            MS. MINER:  Your Honor, I just have a couple.

9    Quickly.

10           THE COURT:  She's entitled to cross.  I was just

11   hesitating over the fact that she's doing recross without

12   having done regular cross.  It's a little bit out of order.

13           MS. MINER:  They brought it up, Your Honor.

14           THE COURT:  Go ahead.

15                        CROSS EXAMINATION

16   BY MS. MINER:

17   **Q.**   Could I have Exhibit 6000 up.  If you could go to the

18   bottom where Mr. Lazarus showed you part of the speaker

19   program where Mike Gurry spoke, correct?

20   **A.**   Yes, ma'am.

21   **Q.**   Now, you're aware that Insys had a number of programs to

22   help patients pay for medicine, correct?

23   **A.**   Correct.

24   **Q.**   They had a voucher program where they could get free

25   product, right?

1    **A.**   Correct.

2    **Q.**   And they had a copay assistance program, correct?

3    **A.**   I believe so.

4    **Q.**   And neither of those programs are available to Medicare

5    patients, are they?

6              MR. LAZARUS:  Objection.  Foundation.

7              THE COURT:  Overruled.

8    **A.**   I don't know, but I don't remember.  But --

9    BY MS. MINER:

10   **Q.**   You had Medicare patients in your practice.  Isn't that

11   fair?

12   **A.**   Oh, yes.

13   **Q.**   And do you recall that Medicare patients couldn't get

14   assistance directly from companies?

15   **A.**   I believe so.

16   **Q.**   And what Mr. Gurry was reporting in this program was on

17   Insys's charitable ventures, they help Medicare patients get

18   those medicines.  Isn't that right?

19   **A.**   It appears that way, yes.

20   **Q.**   Thank you.

21             MR. LAZARUS:  Just one question, Your Honor.

22             THE COURT:  Yes.  So now because she's been allowed

23   to cross, he gets to do the redirect on her cross.

24             MR. LAZARUS:  Thank you, Your Honor.

25                        REDIRECT EXAMINATION

```
1    BY MR. LAZARUS:
2    Q.  Do you have any independent memory, aside from looking at
3    this speaker training agenda, Exhibit 6000, what Mr. Gurry
4    talked about?
5    A.  No.
6              THE COURT:  You're the only one that still has a
7    shot.
8              MS. MINER:  No.  Thanks.
9              THE COURT:  You're excused.
10             Who's your next witness?
11             MR. YEAGER:  Michael Babich, Your Honor.
12             THE COURT:  Does it make sense to take the break
13   now and start him fresh at a little after 11:00?
14             MR. YEAGER:  That's fine.
15             THE COURT:  So I just want to take the break now.
16   11:05.
17             THE CLERK:  All rise for the jury.
18             (The jury exits the courtroom.)
19             (Court recessed at 10:49 a.m.)
20             THE CLERK:  All rise.
21             (The jury enters the courtroom.)
22             THE CLERK:  Court is back in session.  Please be
23   seated.
24             THE COURT:  Call your witness, please, Mr. Yeager.
25             MR. YEAGER:  United States calls Michael Babich to
```

1    the stand.

2            THE CLERK:  Can you please stand and raise your

3    right hand.

4            (MICHAEL BABICH duly sworn by the Deputy Clerk.)

5            THE CLERK:  Thank you.  You may be seated.  Can you

6    please state your name and spell your last name for the

7    record.

8            THE WITNESS:  Full name is Michael Lawrence Babich,

9    last name B-A-B-I-C-H.

10                       DIRECT EXAMINATION

11   BY MR. YEAGER:

12   **Q.**  Good morning, sir.

13   **A.**  Good morning.

14   **Q.**  Could you please tell us where you currently live.

15   **A.**  I currently reside in Scottsdale, Arizona.

16   **Q.**  Where are you from originally?  Where did you grow up?

17   **A.**  I was born and raised in the south side of Chicago.

18   **Q.**  Describe your education for the jury, please.

19   **A.**  I was raised in Chicago and went to a Catholic school

20   throughout K through 8 and all-male parochial Catholic high

21   school in Chicago and then moved on to the University of

22   Illinois in Champaign and Urbana for undergraduate school and

23   then received an MBA from Northwestern University in Chicago

24   as well.

25   **Q.**  And, sir, with regard to your undergraduate education,

1    when did you graduate from the University of Illinois?

2    **A.**   1998.

3    **Q.**   And when did you graduate -- when did you earn your MBA

4    from Northwestern?

5    **A.**   2007.

6    **Q.**   Mr. Babich, are you testifying today pursuant to a

7    cooperation agreement with the United States?

8    **A.**   Yes, I am.

9              MR. YEAGER:  May we please have Exhibit 1843.

10   **Q.**   Do you see that document, sir?

11   **A.**   Yes, I do.

12   **Q.**   Do you recognize it?

13   **A.**   Yes, I do.

14   **Q.**   What is it?

15   **A.**   It is my agreement to plead to two counts, two felony

16   charges, and it is the -- set forth my understanding of what

17   that plea is and also what my duties are.

18             MR. YEAGER:  Your Honor, I'd offer the document.

19             MS. WILKINSON:  Objection.

20             THE COURT:  Objection to the cooperation agreement?

21             MS. WILKINSON:  Yeah.  The underlying document

22   coming in?

23             THE COURT:  Sidebar, please.

24             (The following was held at sidebar.)

25             THE COURT:  I usually admit them.

1          MS. WILKINSON:  It has all kinds of things in it --
2     it's hearsay.  It's a self-serving document in some ways, and
3     he hasn't been impeached on his cooperation.  So I see no
4     reason why the underlying document should come into evidence.
5          MR. TYRRELL:  It sort of vouches for him telling
6     the truth insofar as it says that he agrees to testify
7     truthfully, blah, blah, blah, blah.
8          MS. WILKINSON:  Or it's hearsay.
9          MR. KENDALL:  Your Honor, to be precise, I think
10    the only thing that's relevant is his understanding of his
11    promised reward inducement.  So if they can get him to give
12    his own memory of it.
13         THE COURT:  I've never had anyone object to them
14    coming in.
15         MR. WYSHAK:  We generally put the plea agreements
16    in because I assume you're going to ask him about it on
17    cross.  Are you saying you're not going to offer it on cross?
18         MS. WILKINSON:  I have no idea, but I don't think
19    that --
20         MR. WYSHAK:  Well, no --
21         MS. WILKINSON:  Excuse me.  Could you please let me
22    finish?  You have talked on and on.  If would be nice if you
23    would let somebody finish when they start.
24         MR. WYSHAK:  Sure.
25         MS. WILKINSON:  He does it all the time.

1        THE COURT:  He's not the one that talks the most on

2   and on.  It's not you either.

3        MS. WILKINSON:  Thank you for that small

4   compliment.  I'll take it.

5        I don't think it should come in at this point.  It

6   is his recollection.  And if we open the door on cross, then

7   of course he can introduce it on redirect.  He didn't even

8   ask him what his understanding is.  It's a hearsay document.

9   He hasn't been attacked for his credibility about his

10  understanding of the deal.  So I object to putting it into

11  evidence.

12       MR. YEAGER:  I intend to ask about his

13  understanding of the document.  The point is I'm offering it

14  up to be completely transparent.  I've offered it with a

15  previous witness with no objection.

16       THE COURT:  He's asking it in front of the cross.

17       Look, I haven't ever encountered this, and I

18  haven't thought about it.  Let's just keep it out from now.

19  I'm happy to think about it overnight.

20       MR. YEAGER:  Understood.

21       (End of sidebar.)

22  BY MR. YEAGER:

23  Q.  Mr. Babich, are you familiar with the document?

24  A.  Yes, I am.

25  Q.  I'd ask what's your general understanding of the

1    document?

2              MS. WILKINSON:  I object to the understanding of

3    the document or the agreement?

4              THE COURT:  I think he's entitled to either one.

5    But now he's asked about --

6    BY MR. YEAGER:

7    **Q.**  What's your understanding of the agreement?

8    **A.**  The understanding of the agreement is that I have changed

9    my plea from a not guilty plea to a guilty plea to two

10   separate charges.

11   **Q.**  What were those charges, sir?

12   **A.**  It was two counts.  The first count I pled guilty to was

13   conspiracy to commit mail and wire fraud.  The second count

14   is a count of mail fraud.

15   **Q.**  And with regard to the agreement that you have with the

16   United States, do you have an agreement with the United

17   States regarding a recommendation on the plea -- on the

18   charges for which you've pled guilty?

19   **A.**  It's my understanding that the government will determine

20   if my testimony is truthful and would potentially make a

21   recommendation to the judge based on my truthfulness and

22   cooperation.  I'm not guaranteed anything from that.

23   **Q.**  What is your understanding of the determination of your

24   sentence?  Who holds that responsibility?

25   **A.**  It's Your Honor.  It's Judge Burroughs.

1 **Q.** Do you understand, sir, that you're under oath here today

2 and you need to testify truthfully?

3 **A.** Yes, I do.

4 **Q.** Just to go over it again, to what crimes have you pled

5 guilty, sir?

6 **A.** It was two counts. The first count is a conspiracy to

7 commit mail and wire fraud, and the second count is a mail

8 fraud charge.

9 **Q.** Now, with regard to those counts -- I want to get back to

10 them a little bit later, but first I want to do some

11 background with regard to your experience with Insys

12 Therapeutics. Okay?

13 **A.** Yes.

14 **Q.** What was your first job after graduating from college?

15 **A.** I started my career working at Northern Trust Bank in

16 Chicago, Illinois. I was in a two-year rotation program. It

17 was for fresh graduates to experience all the different

18 aspects of the bank and eventually determine which division

19 you want to go to within the bank. Northern Trust Bank is a

20 large bank based in Chicago, Illinois, headquartered there.

21 **Q.** You graduated from college. What was your degree in?

22 **A.** It was a general business degree, liberal arts degree.

23 **Q.** You went to work at Northern Trust, correct?

24 **A.** Yes.

25 **Q.** How long did you do this rotation program that you talked

1    about?

2    **A.**   It was supposed to be two years.  I was plucked out of

3    the program during the second year of the program.

4    **Q.**   When you say you were plucked out of the program, what

5    does that mean?

6    **A.**   I had an older friend who used to work in a different

7    division of the bank, in the investment division, and he had

8    left the company, and they asked him if he had any

9    recommendations to fill his spot.  And he introduced me to

10   the boss of this specific division.

11   **Q.**   So how old were you when you started at Northern Trust?

12   **A.**   Between 22 and 23.

13   **Q.**   And how long did you work at Northern Trust?

14   **A.**   About three years or so.

15   **Q.**   What was the division that you transferred to?

16   **A.**   It was called the northern investment counselors.  It was

17   a division of which they managed money for high net worth

18   individuals.  It was supposed to be $10 million or more

19   clients they would only accept.

20   **Q.**   So what was your job?  What did you do there?

21   **A.**   I worked for two of the money managers as their

22   assistant.  So I would handle any requests that my two bosses

23   had, the two managers.  So I'd run reports for clients.  I

24   would also recommend -- I would be in charge of presenting to

25   the management team whether or not we should buy Coke or

1   Pepsi, depending on where the stock price was trading at that

2   time.  Overall client service.

3   **Q.**  You've analyzed investments.  Is that essentially what

4   you did?

5   **A.**  Yes, I did.

6   **Q.**  What about them did you analyze?  What were you

7   determining?

8   **A.**  I was helping the management team within this division,

9   there was a group of about 20 of us, with which stocks we

10  should be buying for our high net worth clients.

11  **Q.**  How long did you work at Northern Trust?

12  **A.**  I believe almost four years total.

13  **Q.**  And why did you leave?

14  **A.**  Northern Trust was a place that -- we call them lifers.

15  It was a great company, still is a great company in Chicago,

16  where once people leave they normally -- once people get

17  there, they normally don't leave.

18          But one day I was working on -- I was the lowest on

19  the totem pole.  I believe it was Labor Day or Memorial Day,

20  a Monday holiday and I had to go into the office just in case

21  the client called.  The head boss of the division happened to

22  come in that day and he asked me to go to breakfast.  And he

23  told me about an opportunity with a potential client of his

24  in this division that was looking to hire someone at his

25  family office.

1          And I was surprised because this was the head boss

2     of my division telling me that I should go explore another

3     job when, in fact, I was thinking I would be there for 30 or

4     40 years.  But he told me even though I was up and coming in

5     the division, Northern Trust is very bureaucratic and I

6     probably wouldn't get promoted until the other five people

7     ahead of me were promoted because that's just the way big

8     companies work.

9     **Q.**  So what did you do?

10    **A.**  I went for the interview with the gentleman that he

11    suggested.

12    **Q.**  Who was that person?

13    **A.**  John Kapoor.

14    **Q.**  Do you see Mr. Kapoor in the courtroom here today?

15    **A.**  Yes, I do.

16    **Q.**  Would you please point to him and describe an item of

17    clothing he's wearing?

18    **A.**  He is in the front in a dark blue suit, blue shirt, and a

19    dark blue tie.

20          MR. YEAGER:  Your Honor, may the record reflect

21    that the witness has identified defendant John Kapoor.

22          THE COURT:  Yes.

23    BY MR. YEAGER:

24    **Q.**  So how old were you when you interviewed with Dr. Kapoor?

25    **A.**  It was in 2001, so I would have been approximately

1    25 years old.

2    **Q.**  Describe the interview.

3    **A.**  I went up there.  It was in Lake Forest, Illinois, which

4    is about 40 miles north of Chicago, where I lived and worked

5    at the time.  And I met with John for approximately one hour.

6    He quizzed me on my background.  We discussed investment

7    philosophies.  This was early in the summertime.

8         And I left the interview and didn't hear anything

9    for about a month or so, which is atypical of -- normally

10   when you interview with a corporation you either get called

11   back or they notify you in some manner that you didn't get

12   the job.

13   **Q.**  Okay.  So did you hear from Mr. Kapoor at some point?

14   **A.**  I heard from his assistant later on in the summer, in the

15   July timeframe.  So about a month and a half or two months

16   had passed, and I went back there and interviewed once again

17   for the position, yes.

18   **Q.**  And the second interview, what happened after that?

19   **A.**  Again I didn't hear anything for about six or seven

20   weeks, didn't receive a phone call.  I had called in just to

21   see if there was any follow-up.  And then unfortunately the

22   events of September 11 took place, and a couple of days after

23   that I checked the mail and I had an offer letter from

24   EJ Financial, which was the name of his family office, to

25   join his company as a portfolio analyst.

1    **Q.**   Did you take the job?

2    **A.**   I did, yes.

3    **Q.**   What was your starting salary at EJ Financial?

4    **A.**   70,000.

5    **Q.**   What year was that?  2001; is that right?

6    **A.**   2001 I joined.

7    **Q.**   You've known Mr. Kapoor since then?

8    **A.**   Yes.

9    **Q.**   Describe the place that you went to work after Northern

10   Trust, EJ Financial.

11   **A.**   It was a family office just dedicated to managing all the

12   aspects of Kapoor's life.  It was -- they had accounting

13   staff, couple secretaries, and one or two people who dealt

14   with investments, and myself.

15   **Q.**   And what was your role?

16   **A.**   My role to start off as a portfolio analyst was -- it was

17   twofold.  The first was there was a portfolio that he kept

18   in-house of approximately $100 million that he wanted me to

19   help him manage.  And the second was to interview and hire

20   and fire outside money managers that managed another certain

21   part of his assets.

22   **Q.**   And so what did you do on a daily basis?  Can you

23   describe that for us, please?

24   **A.**   Sure.  So with the $100 million accounts that I had when

25   I first got there, there was large concentrations, meaning of

the 100 million.  For example, there was one stock that he
owned which was HealthSouth, and he had approximately north
of $25 million worth of stock.

So my discussions with him around that was really
the risk in that if that company were to go to zero, you're
losing a large chunk of money.  And my goal is to analyze
these companies and make recommendations to Kapoor about
whether I thought they were good or bad investments.

**Q.**  I want to talk about HealthSouth in a second, but
describe your relationship with Dr. Kapoor at the time.

**A.**  At the time the way the office was shaped, it was kind of
a U-shaped office.  And his office was in one corner, and I
was in a small room with four cubicles, and I was in the
other corner.

So the face time with him in my first couple of
years of working there was very minimal.  Most of the
communication that we had was via email.  I would email his
email address, and Nellie, his assistant, would print off
those emails.

And then if there was a response when I came in in
my cubicle, there would be her interpretation of what he
wrote down as to whether or not I could say buy, sell,
whatever the instructions were at that time.

So it was first couple of years just a situation
where I didn't know him that well.  I occasionally was put in

1    front of him to discuss some ideas, and the phone calls were

2    very infrequent.

3    **Q.**  You mentioned HealthSouth a little while ago.  Do you

4    remember that?

5    **A.**  Yes.

6    **Q.**  Tell us about HealthSouth.  What was your involvement

7    with HealthSouth?

8          MS. WILKINSON:  Objection.  Relevance.

9          THE COURT:  Are you just asking about his job?

10          MR. YEAGER:  I'm asking about his job and also the

11    interaction with regard to his daily interaction with

12    Dr. Kapoor, Your Honor.  It's important for the case.

13          THE COURT:  I'll give you some latitude on it, but

14    don't spend too much time on it, please.

15    BY MR. YEAGER:

16    **Q.**  What is HealthSouth?

17    **A.**  As I mentioned, John had a large amount of stock in

18    HealthSouth, north of $25 million.  My recommendation to him

19    was to start to sell the stock for two reasons.  One, he

20    owned too much of it.  The second, my duty as an analyst was

21    I saw some inconsistencies in what the company was saying to

22    Wall Street.  They're a publicly traded company.  And I

23    eventually was successful in convincing John to sell

24    approximately 80-plus percent of his HealthSouth stock.  That

25    turned out to be a great idea --

```
 1                    MS. WILKINSON:  Your Honor --
 2                    THE COURT:  Sustained.
 3       BY MR. YEAGER:
 4       Q.   What happened after you talked to Dr. Kapoor about
 5       HealthSouth?
 6       A.   We sold a large amount of stock, and HealthSouth stock
 7       tanked because of some issues they had.
 8                    MS. WILKINSON:  Objection.
 9                    THE COURT:  Sustained.
10                    MS. WILKINSON:  I move to strike, Your Honor.  Same
11       thing we were --
12                    THE COURT:  He's allowed to testify about his
13       relationship with Dr. Kapoor, but sort of the detail about
14       the money and the stock and all that really isn't relevant to
15       this case.
16       BY MR. YEAGER:
17       Q.   After you sold the stock, Mr. Babich, what happened?
18       A.   I walked into my cubicle one morning and there was an
19       envelope from EJ Financial with my name written on it in the
20       handwriting of Nellie Oquendo.  When I opened it, it was a
21       $5,000 check from John Kapoor's personal checking account to
22       myself.
23       Q.   And what did you do?
24       A.   I called my parents and told them you wouldn't believe
25       what just happened.
```

1  **Q.**   Describe your relationship with Mr. Kapoor after the

2  HealthSouth sale.

3  **A.**   The amount of face time that I received from him

4  increased slowly.  I was able to attend more meetings with

5  him and also just get to know him a little bit better.  He

6  was very distant in the first couple of years.  And at that

7  time, right after that event, we started to talk more and

8  more about investment ideas.

9          In addition, he had one person that was fired from

10  EJ Financial that handled his private equity investments, and

11  I was friendly with the person, the employee, and I knew what

12  his job was.  So I went to John and said, you don't need to

13  hire someone from the outside, I can handle his

14  responsibilities.  So I eventually took on more

15  responsibility.

16  **Q.**   With regard to that responsibility, did something happen

17  with regard to Dr. Kapoor's spouse?

18  **A.**   Yes.  She passed away.

19  **Q.**   Describe your relationship following her death.

20  **A.**   He took some time for himself after the passing,

21  approximately I would say 18 months where he wasn't in the

22  office very often.

23          And I was given more responsibility in the fact

24  that he had large positions in some publicly traded companies

25  of which he was the chairman of some of these companies.  And

1    I was asked to listen in to some of their board calls and

2    just pay more attention to those, give my opinion of what was

3    going on with those companies.  So it was just a continued

4    added responsibility during that 18-month time period where

5    he wasn't as present in the office.

6    **Q.**  Describe how you came to have contact with Mr. Kapoor

7    with regard to your work.  How did you interact with him?

8    **A.**  Mostly by email still at that point.  I would send emails

9    to his email account, and the responses would be given back

10   to me in written form by his assistant.

11   **Q.**  And did that practice ever change during the 18 years

12   that you knew him?

13   **A.**  No.  That was always the main form.

14   **Q.**  Mr. Babich, what are branded drugs?

15   **A.**  Branded drugs are products that are given what's called

16   exclusivity by the FDA.  If you get approval for a branded

17   drug, you are allowed to sell and market that product without

18   a generic coming into the market.  So you have a period

19   where, since the company was the one who developed the drug,

20   they have that period of time where they can go out and

21   maximize their profits for all the efforts that they put into

22   developing the drug.

23   **Q.**  So what is Sciele Pharmaceuticals?

24   **A.**  Sciele Pharma was a company that John owned more than

25   20 percent of the shares.  I believe he was one of the

1    creators of the company.  He was the chairman of the company

2    for a period of time.  And it was a company where Patrick

3    Fourteau who was also on the board of Insys was the CEO at

4    the time in addition to Pierre Lapalme.

5    **Q.**   What did they sell?  What does Sciele sell?

6    **A.**   They sold a number of products.  The two main products

7    that at that I recall was Sular, which is a calcium channel

8    blocker.  And another prominent product that they had was a

9    nitroglycerin spray; it was called the Nitrolingual

10   Pumpspray.

11   **Q.**   When you say it's a Nitrolingual Pumpspray, is it a

12   similar technology to what was ultimately used with Subsys?

13   **A.**   Yes.  Similar technology, spraying it in the tongue area.

14   **Q.**   What is Alliant Pharmaceuticals?

15   **A.**   Alliant Pharmaceuticals was a private company that was

16   started during my time of working at EJ Financial.

17        It was a pediatric company that we became aware of.

18   There was two entrepreneurs that were looking to market these

19   pediatric products, and they were unsuccessful in finding

20   someone to invest in them.

21        But someone had recommended that they should meet

22   with John Kapoor.  The two people behind the company, Mark

23   Pugh and Art Deas came to Lake Forest.  I was involved in

24   those meetings from the onset.

25        And John eventually agreed to invest in the company

1    as long as they followed his model, which was hiring -- it

2    was called the low cost model, hiring sales reps at low base

3    salaries.  Our base salaries for Alliant were approximately

4    $30,000 with bonuses available for that.  And for a

5    smaller -- I believe the total investment of Alliant was

6    approximately $2 million.  We ended up selling the Sciele

7    company -- I'm sorry.  We sold Alliant, the pediatric

8    company, to Sciele, for over $100 million.

9    **Q.**  Describe your relationship with Dr. Kapoor after you

10   returned to work following the death of his wife.

11   **A.**  After about a year and a half or so passed, I received an

12   office which provided me just really more access to seeing

13   him when he'd come in in the morning.  So our conversations

14   were more frequent during that time period.

15           There was a lot of activity obviously with the

16   Alliant transaction that was going on at that time.  And as

17   he was bringing in more money during that time period, Insys

18   pharmaceuticals also started during that period as well.

19           MS. WILKINSON:  Objection.  Counsel, could you just

20   lay a foundation on the timing of that, when he came back?

21           MR. YEAGER:  Happy to.

22           MS. WILKINSON:  Thank you.

23   BY MR. YEAGER:

24   **Q.**  Do you know roughly what period of time he came back?

25   You said it was 18 months after she passed.  Are you aware

1    when she passed?

2    **A.**   I don't know the exact time period when she passed.  But

3    I'm talking about the late 2006 timeframe, early 2007.

4    **Q.**   Just to go back for a second.  You previously mentioned

5    that you'd earned your master's in business administration.

6    Describe how you did that while working at EJ Financial.

7    **A.**   Northwestern offers a nighttime program where you attend

8    school in the evening while you keep your job.  So I was able

9    to complete my degree while keeping my full-time job.

10   **Q.**   How did you pay for it?

11   **A.**   John Kapoor paid for the majority of it.

12   **Q.**   Describe that.  How did that happen?

13   **A.**   He was always interested in doing -- when I approached

14   him about going to graduate school, he asked me what other

15   companies did for their employees.

16          So I called a couple friends who work in that type

17   of business to see what is the average that companies pay

18   for.  I showed him three examples of companies in Chicago and

19   what they pay for.  And he agreed to pay for the vast

20   majority of it.

21   **Q.**   Okay.  You mentioned Insys Therapeutics, and I want to

22   talk about how that began.

23          But before we do, can you tell us during the time

24   period between when you started there and when you got

25   involved with Insys Therapeutics, what number of corporations

1  or businesses involving healthcare was John Kapoor directly

2  involved with?

3  **A.**   So when I first got there in the first couple of years,

4  he was involved with five publicly traded companies at the

5  time.   The first one was Sciele, which we talked about.   Its

6  original name was First Horizon.   They went through a name

7  change.   The second one was called Option Care.   The third

8  one was Introgen, the fourth one was Akorn, and the fifth one

9  was Neopharm.

10  **Q.**   What is Insys Therapeutics?

11  **A.**   Early on?

12  **Q.**   Yes.

13  **A.**   Early on Insys, which stands for innovative systems, the

14  goal of starting Insys was to come up with the first generic

15  version of Marinol product.

16  **Q.**   Were you familiar with Marinol?

17  **A.**   Just from stories.   In I believe it was the late '80s,

18  early '90s, there was a company that John was involved in

19  called Unimed, where he was the first person to market the

20  Marinol product.   So I heard stories about that time, but not

21  being a physician I didn't know what the drug was at the

22  time.

23  **Q.**   Kapoor was involved with a company called Unimed and

24  there was a drug called Marinol; is that right?

25  **A.**   Yes.

1  **Q.**   What is Marinol?

2  **A.**   Marinol is a capsule that patients take.  It has two

3  indications.  The first is a second-line therapy for cancer

4  induced nausea and vomiting.  The second line means if the

5  first drug they're giving you isn't helping with the nausea

6  and vomiting, Marinol is to be added on as the second drug.

7          The other indication that the product eventually

8  got was for AIDS wasting.  It was for appetite stimulation

9  for AIDS patients, which was very prominent in the '80s.

10 Patients who unfortunately had AIDS were not the -- the

11 medications were not caught up by that point where they were

12 losing weight rapidly.  So it was used as a weight stimulant,

13 appetite stimulant for patients.

14 **Q.**   Was Marinol branded or generic drug?

15 **A.**   At the time Marinol was a branded drug when it was at

16 Unimed.

17 **Q.**   What was the idea related to Insys Therapeutics and

18 Marinol?

19 **A.**   So Marinol was off patent, but there was no generic drugs

20 at the time back in 2005-2006 for Marinol.

21         John had hired Dr. George Kottayil, who also used

22 to work at Unimed a number of years ago.  And the strategy

23 when they developed Insys was to come up with the first

24 generic form of the Marinol product.

25         The reason why that's important in the generic

1    space, whoever gets the first generic usually makes the bulk

2    of the revenue from the product itself.  So that was the

3    rationale of why they started the company is to use the

4    potential revenue to fund other projects.

5    **Q.**   And was Insys a private or a public company?

6    **A.**   It started off as a private company.

7    **Q.**   And who was the primary investor in the company?

8    **A.**   The sole investor was John Kapoor.

9    **Q.**   How much did Dr. Kapoor have invested in Insys initially?

10   **A.**   The original plan was to get the generic drug approved

11   for $5 million or less.

12   **Q.**   So describe Mr. Kapoor's involvement, his day-to-day

13   involvement with Insys when it first started.

14   **A.**   When it first started --

15           MS. WILKINSON:  Objection.  Timeframe.

16   BY MR. YEAGER:

17   **Q.**   When did Insys first start?

18   **A.**   It's complicated because there was a reverse merger,

19   which I don't want to be incorrect, but some documents will

20   state 1990 --

21           MS. WILKINSON:  Objection.  What documents will

22   state, Your Honor.

23           THE COURT:  Without referring to what's in

24   documents.

25   BY MR. YEAGER:

1   **Q.**   What is Neopharm?

2   **A.**   Neopharm was a -- the company that I mentioned earlier

3   that when I joined EJ Financial, John had owned approximately

4   20 percent or more of the company shares, and they were

5   developing a drug for glioblastoma, which ultimately their

6   Phase 3 trial failed and the company suffered severe stock

7   price decline.

8   **Q.**   How does Neopharm relate to Insys?

9   **A.**   We eventually did a reverse merger and merged Insys and

10  Neopharm together.

11  **Q.**   When was that?

12  **A.**   It was in the 2009 timeframe, I believe.

13  **Q.**   So with regard to Dr. Kapoor's day-to-day involvement,

14  what was it at the time that you were dealing with this

15  research and development of a generic Marinol?

16  **A.**   So the office that the team -- the team was three

17  scientists who were the first three employees of Insys.  They

18  found lab space in Mundelein, Illinois, which is

19  approximately ten minutes away from Lake Forest.

20          And the involvement was whenever John wanted George

21  to come over to the office, George would come over and give

22  an update on the development of the generic Marinol.  It was

23  approximately, as I recall, the ones that I was involved in,

24  once a month.

25  **Q.**   Who is George again?

1    **A.**   George Kottayil was one of the original employees of

2    Insys, and he also used to work at Unimed.  So he had

3    familiarity with the Marinol product and how to create it.

4    **Q.**   So describe the initial success of the efforts with

5    regard to this generic Marinol drug.

6    **A.**   There was no success.  It was a constant -- once we filed

7    the application with the FDA to get the drug approved, the

8    first response that we got from the FDA was that the generic

9    drug had over 100 deficiencies with the application.

10   **Q.**   Just to be clear, the Marinol by the way, the generic

11   drug, it's a form of THC; is that correct?

12   **A.**   Yes.

13   **Q.**   The drug itself, you say you were having problems in

14   developing it, correct?

15   **A.**   Yes.

16   **Q.**   Were there any other drugs that Insys was researching and

17   developing at the time?

18   **A.**   At that initial onset, there was not.

19   **Q.**   Did that change at some point?

20   **A.**   Yes, it did.

21   **Q.**   Can you describe that for the jury, please.

22   **A.**   Sure.  I mentioned before there was Sciele Pharma that

23   John used to be involved in.  That company was eventually

24   sold.

25           And he had told me that he was always surprised

1    that there weren't more sprays on the market.  The reason for

2    this, his surprise, was that they were selling a spray of

3    this nitroglycerin which is used for angina attacks, people

4    with heart issues.  They were selling that at a significant

5    premium to the generic tablets that were available out there.

6         MS. WILKINSON:  Objection, Your Honor.  Could we go

7    sidebar?

8         THE COURT:  Yes.

9         (The following was held at sidebar.)

10        MS. WILKINSON:  This testimony is totally

11   irrelevant about the pricing strategy.  They did this in the

12   302's.  It's totally prejudicial, as we know.  Other cases

13   about a drug costing, the amount of testing has nothing to do

14   with Subsys.

15        MR. YEAGER:  It absolutely does.

16        MS. WILKINSON:  And it is only being introduced to

17   prejudice my client.  It's not an argument or any issue they

18   raised in the trial thus far, and it has nothing to do with

19   Subsys, which was priced competitively with other branded

20   drugs.  We all know those cases have been in the public, and

21   people are very concerned about that issue.

22        MR. YEAGER:  Judge, Ms. Wilkinson knows exactly why

23   it's relevant.  It's in the 302's, and she's portrayed to

24   this jury in her opening statements and throughout, the

25   reason for Subsys, the sole reason is a sad moment with his

1   wife.  That's part of the issue.  What really happened was he

2   realized that the nitroglycerin tablets, which cost ten cents

3   on the dollar, sell and they make a sublingual spray and they

4   make a lot of money off of it.

5          He opens up research at Insys Therapeutics to find

6   a spray.  Not a cancer spay, a sublingual spray to compete

7   with tablets over a period of time, and that's how the Subsys

8   spray started.  It's absolutely relevant to the reasons

9   behind the drug which have been raised by counsel on opening.

10         Secondly, with regard to his corporate experience,

11  it's incredibly important.  They've portrayed Mr. Kapoor as

12  somebody who is sort of back door, didn't know what was going

13  on.  And the exact opposite is true.  He was intimately

14  involved.  Many of the strategies they were following at

15  Insys were created by him in other companies that Mr. Babich

16  is aware of.

17         MS. WILKINSON:  Your Honor, I guess they weren't

18  listening to my opening statement.  I stood up and said he

19  was involved.  It was his strategy.  We've never taken the

20  position that he wasn't involved.  I think what's what

21  counsel was expecting, but it's not what we've been saying.

22         THE COURT:  This is where I think the line is.  You

23  can establish that he wanted to make money and that he was

24  motivated by making money.  But not how much money he made

25  and that he was a billionaire and all that.

1          MR. YEAGER:  That's fine.  I have no issues with

2    that.

3          MS. WILKINSON:  But they've been doing that all

4    along.  That's very hard for me to object how much they made

5    off selling a company.

6          MR. YEAGER:  I didn't actually ask him --

7          MS. WILKINSON:  Right.  He wants to come after

8    Dr. Kapoor.  He's volunteering things you're not even asking.

9    I agree.

10          THE COURT:  I'll give him a cautionary to answer

11    the question.  You can establish his motivation for the

12    money.  That's all fair.  But the fact that he's rich and

13    that some in some way be relevant is not fair.

14          MR. YEAGER:  I understood.

15          (End of sidebar.)

16          THE COURT:  Mr. Babich, if could listen to his

17    question and just answer the question.  A little less

18    narrative and a little more direct response to the question.

19    Okay?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  He'll follow up with another question

22    if he wants.

23    BY MR. YEAGER:

24    Q.  Mr. Babich, just to go ahead, there was a drug that was

25    at Sciele that was a sublingual spray, correct?

1    **A.**   Yes.

2    **Q.**   What was of the significance of that when it came to

3    Insys?

4    **A.**   It was significant because John's idea was just that why

5    aren't there more sprays, and that's when we started to -- he

6    told George to evaluate some molecules to put in the spray

7    device.

8    **Q.**   Did John Kapoor express a motive behind wanting more

9    sprays, a reason to find out if there were more sprays?

10   **A.**   The motive was that he thought it was a great delivery

11   system from his experience at Sciele, and they were able to

12   sell it a lot more than the generic.

13   **Q.**   Just to be clear, the generic was what?

14   **A.**   It cost pennies at the time.

15   **Q.**   So the generic, what form did the generic take it?

16   **A.**   They were little tabs.

17   **Q.**   And then there's a sublingual spray for the

18   nitroglycerin -- a sublingual nitroglycerin spray, correct?

19   **A.**   Yes.

20   **Q.**   They were able to make more money or the spray versus the

21   tablets; is that correct?

22   **A.**   That is correct.

23   **Q.**   So with regard to Insys, that idea, what happened at

24   Insys relative to that idea of finding more sprays?

25            MS. WILKINSON:   Objection to the leading.

1          MR. YEAGER:  I'm trying to focus and move beyond
2    the objection, Your Honor.
3          THE COURT:  It's overruled.
4    BY MR. YEAGER:
5    **Q.**  Go ahead.
6          THE COURT:  He has asked some leading questions,
7    but that didn't happen to be one of them.
8          MS. WILKINSON:  Okay.  I'll be quicker next time.
9    **A.**  George and John discussed various molecules that they
10   would look at, one of which was fentanyl, and there were some
11   others.
12   BY MR. YEAGER:
13   **Q.**  And so what happened with regard to research and
14   development of a new sublingual spray?
15   **A.**  I'm sorry.  Could ask you that again?
16   **Q.**  Did they explore the fentanyl option or other options?
17   What happened with regard to research and development of this
18   fentanyl spray at Insys?  Of the sublingual spray at Insys, I
19   should say.
20   **A.**  Yes.  That was one of the molecules that was pursued.  I
21   do not know what other molecules they pursued at that time.
22   **Q.**  All right.  So with regard to fentanyl, did they pursue
23   that particular molecule?
24   **A.**  Yes, they did.
25   **Q.**  Describe the research and development related to that

1  idea using fentanyl as a sublingual spray.

2  **A.**   The idea was that John knew that there was a lollipop,

3  which was called Actiq, that dominated the market at that

4  time.   So he had told me that he believed that the spray

5  would be more convenient to use than the lollipop.

6  **Q.**   All right.   Now, with regard to Insys, where was it

7  currently located when the idea for the sublingual fentanyl

8  spray starts to be worked on?

9  **A.**   It was still back in Mundelein, Illinois.

10  **Q.**   Did that change at some point?

11  **A.**   Yes, it did.

12  **Q.**   Describe that for the jury, please.

13  **A.**   In early 2007, John had expressed to me that he had

14  always had a home in Arizona, and he was interested in moving

15  some of his operations back to Arizona.   And he asked me if I

16  would be interested in moving to Arizona.

17         I explained to him that I could do my job from

18  anywhere.   I didn't really have a huge desire to move to

19  Arizona at that time, but he talked to me about getting more

20  involved at Insys, and that there would be an opportunity

21  there down the road if the company continues to make

22  progress.

23         I went to meet with the three scientists to notify

24  them of John's intent to move the company to Arizona.   And I

25  was surprised that they all agreed fairly quickly to move to

1   Arizona as well.  So not having a scientific background, when
2   I saw the three science people determine that they would move
3   because their wives or significant others had very good jobs
4   at some of the bigger pharmaceutical companies which were
5   very prevalent up in that area, I was more convinced that
6   maybe they're on to something if the science folks believe
7   it.  And I agreed to move to Arizona as well.
8   **Q.**  So when you moved, were you working for Insys or
9   EJ Financial?  Who did you work for?
10  **A.**  When I moved, I was working for EJ Financial.
11  **Q.**  Did you play a role with regard to the move of Insys?
12  What were your responsibilities?
13  **A.**  Yes.  Because it was only scientists at the time, John
14  had asked me to handle any of the business aspects of the
15  company.  So I was in charge with finding a facility for the
16  headquarters to be in.
17          In addition, lab space where the scientists can
18  work is not very prevalent in the Phoenix area, so I was in
19  charge of finding the engineers and architects to where we
20  actually built out our own laboratory.  So at the time, I was
21  dedicating probably 30 or 40 percent of my time to Insys and
22  the rest for EJ Financial.
23  **Q.**  And with regard to the Insys, the structure when it moved
24  to Arizona, did it have a CEO or management structure
25  associated with it?

1    **A.**  It did not, no.

2    **Q.**  Who managed it?

3    **A.**  John was the sole investor.  I can't recall what the

4    official titles were at that time, but it was always John's

5    money.  So everyone knew that he was the boss.

6    **Q.**  When you moved, how old were you at this point?

7    **A.**  30 to 31 years of age.

8    **Q.**  You moved to Arizona.  You're 30, 31 years old.

9         What was your job when you got there?  What did you

10   do with regard to Insys Therapeutics once you arrived in

11   Arizona?

12   **A.**  Once we found the lab space and set up the company, I

13   eventually took the role as chief operating officer of the

14   company.

15   **Q.**  What were your responsibilities as the COO, chief

16   operating officer?

17   **A.**  Really nothing had changed.  John would come in a couple

18   of times per week, get updates on the company, the hopes of

19   getting the generic approved.  And by that time, we were

20   moving into testing the fentanyl spray in the first stage of

21   clinical trial.

22   **Q.**  I want to talk to you about that in a second.

23        Where did you live when you moved there?

24   **A.**  When I first moved to Arizona, I was still commuting back

25   and forth to Chicago finishing up my MBA.  So I lived in John

1    Kapoor's -- they called it the guesthouse, but it was a
2    separate home about a mile away from his primary residence.
3    **Q.**   And how long did you live there?
4    **A.**   Probably greater than four months, four to six months.
5    **Q.**   So you started to talk about the work that the company
6    was doing on research and development.  What were they
7    working on?
8    **A.**   The first stage of taking fentanyl into human patients,
9    Phase 1.
10   **Q.**   What do you mean by Phase 1?  Generally how do you
11   develop a drug in order to put it on the market?  Very basic.
12   **A.**   I'll keep it basic because I'm not a doctor.  But Phase 1
13   is where you test the drug in healthy human volunteers.  So
14   in this instance, you are giving the drug to patients, and
15   you're really getting a read on what the blood levels look
16   like.  More simply, how fast the drug is getting into the
17   patient's bloodstream.
18   **Q.**   Okay.  And then are there other phases?
19   **A.**   Yes.  There are Phase 2s and Phase 3 as well.  In this
20   situation, since that product that I mentioned, Actiq, was
21   already out there, we were allowed by the FDA to skip Phase 2
22   and go directly into Phase 3.
23   **Q.**   All right.  So let's talk about the different phases,
24   Phase 1 and Phase 3.
25            Describe what happened with regard to the Phase 1

1    study of Subsys.

2    **A.**   The Phase 1 study of Subsys, when we got the results in a

3    graph form, it showed an IV, which was part of the arm.  And

4    when you receive an IV, that gets into the bloodstream very

5    quick.  IV is really just the gold standard of delivering a

6    drug.

7            And then the other standard is -- most drugs that

8    you take are consumed via mouth, so pills and other forms.

9    And those take a while to get in the bloodstream.

10           What we saw with the fentanyl product right away in

11   Phase 1, that we were very close to IV-like speeds.  That was

12   very exciting from the scientific point of view, that we

13   showed that our drug is getting absorbed into the patient's

14   bloodstream quick.

15   **Q.**   So bottom line is it looked like it was going to be a

16   fast drug if it worked, correct?

17   **A.**   If it worked, yes.

18   **Q.**   Describe the financial plan for Subsys after positive

19   information came back in the Phase 1 study.

20   **A.**   It was at that time that we believed that we would

21   hopefully get the generic drug approved still -- first

22   because no other generic had come out yet.  And now we had

23   some positive Phase 1 data.

24           At the time, the pharmaceutical market was -- I'll

25   call it "hot," in Wall Street lingo.  So the decision was

1    made to try to take the company public at that time.

2    **Q.**   What is an IPO?

3    **A.**   It's an initial public offering.

4    **Q.**   Is that what you mean when you say taking the company

5    public?

6    **A.**   Yes.

7    **Q.**   What basically is that?  Can you just tell us what does

8    it mean to take a company public?

9    **A.**   Taking a company public for the most part is getting

10   outside investors, the big Wall Street firms, to invest in

11   your company.  And then your company then gets traded.  If

12   you watch CNBC and you see the tickers at the bottom, you go

13   from a private to a public company, but it's basically a way

14   to bring in additional investors into a company.

15   **Q.**   The's stock that is traded publicly, correct?

16   **A.**   Yes.

17   **Q.**   I could go buy stock in Insys once it's publicly traded;

18   is that right?

19   **A.**   Yes.  Once it's public, you can.

20   **Q.**   What is the process associated, very basically, with

21   launching an IPO, an initial public offering?  How long does

22   it take?  What do you do?

23   **A.**   The attempt to do it takes approximately one year.  You

24   hire a team of attorneys, auditors, and a complete management

25   team.

1    **Q.**  And describe the size of the company as you planned for

2    the first IPO.

3    **A.**  So before we went to try to do the IPO, there was

4    probably six or seven employees:  scientists, myself, and an

5    IT person.  Once we decided to go to the IPO route, we hired

6    an additional 10 to 12 people.  So the employee count was

7    approximately 20 people.

8    **Q.**  And what happened with the initial public offering?

9    **A.**  It failed because of the fact that by the time we

10   finished all the hurdles after one year, we still did not

11   have the approval for the generic drug.  And the markets

12   weren't as hot as they were when we first started.

13           So the bankers who initially agreed to help us with

14   the going public told us that there's no need to even try to

15   go out and raise money because it's just not going to happen.

16   **Q.**  All right.  So what happened after the IPO failed?

17   **A.**  I was told to cut every potential spend that we had in

18   the company, which included firing the CEO that we had

19   brought in, firing the CFO and all other noncrucial employees

20   at that time.

21   **Q.**  Just to go back, when had you hired a CEO and CFO, if you

22   remember?

23   **A.**  We hired the CEO approximately in I believe late 2007,

24   and the CFO was shortly thereafter.  You can't try to go

25   public without a CEO or CFO.  So it was common practice.

1    **Q.**  So you fired these employees including the CFO and the

2    CEO; is that right?

3    **A.**  Yes.

4    **Q.**  Now, who do you work for at this point?

5    **A.**  Eventually I became an employee of Insys Therapeutics.  I

6    don't know the exact date when that switched over.  But while

7    I was working for Insys, I was paid by EJ Financial for a

8    period of time.

9    **Q.**  In any event, you were not fired, correct?

10   **A.**  I was not, no.

11   **Q.**  Why was the CEO fired?

12            MS. WILKINSON:  Objection.  Relevance.

13            MR. TYRRELL:  And foundation.

14            THE COURT:  He can lay the foundation.  I'm not in

15   a position to gauge relevance without a sidebar.  Do you want

16   a sidebar on it?

17            MR. YEAGER:  I'll move on, Your Honor.

18   BY MR. YEAGER:

19   **Q.**  Following the failed IPO, Mr. Babich, for Insys, what is

20   the financial position of the company?

21   **A.**  We are relying on John's funding.  And the way that he

22   funded Insys was on an as-needed basis.  So I would submit to

23   him that here's all the bills that we have, and here's how

24   much money I think we need for the next couple of months.  So

25   it was always his determination as to how much money he would

1    put in at a given time.

2    Q.   Let's talk about some of the funding that was necessary.

3    You talked about the generic drug.  How much money had been

4    invested in the generic drug?

5    A.   At that time, greater than $15 million.

6    Q.   How about in Subsys?  Describe the cost related to the

7    Phase 1 and Phase 3 development of Subsys.

8    A.   So the cost of doing a Phase 1 is relatively cheap.  I

9    believe it was in the million dollar range.  But the Phase 3

10   study which we had not started at this time, we were

11   receiving quotes for greater than $25 million for the Phase 3

12   trial.

13   Q.   So directing your attention to 2010.  Was there a second

14   effort at an IPO?

15   A.   Yes, there was.

16   Q.   Can you describe -- why was that attempted?

17   A.   Again the financial markets, particularly in healthcare,

18   became positive again.  People were investing in a lot of

19   healthcare and pharmaceutical products.  And at that point we

20   knew that we were going to be receiving our Phase 3 data

21   pretty soon.  We were all anticipating a positive result from

22   the Phase 3.

23          In addition, during that time period, I do believe

24   we received approval for the generic Marinol.  However, we

25   were not the first approval for it, but at least the company

1    had made some type of progress.

2          The more pressing issue was the fact that John at

3    this point had put more than $40 million in the company, and

4    he had told me numerous times that he's never put this much

5    money into a company.  We need to figure out a way to get

6    outside investors.  And at that point, he decided we should

7    try to go public again.

8    **Q.**   And so did you try a second offering of an IPO?

9    **A.**   Yes, we did.

10   **Q.**   And what happened?

11   **A.**   Again we failed.  We never -- the different bankers who

12   agreed to work with us when we were cleared to go by the SEC,

13   once the SEC said legally you can go out and try to raise

14   capital, the bankers decided it would be a waste of time.

15   There was not enough appetite from the investor standpoint

16   that they would invest in the company at this time.

17   **Q.**   So what happened after the second IPO failed?  What did

18   you do?

19   **A.**   We fired people again.  We fired the CFO, and we fired

20   everyone else that was not core to the continuing success of

21   the company.

22   **Q.**   Okay.  So after you fired people following the second

23   effort at an IPO, describe the position of the different R&D

24   projects at that point.

25   **A.**   Since we did not receive generic approval first, we were

1    a fentanyl spray company hoping that the Phase 3 results came

2    out positive.

3    Q.   Just explain what you mean by that very briefly.  You did

4    not receive -- you weren't the first generic product for the

5    Marinol drug, is that correct, for the generic THC?

6    A.   Yes.  So we lost out on that opportunity.  So at that

7    point, all the future potential success of Insys was going to

8    be based on the fentanyl drug.

9    Q.   So what did that mean for the company?  What was the

10   financial position of the company regarding Subsys at that

11   point?

12   A.   We were basically if John was going to fund the company,

13   we would survive.  If he didn't, we would not survive.  So we

14   were solely reliant on his investment and his potential

15   commitment to the company.

16   Q.   Were there investors in the company at the time?

17   A.   No.

18   Q.   Was there a private stock in the company at the time?

19   A.   Yes.  It was commonplace always for him to give stock

20   options to the employees.

21   Q.   Okay.  So you've got this financial position you've

22   described.  What happens with regard to the stock?

23   A.   It was during a period where if people had exercised some

24   of their options they were technically shareholders at that

25   time.

1          In addition, there was a -- George Kottayil, who I

2    mentioned was one of the original employees, he owned a large

3    chunk of stock.

4          At that time period, John was refusing --

5          MS. WILKINSON:  Objection to the narrative again,

6    Your Honor.  I need to talk to counsel.

7          THE COURT:  Talk to counsel.

8          You just need to try and answer more succinctly.

9    He can ask the next question if he wants to.

10         MS. WILKINSON:  Thank you, Your Honor.  Thank you,

11   counsel.

12   BY MR. YEAGER:

13   Q.  Let me just walk you through this so we can move on.

14         The second IPO fails.  Describe Kapoor's

15   involvement in the day-to-day management of Insys following

16   the failure of the second IPO.

17   A.  He was always heavily involved, but it started to -- I

18   would say he was at the office about two to two and a half

19   days per week, which was more than prior to that because, of

20   course, if he's going to have to potentially invest millions

21   more dollars, he always wanted to know how the recruitment

22   and the trial was going, etc.

23   Q.  All right.  Direct your attention to late 2010, early

24   2011.  Can you describe the progress of the Phase 3 study of

25   Subsys.

1   **A.**  So there were two aspects to the Phase 3 trial.  One is

2   efficacy, meaning is it working.  And the other is the safety

3   component.

4           We had finished the efficacy portion of the trial

5   first.  It was an outside company that handles all clinical

6   trials, which is commonplace, and they emailed us letting us

7   know that the results of the trial were in.  So we set up a

8   conference call at that time.

9   **Q.**  All right.  Just describe for us what is an end point

10  with regard to a Phase 3 study?  Very basic, please.

11  **A.**  So in this instance, the efficacy part of the clinical

12  trial was going to prove --

13  **Q.**  Stop right there.

14          What do you mean "the efficacy"?  What does that

15  mean?

16  **A.**  Does it work.

17  **Q.**  Okay.  Go ahead.

18  **A.**  So in this case, we are going to get the results of does

19  this product work in cancer patients at 30 minutes.

20  **Q.**  That's what's called the primary end point; is that

21  correct?

22  **A.**  That is the primary end point of our study, yes.

23  **Q.**  Were there additional end points, other things that were

24  being studied?

25  **A.**  Yes.  There were secondary end points as well.

1    **Q.**   What were those?

2    **A.**   There was a 5-, 10-, and a 15-minute end point as well, I

3    believe.   There might have been a 20.   There were at least

4    three others testing if the drug worked earlier than the

5    30 minutes.

6    **Q.**   Describe the call with the Phase 3 study research

7    company.

8    **A.**   Sure.   It was extremely positive.   They didn't waste any

9    time.   John Kapoor, myself, Larry Dillaha, who was the chief

10   medical officer, and a couple of the scientists on the phone,

11   and they said congratulations, you hit your primary end

12   point.

13          So we were obviously ecstatic because that's most

14   important.   But they also said we also hit all of our other

15   end points showing that the product was working, giving

16   patients pain relief at 5, 10, and 15 minutes as well.   So we

17   hit all of our secondary end points.

18   **Q.**   What does that mean for the position of the company?

19   What was the significance of that moment?

20   **A.**   The significance was at the time there were no other

21   products in this class that had proven that they could work

22   potentially in five minutes.

23   **Q.**   You got the Phase 3 results.   What was of the company's

24   strategy after that?

25   **A.**   We still had to finish the safety trial.   So we had to

1    spend there.  But the strategy at that point was we needed to

2    build up -- we needed to submit the new drug application, and

3    then we needed to determine what John wanted to do with the

4    company next.

5    **Q.**   What's a new drug application?

6    **A.**   So once you finish -- you have all your data from this

7    expensive clinical trial that you have.  You have to put it

8    together, and you submit it to the FDA, and they review it

9    for approval.

10           In this instance, it was a 10-month review cycle.

11   So the FDA either had to tell us the drug was approved, not

12   approved, within 10 months or they can give you an extension

13   on the review.

14   **Q.**   And what happened?

15   **A.**   We received approval in early January 2012 after a

16   10-month review.

17   **Q.**   Okay.  So what is the financial strategy with regard to

18   Insys at the time following the Phase 3 study results?

19   **A.**   We discussed an IPO again, to try that.  But during that

20   time period there were also other competing fentanyl products

21   that had gotten to the market before us.  So at this point,

22   we have -- potentially by the time we get approval, we have

23   four other products that we're going to compete with instead

24   of two, which we thought years ago when they thought of the

25   idea for the spray.

1    **Q.**   So what did you do?

2    **A.**   It wasn't what I did.  John decided to keep the company

3    afloat and continue to invest in the company.  And he knew

4    based on feedback from -- I heard him say to me that I'm

5    going to have to fund this thing through its commercial

6    launch.

7    **Q.**   So what year is this?

8    **A.**   This in 2011.

9    **Q.**   And what did that mean as far as the drug was concerned?

10   When was the earliest time you could commercially launch the

11   drug?

12   **A.**   Technically we could have launched the drug the day after

13   we got approval, which was the first week of January 2012.

14   We waited until the end of March 2012 because we wanted to

15   wait for the -- the FDA was doing a new REMS program, so we

16   chose to wait until the REMS was in place before we launched

17   the product.

18   **Q.**   Okay.  So I want to go back and I want to talk about 2012

19   and what happened at Insys.

20          But before I do, what happened in -- was the

21   company -- did the company ever have a successful IPO?

22   **A.**   Yes, it did.

23   **Q.**   When did that happen?

24   **A.**   That happened in May of 2013.

25   **Q.**   When was the decision made to pursue the third IPO?

1    **A.**   Right after the launch of the drug.

2    **Q.**   And with regard to that -- you said it takes about a

3    year; is that right?

4    **A.**   Yes.

5    **Q.**   What did Insys do in order to prepare for the third IPO

6    in 2013?

7    **A.**   We hired a new CFO and went back and found a new set of

8    bankers to work with us as well.

9    **Q.**   Let's talk about the IPO in 2013.  When did you go

10   public?

11   **A.**   It was in May of 2013.  I forget the exact date.

12   **Q.**   With regard to that, what was the initial -- what was the

13   suggested stock price for the IPO?

14   **A.**   We had a stock price on the cover, which is what you hope

15   to get investors to buy your shares at, in the high teens.

16   **Q.**   Did ultimately -- is that what the stock price was?

17   **A.**   No.  The investors chose to invest in the company but

18   only at $8 per share.

19   **Q.**   What did that mean with regard to Dr. Kapoor?

20   **A.**   It was important because he had all the debt.  He was the

21   sole investor, so he had all the debt on the company at that

22   time.  But the banks made him agree that if he were to take

23   the company public that he would convert all of his debt into

24   the share price at that time.  So by lowering the share

25   price, he was able to get more shares when his debt converted

1   into the share price.

2   **Q.**   You said the IPO was in April or May?

3   **A.**   May 2013.

4   **Q.**   And what happened with regard to the IPO?

5   **A.**   We raised the amount of money that we wanted to.  We went

6   public the next day, meaning our stock was trading to outside

7   investors the following day.  So in terms of taking it

8   public, it was a successful offering because it was done at

9   this point.

10          MR. YEAGER:  May I please have Exhibit 575 for the

11   witness and counsel.

12   **Q.**   This is a lengthy document, Mr. Babich.  Do you recognize

13   it?

14   **A.**   Yes, I do.

15   **Q.**   What is it?

16   **A.**   It's a registration statement with the SEC that is a

17   normal document that you file when you're going public.

18   **Q.**   It's called an S1; is that correct?

19   **A.**   Yes.

20   **Q.**   What is the purpose of the document, if you know?

21   **A.**   The purpose of the document is for investors.  It's a

22   disclosure document to potential investors where they can

23   read everything about the company.

24          MR. YEAGER:  I'd offer it.

25          MS. WILKINSON:  No objection.

1          THE COURT:  Admitted.

2          (Government Exhibit No. 575 admitted.)

3     BY MR. YEAGER:

4     **Q.**  I direct your attention to page 4.  Do you recognize

5     this?  Can you see that?

6     **A.**  Now I can, yes.

7     **Q.**  Okay.  And what is this section?

8     **A.**  This is called "Risks Associated With Our Business."

9     It's the starting point.  It's a summary of the risks for the

10    company, and the subsequent pages are going to be all the

11    risks for the company.

12    **Q.**  This is sort of a bullet point, and then after that

13    there's a lot more full some descriptions of the bullet

14    points; is that correct?

15    **A.**  That's correct.

16          MR. YEAGER:  I'd ask, Ms. Stein, if you could blow

17    up the second bullet point.

18    **Q.**  If you could read that out loud, Mr. Babich.

19    **A.**  "We are largely dependent on the commercial success of

20    our two approved products, Subsys and Dronabinol SG capsule.

21    If these products or any of our product candidates for which

22    we receive regulatory approval do not achieve broad market

23    acceptance or coverage by third-party payers, the revenues

24    that we generate from these products will be limited."

25    **Q.**  All right.  So if we could go through it.  If we could

1     highlight Subsys for a second.

2          Subsys is the fentanyl spray; is that right?

3     **A.**   Yes.

4     **Q.**   That's the drug you've had success, you've launched, it's

5     been on the market for a year at this point; is that right?

6     **A.**   That's right.

7     **Q.**   What about the Dronabinol SG capsule?  We haven't heard

8     that drug described before.  What is that?

9     **A.**   That is the generic drug that we got approved.  It stands

10    for soft gelatin capsule.

11    **Q.**   In terms of the value of the company, are these drugs

12    equals?

13    **A.**   No.  99 percent of our profits at the time of this S1

14    were from Subsys.  We were barely making any money on the

15    generic capsule.

16    **Q.**   The next part, "If these products or any of our product

17    candidates for which we receive regulatory approval do not

18    achieve broad market acceptance."

19          What is broad market acceptance?  What does that

20    mean?

21    **A.**   If doctors don't write the drug.  Because it's branded

22    drug, it needs to be written by physicians.  So if the

23    doctors don't use it.

24    **Q.**   Mark acceptance is doctors have to write it; is that

25    right?

1    **A.**   Yes.

2    **Q.**   "Or coverage by third-party payers," what does that mean?

3    **A.**   It means insurance companies have to pay for it.

4          MR. YEAGER:  Ms. Stein, if we could go down 1, 2,

5    3, 4 from the bottom there, "We face."  There you go.  Thank

6    you.

7    **Q.**   If you could read that, Mr. Babich.

8    **A.**   "We face intense competition from both branded and

9    generic products, and our operating results will suffer if we

10   fail to compete effectively."

11   **Q.**   What is that talking about?

12   **A.**   It's referring to the fact that we're competing with five

13   other products with Subsys.  There's five other products on

14   the market.  And also by this point there's at least two

15   generic products for the SG capsule as well.

16          So there's competition out there.  We don't have

17   the ability to go out and have the only fentanyl product on

18   the market.

19   **Q.**   And with regard to the competition on the market for

20   Subsys, the five products, one of them is the generic Actiq;

21   is that correct?

22   **A.**   Yes.  But there's also a branded Actiq as well.

23   **Q.**   Of all those five, are they all equal?  In terms of

24   competition, what is the major competition that you're facing

25   at the time?

1   **A.**   Two-thirds of the scripts at this point are written for

2   the generic Actiq, and approximately 30 percent are written

3   for Fentora.

4   **Q.**   So the two big fights are with the generic drug and with

5   Fentora, the branded drug; is that right?

6   **A.**   That's correct.

7   **Q.**   Okay.  Now, if we could go down to the second bullet from

8   the bottom.  Thank you.  What is this risk?

9   **A.**   It states that "Our level of indebtedness, which is

10   approximately $70.4 million as of March 31, 2013, could

11   adversely affect our ability to raise additional capital to

12   fund our operations."

13   **Q.**   The debt, who did Subsys owe the debt to?

14   **A.**   John Kapoor.

15   **Q.**   If we could go to the next page, please.  At the top

16   there, right before recent financial results, our founder.

17   Can you do that?

18         What is the last risk that you guys identify for

19   potential stock purchasers?

20   **A.**   "Our founder, executive chairman, and principal

21   stockholder can individually control our direction and

22   policies, and his interests may be adverse to the interests

23   of our stockholders."

24         MR. YEAGER:  May we please have defendant's

25   Exhibit 5620, please.

1   **Q.**  Do you recognize this exhibit?

2   **A.**  Yes, I do.

3   **Q.**  I should say do you recognize the people depicted in this

4   exhibit?

5   **A.**  Yes, I to.

6   **Q.**  Walk us through.  Go left to right, top to bottom.

7   **A.**  So this is the Insys board of directors at the time that

8   the company went public.

9           MR. YEAGER:  May this be published?  I think it's

10  in.

11          MS. WILKINSON:  I think it's in.

12          MR. YEAGER:  I offer it, if it's not.

13          THE COURT:  Is it in?  It's in.  Go ahead.

14  **A.**  So Steve Meyer at the top left, he used to be the

15  controller of Baxter.  He is an accounting expert.  He was

16  brought on the board to be the accounting expert.  Every

17  board of directors of a public company needs someone who is

18  extremely proficient in accounting.  Steve was a board member

19  at Insys, and he was also a board member at Akorn, one of

20  John's other companies, John Kapoor.

21          Pierre Lapalme is another board member.  Pierre was

22  at one point he served on the board at Sciele Pharma and

23  eventually became the chairman of Sciele Pharma as well.

24          Patrick Fourteau on the upper right, he was a

25  former board member and the CEO of Sciele Pharma.

1          Brian Tambi, on the bottom left, was someone that
2     John had worked with at Lyphomed, which is one of his
3     companies back in the '80s.  And I really just knew Brian and
4     John were very good friends.  I don't know much about his
5     history.
6          Ted Stanley was also a board member.  He was also
7     one of the scientific innovators of the drug Actiq, which was
8     of the drug that we were trying to compete with as well.  And
9     then that's myself on the lower right.
10    BY MR. YEAGER:
11    **Q.**  This is the board as it existed, correct?
12    **A.**  At the time we went public, yes.
13    **Q.**  How did the board vote?  How did a motion carry before
14    the board?  How many people had to support it in order for it
15    to carry?
16    **A.**  Four, majority.
17    **Q.**  With regard to John Kapoor, he's depicted there, correct?
18    **A.**  Yes.
19    **Q.**  What was his role with the board?
20    **A.**  He was the executive chairman.
21    **Q.**  And describe his interaction with the board.  What were
22    his responsibilities, his role with the board?
23              MS. WILKINSON:  Objection.  Timeframe, foundation.
24              THE COURT:  Timeframe, please.
25    BY MR. YEAGER:

1    **Q.**  What's the timeframe with regard to -- are these people

2    members of the board at the time of the IPO?

3    **A.**  Yes, they are.

4    **Q.**  That's what I'm talking about.  So at the time of the IPO

5    in 2013, just to be clear, these people are all members of

6    the board of directors, correct?

7    **A.**  Yes.

8    **Q.**  What was John Kapoor's role with the board at that time?

9    **A.**  With the board, all of these people he's had past history

10   with.  Everyone knew that he owned greater than 60 percent of

11   the shares.  So the board meetings were just to approve or

12   disapprove of whatever things he wanted to do with the

13   company.

14   **Q.**  What was your role with the board?

15   **A.**  My role with the board was supposed to be to give a

16   snapshot of the company on a quarterly basis and prepare my

17   team, the management team, to go in and present their slides.

18          Most of the time I would start the meeting after

19   the executive chairman motioned for it to start.  I would

20   talk for a couple of minutes, and then the rest of the

21   meeting John would give his vision and thoughts on the

22   company.

23   **Q.**  Who is the executive chairman?

24   **A.**  John Kapoor.

25   **Q.**  Now, in terms of your role on the board, were you CEO at

1    this point?

2    **A.**   Yes, I was.

3    **Q.**   When did you become CEO of Insys?

4    **A.**   I believe it was in 2011.

5    **Q.**   And what was your role as CEO of Insys as the drug

6    launched?

7    **A.**   As it launched, my job primarily was to help with the

8    launch of the product, but really my efforts were more

9    focused in on starting the IPO process again.

10   **Q.**   I want to come back and talk about the board a little bit

11   later, but right now -- you said that the stock launched in

12   2013, the IPO -- the final IPO, the third IPO was 2013,

13   correct?

14   **A.**   The successful one was.

15   **Q.**   By "successful," what do you mean?

16   **A.**   That we actually finally got investors to invest in the

17   company and we completed the transaction.

18   **Q.**   Describe the success of the stock after you went public.

19   **A.**   For the period of 2013, which was May until the end of

20   December, we were the number one IPO in the country, based on

21   more than 300 public companies that year.

22           The stock was up over 400 percent, meaning if you

23   invested a thousand dollars in the company at that time, you

24   made a 400-plus percent return on your investment.

25   **Q.**   And with regard to -- what is market cap?

1    **A.**   Market cap is just the value of the company.  It's the

2    number of shares that are out there in the company times the

3    stock price.

4    **Q.**   What was the market cap for Insys Therapeutics by the end

5    of 2013?

6    **A.**   It would have been north of a billion dollars.

7    **Q.**   How did you get to that level of success in 2013?  How

8    did the company succeed to sell that much stock?

9    **A.**   I'm sorry.  Can you re-ask that?

10   **Q.**   Describe the financial success of the company prior to

11   launch.  Prior to the IPO.

12   **A.**   So prior to the IPO, one of the reasons I believe was the

13   focus of the company was John wanted to show that we could be

14   profitable.  So in Q1 in 2013 on less than $10 million of

15   revenue of Subsys, we were able to prove that we were

16   profitable.

17            So when I went out and talked to Wall Street, I was

18   able to market the company and say this is the only money we

19   need, we're already profitable, and we're not going to take

20   on any more debt.

21   **Q.**   So you became profitable in just under a year, is that

22   correct, a year from launch of the drug?  Is that right?

23   **A.**   Yes, we did.

24   **Q.**   How did you become profitable?

25   **A.**   Vast majority, 99.9 percent of it was from Subsys

1    revenue.

2    **Q.**   And how did you gain so much success with Subsys revenue

3    in that short period of time?

4    **A.**   In 2013 --

5    **Q.**   By 2013.

6    **A.**   By 2013, it was we continued to spend more in speaker

7    programs, and we continued to build out our commercial

8    infrastructure.

9    **Q.**   When you say you continued to spend more with regard to

10   your speaker programs, how did your speaker programs -- how

11   is it that you used your speaker programs to achieve success?

12   **A.**   We achieved some success with certain doctors by bribes.

13   **Q.**   All right.  Earlier you said that you pled guilty to two

14   federal felonies; is that right?

15   **A.**   Yes.

16   **Q.**   And what were the felonies that you pled guilty to?

17   **A.**   The first one is conspiracy to commit mail and wire

18   fraud.  And the second one is a count of mail fraud.

19   **Q.**   And with regard to the conspiracy to commit mail and wire

20   fraud, with whom did you plead guilty to conspiring with?  In

21   other words, who did you conspire with in that particular

22   crime?

23   **A.**   It was all the co-conspirators listed in the case.  In

24   addition, Matt Napoletano, Alec Burlakoff.

25   **Q.**   When you say "all the co-conspirators listed in the

1   case," who are you referring to?

2   **A.**   John Kapoor, Sunrise Lee, Rich Simon, Joe Rowan, and Mike

3   Gurry.

4   **Q.**   And in addition to the defendants in this courtroom, who

5   else?

6   **A.**   Matt Napoletano and Alec Burlakoff.

7   **Q.**   Anyone else?

8   **A.**   No, I don't think so.

9   **Q.**   I want to talk about the launch of the drug and the way

10  you came to use the speaker program.  But before I do, I want

11  to talk a little bit more about the conspiracy charge that

12  you pled guilty to.  Okay?

13          So you talked about a conspiracy to bribe doctors.

14  Do you remember that?

15  **A.**   Yes.

16  **Q.**   There were two things listed there, conspiracy to bribe

17  doctors and what else did you do?

18  **A.**   Provide false and misleading statements to insurance

19  companies.

20  **Q.**   It talks about mail and wire fraud; is that correct?

21  **A.**   Yes.

22  **Q.**   With regard to the conspiracy, how is it that you -- let

23  me go back for a second.

24          How is it that you conspired to provide false and

25  misleading information to insurers?

1    **A.**   Because we used the telephone as a means to communicate

2    with insure companies by providing false statements.

3    **Q.**   How about the mail part of it?  How did that play a role

4    with regard to the felony that you pled guilty to, conspiracy

5    to commit mail fraud?

6    **A.**   When we paid physicians their honoraria or their speaking

7    fees, we used the mail to mail checks to the doctors.

8    **Q.**   In terms of "we," where did the money come from and the

9    organizational structure necessary to provide the bribes to

10   the doctors and to defraud the insurers?

11   **A.**   Are you talking about the IPO or after the IPO?

12   **Q.**   I'm talking before and after the IPO.

13   **A.**   All the checks flew through -- the whole entity was Insys

14   Therapeutics, Insys pharma, that it ran through.  I didn't

15   know if you were asking about who was funding it or not.

16   **Q.**   I'll get there in a second.

17          The checks, the money that paid the doctors, the

18   bribes came and went through -- where did it come from?  What

19   entity?

20   **A.**   Through Insys.

21   **Q.**   And with regard to that, what about the organizational

22   structure used to defraud insurers?

23   **A.**   That also came from Insys.

24   **Q.**   Who funded Insys at the time?

25   **A.**   What time?

1   **Q.**   2012, before the IPO?

2   **A.**   John Kapoor did.

3   **Q.**   Directing your attention to 2011, you get the news that

4   the drug has accomplished a Phase 3 success.  How is it that

5   you went about preparing to launch the drug in 2012?  What

6   did you do?

7   **A.**   In 2011 is when we started to contemplate how we would

8   launch this.  Really the key factor from John's perspective

9   was marketing is very important, and we happened to come

10   across the resume of Matt Napoletano.

11   **Q.**   So did you interview Matt Napoletano?

12   **A.**   Yes.  Both John and I did interview Matt.

13   **Q.**   And what happened after the interview?

14   **A.**   We offered him the position of vice president of

15   marketing.

16   **Q.**   Describe the interview with Matt Napoletano and John

17   Kapoor and you.

18   **A.**   It was commonplace for us to interview the people

19   separately and then convene at the end of an interview

20   process.

21        I was impressed with Matt because he used to work

22   on Fentora, which was a drug that we were trying to compete

23   with.  And he called it the Fentora playbook.  He knew

24   exactly what we needed to do, what doctors we needed to

25   target, and all the strategies involved with marketing that

1    we needed to potentially use to be successful.

2    **Q.**   All right.  And so he was hired?

3    **A.**   Yes, he was.

4    **Q.**   And what was the title that he received?

5    **A.**   I believe it was the VP, vice president of marketing.

6    **Q.**   What did you do with regard to sales?

7    **A.**   We hired Matt first and then eventually we came across

8    the resume again.  I don't recall who knew him, but there was

9    a gentleman by the name of Shawn Simon who we originally

10   brought on as our first vice president of sales.

11   **Q.**   Did you hire in-house counsel, general counsel?

12   **A.**   We did not.

13   **Q.**   Did you hire in-house compliance officer?

14   **A.**   We did not.

15   **Q.**   Why not?

16   **A.**   Because John's business philosophy was to not hire people

17   unless you, in his view he really needed them.  He was still

18   writing the checks for the company at this time.  He wanted

19   to keep it a very low-cost model.

20          Matt was concerned when he interviewed because he

21   had a list of things that we needed.  He was shocked that we

22   weren't going to hire an attorney as chief counsel and also

23   shocked that we weren't going to hire a compliance officer at

24   the time.

25          But once John made a decision that he wasn't going

1    to do it, my job was always to train the people under me that

2    you really don't want to push back because once he makes up

3    his mind, the decision is done.

4              MR. YEAGER:  May I please have Exhibit 481.  I

5    think it's in evidence.

6    **Q.**  Mr. Babich, do you recognize Exhibit 481?

7    **A.**  Yes, I do.

8    **Q.**  What is that?

9    **A.**  It is part of our package insert label for Subsys.

10   **Q.**  And how did this come to be -- how did you go about

11   building a label?

12   **A.**  The FDA, when they approve your drug, you have what's

13   called label negotiation before approval.  It's a time period

14   of 30 or 60 days where you basically negotiate with the FDA

15   of what your label is going to look like.  And it lists all

16   the risks and all the information about a drug that a patient

17   and a doctor should read before taking.

18   **Q.**  You mentioned a primary end point.  Is that in the label?

19   **A.**  The primary end point of 30 minutes, yes.

20   **Q.**  Are there secondary end points in the label?

21   **A.**  Not that I'm aware of.

22   **Q.**  And with regard to that, why not?

23             MS. WILKINSON:  Objection.  Foundation.

24             THE COURT:  Lay a better foundation, please.

25   BY MR. YEAGER:

1    **Q.**  Are you familiar with the label?

2    **A.**  Yes.

3    **Q.**  Did you discuss strategy with regard to the label?  Were

4    you involved in the creation of the label?

5    **A.**  Yes.  I was on the calls with the FDA as we discussed the

6    label.

7    **Q.**  Why does the label not have secondary end points?

8    **A.**  The FDA would not allow it.

9    **Q.**  Why not?

10   **A.**  Because my recollection of the phone call was that they

11   did not want us to --

12           MS. WILKINSON:  Objection.  Hearsay, Your Honor.

13           MR. YEAGER:  Goes to state of mind, Your Honor.

14           MS. WILKINSON:  That wasn't -- the question wasn't

15   about his state of mind, Your Honor.  It was about what was

16   in the label and why.

17           THE COURT:  Sustained.

18   BY MR. YEAGER:

19   **Q.**  In any event, are the secondary end points in the label,

20   Mr. Babich?

21   **A.**  No.

22   **Q.**  So you've hired now the VP of marketing, the VP of sales,

23   and you've got a label.  You're working on the label,

24   correct?  This is 2011?

25   **A.**  Yes.

1   **Q.**   How do you formulate a marketing strategy prior to the

2   launch?

3   **A.**   We for the most part used Matt Napoletano's playbook of

4   what to do.  And one of the key things we had to do was

5   determine the size of the sales force as well.

6           So the other person that I didn't mention that was

7   hired that was important was Xun Yu.  He was an analyst that

8   would crunch all the data and put forth the number of reps he

9   thought we needed to hire as well.

10  **Q.**   Okay.  So let's talk about the marketing strategy.  You

11  have say Matt Napoletano had a playbook; is that right?

12  **A.**   Yes.

13  **Q.**   What does that mean?

14  **A.**   Matt's not very short-winded.  He loved to have hundreds

15  and hundreds of pages in front of him.  It was really just

16  his strategy of what he needed -- his wish list for how he

17  would market this drug effectively.

18  **Q.**   Did anyone else participate in approving the strategy?

19  **A.**   Yes.

20  **Q.**   Who?

21  **A.**   John Kapoor and myself.

22  **Q.**   And what was the marketing strategy of Subsys as you

23  entered 2012?

24  **A.**   It was to start to get the thought leaders on board, the

25  high writers of Fentora and Actiq.  We needed to get them in

1    the room and talk about the product attributes of Subsys.

2    **Q.**   Did that happen?

3    **A.**   Yes.  There was a small meeting eventually.

4    **Q.**   What about the speaker program, Mr. Babich?  Was there an

5    idea for a speaker program at the time?

6    **A.**   Yes.  Matt had mentioned speaker programs prior to the

7    launch, that he would like to have a budget for speaker

8    programs.

9    **Q.**   And was that approved by John Kapoor?

10   **A.**   At the time, it was not.

11   **Q.**   Why not?

12   **A.**   It was too expensive, is one thing.  It was a

13   multimillion dollar endeavor at that point, and he wanted to

14   launch the drug without speaker programs.

15   **Q.**   Was the benefit of a speaker program, was it discussed

16   with Mr. Kapoor?

17   **A.**   Yes, it was.

18   **Q.**   Can you describe that for us, please.

19            MS. WILKINSON:  Objection.  Time and foundation.

20   BY MR. YEAGER:

21   **Q.**   We're in 2011, correct?

22   **A.**   Yes.

23   **Q.**   Before launch, correct?

24   **A.**   Yes.

25   **Q.**   Go ahead.

**A.**   Matt would talk about speaker programs and what they were
used for.  And he described that they were used to have a
doctor speak to an audience of peers and basically promote
the product on behalf of the company.

And then that really wasn't making a lot of
headway.  Matt had to talk about the speaker programs
multiple times, and eventually Matt would just come out and
say, John, it's a way to pay the doctors who are speaking for
the product.

**Q.**   What happened after that?

**A.**   When after that?  I'm sorry.

**Q.**   When was that conversation where Matt said to John Kapoor
and you, it's really a way of paying the doctors?

**A.**   That happened a couple of times.  It happened once I
recall before 2012, before the launch.  And then it also
happened numerous times after the launch as well.

**Q.**   So we get to 2012.  The drug's approved when?

**A.**   The drug was approved the first week of January 2012.

**Q.**   And when does the drug launch?  In other words, when do
you start selling it nationally?

**A.**   The last week of March 2012, so two and a half months
later.

**Q.**   At this time had John Kapoor committed to using a speaker
program?

**A.**   He did not, no.

1   **Q.**   Did you use consultants at this time, advisory boards?

2   **A.**   Yes, we did.

3   **Q.**   I think you were referencing this earlier.  Describe that

4   for the jury, please.

5   **A.**   So in Matt's efforts to get John to use speaker programs,

6   Matt knew he needed to get Subsys out into an audience.  So

7   there was a small what is called an ad board, approximately

8   eight physicians that took place before the launch of the

9   drug.

10          These physicians were flown to Arizona and spent

11   the weekend in Arizona.  Matt, John, myself spoke to them,

12   introduced the company, the product.  Matt talked to them for

13   about five hours about all the aspects of the product itself

14   in order to get their feedback on the product.

15          The eight doctors that were there were what we knew

16   were the majority of which were the decile 9's and 10's, the

17   large writers of Actiq and Fentora.

18          And as Matt would tell us, it looks like we're

19   trying to tell them about the product, but really what I'm

20   doing is I'm selling the crap out of the product already and

21   we haven't even launched.

22   **Q.**   So did Kapoor commit to the speaker program at that

23   point?

24   **A.**   No, he did not.

25   **Q.**   Did he say yes or no?

1  **A.**   It was just a we'll see.  Let's launch the drug first and

2  we'll see.

3  **Q.**   What about the Insys sales strategy?  We talked about the

4  marketing strategy.  As the drug is launching in 2012, what

5  is the sales strategy associated with the drug?

6  **A.**   So we were told to use the same sales strategy that he

7  used at Alliant Pharmaceuticals and Sciele, which he called

8  the low-cost model.  The low-cost model is hiring people at

9  low base salaries, compared to what normal pharmaceutical

10  reps make, and unlimited upside bonuses potential.

11  **Q.**   What was the starting salary of a sales rep at Insys

12  Therapeutics in the spring of 2012?

13  **A.**   The majority of them started at a $40,000 base salary.

14  There was rare exceptions of people that got a little bit

15  higher than that.

16  **Q.**   What about bonus?  Was there a bonus offered?

17  **A.**   It was uncapped bonus.  They could earn an uncapped

18  amount.

19  **Q.**   What does that mean, uncapped?

20  **A.**   If they sold a tremendous amount of product, whatever the

21  commission plan for it was that quarter, we would cut them a

22  check for that amount.

23  **Q.**   Some companies place a cap.  In other words, you could

24  make a bonus for a certain amount of money and then you could

25  get no more, correct?

1        MR. TYRRELL:  Objection.  Foundation.

2        THE COURT:  Sustained.

3   BY MR. YEAGER:

4   **Q.**  Are you familiar with how other companies set up sales

5   bonuses for their sales force?

6   **A.**  Yes, I am.

7   **Q.**  What is the standard industry practice with regard to

8   sales reps?

9        MR. TYRRELL:  Objection.  Familiarity is not a

10  foundation.  We have to know how he knows.

11  BY MR. YEAGER:

12  **Q.**  How do you know?

13  **A.**  Because I managed a lot of pharmaceutical stocks owned by

14  John Kapoor.

15  **Q.**  Okay.  Can you tell us what the bonus was?  What a cap

16  bonus was?  Strike that.

17        Go back to talk about the other companies in the

18  industry.  Did they use cap bonuses?

19  **A.**  The majority of them that I'm familiar with did, yes.

20  **Q.**  But Insys did not, correct?

21  **A.**  We did not.

22  **Q.**  Why not?

23  **A.**  That was John's philosophy.  It was an "eat what you

24  kill" philosophy.  If you sell a lot, you make a lot.

25  **Q.**  In terms of building the company up prior to launch, what

1  amount of personnel did you have to hire?

2  **A.**  The people that were hired before the launch, I would say

3  approximately 55 people.

4  **Q.**  And what role did John Kapoor play in hiring decisions at

5  Insys Therapeutics?

6  **A.**  He hired Matt.  He hired Shawn Simon, who I mentioned,

7  and he also interviewed and hired all five of the original

8  managers as well.

9  **Q.**  When did the drug launch?

10  **A.**  The last week of March 2013.

11  **Q.**  And how was the drug launched?

12  **A.**  Can you be more specific?

13  **Q.**  Was there a meeting in which the drug launched?

14  **A.**  Yes.  So it was a meeting in Scottsdale, Arizona.  It was

15  a one-week face-to-face meeting.  We brought in all the sales

16  reps, the managers, and obviously us as the management team

17  was there as well.

18  **Q.**  Just to be clear, who was the management team at the

19  time?  Just walk through each of the positions.

20  **A.**  John Kapoor, executive chairman; myself, chief executive

21  officer; Larry Dillaha, chief medical officer; Shawn Simon,

22  VP of sales; and Matt Napoletano, VP of marketing.

23  **Q.**  Describe the first day of the launch training.

24  **A.**  The first day was supposed to be -- we were supposed to

25  get a lot more in.  Myself and John Kapoor gave brief

1    introductions to the companies and what we envisioned the

2    company to do.  Matt talked for about another six hours, so

3    he kind of ruined day one and screwed up the schedule for the

4    week.  But we got our key messages out that we wanted to that

5    day.  The management team, myself and Matt, felt good about

6    day one.

7    **Q.**   What happened on day two?

8    **A.**   I was awoken with a phone call from John Kapoor very

9    early in the morning on Tuesday morning.  He was very upset

10   with how day one went.  He told me that our messaging was

11   fucking terrible.  Excuse my language.  He told me that we

12   have no idea what we're doing and he's going to be at the

13   hotel very soon, so make sure everyone's there.

14   **Q.**   So what did you do after the call?

15   **A.**   Woke up and called Matt Napoletano, Shawn Simon, and

16   Larry and said hurry up and get dressed, John's coming in,

17   and we'll meet in this particular room in the hotel.

18   **Q.**   Describe the meeting, for the jury, please.

19   **A.**   I had already prewarned them that John was coming in

20   extremely angry.

21         And Matt was particularly took offense to it

22   because the only thing -- the main thing I heard on the phone

23   from John was our marketing message is terrible.  And Matt

24   put a lot of work into the marketing message.  So Matt, I had

25   to calm him down as well.

1          And so they at least knew beforehand that John was

2     coming in extremely angry.

3     **Q.**   Let's talk about it.  What was the marketing message that

4     Matt Napoletano had trained the sales force for?

5     **A.**   So the majority of our sales reps at this time had never

6     called on a physician before.  So one of the things that Matt

7     preached was, especially since we're launching a new drug,

8     when you walk into the doctor's office, introduce Subsys and

9     state what it's indicated for.  Which you should say, Doc, I

10    have a new drug, Subsys, we just launched today.  It's

11    indicated for the treatment of breakthrough pain and

12    opioid-tolerant cancer patients.

13    **Q.**   And what was John Kapoor's message?  What did he want the

14    message to be?

15    **A.**   He wanted to tell the reps that we have the same

16    indication as Actiq and Fentora.

17    **Q.**   Did his message involve of the discussion of cancer?

18    **A.**   No.

19    **Q.**   Did he ask for anything else to be part of the message?

20    **A.**   Yes.  He didn't feel that we were talking about the

21    five-minute onset of action enough.

22    **Q.**   And was that discussed?

23    **A.**   At that meeting that morning?

24    **Q.**   Yes.

25    **A.**   Yes, it was.

1    **Q.**   Describe the conversation.

2    **A.**   One of Matt's other messages was stating your primary end

3    point after you have introduce the product and state the

4    indication, you are to talk about what you did in the Phase 3

5    trial, meaning you talk about the primary end point.

6            So you should state in the primary end point we saw

7    statistically significant pain relief at 30 minutes.   In

8    addition -- and you could talk -- there is a graph in the

9    package insert for Subsys, and Matt said you could refer the

10   doctor to the graph about anything else.

11           And John wanted to only talk about -- he wanted to

12   stress the five-minute onset of action, and he wanted us to

13   go buy those -- I forget the fancy name for them, but the

14   sand hourglass, and he wanted reps to have a five-minute sand

15   hourglass and just walk into a doctor's office and put that

16   on their desk to emphasize how quickly the drug works.

17   **Q.**   With regard to that, is that the message that was

18   conveyed that day?

19   **A.**   Part of that message was conveyed that day because our

20   goal -- after John left the meeting, Matt was distraught.

21   And obviously Shawn, who had been in the pharmaceutical arena

22   for 15-plus years, basically said we can't do this.

23           MS. WILKINSON:   Objection.   Excuse me one second.

24   BY MR. YEAGER:

25   **Q.**   Not what Shawn Simon said.   With regard to the

1  conversation, did you convey anything?  Did you speak to the

2  sales reps that day?

3  **A.**   I'm sure I spoke to them that day.  I don't know if an

4  organized setting or not, but I talked to them of course.

5  **Q.**   In any event, what happened after the launch?  Was the

6  drug successful?

7  **A.**   There were two sides of it.  Matt, who had launched drugs

8  before, he would always show me the trajectory of the launch

9  and told me he was very excited about the launch.  And John

10  Kapoor called it the worst fucking launch in pharmaceutical

11  history he's ever seen.

12       MR. YEAGER:  So if we could have Exhibit 290 up,

13  please.

14  **Q.**   Mr. Babich, this exhibit is in evidence.  Do you

15  recognize it?

16  **A.**   Yes, I do.

17  **Q.**   What is it?

18  **A.**   It's a PowerPoint that was used at our February 5, 2013,

19  board of directors meeting.

20       MR. YEAGER:  May I please have page 11, Ms. Stein.

21  **Q.**   Do you recognize this particular page, Mr. Babich?

22  **A.**   Yes, I do.

23  **Q.**   What are we looking at?

24  **A.**   This is a month-by-month representation of the sales of

25  Subsys.  The first one is March -- on the far left is March,

1    and on the far right is December of 2012.  So it illustrates

2    how the drug was selling throughout the year of 2012.

3    **Q.**  This is the drug sales and net revenue during the first

4    year that it was on the market; is that correct?

5    **A.**  Yes, it is.

6    **Q.**  All right.  So there was debate between Kapoor and

7    Napoletano, you said?

8    **A.**  Yes, there was.

9    **Q.**  You said that John Kapoor was unhappy with the sales.  He

10   described it as a bad launch; is that correct?  Those weren't

11   your words, but essentially that's what he said, correct?

12   **A.**  Yes.

13   **Q.**  Did he explain why?

14   **A.**  Yes.  Because we were seeing when a patient started on

15   the drug the majority of them weren't coming back to get

16   refilled on the drug.  That was the main issue.

17   **Q.**  I'm sorry.  I couldn't hear you.  Majority what?

18   **A.**  The majority of patients that were starting on the drug

19   for the first couple of months would get their initial script

20   for the first month and they wouldn't return for their drug

21   the second or third month.  They wouldn't stay on Subsys.

22   **Q.**  Was this a concern of John Kapoor's?

23   **A.**  Yes.

24   **Q.**  And describe that.  What did he say about it?

25   **A.**  He said it was the most important problem in the company

1    at the time.

2    **Q.**   Did you have an understanding -- strike that.

3         Describe your understanding at the time of why that

4    was happening.  Why were patients not coming back to the

5    drug.

6    **A.**   At the time, I didn't have an opinion.  I had data

7    because we had the REMS data which is real-time data.  Matt

8    was telling me it was normal because if the drug, for

9    example, isn't getting approved by insurance, the patient is

10   not going to come back and take the drug.

11        So my opinions were those of those around me

12   telling me.  I've never launched a pharmaceutical drug in my

13   life at this time.

14   **Q.**   Did John Kapoor express his opinion as to why the drug

15   was not succeeding, why patients were not coming back to the

16   drug?

17   **A.**   Yes.

18   **Q.**   What did he say?

19   **A.**   Because they're starting on too low of a dose.

20   **Q.**   Was there concern about the sales force?

21   **A.**   Can you be more specific?

22   **Q.**   Well, directing your attention to the top of the graph.

23   Do you see the big box there, Insys speaker programs?

24   **A.**   Yes.

25   **Q.**   Number two.  Do you see number two there?

1    **A.**   Yes, I do.

2    **Q.**   Are you familiar with what that means?  First of all, if

3    you could read it and tell us what does it mean.

4    **A.**   Sales force leadership changes.

5    **Q.**   Were there leadership changes made during the spring and

6    summer of 2012?

7    **A.**   Yes.  John fired Shawn Simon, the VP of sales, or had me

8    fire Shawn Simon, the VP of sales.

9    **Q.**   Why?  Why was Shawn Simon fired?

10   **A.**   He just said he didn't want to work with him anymore,

11   he's not the guy for the job, and get rid of him.

12   **Q.**   Who is Alec Burlakoff?

13   **A.**   Alec Burlakoff, the first time I heard his name, was back

14   in 2011, where Matt had talked about potentially bringing him

15   on as a manager for the company for Subsys.

16   **Q.**   If we could go back for a second.  You talk about -- what

17   is John Kapoor's involvement after the drug launched?  How

18   frequently did you see him?  How frequently did you work with

19   him?

20   **A.**   Post launch -- prior to the launch it was two to two and

21   a half days per week in the office.  After the launch, it was

22   four days per week.  Usually it was 8:00 or 8:30 start and

23   would leave around 12:00 or 1:00.

24        On the days that he wasn't there, it was a

25   regularly scheduled conference call.  He would join in from

1    whatever location he was in.  He used to call me, you know,

2    three or four times per day.  After launch, he would call me

3    six or seven times a day from morning until night.

4    **Q.**   And with regard to meetings, are you familiar with

5    something called the 8:30 call?

6    **A.**   Yes, I am.

7    **Q.**   And what is that?

8    **A.**   The 8:30 call was a sales and marketing meeting.  What is

9    unique about Subsys is -- and no other product that I was

10   aware of ever had this -- is we would actually get a

11   spreadsheet from the company that administered the REMS, and

12   it would give us a list of all the scripts written the day

13   before, what doctor wrote the scripts, what pharmacy the

14   patient picked them up, and the strength.

15          And it also had a code, a 10-number code next to

16   it.  So our sales operations team to make that code into a

17   real patient we knew.  Because if they got refilled the next

18   month, we could tell that patient got the drug again because

19   we had the patient identification number.

20   **Q.**   So that ten digit number you're calling a patient

21   identification number, it's a way of tracking individual

22   patients.  It's assigned to individual patients?

23   **A.**   Absolutely.

24   **Q.**   This is an obvious question.  How did you determine, in

25   terms of metrics, what success was at the time?  How did you

1   go about figuring out whether or not Subsys was succeeding?

2   **A.**   From the revenue.  Everything came down to money.  How

3   much money was coming in.  If a patient went on a higher

4   dose, that higher dose cost more money.  So each patient to

5   us was a business relation, how much is that patient going to

6   bring?

7   **Q.**   With regard to the 8:30 call, describe how it worked.

8   Who attended.  Where was it?  What happened?

9            MR. TYRRELL:  Objection.  Time.

10           MS. WILKINSON:  Objection to time.  We're talking

11   about years.

12           THE COURT:  Timeframe, please.

13   BY MR. YEAGER:

14   **Q.**   Directing your attention after the launch of the drug in

15   2012, who was present during the 8:30 call?

16   **A.**   In 2012, it would have been Matt Napoletano, John Kapoor,

17   myself, Xun Yu.  I don't recall Mike Gurry's start date, but

18   eventually he would be involved in the 8:30 calls.  And

19   depending on who our VP of sales was at the time, either

20   Shawn Simon or Alec Burlakoff.

21   **Q.**   In terms of the meeting, how did it work?  You started

22   talking about the REMS data.  How was it used?

23   **A.**   Xun Yu, who was our data person, would take this dump of

24   data and put it into a very easy-to-read format, and it would

25   list off all the highlights of the day.  And at this point

1    we're only getting 60 to 100 prescriptions per day, so it was

2    very easy for all of us to recognize what doctor wrote a

3    script.  You'd see a doctor's name pop up more and more.

4            So it was a mechanism that we used to learn who the

5    top writers were, what strength they were using, and really

6    what the doctor's trends were.

7            So it was an open discussion from the team about

8    what we saw on the day before's scripts, and then we could

9    strategize what we would do that day and going forward.

10   **Q.**   Describe your actions.  If there was evidence of a

11   patient coming off or patients coming off, how was it dealt

12   with during this time?

13   **A.**   So since we can identify what dose that patient was on,

14   we started to dig into what is causing this significant

15   drop-off rate.  And Xun would run this data and show that a

16   lot of our patients who were starting at the low dose,

17   100 micrograms, sometimes 200, had more of a falloff rate

18   than if the doctor started them at a higher dose of the drug.

19   **Q.**   So with regard to the 8:30 call, were there other type of

20   management meetings that occurred on a regular basis?

21   **A.**   There was another sales management meeting that always

22   took place on Fridays, usually around 11:00 a.m.  That

23   involved the same people except we expanded that call to

24   include some different areas of commercial, Dion Reimer, who

25   handled our trade and distribution.  And sometimes if medical

1   needed to be involved, Larry Dillaha would join those calls.

2          Primarily it was another summary of the sales.  And

3   at the time in 2012, John asked Patrick Fourteau to join

4   those calls on Fridays as well.

5   **Q.**  So those were the Friday management call; is that right?

6   **A.**  Those are the Friday sales management calls.

7          And then we also had a management team meeting as

8   well.  That was the same commercial team, including John

9   Kapoor and the other business heads.  We had a lot of

10   meetings.

11   **Q.**  Okay.  Alec Burlakoff.  We started to talk about him.  I

12   got ahead of myself.

13          Who is Alec Burlakoff?

14   **A.**  Alec was originally a sales manager for us in the

15   Southeast in late summer of 2012, and he eventually became

16   our vice president of sales.

17          MR. YEAGER:  May I please have Exhibit No. 164 for

18   the witness, please.

19   **Q.**  Do you recognize this email, sir?

20   **A.**  Yes, I do.

21          MR. YEAGER:  I'd offer it.

22          MS. WILKINSON:  I don't think you gave it to us.

23          MR. TYRRELL:  We don't have a copy of that.

24          MR. YEAGER:  Ms. Folan, is 164 in?

25          THE CLERK:  No.

```
 1              MR. YEAGER:  I thought it was.  One moment, Your
 2    Honor.
 3              THE COURT:  Do you have any objection?
 4              MS. WILKINSON:  Not from me, Your Honor.
 5              THE COURT:  Anybody else?
 6              MR. TYRRELL:  None from me, Your Honor.
 7              MR. KENDALL:  No.
 8              THE COURT:  It's admitted.
 9              MS. WILKINSON:  Your Honor, based on Mr. Yeager's
10    representation, he wants to put in the email and the resume.
11    I don't have any objection to that.  That all together has
12    the email and the resume.
13              MS. MINER:  It's all 164?
14              MS. WILKINSON:  You're not offering 164 anymore?
15              MR. YEAGER:  No.
16              MS. WILKINSON:  Just 165 because it has both
17    documents.
18              THE COURT:  164 is not admitted.  It's not being
19    offered.  165 is being offered.  Anyone have any objection to
20    its admission?
21              MS. MINER:  No.  It.
22              MR. TYRRELL:  Your Honor, I'm sorry.  I don't mean
23    to be difficult.  I would like an opportunity to look at the
24    document.
25              THE COURT:  We can recess for the day.
```

```
1              MR. TYRRELL:  I have no objection, having looked at
2     it now.
3              THE COURT:  You have no objection?
4              MR. TYRRELL:  I just wanted to look at it.
5              THE COURT:  That's fine.  I'm happy to recess for
6     the day now.
7              MR. YEAGER:  That's fine, Your Honor.  Whatever you
8     think is best.
9              THE COURT:  Why don't we recess.  We'll see you at
10    9:00 tomorrow morning.  Keep an open mind.  Don't talk to
11    anybody about the case, and no homework.  No independent
12    research.
13             THE CLERK:  All rise for the jury.
14             (The jury exits the courtroom.)
15             (Government Exhibit No. 165 admitted.)
16             THE COURT:  We'll see everyone at 9:00 tomorrow.
17             MR. LAZARUS:  Just with respect to the sidebar
18    regarding the cooperation agreement, can I provide three
19    citations to the Court?
20             THE COURT:  Yes.  All right.  I'll see everyone
21    tomorrow.
22             (Court recessed at 12:57 p.m.)
23
24
25
```

```
 1                    - - - - - - - - - - -

 2                        CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly              February 12, 2019

11    _____          _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           INDEX OF WITNESSES

2      WITNESS                                                    PAGE

3

       HEATHER ALFONSO
4
           Cross Examination (resumed) by Mr. Stojilkovic......   13
5          Cross Examination by Mr. Tyrrell....................   60
           Redirect Examination by Mr. Lazarus.................   64
6          Recross-Examination by Mr. Stojilkovic..............   79
           Cross Examination by Ms. Miner......................   81
7          Redirect Examination by Mr. Lazarus.................   82

8
       MICHAEL BABICH
9
           Direct Examination by Mr. Yeager....................   84
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S
 2
          Defendant Exhibit                Received
 3
              6000      .....................     26
 4
              6003      .....................     37
 5
              6020      .....................     17
 6
              6026      .....................     23
 7
              6027      .....................     22
 8
 9
10
11        Government Exhibit               Received
12            165       .....................    166
13            575       .....................    131
14
15
16
17
18
19
20
21
22
23
24
25
```