UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>MICHAEL J. GURRY, et al.<br><br>        Defendants. | Cr. No. 16-10343-ADB |

**DEFENDANT MICHAEL GURRY'S
SENTENCING MEMORANDUM**

Unassuming.  Quiet.  Humble.  Dependable.  Generous.  Caring.  Respectful.  Kind.

Disciplined.  These are qualities that others have used to describe Mike Gurry over and over

again.  A devoted father, son and family member.  A decorated Navy officer dedicated to his

country and his fellow service members.  A trustworthy leader.  A reliable colleague and

generous mentor.  This is the Michael Gurry who stands before you to be sentenced for his role

in the debacle at Insys.  (Mr. Gurry's character letters from numerous family members, friends

and colleagues are attached hereto as Exhibit A.)

Michael Gurry's role at Insys was limited.  As the jury found, he was not involved in the

sales side of the company and never dealt with individual prescribers.  His role was limited to

being in charge of the Insys Reimbursement Center for the limited period of January, 2013 to

May, 2014.

Given his otherwise exemplary life, Michel Gurry respectfully submits that a sentence of

less than one year of incarceration is sufficient but no greater than necessary to effectuate the

goals of 18 U.S.C. § 3553(a).  There is no doubt that Mike has paid, and will continue to pay, a

heavy price for the conduct for which he was convicted.  He has suffered from Post Traumatic

Stress Disorder since his arrest in this case, when agents burst into his hotel room, pointed guns

at his head and dragged him away in handcuffs without even telling him the charges against him. In addition to being incarcerated, he faces financial ruin.  The sentence he seeks would reflect the exemplary life he led before he joined Insys Therapeutics and is sufficiently serious to send a strong warning to others who may be tempted to lie or allow others to lie in the service of prior authorizations.

A sentence of any amount of incarceration is also sufficient to send a strong message to others in the pharmaceutical industry.  Mr. Gurry was convicted because the jury found that he agreed to the fraud in the IRC, conduct the Government has historically addressed through civil False Claims Act settlements with pharmaceutical companies.  Counsel for Mr. Gurry has been unable to a single case in which an individual has been incarcerated for lying to insurance companies to obtain prior authorizations.  A short sentence of incarceration in this case will send a message that fraud in the quest for prior authorizations is a serious crime that will warrant significant punishment.

## ARGUMENT

The Sentencing Guidelines are advisory and are but one factor for this Court's consideration in imposing a sentence.  United States v. Booker, 543 U.S. 220 (2005).  The Supreme Court held in Gall that a district court should begin all sentencing proceedings by calculating the guideline range; and, after arguments by the parties, the "district judge should then consider all of the § 3553(a) factors to determine whether they support a sentence requested by a party" and in so doing, the district judge "may not presume that the Guidelines range is reasonable."  United States v. Gall, 552 U.S. 38, 49-50 (2007).  Instead, the Court must craft a sentence that is sufficient but no greater than necessary to achieve the goals of sentencing.  18 U.S.C. § 3553(a).  Moreover, sentencing must be individualized and must comport with the

principle that "the punishment should fit the offender and not merely the crime." Pepper v.

United States, 562 U.S. 476, 487-88 (2011).  A sentence of less than one year of incarceration is

appropriate under the circumstances of this case.

## I.      History and Characteristics of Mike Gurry

Mike Gurry is a 56-year-old devoted father with a long record of honorable military

service who is highly respected by his colleagues.  He took a pay cut to work at Insys, see

2/21/19 Tr. 91:2-4, which at the time was an unproven newcomer in the pharmaceutical industry,

because he believed that the company offered a best-in-class TIRF product that would help

cancer patients in excruciating pain, like the pain he witnessed his own mother endure before her

death from breast cancer in 2009.  PSR ¶ 167.[1]

As the Court heard from multiple witnesses at trial, Mike was something of an anomaly

at Insys.  He did not know anyone at the company before his interview.  See 2/21/19 Tr. 89:21-

23.  Mike had no way to foresee the aggressive marketing culture Insys would cultivate under

CEO Michael Babich or Alec Burlakoff, who was promoted to VP of Sales one month after Mr.

Gurry joined the company.  Multiple witnesses at trial confirmed that Mike stood out at Insys as

someone who eschewed the party culture at the company.  He stayed away from the Insys

Speakers Program and its excesses, as the jury made clear with its split verdict.  He wasn't

engaged in extramarital affairs, he wasn't slipping cash to prescribers, he wasn't partying at strip

clubs, and he certainly wasn't dressing up as a dancing Subsys bottle on any music videos.  The

Court did not have to require the parties to redact any foul language from his emails.  Mike is

"disciplined," "quiet," "polite," "respectful," "supportive," and even a bit of a "stiff."  See 2/6/19

---

[1] The final PSR has not been issued as of the date of this memorandum.  References to the PSR are to the draft PSR, dated October 15, 2019.

Tr. 127:21-23, 128:1-3; 2/21/19 Tr. 90:1-7, 94:10-12; 2/26/19 Tr. 178:8-14; 3/26/19 Tr. 226:19-20.

The Mike Gurry the witnesses described at trial is the same person his friends, family, and colleagues in the military and pharmaceutical industry have always known.   He is "an admirable man," "intelligent," "caring," "honest," "disciplined," "dedicated," "gentle," "unassuming," "humble," and "modest."   Ex. A at 2, 16, 27-28, 30-32, 35-36, 40, 45, 48, 51-54, 56, 64, 69, 72-73, 77 (Birardi, G. Gouveia, M. Gurry, Hajhamou, Hammond, Hundzyski, B. Madden-Gurry, Kawulicz, R. Marooney, McCourt, Meehan, Moore, Talbot, O'Hare, Romano, Schohl).  Those who know him speak of his "integrity," his "work ethic, leadership and unselfishness," and his "generosity."  Id. at 2, 5-6, 9, 13, 16, 27-29, 33-39, 42-45, 54, 60-61, 77-78 (Birardi, Bova, Czyzyk, Golden, G. Gouveia, M. Gurry, T. Gurry, Hennessey, Hundzynski, Ingersoll, Kautzmann, Kirby, Madden, B. Madden-Gurry, Meehan, R. Moran, Talbot, Turner). To give just one example, Mike's childhood friend recalls him sharing his school lunches when his friend had none.  Id. at 10 (Daube).  When another friend's daughter was diagnosed with cancer, Mike "hopped on a plane and came straight to the hospital to offer his support."  Id. at 11 (Ewing).  Mike is "a person to be counted on" who "puts others in front of himself."  Id. at 16, 48 (G. Gouveia, R. Marooney).  Those that know Mike best describe him as "a role model" with a strong "moral compass" and "the highest moral code."  Id. at 16-19, 38-39, 54, 58-59 (G. Gouveia, K. Gouveia, Kautzmann, Meehan, Moran).  He is "a man that can be trusted" and a "man of great character."  Id. at 10-11 (Daube, Ewing).  A former colleague, who is also a former probation officer, calls Mike "truly one of the most upstanding citizens I have ever met in my life."  Id. at 1 (Beck).

Mike Gurry is not greedy and has never been motivated by money.  His uncle, who served a long and distinguished law enforcement career and has seen his fair share of white collar defendants, speaks of Mike's "morality and integrity" and notes he is "not someone that I believe would be motivated by greed."  Id. at 58-59 (Moran).  As one of his daughters tells the Court, he has "never been materialistic or interested in spending money on things that don't matter," and that he "loves buying his shirts from Costco."  Id. at 20-22 (C. Gurry).   His divorce attorney comments that Mike was "never out for his own gain" during the divorce, and that he was instead focused on "maintaining the bond that he had with his three children."  Id. at 49-50 (Marquis).

### A.        Mike Gurry's Family History

Mike grew up in a tight-knit family and was close to his two sisters and parents.  PSR ¶¶ 164-65.  He was born in 1963 in the Bronx, the son of a New York City firefighter.  Id. at ¶¶ 164, 166.

Mike holds a Bachelor's of Science in Accounting from Villanova University in Pennsylvania and a Master's Degree in Business Administration from Manhattan College in New York. Id. at ¶¶ 178, 191, 193.  He "worked hard" to earn good grades and on his high school football team, even though his teammate laughingly remembers the team was "very bad."  Ex. A at 10 (Daube).  He helped pay for college by earning a Naval ROTC scholarship and working construction jobs over the summers.  Id. at 10, 27-28 (Daube, M. Gurry).

Mike has always had a special bond with his two sisters.  He was an enormous help to his sister Kerry Gurry Marooney when her toddler son suffered his two-year battle with cancer.  Id. at 46-47 (K. Marooney).  Kristin Gouveia tells the Court about the time their parents were divorcing, when money was tight.  Id. at 17-19 (K. Gouveia).  Mike, a college student at the time, scrimped to buy his sisters something special for Christmas because he knew they were

going through a difficult time.  He was in a car accident on the way home from holiday shopping, with those gifts in the trunk.  The accident was serious; Mike was injured and required assistance to find his way out of the wrecked vehicle.  His first concern, however, was with the gifts he wanted his sisters to have, and Mike uncharacteristically cried when he saw those gifts were intact.

Mike married Jennifer Morris in 1992 and they had three children, to whom Mike remains extremely close and supportive.  PSR ¶ 174.  Mike is an "incredible father" to his three children, and "always made sure his children's needs were met over and above his own."  Ex. A at 27-28, 33-34 (M. Gurry, Hennessey).  As one of his daughters describes their relationship, he was her "hero," "the person who would hoist me up on his shoulders so I could see the world better and brighter."  Id. at 20-22 (C. Gurry).  He has always been involved in his children's lives, even after his divorce from their mother.  He taught them to "do the right thing, even when nobody's watching," to "always be honest," "to never have cruel intentions."  Id. at 23-24 (K. Gurry).  His daughters recall that Mike was one of the few fathers who attended his children's activities, and he was at "every dance recital, horseshow, and school event" and was "always the person who would cheer me on from the sidelines of my soccer game."  Id. at 20-22, 25-26 (C. Gurry, L. Gurry).  His colleagues remember him going to work early so he could leave in time for school events, and taking red eye flights so he would not miss a game or recital.  Id. at 72-73 (Schohl).  It was a "major priority" for him to put all three of his children through college.  Id. at 27-28 (M. Gurry).  When he was unemployed due to a layoff, he "simply went without" in order to ensure that his financial support of his children was never reduced.  Id. at 17-19 (K. Gouveia).

Mike personally suffered by watching his close family members succumb to cancer.  He lost his mother to her second bout of breast cancer in 2009.  It was a "long battle" and "difficult"

for Mike to watch.  Id. at 29 (T. Gurry).  Mike was actively involved in her care, visiting

regularly to help with her needs.  Id. at 17-19, 46-47, 55, 60-61 (K. Gouveia, K. Marooney, M.

Meehan, R. Moran).  Mike also lost an aunt and, tragically, his five year old nephew to cancer.

Id. at 58-61 (Moran, R. Moran).  Mike was a "key supporter[ ]" during his nephew's illness,

keeping him company during chemotherapy and babysitting his younger brother.  Id. at 27-28,

46-47, 55, 60-61 (M. Gurry, K. Marooney, M. Meehan, R. Moran).  As Mike's aunt, herself a

retired oncology nurse clinician, tells the Court, his experience watching his family members

suffer made Mike "acutely aware of the need for an effective medication to relieve the pain and

suffering of cancer patients."  Id. at 60-61 (R. Moran).  It was this experience that inspired Mike

to join Insys Therapeutics.  Id. at 23-24 (K. Gurry).

Mike's family have witnessed the severe toll this case has taken on Mike, saying it has

been "one of the hardest things" to watch him go through.  Id. at 25-26 (L. Gurry).  It has "aged

him significantly emotionally and mentally."  Id. at 23-24 (K. Gurry).  He was diagnosed with

anxiety and Post-Traumatic Stress Disorder when he began experiencing extreme nightmares

shortly after his arrest in December 2016.  PSR ¶ 185.  The nightmares continue to this day, with

him waking up with "frightful screaming" throughout the trial, Ex. A at 33-34 (Hennessey), and

Mike passed out at his son's college graduation celebration the week after the verdict was read.

PSR ¶ 186.

### B.     Mike Gurry's Active and Honorable Military Service

Unlike the other defendants and most white collar defendants, Mike has a long history of

service to his country.[2]  "Our Nation has a long tradition of according leniency to veterans in

recognition of their service," and this Court should do so here.  Porter v. McCollum, 558 U.S. 30,

---

[2] Excerpts from Mike's military records are attached as Exhibit B.

43 (2009); see also Kimbrough v. United States, 552 U.S. 85, 110 (2007) (affirming downward departure for military service); United States v. Howe, 543 F.3d 128, (3d Cir. 2008) (affirming downward departure to sentencing of probation where defendant was honorably discharged after 20 years of military service).

Mike joined the United States Navy after graduating from college in May 1985 and was honorably discharged from active duty in May 1989.  Ex. B at 9.  Mike completed two tours of duty in the Western Pacific and earned two Navy and Marine Corps Achievement Medals for Meritorious Service.  PSR ¶ 192; Ex. B at 11, 15.  His rank when he left active duty was Lieutenant (0-3).  Ex. B at 7.  Mike took the Surface Warfare Officers School, BASICC Course and served as Officer of the Deck, Gunnery Officer, Assistant Operation Office, Damage Control Assistant, and retired as a Commander.  PSR ¶ 192.  These are positions that reflect Mike's distinguished service.  One shipmate tells the Court these "prestigious positions" that are "only awarded to officers that have excelled and earned the captain's and the crew's trust."  Ex. A at 3-4 (Bolejack).  As his superiors described Mike during his service, he is "exceptional," "hardworking, sincere, and meticulous," has a "strong sense of individual integrity," an "outstanding leader, none better" and "ahead of his peers."  Ex. B at 6, 19.  Mike continued to serve his country after he left active duty by serving in the United States Navy Reserves for almost twenty years, giving up many weekends and vacation weeks to continue to serve his country.  PSR ¶ 192.

Mike earned the respect of his fellow servicemen, many of whom wrote letters to the Court in his support.  Mike was "highly trusted" by senior officers and "respected by the men he led."  Ex. A at 75-76 (Spatz).  They describe him as "[d]ependable," "[c]ommitted to the service of our nation and others," and note his "[t]rust, integrity & discipline."  Id. at 42-43 (Kirby).  His

cousin Jim Meehan, who served as a naval officer with him, tells the Court that Mike was a "mentor" who was "instrumental" in encouraging him to attend the U.S. Naval Academy. Id. at 54 (Meehan). Jeffrey Turner speaks of Mike's "loyalty, integrity, and absolute high standards in achieving the unit's readiness and mission" and describes his character as "beyond reproach." Id. at 78 (Turner). Another shipmate, Doug Bolejack, remembers that Mike was a strong advocate for his men, advocating for them to gain acceptance to a program designed to increase minority enlistment into the officer corps. Id. at 3-4 (Bolejack). His "division excelled" under Mike's leadership, with his ship winning the "Battle E," awarded to only 1 of 16 ships. Id.

Mike's military colleagues tell the Court that Mike "distinguished himself as honest, fair, and hard working." Id. at 14-15 (Goode). He was "never known to cut corners, to cheat his sailors, or to prioritize himself over others." Id. They would "trust [Mike] to do the right thing" and note that "[w]e need more people like Mike actively participating in society." Id. at 42-43 (Kirby).

## C.    Mike Gurry's Pharmaceutical Career

Mike has worked in the pharmaceutical industry for decades, and was well-regarded by his peers and colleagues, who speak of his "impeccable character, professionalism and class," found him "trustworthy," and regarded him as a mentor. Id. at 7-8, 38-39, 62-63, 74, 78, 80 (Clarkin, Kautzmann, J. Morgan, Nosek, Shulman, Turner, Zelenz).

Mike started as a sales representative at TAP Pharmaceuticals selling a drug for the treatment of prostate cancer. Id. at 51-53 (McCourt). He was his former supervisor's "first promotion" to District Manager because "he was intelligent, humble, empathetic, and really cared about the patients we served" and he "stood out amongst his peers," working tirelessly to promote patient advocacy. Id. Another TAP colleague, who also served with Mike in the naval

reserves, found him an "excellent representative of the company" with a "high sense of morals" and a "mentor."  Id. at 78 (Turner).

Mike moved to Medicis Pharmaceuticals in Scottsdale, Arizona in July of 1994, eventually becoming Executive Director of Managed Markets, when he was laid off during a company restructuring in February of 2012.  PSR ¶ 199.  It was at Medicis where Mike first shifted his focus to the payor side of the business.  Ex. A at 72-73 (Schohl).  Former colleagues note that Mike stood out for his insistence on doing business the right way.  His coach found "he never came across as self-centered or one who was out to beat the system."  Id. at 64 (O'Hare).  He wanted to ensure that both he and his team could look themselves in the mirror each morning and be proud of what they did and how they did it.  When he did identify potential concerns, he was forthright in bringing them forward and in volunteering to be part of the solution rather than being silent and becoming part of the problem."  Id. at 66-67 (Poltonavage).  Mike "would challenge certain strategies with the mindset of doing it the right way, while many kept quiet."  Id. at 70 (Sanders).  His colleagues believe Mike was "given a raw deal" when he was laid off at Medicis because he "stuck to his values & ethics."  Id. at 66-67 (Poltonavage).  Others colleagues echos those sentiments, saying that "Mike was the most ethical manager I ever had the pleasure to be around," "the person I trusted most on my entire team," and confirming that he always told his team to "do the right thing" and "play by the rules," was "by the book," "did not succumb to the pressure," and "would never take short cuts."  Id. at 5-6, 9, 12-13, 31-32, 38-39, 62, 69, 79-80 (Bova, Czyzyk, Gaeng, Golden, Hammond, Kautzmann, J. Morgan, Romano, Waite, Zelenz).

After he was laid off from Medicis, Mike took a job at Insys Therapeutics as Vice President of Managed Markets in August of 2012, with a sizeable pay cut, because he wanted to

work on a product that would help cancer patients like his mother.  PSR ¶ 197.  Having

maintained high ethical standards at Medicis, Mike believed he could do the same at Insys.  Dion

Reimer, who appeared on the Government's witness list in this case, tells the Court that "[i]n my

dealings with Mike, he always conducted himself in [a] proper manner."  Ex. A at 68 (Reimer).

Another Insys employee says Mike "was a compliant employee" and "was respected as a

professional."  Id. at 65 (Pipko).  He goes on to say he feels "Mike is a good man" who "may

have been at the wrong place at the wrong time," but he "only witnessed Mike as a quality

human being with many virtuous qualities."  Id.

Mike briefly worked as Vice President of Managed Care for Horizon Pharma in Lake

Forest Illinois, but was fired after he was arrested the following month.  PSR ¶ 196.  Mike has

been unable to find employment in the pharmaceutical industry since his arrest.  He is devastated

that he may never be able to work again his chosen profession.  His former supervisor at TAP

Pharmaceuticals, herself a former defendant in the criminal investigation into that company, tells

the Court that she still has to explain herself in professional interviews, even though she was

acquitted of the charges.  Ex. A at 51-53 (McCourt).  Mike's conviction will undoubtedly follow

him for the rest of his life.

## II.    Nature of the Offense

The Court is already familiar with the facts in this case after presiding over a lengthy

trial, and this memorandum will not revisit many of the arguments that were made to the jury.[3]

A few points are worth highlighting as the Court considers the appropriate sentence for Mr.

Gurry.  The jury found Mike was not responsible for the Insys Speakers Program.  He did not

---

[3] Mr. Gurry addresses the evidence at trial for the purposes of sentencing only, and nothing in this memorandum is intended to waive any objection on appeal, including but not limited to any argument raised in motions for a directed verdict, for an acquittal, or for a new trial.

oversee the program, he did not recruit speakers, he did not attend speakers programs, and he rarely had any contact with prescribers.

As Vice President of Managed Markets, Mike was primarily responsible for negotiating with payors to ensure patients had access to Subsys.  He negotiated with insurance companies to get Subsys placed on formularies.  He negotiated with hospitals, pharmacies, and the government to make Subsys available to patients.  See 2/21/19 Tr. 96:11-97:4.  He was also responsible for overseeing charitable patient assistant programs.  See 2/21/19 Tr. 97:5-13.  The government has never alleged Mike engaged in any wrongdoing in performing any of these duties.  In addition to this full portfolio of projects, Mike was also initially tasked with reimbursement assistance because, as Michael Babich put it, he was at the time the only person at Insys who "somewhat" had knowledge of reimbursement issues.  See 2/21/19 Tr. 97:14-24.  Mike quickly hired Elizabeth Gurrieri because she did have previous prior authorization experience.  See 2/21/19 Tr. 103:18-22, 105:5-9; 2/26/19 Tr. 129:19-21.

Although Mike was her supervisor until May of 2014, see 2/21/19 Tr. 107:21-25, his position in the corporate hierarchy does not make him more culpable than Ms. Gurrieri, who ran the IRC as "Her-Story" from its inception.  See 2/26/19 Tr. 135:22-24, 153:12-14, 154:11-20; Trial Ex. 357.  Ms. Gurrieri's next two supervisors, Chris Homrich and Jon Delnegro, have never been charged in this case, even though the insurance fraud continued unabated during their tenure.  See 2/21/19 Tr. 107:21-108:15.  Prior authorization specialists testified at trial that it was Ms. Gurrieri, or people who reported to her, who instructed them to lie to insurance companies, both before and after Mike Gurry's departure from the IRC.  See 2/8/19 Tr. 93:25–94:10, 95:25–96:7, 109:5-13, 115:15-24, 116:2-9, 128:7-21; 3/26/19 Tr. 32:9-11, 36:9-20.

There was also evidence at trial that when Mike became aware of problems at Insys, he worked to fix them.  As Jeff Pearlman told Sue Biesler, when noncompliant conduct was "brought to the attention of Gurry," that "brings [it] to an end."  Trial Ex. 5615.  Mike instructed Ms. Gurrieri to make sure prior authorization specialists were saying they were calling "on behalf of" doctors, not "from" the doctor's office.  Trial Ex. 371.  When a putative whistleblower recorded a conversation asking Mike to approve paying a co-pay on behalf of a Medicare patient, Mike immediately answered "No.  No, we can't assist a Medicare patient in any way shape or form."  See Trial Ex. 6875.  Compliance at Insys was certainly far from perfect, but Mike did advocate for creating a quality control position in the IRC.  See 2/21/19 Tr. 133:17-21; Trial Ex. 5855.  Mike also stepped in when sales reps tried to give gifts to the IRC.  See Trial Ex. 5617.

The evidence at trial certainly proved the Mike was inattentive and that he failed to properly supervise Liz Gurrieri.  He deeply regrets that he failed to stop the fraud in the IRC.  He wishes he had fired Ms. Gurrieri when employees complained about her.  He did not because he believes in giving people a second chance, as the many people he has mentored over the years have told the Court, and as he hopes the Court will do for him.

## III.   Sentencing Guidelines

### A.   Mr. Gurry's Guidelines Calculation

Mr. Gurry's sentencing guidelines range is calculated as follows.  U.S.S.G. § 2E1.1(a)(2) provides that the base offense level is the offense level applicable to the underlying racketeering activity.  PSR ¶ 130.  Mr. Gurry was convicted of two predicates, mail and wire fraud, which group together pursuant to U.S.S.G. § 3D1.2(d).  PSR ¶ 131.[4]  The base offense level for this

---

[4] The final PSR has not been prepared as of the date of this memorandum.  Mr. Gurry objected to the draft PSR on the grounds that it erroneously states that he was convicted of all five predicates.  Mr. Gurry reserved the right to object if the CSA and Honest Services predicates are included in his final PSR.

group is 6.  U.S.S.G. § 2B1.1(a)(2); PSR ¶ 134.  That level is increased by 20 because the loss in

this case is at least $9,500,000 but not more than $25,000,000.  U.S.S.G. § 2B1.1(b)(1)(K); PSR

¶ 135.  Another two-level increase is applied because the offense involved 10 or more victims.

U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR ¶ 136.  The total offense level is therefore 28.  With no

criminal history, Mr. Gurry's guidelines sentencing range is 78-97 months.  The guidelines also

call for 1 to 3 years of supervised release, a fine between $12,500 to $125,000,[5] and a special

assessment of $100.  U.S.S.G. §§ 5D1.2(a)(2), 5E1.2(h)(1); 18 U.S.C. § 3013; PSR ¶¶ 213, 217.

### 1.    Mr. Gurry Should Not Receive a Role Enhancement

Mr. Gurry objects to the four-level role adjustment applied by Probation under U.S.S.G.

§ 3B1.1(a).[6]  PSR ¶ 138.  It is not sufficient that Mr. Gurry was Liz Gurrieri's supervisor because

the leadership enhancement is not "automatically imposed on business owners or executives."

See United States v. Huerta, 371 F.3d 88, 92 (2d Cir. 2004).  The issue is not Mr. Gurry's title,

but rather whether he was an organizer or leader of the criminal activity.[7]  See United States v.

Frankhauser, 80 F.3d 641, 655 (1st Cir. 1996); United States v. Laboy, 351 F.3d 578, 584-85 (1st

Cir. 2003); see also U.S.S.G. § 3B1.1 cmt. 4 (noting titles are not controlling).

The Government bears the burden of proving by a preponderance of the evidence that an

aggravating role enhancement applies.  See United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir.

2010).  The evidence at trial showed that the leader and organizer of the IRC fraud, which

continued unabated long after Mike's departure from the IRC, was Liz Gurrieri.  It was Liz

---

[5] The draft PSR applies the current fine table found at U.S.S.G. § 5E1.2(c).  PSR ¶ 218.  However, because Mike was removed from the IRC in May of 2014, the guidelines direct the Court to apply the applicable fine guideline range that was in effect on November 1, 2014.  U.S.S.G. § 5E1.2(h)(1); U.S.S.G. § 5E1.2(c)(3) (2014).

[6] Mr. Gurry understands that the Government is not seeking an enhancement for the risk of death or serious bodily injury in his case.

[7] In any event, Mr. Gurry was lower on the Insys organization chart than a number of the Government's cooperators, including Michael Babich, Alec Burlakoff, and Matt Napoletano, about whom "leader or organizer" is a more apt descriptor.

Gurrieri who "ran the show" in the IRC, both during and after Mike Gurry's time with the IRC. See 2/8/19 Tr. 181:15-17.  It was Liz Gurrieri who "piloted" the IRC, which she described as "her story" in training materials.  See 2/26/19 Tr. 135:22-136:4, Trial Ex. 357.  IRC employees testified that it was Liz Gurrieri, or people supervised by her, who instructed them to use the spiel, to lie to insurance companies about tried and failed medications and whether patients had a cancer diagnosis or dysphasia.  See 2/8/19 Tr. 181:7-14; 3/26/19 Tr. 36:6-23.  The IRC continued to mislead insurance companies long after Mike Gurry was reassigned.  See 2/26/19 Tr. 71:2-16.  As Michael Babich told the jury, it was also Liz Gurrieri who suggested those strategies to other Insys executives at the 8:30 meeting.  See 2/14/19 Tr. 86:2-11, 92:1-14, 107:3-18.  As Babich acknowledged, hiring and supervising IRC employees largely fell to Liz Gurrieri, 2/21/19 Tr. 114:8-15, who Kim Fordham testified "wanted to control the IRC totally." 2/8/19 Tr. 181:23-25.  At most, taken in the light most favorable to the Government and without admitting the truth of these allegations, the evidence at trial showed Mr. Gurry was aware of the fraud in the IRC and agreed with Liz Gurrieri that the IRC should lie to insurance companies, but not that he organized, supervised, or directed the IRC fraud.

Mr. Gurry submits that no aggravating role enhancement applies.  If any role enhancement applies, however, it would be the 3-level increase for being a manager or supervisor under U.S.S.G. § 3B1.1(b).  Even if the Court finds that Mike exercised "some degree of control over other involved in the commission of the offense," see United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990), that degree of control did not rise to the level of significant control and authority exercised by leaders or organizers.  To distinguish between leaders and organizers and managers or supervisors, courts look to factors including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of

accomplices, the claimed right to a larger share of the fruits of the crime, the degree of

participation in planning or organizing the offense, the nature and scope of the illegal activity,

and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. 4. These

factors suggest Mike was far from a leader at Insys. Mike took direction from others who were

higher on the corporate hierarchy, including Michael Babich, who claimed and received a far

greater share of the profits. Compare 2/14/19 Tr. 120:23-121:4 with 2/21/19 Tr. 92:5-11. The

relatively minimal degree of control Mike exercised is demonstrated by the fact that he was

removed from the IRC and the fraud continued without him.

## 2.    The Public Company Enhancement Does Not Apply

Mr. Gurry also objects to the Government's proposed four-level enhancement under

U.S.S.G. § 2B1.1(b)(17)(B)(ii)(1) for an offense that substantially endangered the solvency of

financial security of a publicly traded company.[8] The public company enhancement is a poor fit

in this case, for three reasons. First, the more natural reading of the enhancement is that it

applies where the company is a victim of the offense. United States v. Melton, 870 F.3d 830,

843-44 (8th Cir. 2017) (affirming application of enhancement where CFO of publicly traded

company diverted company funds to pay personal debt and failed to pay company's payroll

taxes). It would be counterintuitive to apply it where, as here, the jury found the company was

itself a RICO enterprise. Second, the evidence at trial proved that, if anything, the offense was

responsible for Insys' previous financial success, including its successful initial public offering

and the subsequent increase in the value of Insys stock. Third, it was not until the fraud was

discovered that the value of the company declined. To apply the enhancement here would

conflate the offense conduct with the impact of the Government's prosecution.

---

[8] Mr. Gurry did not address this enhancement in his objections to the draft PSR because the Government did not
seek it until after the deadline for objections.

### B.      A Substantial Downward Departure is Warranted in Mr. Gurry's Case

The sentencing court is afforded "very broad" discretion, <u>United States v. Prosperi</u>, 686

F.3d 32, 42 (1st Cir. 2012), and "[a] sentencing judge has very wide latitude to decide the proper

degree of punishment for an individual offender and a particular crime." <u>United States v.</u>

<u>Cavera</u>, 550 F.3d 180, 188 (2d Cir. 2008).  In particular, the Court may depart from the

guidelines range based "solely on policy considerations" or where the Court concludes that the

guidelines range is greater than necessary to achieve the purposes of § 3553(a) because the

guidelines lack underlying empirical data.  <u>Kimbrough</u>, 552 U.S. at 101, 109-10.  The Court

should exercise its discretion in Mr. Gurry's case and impose a sentence that represents a

significant downward departure because the loss guideline does a poor job of measuring

culpability and lacks a sound empirical basis.

The Sentencing Guidelines use "loss" as a one-dimensional measure of a defendant's

culpability.  <u>See</u> U.S.S.G. § 2B1.1 background ("loss serves as a measure of the seriousness of

the offense and the defendant's relative culpability and is a principal factor in determining the

offense level under this guideline").  However, "the data suggest that loss is an unsound measure

of the seriousness of many offenses, with the result that judges are increasingly willing to go

below the Guidelines when they impose sentences in white-collar cases." <u>See</u> <u>United States v.</u>

<u>Musgrave</u>, 647 F. App'x 529, 538-39 (6th Cir. 2016) (quoting Mark H. Allenbaugh, <u>"Drawn</u>

<u>from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing</u>

<u>Guidelines and Loss Data</u>, 26 Fed. Sent'g Rep. 19, 19 (2013)).  "The notion that this complicated

analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of

numbers artificially assigned to a few arbitrarily-selected variables wars with common sense."

<u>United States v. Gupta</u>, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012); <u>see also</u> <u>United States v.</u>

<u>Adelson</u>, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).  By focusing on a single factor in all theft

or fraud cases, "the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." Gupta, 904 F. Supp. 2d at 351 (internal citation omitted).

To note just one problem with using loss as a proxy for Mr. Gurry's culpability, the loss in this case is an estimate of Medicare claims for Subsys for non-cancer patients that were submitted through the IRC from 2012 through 2015. The evidence at trial proved that Mr. Gurry was removed from the IRC in May of 2014, and he had no control over the volume of prior authorizations the IRC processed or what IRC employees said to insurance companies after that date. See 2/21/19 Tr. 107:21-25. Any losses incurred after Mr. Gurry left the IRC are not readily attributable to his state of mind. See United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting in many cases loss is the function of chance).

The loss table was amended three times (in 1989, 2001, and 2003) to increase offense levels, and once in 2015 to adjust the table for inflation. See U.S.S.G. § 2F1.1 (1998); U.S.S.G. § 2B1.1 (2001); U.S.S.G. § 2B1.1 (2003); U.S.S.G. § 2B1.1 (2015). The effect of the 1989, 2001 and 2003 amendments was to "multiply several times the recommended sentence applicable in 1987 for large-loss fraud, which itself was set higher than historic sentences." United States v. Corsey, 723 F.3d 366, 379-80 (2d Cir. 2013) (Underhill, J., concurring). The U.S. Sentencing Commission increased the loss tables at Congress's direction "without the benefit of empirical study of actual fraud sentences." Id. at 380. Mr. Gurry's case is illustrative of how these unsupported changes have had a significant impact on white collar defendants. In 1987, his guidelines range would have been 30-37 months imprisonment, even without adjusting

the loss in this case for inflation.[9]  That is 4-5 *years* less than his guidelines sentencing range today.  Although Congress may have decided to increase the penalties faced by white collar fraud defendants, the piling-on of points that now characterizes the fraud guidelines is far beyond what is warranted by the culpability of many defendants.

## IV.    Need for the Sentence Imposed

Mike has been convicted of a serious offense.  Although he will maintain his innocence on appeal, he understands the jury's verdict requires the Court to impose a sentence on him.  A sentence of less than one year of incarceration is a serious punishment in the context of this case.  Indeed, any sentence of incarceration, together with the devastating financial penalties the government has asked the Court to impose, is a serious punishment.  As Judge Stearns has previously observed, "it is very difficult . . . to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime.  I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when call to account."  See Prosperi, 686 F.3d at 48.  The charges and trial in this case have been widely publicized, both locally and nationally, with the Government comparing Mike and his co-defendants to "street-level drug dealers."  Ex. C (USAO press release).  Fairly or not, Mike's name will forever be linked to the opioid epidemic.  He has suffered irreparable loss of his reputation and his career.  He has become toxic in the pharmaceutical industry.  He was terminated from his last job when his former employer learned of his arrest in this case and he does not expect to be able to work in his chosen profession again.  The financial penalties the

---

[9] Mr. Gurry would have received a 11-level enhancement for a loss of $17,854,641 (without any adjustments for inflation) in 1987, when the guidelines were first introduced.  *See* U.S.S.G. § 2F1.1 (b)(1)(L) (1987).  With a 2-level increase for having more than one victim, Mr. Gurry's adjusted offense level in 1987 would have been 19.  *See id.* at § 2F1.1(b)(2)(A)-(D).  Mr. Gurry's total offense level of 19 would have garnered a guidelines range of 30-37 months imprisonment.  *See* U.S.S.G. Ch. 5, Part A (1987).

government seeks will wipe out what savings he has left.  The stress of this case has had a

serious impact on his mental and physical health, with Mike losing consciousness at his son's

college graduation a few days after the verdict was announced.

There is no need for specific deterrence in this case.  Mike is not at risk of re-offense.

Importantly, Mike has no criminal history.  A study conducted by the Sentencing Commission in

2004 indicates that defendants with Mike's profile are very unlikely to recidivate.  Defendants

over the age of 50 have a recidivism rate of only 9.5%.  Ex. D at 12, U.S. Sentencing Comm'n,

Measuring Recidivism:  the Criminal History Computation of the Federal Sentencing Guidelines,

A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative

Mandate (May 2004).  Only 7.1% of offenders with a college degree and a criminal history of I

re-offend.  Id. at 29.  Finally, Mike has never been previously incarcerated, and a defendant's

first term of imprisonment is generally thought to be the most effective.  See United States v.

Baker, 445 F.3d 987, 992 (7th Cir. 2006) (finding district court determination that prison term

will mean more to defendant who has not been previously incarcerated "significant" and

"consistent with § 3553's directive that the sentence reflect the need for 'just punishment' and

'adequate deterrence.'") (internal citations omitted).

Any sentence of incarceration is sufficient for general deterrence in this case.  "There is

considerable evidence that even relatively short sentences can have a strong deterrent effect on

prospective 'white collar' offenders."  Adelson, 441 F. Supp. 2d at 514 (collecting studies).[10]

That is particularly true here, in a case that was closely watched by Insys' competitors.  The

---

[10] Studies have consistently shown that in white collar cases the certainty of punishment has a greater deterrent effect than the length of sentences.  See Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 447-49 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity. . . . [T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); see also Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME & JUST. 1, 28 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

pharmaceutical industry has heard the jury's message loud and clear.  Mike and his co-defendants have become a cautionary tale and Insys itself is in bankruptcy.  See, e.g., Ex. E Gabrielle Emanuel & Katie Thomas, "Top Executives of Insys, an Opioid Company, Are Found Guilty of Racketeering," N.Y. Times, May 2, 2019 (noting verdict in this case "demonstrated that the public was willing to mete out penalties" for opioid executives and that racketeering charges "raise[ ] the stakes by a lot" for drug companies); Ex. F, Thomas Sullivan, "Pharma Executives on Notice:  Jury Convicts Insys Founder and Four Former Executives of Racketeering Conspiracy," Policymed.com, May 12, 2019.

## V.    Need to Avoid Unwarranted Sentencing Disparities

Mike should receive the lowest sentence of any of the defendants who went to trial in this case.  He is the only defendant who was acquitted of the Controlled Substances Act and Honest Services predicates by the jury.  Although those predicates were subsequently vacated by the Court for all defendants, the jury's verdict is still meaningful.  The jury clearly found that Mike was not responsible for the Insys Speakers Program and its excesses, and that Mike was the least culpable of any defendant at trial.

A number of individuals who were employed by Insys or who admitted to taking improper speakers' fees from Insys have already been sentenced by other courts.  Some of the defendants who chose to cooperate, including Heather Alfonso who testified in this case and Natalie Levine, CEO Michael Babich's wife, received sentences of probation.  See United States v. Alfonso, Case No. 15-cr-00111-JBA (D. Conn.); United States v. Levine, Case No. 17-cr-147 (D. Conn.).  However, the Insys-related sentences are not particularly useful guideposts for Mr. Gurry's sentence because all of the Insys defendants sentenced to date have been convicted of conduct relating to the speakers' program.  Many of the prescribers convicted for taking kickbacks from Insys were also convicted of violating the Controlled Substances Act by

improperly distributing a number of opioids, not just Subsys, and because they violated their fiduciary duties to patients.  Such conduct is dissimilar from Mike's offense conduct and the Insys sentences to date are therefore not apt comparisons for the Court to consider here.

There are, however, a number of other cases in which companies and individuals were convicted of prior authorization frauds similar to the conduct the jury found Mike committed. Importantly, Mr. Gurry's counsel has not been able to locate a single case in which an individual has been sentenced to a term of incarceration for false statements made during the course of a prior authorization request.  A lengthy term of imprisonment for Mr. Gurry would create an unwarranted and unjustified sentencing disparity.

First, in a case that is remarkably similar to the one before the Court, three Warner Chilcott executives were charged with crimes relating to involvement with fraudulent prior authorizations.  None of them served a single day in prison.  The conduct at Warner Chilcott is nearly identical to what the Court heard at trial about Insys.  As the Government described it at sentencing, Warner Chilcott was "corrupt to the core.  The primary way that this company sold its drugs was by paying kickbacks to doctors, by trying to convince doctors to prescribe their drugs based on taking them out to lavish dinners and signing up high-prescribing doctors as paid speakers and demanding prescriptions in return."  See United States v. Eckles, Case No. 15-cr-10320-GAO, Docket No. 44 at 6 (D. Mass).  Employees also filled out prior authorization forms, and would "input[ ] false medical rationales in support of the PA."  United States v. Garcia, Case No. 15-cr-10310-PBS, Docket No. 27 at 3 (D. Mass.); see also United States v. Podolsky, Case No. 15-cr-10132-PBS, Docket No. 44 at 4 (D. Mass.).  This was a significant fraud scheme; Warner Chilcott pleaded guilty and paid $125 million in criminal fines, forfeiture, restitution, and civil penalties.  See United States v. Warner Chilcott Sales (U.S.) LLC, Case No. 15-cr-

10327-FDS, Docket No. 20 at 1, Docket No. 27 at 24 (D. Mass.).  The gain to Warner Chilcott

was $16,385,714, similar to the $17,854,641 loss in this case.  Id., Docket No. 27 at 20.  The

three individuals who pleaded guilty received sentences ranging from 12 months of probation to

8 months of home confinement.  Their conduct was substantially worse than Mike Gurry's.

Significantly, unlike Mike, they were all involved in the thoroughly corrupt speakers' program.

See Eckles, Docket No. 44 at 11; Garcia, Docket No. 38 at 8-9; Podolsky, Docket No. 44 at 5.

    In other similar cases, the Government has not even charged individuals.[11]  CareMed

Pharmaceutical Services paid $10 million to resolve civil claims virtually identical to those

alleged against Insys, including that CareMed employees made false statements to insurers in

seeking prior authorizations, fabricated patients' medical information, falsely stated they were

calling from the prescriber's office, and installed caller ID blocking to prevent the company's

name and location from appearing when making outgoing calls to insurance companies.  See

United States ex rel. Hahar, et al. v. Sorkin's Rx LTD, d/b/a/ CareMed Pharmaceutical Services,

Case No. 12-cv-4366-DLC, Docket No. 20 at 2-4 (S.D.N.Y.); see also USAO Press Release,

Manhattan U.S. Attorney Settles Civil Fraud Claims Against Caremed Pharmaceutical Services

for Engaging in Fraudulent Conduct, Oct. 9, 2014, available at https://www.justice.gov/usao-

sdny/pr/manhattan-us-attorney-settles-civil-fraud-claims-against-caremed-pharmaceutical.  Shire

Pharmaceuticals paid $56.5 million to resolve civil allegations that included some of the same

conduct the Court heard about in this case, such as allegations that Shire employees failed to

disclose that they were Shire employees rather than physicians' staff when calling insurers to

secure prior authorizations.  See United States ex rel. Torres v. Shire Specialty Pharmaceuticals,

_____

[11] More recently, the Government has charged individuals in connection with prior authorization frauds at Aegerion
Pharmaceuticals and Empire Pharmacy, but as of the date of this memorandum those individuals have not been
convicted.  See United States v. Moffett, Case No. 18-cr-10249-WGY (D. Mass., filed Aug. 7, 2018); United States
v. Shtindler, Case No. 19-cr-00848-MAS (D.N.J., filed Nov. 25, 2019).

et al., Case No. 08-cv-4795 (E.D. Pa.); <u>United States ex rel. Hsieh, Harris, and Clark v. Shire</u>

<u>PLC, et al.</u>, Case No. 09-cv-6994, Docket No. 47 at 4-5, 7 (N.D. Ill.).  No individuals were

charged in these cases.

## VI.     Restitution and Forfeiture

Although Mr. Gurry understands that there may be separate proceedings to determine the

amount of any restitution award, he wishes to note his objection to the restitution the

Government is proposing in this case.[12]  Although the Government acknowledges it asked

potential victims to make any restitution requests by the summer of 2019, <u>see</u> Docket No. 1035

at 6 n.4, the first time it produced any restitution materials to the defense was December 6, 2019,

and the Government did not confirm its final restitution request until it filed its motion for

restitution on December 13, 2019.  Defendants therefore have not had a meaningful opportunity

to object to the Government's proposed basis for restitution.  Mr. Gurry notes that the restitution

calculation is highly problematic even at first glance.  To name just a few problems, it apparently

includes all Subsys prescriptions that went through the IRC, including on-label prescriptions for

the treatment of breakthrough cancer pain.  Some insurers are apparently requesting restitution

for prescriptions approved after the conspiracy period, and after Mr. Gurry was no longer

associated with the IRC.

Mr. Gurry understands that the proposed restitution amount far exceeds the combined

assets of all defendants and Insys Therapeutics.  Mr. Gurry has nothing like that kind of money

and has never earned anything near that amount at any time in his career.  Mr. Gurry expects that

if the restitution award is anywhere near these figures, he will be financially ruined for the rest of

his life.  The Supreme Court has recognized that there are circumstances where holding a single

---

[12] Defendants propose addressing the specifics of that request at a further proceeding and Mr. Gurry expressly reserves his right to object at that time to the restitution calculation recently proposed by the Government.

defendant liable for millions of losses collectively caused by others would be excessive and disproportionate under the Eighth Amendment of the Constitution.  See Paroline v. United States, 572 U.S. 434, 455 (2014).  The proposed restitution also vastly overstates Mr. Gurry's culpability because, among other reasons, it includes Subsys sales years after Mr. Gurry was no longer involved in the IRC or even employed by Insys.  Mr. Gurry therefore objects that the Government's restitution proposal is an unconstitutional excessive fine.

Finally, the Government disclosed its forfeiture position for the first time yesterday.  Mr. Gurry will oppose the Government's forfeiture motion by the deadline set forth in the local rules. He expressly preserves all objections to the Government's forfeiture proposal, including but not limited to opposing the Government's method of calculating forfeiture, opposing any request for a money judgment to the extent that judgment would authorize forfeiture of substitute assets outside the procedures and limitations set forth in 18 U.S.C. § 1963(m), and any objection that forfeiture in this case would constitute an excessive fine in violation of the Eighth Amendment.

## CONCLUSION

For the foregoing reasons, Michael Gurry respectfully submits that a sentence of less than one year of incarceration is sufficient by no greater than necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

MICHAEL GURRY,
By his attorneys,


/s/ Tracy A. Miner
Tracy A. Miner, BBO No. 547137
Megan A. Siddall, BBO No. 568979
Miner Orkand Siddall LLP
470 Atlantic Ave, Floor 4
Boston, MA  02110
Telephone: (617) 263-8421
Fax:  (617) 273-8004
Email: msiddall@mosllp.com
Email:  tminer@mosllp.com

Dated:  December 18, 2019

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served by ECF on counsel for all parties on December 18, 2019.

/s/ Megan A. Siddall
Megan A. Siddall