UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>MICHAEL J. GURRY, )<br>)<br>  Defendant. )<br>_____) | Court No.: 16-cr-10343-03-ADB |

**UNITED STATES' SENTENCING MEMORANDUM
IN AID OF SENTENCING FOR MICHAEL J. GURRY**

The United States of America hereby submits this memorandum in aid of sentencing for defendant Michael J. Gurry.

I.  Introduction

The evidence in this case revealed a criminal scheme to profit through a pattern of bribes and fraud. Within that scheme, Michael Gurry held immediate responsibility for creating and executing the criminal strategies used by the Insys Reimbursement Center (IRC) to defraud insurers. As such, he was instrumental in organizing and enforcing a criminal agreement that caused massive loss. Put simply, the IRC was Gurry's unit. His unit's success, meant that it became an integral part of the conspiracy, ultimately forming a "symbiotic" relationship with the Insys sales force. 02/26 Tr. 58:20-59: & Ex. 365. Accordingly, the United States recommends that Michael Gurry be sentenced to a period of incarceration of no less than 11 years (132 months).

II. Gurry's Criminal Conduct

A. Gurry's Leadership Role

Following the launch of Subsys, the company hired a third party to assist prescribers in obtaining prior authorizations. 02/14 Tr. 67: 23-25. After several months, data demonstrated that insurers were authorizing payment for only thirty-five percent of prescriptions. 02/14 Tr. 67: 22-68:3; 74:15-17. To Kapoor and his co-conspirators, this was unacceptable. If bribed doctors wrote prescriptions, but insurance companies did not authorize payment, no one made money. 03/05 Tr. 122:4-8.

In August 2012, John Kapoor and Mike Babich hired Michael Gurry as Vice President of Managed Markets. 02/13 Trial Tr. 89: 9-14. In that capacity, Kapoor assigned Gurry to lead efforts at Insys to increase the percentage of prior authorizations granted by insurers. 02/14 Trial Tr. 70:22-24. Gurry, together with other Insys executives, began exploring the possibility of creating an in house prior authorization unit. 02/22 Tr. 143:3-144:13.

In October 2012, Michael Gurry hired a woman named Liz Gurrieri to work at Insys headquarters as a "prior authorization specialist." 02/22 Tr. 132:24-133:134:22. One month later, Gurry launched a pilot program designed to test the feasibility of running the internal reimbursement center. 02/14 Tr. 68:11; 69:1-20 & Ex. 415; 71: 13-24. At Gurry's direction, Gurrieri began directly contacting insurers on behalf of select practitioners based in several locations around the country. 02/22 Tr. 141:24-25; 145: 9-11. The program was deemed a success, and using information learned from the pilot program, Gurry sought and obtained approval from Kapoor to launch the Insys Reimbursement Center (IRC) in January 2013. 02/22 Tr. 175:2-4.

As V.P. of Managed Markets, Gurry attended the 8:30 call with many of the senior members of the conspiracy, including Kapoor, Babich, Napoletano, Burlakoff, and Simon. 02/13 Tr. 106:19-23; 03/05 Tr. 120:17-19, 122:9-17. As described below, Gurry regularly discussed criminal strategies employed by the IRC during the call. Then, after the 8:30 call concluded, Gurry met with his subordinates at the IRC to discuss concerns expressed by Kapoor, and to explore strategies to address those concerns. 02/25 Tr. 21:25-22:13; Ex. 2089; Ex. 2091.

In addition to IRC strategies to defraud, the scheme to bribe was also routinely discussed during the 8:30 call. 02/13 Tr. 17:17-23; 50: 19-22; 85. The frequency with which bribes were discussed, as well as the symbiotic relationship between sales and the IRC, make clear that as a leader in the conspiracy, Gurry was well informed regarding every aspect of the crime for which he was convicted. 02/26 Tr. 58:20-59: & Ex. 365.

B.  Gurry's Unit

Despite the initial success of the pilot program, Gurry received constant pressure from Kapoor to increase the percentage of approvals gained by his staff. 02/25 Tr. 21:25-22:5. During the 8:30 call, Kapoor would get angry, yell, and make unattainable demands of Gurry and others. 02/25 Tr. 24:15-25:15; see 02/14 Tr. 88: 16-20. In response to that pressure, Gurry and his subordinates began tracking the answers provided to insurers, then used the information to create a list of the answers most likely to result in approval. 02/25 Tr. 30:24-31:19. The list was organized by insurer, and included misleading answers. 02/25 Tr. 31:11-19.

As Gurry and his subordinates discovered new methods for defrauding insurers, Gurry would use the 8:30 call to brief Kapoor and other conspirators on the success of those strategies. When IRC employees learned that insurers were unwilling to engage a third party, such as the

IRC in the prior authorization process, Gurry responded by authorizing IRC employees to lead insurers to believe that they were calling from the office of the practitioner, as if they were employees of the practitioner. 03/05 Tr. 231:4-232:7-233:9. Kapoor approved. 03/05 Tr. 232:20-233:5.

When IRC employees learned that insurers and pharmacy benefit managers were less likely to authorize payment for a drug prescribed for a use that was not recognized on the drug's label, Gurry informed Kapoor that he had authorized a misleading script, called the "spiel," designed to trick insurers into believing that the drug had been prescribed to treat breakthrough cancer pain. 02/14 Tr. 92:1-14.

When IRC employees learned that insurers looked more favorably on approving payment for a sublingual spray if the patient had difficulty swallowing, a diagnosis called "dysphagia," Gurry authorized the use of the diagnosis even when patients were not suffering from the disorder. 02/14 Tr. 86: 8-14 & Ex. 421. Kapoor approved, commenting to Burlakoff, "shit, everybody has difficulty swallowing, right, Alec?" 02/14 Tr. 86: 2-14; 03/05 Tr. 227: 17-24.

Last, when IRC employees learned that a history of cancer—however old-—could be used to mislead insurers, Gurry informed Kapoor that he had encouraged employees to review patient medical records for a history of cancer, even when the prescribing physician had not relied upon the previous diagnosis of cancer. 02/14 Tr. 91:1-92:4; 107:25-108:6; 03/05 Tr. 232:4-6.

III. The Impact of Gurry's Criminal Conduct

The Court, and the jury, heard *hours* of recorded lies to pharmacy benefit managers during which insurers were misled time and time again. See Ex. 2085. Those tapes were just examples

of a persistent, overwhelming course of criminal conduct that was not just blessed by the defendant, but mandated. The impact of such deceit was profound. Each time one of Gurry's subordinates lied, they were talking about the medical history of a real person. The defendant and his conspirators callously used the identities of patients to make money. Each call, each lie, created a false history that not only cost the insurers fraudulently duped into paying the claim, but immeasurably impacted the lives of the patients that were used as a vehicle to get paid.

In response to being convicted, the defendant, through his objections to the PSR, claims he saw nothing and heard nothing. The audacity of his objections, however, speak volumes. The government respectfully submits that the defendant's lack of remorse is not a mistake, but a symptom of why he committed this crime in the first place.

IV. Conclusion

For all these reasons, the government respectfully requests that the defendant be sentenced to a term of incarceration of no less than 11 years (132 months).

                                              Respectfully submitted,

                                              ANDREW E. LELLING
                                              United States Attorney

Dated: December 18, 2019        by:      /s/ *K. Nathaniel Yeager*
                                              K. NATHANIEL YEAGER (BBO # 630992)
                                              DAVID G. LAZARUS (BBO #624907)
                                              FRED WYSHAK, JR. (BBO #535940)

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                              /s/ *K. Nathaniel Yeager*
Dated: December 18, 2019                    Assistant U.S. Attorney