UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * * * * | |
| v. | * * | Criminal Action No. 16-cr-10343-ADB |
| MICHAEL J. GURRY, RICHARD M. SIMON, SUNRISE LEE, JOSEPH A. ROWAN, and JOHN KAPOOR, | * * * * | |
| Defendants. | * | |

# MEMORANDUM AND ORDER ON
# DEFENDANTS' MOTIONS TO STAY SENTENCES PENDING APPEAL

BURROUGHS, D.J.

On May 2, 2019, a jury convicted Defendants Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and John Kapoor (collectively, "Defendants") of conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d). Each of the Defendants, along with cooperating defendants Alec Burlakoff and Michael Babich, was subsequently sentenced to a term of imprisonment followed by a period of supervised release. [ECF Nos. 1141, 1162, 1202, 1163, 1181, 1173, 1175 at 60–61].

Presently before the Court are the Defendants' motions to stay their sentences pending appeal. [ECF Nos. 1142, 1189, 1209, 1217, 1221]. Because the appeals do not raise a substantial question of law or fact that is likely to result in reversal, an order for a new trial, or a sentence that does not include a term of imprisonment, the Defendants' motions, [ECF Nos. 1142, 1189, 1209, 1217, 1221], are DENIED.

I.  **BACKGROUND**

After a fifty-day trial, a jury convicted Defendants Gurry, Simon, Lee, Rowan, and Kapoor of conspiring to violate the RICO Act in violation of 18 U.S.C. § 1962(d). [ECF No. 841 at 2–6]. The jury found that Simon, Lee, Rowan, and Kapoor had conspired to commit each of the charged predicate acts, which included illegal distribution of a controlled substance, mail fraud, wire fraud, and honest services mail fraud and wire fraud, and that Gurry had conspired to commit the predicate acts of mail fraud and wire fraud. [Id.]. All five Defendants moved for judgment of acquittal and for a new trial. See [ECF Nos. 859–64]. On November 26, 2019, the Court granted a partial judgment of acquittal in the cases of Kapoor, Simon, Lee, and Rowan, and vacated the Controlled Substances Act and honest services fraud convictions, but otherwise denied the motions. [ECF No. 1028].

In January 2020, all of the Defendants, along with cooperating defendants Burlakoff and Babich, were sentenced. Gurry was sentenced to thirty-three months' imprisonment followed by three years of supervised release. [ECF No. 1141]. Simon was sentenced to thirty-three months' imprisonment followed by three years of supervised release. [ECF No. 1162]. Lee was sentenced to a term of imprisonment of one year and one day followed by three years of supervised release. [ECF No. 1202]. Rowan was sentenced to twenty-seven months' imprisonment followed by three years of supervised release. [ECF No. 1163]. Kapoor was sentenced to sixty-six months' imprisonment followed by three years of supervised release. [ECF No. 1175 at 60–61].[1] The Defendants now argue that their sentences should be stayed

---

[1] Burlakoff was sentenced to twenty-six months' imprisonment followed by a term of three years of supervised release, [ECF No. 1181 at 39], and Babich was sentenced to thirty months' imprisonment followed by three years of supervised release, [ECF No. 1173 at 25–26]. Neither Babich nor Burlakoff has filed for a stay of their sentences pending appeal.

pending their appeals, as there is a possibility that they could serve the entirety of their sentences before the appellate court renders a decision. See [ECF Nos. 1142, 1189, 1209, 1217, 1221].

## II. DISCUSSION

### A. Legal Standard

In accordance with the Bail Reform Act of 1984, defendants that have been convicted and sentenced to a term of imprisonment are generally to be detained pending appeal. See United States v. Bayko, 774 F.2d 516, 522 (1st Cir. 1985) (citing 18 U.S.C. § 3143(b)). The First Circuit has explained that the Bail Reform Act creates "no presumption in favor of release pending appeal; on the contrary, even when the conviction does not involve a crime of violence or drug offense, detention (following conviction and sentencing) is mandatory unless the judicial officer finds" that one of the enumerated exceptions applies. United States v. Colon-Munoz, 292 F.3d 18, 20 (1st Cir. 2002). Under 18 U.S.C. § 3143(b), the Court must "order that a person who has been guilty of an offense and sentenced to a term of imprisonment, . . . be detained," unless the Court determines: (A) "by clear and convincing evidence" that the person is not a flight risk or a danger to the community; and (B) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment," or (iv) a reduced sentence that would be less than the time already served. 18 U.S.C. § 3143(b)(1).[2]

The Government does not argue that Gurry, Simon, Lee, or Rowan are flight risks. See generally [ECF Nos. 1183, 1224, 1226, 1227]. Though the Government contends that Kapoor

---

[2] The Defendants are not currently serving time in prison, so exception 18 U.S.C. § 3143(b)(1)(B)(iv), concerning a reduced sentence that would be less than time already served, is not at issue.

3

has failed to demonstrate by clear and convincing evidence that he is not a flight risk, [ECF No. 1218 at 15], the Court has already determined that Kapoor is neither a flight risk nor a danger to the community. See [ECF No. 844, 5/2/19 Trial Tr. at 11:18–12:2; ECF No. 1175, 1/23/20 Sentencing Tr. at 62:21–63:1].  Further, it is uncontested that the Defendants' appeals were not filed merely for the purpose of delay. See generally [ECF Nos. 1183, 1218, 1224, 1226, 1227]. Therefore, the Defendants must demonstrate that their appeals raise a question of law that is likely to result in reversal, a new trial, or a sentence that does not include incarceration. 18 U.S.C. § 3143(b)(1)(B)(i)–(iii).

In order to justify a stay of sentencing, an appeal must present a "'close' question or one that very well could be decided the other way . . . ." Bayko, 774 F.2d at 522 (quoting United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)); see also United States v. Zimny, 857 F.3d 97, 100 (1st Cir. 2017) (quoting Bayko, 774 F.2d at 522).  "A defendant seeking the benefit of the exception has the burden of establishing the factual predicate for the exception." United States v. Carpenter, No. 04-cr-10029, 2014 WL 2178020, at *4 (D. Mass. May 23, 2014) (citing Morison v. United States, 486 U.S. 1306, 1306–07 (1988)).

The First Circuit has interpreted 18 U.S.C. § 3143(b)(1)(B) as encompassing two distinct requirements: "(1) that the appeal raise a substantial question of law or fact and (2) that if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in" acquittal, a new trial, or a reduced sentence. United States v. DiMasi, 817 F. Supp. 2d 9, 13 (D. Mass. 2011) (quoting Bayko, 774 F.2d at 522).

### B. The Defendants' Appeals Do Not Raise a Substantial Question of Law or Fact Likely to Result in Reduced Sentences

The Defendants raise a number of issues that they will present on appeal, "all of which have, of course, been previously addressed" by the Court. Carpenter, 2014 WL 2178020, at *4.

The Defendants argue, first, that they were prejudiced by evidentiary spillover from the now-vacated Controlled Substances Act and honest services fraud charges; second, that there was insufficient proof that mailings were used to further the insurance fraud; third, that the wire fraud predicate is bared by the intracorporate conspiracy doctrine; fourth, that the Government's improper statements in rebuttal were prejudicial; and, fifth, that there was insufficient evidence to support the convictions.  Additionally, Simon argues that he was prejudiced by his trial counsel's alleged conflict of interest.  The Court considers these arguments collectively when possible and notes any differences in the Defendants' arguments when necessary.

        1.        <u>Evidentiary Spillover</u>

The Defendants first argue that they were prejudiced by evidentiary spillover from the now-vacated Controlled Substances Act ("CSA") and honest services fraud ("HSF") violations. Kapoor, for example, argues that, "[a] substantial question exists whether the sur[v]iving insurance fraud verdict can stand given the nature and extent of the government's presentation at trial on the now-rejected CSA and HSF allegations." [ECF No. 1189 at 8].  Gurry similarly argues that emotional testimony from former Subsys patients was admitted in error, which "invited the jury to convict Mr. Gurry on an improper emotional basis . . . ."  [ECF No. 1142 at 8].  The other Defendants join in the arguments.  <u>See</u> [ECF No. 1209 at 7; ECF No. 1217 at 6–7; ECF No. 1221 at 17].  A defendant cannot succeed on a claim of prejudicial spillover unless the prejudice was "so pervasive that a miscarriage of justice looms." <u>United States v. Paz-Alvarez</u>, 799 F.3d 12, 30 (1st Cir. 2015) (quoting <u>United States v. Levy-Cordero</u>, 67 F.3d 1002, 1008 (1st Cir. 1995)).  Courts have concluded that where the dismissed "and the remaining counts arise out of similar facts, and the evidence introduced would have been admissible as to both, the defendant has suffered no prejudice."  <u>United States v. Rooney</u>, 37 F.3d 847, 855–56 (2d Cir.

1994) (collecting cases). In this case, the Court found that "the patient evidence [the Defendants] object to would likely have been admissible against [them] even if the trial were only on the ordinary mail and wire fraud predicates because the Government could have used the testimony to show a patient's history of cancer or lack of dysphagia." [ECF No. 1028 at 41]. The Defendants now argue that even if the evidence would be admissible to demonstrate the patient's medical history, evidence concerning the effects of the patient's addiction would still be inadmissible. See, e.g., [ECF No. 1189 at 12; ECF No. 1217 at 11].

The Court allowed the Government to "present evidence concerning the medical care that patients received from co-conspirator physicians, or the medical status of patients to show that prescribing was not medically necessary or was in excess of what was medically necessary." [ECF No. 676 at 2]. The patient testimony was admitted, in accordance with the Court's motion *in limine* ruling, for the purpose of demonstrating that certain Subsys prescriptions "were not medically necessary or were excessive," and to show that the patients' medical status was different than what had been reported through the Insys Reimbursement Center ("IRC"). [ECF No. 1028 at 52]. The witnesses therefore testified concerning "their medical history, including tried-and-failed medications and whether they suffered from cancer or dysphagia; when and how they first were prescribed Subsys; dosing history for Subsys prescriptions; and when they stopped taking Subsys." [Id. at 51–52]. The allowed evidence was therefore relevant to demonstrate that the prescriptions were fraudulent, as required for the mail and wire fraud predicates, by showing that the prescriptions were not medically necessary or were for unnecessarily high dosages. The Court worked to ensure that the testimony "did not veer into the social consequences of addiction." [Id. at 52].

Though the Defendants now once again argue that the allowed testimony could have been presented by stipulation, [ECF No. 1142 at 8], "the Government was not obliged to agree to a stipulation . . . ." [ECF No. 1028 at 53 (citing Old Chief v. United States, 519 U.S. 172, 189 (1997) ("[T]he prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away . . . ."))].

Further, in order to mitigate any potential evidentiary spillover from one charge to another, the Court provided specific jury instructions that explained how the jury had to find each alleged RICO predicate. The Court instructed,

> You may not find that the Government has proved this [pattern of racketeering] element unless you all agree unanimously as to which type or types of racketeering acts the Defendant in question agreed would be committed by a member or members of the conspiracy. That is, you cannot find a Defendant guilty if some of you think the Defendant agreed that a member of the conspiracy would commit racketeering acts A and B, but the rest of you think that the Defendant only agreed that a member of the conspiracy would commit acts C and D.

[ECF No. 930, 4/4/19 Tr. at 42:17–25]; see also [Id. at 29:21–30:6 ("There are five Defendants on trial before you. You must, as a matter of law, consider each Defendant and his or her involvement with the crime separately, and you will have to return a separate verdict on each Defendant. In reaching your verdict, bear in mind that all guilt is personal and individual. Your verdict of guilty or not guilty must be based solely on the evidence about each Defendant.")]; [ECF No. 885, 1/28/19 Trial Tr. at 26:20–25 ("You must separately consider the evidence against each defendant, and you must return a separate verdict for each defendant. The case against each defendant stands or falls upon the proof or lack of proof against that defendant alone, and your verdict as to any defendant should not influence your decision as to any other defendant.")].

The Court therefore limited the potential effects of any alleged prejudicial spillover by instructing the jury to consider the evidence separately as to each count and each defendant. See United States v. Richardson, 515 F.3d 74, 83 (1st Cir. 2008) (finding that the district court had effectively limited any prejudice by instructing the jury to consider the evidence as to each count separately); United States v. Baltas, 236 F.3d 27, 34 (1st Cir. 2001) ("[T]he district court took appropriate measures to prevent potential spillover prejudice by instructing the jury, both during the preliminary and closing charges, to consider the evidence separately as to each count of the indictment, and to determine guilt on an individual basis.").

Finally, the fact that the jury found that Gurry had only conspired to commit mail and wire fraud, but did not find that he had conspired to commit honest services fraud or violate the Controlled Substances Act, indicates that the jury understood the instructions and were not unduly affected by the alleged effects of any potential spillover. See, e.g., United States v. Mubayyid, 658 F.3d 35, 73–74 (1st Cir. 2011) ("[T]he jury's acquittal of [the codefendant] on his false statement charge, pursuant to the same statute under which [the defendant] was convicted[] further undercuts the defendants' spillover argument."); United States v. Edgar, 82 F.3d 499, 504 (1st Cir. 1996) (finding that the defendant failed to prove prejudicial spillover when the jury acquitted the defendant on some charges and convicted on others, "show[ing] itself clearly capable of discriminating among the evidence applicable to each count"). The Defendants have therefore failed to demonstrate that their appeals will raise a substantial question of law based on any allegedly prejudicial spillover.

2. Whether There Was Sufficient Proof That Mailings Were Used to Facilitate the Insurance Fraud Scheme

The Defendants next argue that the mail fraud predicate was not supported by sufficient proof that mailings were used to facilitate the underlying fraudulent scheme. See [ECF No. 1189

at 15]. "The crime of mail fraud includes three elements: '(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail . . . communications in furtherance of that scheme." United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015) (quoting United States v. Hebshie, 549 F.3d 30, 35 (1st Cir. 2008)). The First Circuit has explained that courts are to give the third element a "liberal construction." United States v. Serino, 835 F.2d 924, 928 (1st Cir. 1987). The element is satisfied so long as the use of the mail was at least "incident to an essential part of the scheme." Schmuck v. United States, 489 U.S. 705, 710–11 (1989). "[A] mere 'connection or relationship' is sufficient. Hebshie, 549 F.3d at 36 (quoting United States v. Pimental, 380 F.3d 575, 587 n.5 (1st Cir. 2004)).

The Court has previously stated that the mail fraud predicate required only that the mailed bribes have "some tendency to facilitate execution of the fraud." [ECF No. 1028 at 29]. The Government demonstrated that the Defendants conspired to defraud insurance companies and sent bribes and kickbacks to certain prescribing doctors through the mail. "The mailing of bribes to prescribers facilitated the execution of the fraudulent scheme by incentivizing prescriptions from high-volume practitioners." [ECF No. 1028 at 32]. Those bribes led to the filling of prescriptions that were medically unnecessary and that insurers otherwise would not have covered. In order to ensure that the fraudulent prescriptions were covered, the Defendants utilized the IRC to make it more likely that prior authorizations would be obtained by misrepresenting patients' medical information. Therefore, the Government demonstrated that the mailing of the bribes was part of the overall scheme to defraud. There was ample evidence to find that the Defendants engaged in a conspiracy to pay off doctors, using the mail, and to then submit those claims for payment by misrepresenting prescriptions to insurance providers.

9

### 3. Application of the Intracorporate Conspiracy Doctrine to the Wire Fraud Predicate

Defendants argue that the underlying wire fraud predicate was precluded by the intracorporate conspiracy doctrine. See [ECF No. 1142 at 9; ECF No. 1189 at 16; ECF No. 1209 at 7; ECF No. 1217 at 15]. "The intracorporate conspiracy doctrine provides that 'an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy.'" [ECF No. 1028 at 29 (quoting Ziglar v. Abassi, 137 S.Ct. 1843, 187 (2017))].

There is currently a circuit split regarding whether the doctrine applies to RICO conspiracies. As the Court noted in its order on the defendants' motion for acquittal, however, even those circuits that have adopted the intracorporate conspiracy doctrine have only allowed it in civil cases and "do not apply it to the criminal context." [ECF No. 1028 at 29–30 (collecting cases)]. There is therefore no circuit split regarding the applicability of the doctrine to this case. As the First Circuit has explained, "[t]here is a world of difference between invoking the fiction of a corporate personality to *subject* a corporation to civil liability for acts of its agents and invoking it to *shield* a corporation or its agents from criminal liability where its agents acted on its behalf." United States v. Peters, 732 F.2d 1004, 1008 n.7 (1st Cir. 1984) (emphasis in original). Therefore, whether the intracorporate conspiracy doctrine could be applied in this case to preclude a conviction under RICO for insurance fraud is not a substantial question of law that would be likely to result in a reduced sentence.

### 4. Government's Statements in Rebuttal

The Defendants next argue that their appeals are likely to result in an acquittal, a new trial, or a reduced sentence because of the Government's statements in rebuttal. [ECF No. 1142 at 4; ECF No. 1189 at 17; ECF No. 1209 at 8; ECF No. 1217 at 16; ECF No. 1221 at 17]. As a

preliminary matter, the Defendants argue that the Court's determination that they waived the issue raises a substantial question on appeal. As was previously explained in the Court's Order partially granting the parties' motions for acquittal, the Defendants moved for curative instructions and then did not object to the instructions the Court gave. [ECF No. 1028 at 44]. Though the Court stopped to ensure that the instructions were adequate by offering to discuss the matter at sidebar, no party requested the sidebar or objected. [4/8/19 Tr. at 22:1–5]. Therefore, the Defendants have waived their argument concerning the Government's statements in its rebuttal. See United States v. Roberson, 459 F.3d 39, 45 (1st Cir. 2006) ("To preserve an objection to a jury instruction under Fed. R. Crim. P. 30(d), a litigant must lodge a specific objection and state the grounds for the objection *after* the court has charged the jury and before the jury begins deliberations." (emphasis in original)). The Court's decision is consistent with the Federal Rules of Criminal Procedure, which require that a party must raise the "specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d).

Even if the Defendants had not waived the issue, however, the Court previously found that its curative instructions were sufficient to mitigate the potentially harmful effects of the Government's statements. [ECF No. 1028 at 45 n.92, 45–49]. In evaluating the allegedly prejudicial impact of the statements, the Court engaged in a three-part inquiry, considering: "(1) whether the prosecutor's conduct was isolated and/or deliberate;" (2) whether the Court offered a sufficient curative instruction; and (3) whether, considering the strength of evidence against the Defendants, "it is likely that any resulting prejudice affected the verdict." United States v. Zarauskas, 814 F.3d 509, 516 (1st Cir. 2016); [ECF No. 1028 at 46–49].

The Court found that the Government's "loaded gun" metaphor was improper, but that it was an isolated incident, as one statement in a closing argument that lasted approximately thirty minutes. [ECF No. 1028 at 48]. Further, the Court's curative instructions were sufficient. [Id. at 49]. The Court reminded the jury that "knowledge of foreseeable consequences without more is not enough to establish that someone specifically intended certain conduct." [ECF No. 932, 4/8/19 Trial Tr. at 21:2–4]. Finally, the strength of the evidence against the Defendants was strong enough that it was unlikely that the metaphor affected the trial's outcome. [ECF No. 1028 at 48–49]. Although Kapoor argues that the curative instructions were insufficient because they did not admonish that the Government's arguments were inappropriate, [ECF No. 1189 at 19], he has offered no support for the position that the jury needed to be specifically instructed that the Government had erred. See generally [ECF No. 1189].

Gurry additionally argues that he is entitled to a new trial as a result of the Government's closing rebuttal. [ECF No. 1142 at 4]. Specifically, the Government told the jury that Gurry "bears the responsibility" for fraud in the IRC because he was "a corporate officer," though he was not. [Id. (quoting ECF No. 931, 4/5/19 Trial Tr. at 174:12–14)]. The Court engaged in the same three-part analysis discussed above. Despite finding the statement improper, the Court denied Gurry's motion for a new trial, finding, first, that Gurry had waived the issue by failing to object after the Court's curative instructions, and, second, that the Court's curative instructions were sufficient. [ECF No. 1028 at 45 n.92]. The mistaken reference to Gurry's role was an isolated incident and the Court provided adequate curative instructions. [Id.]. Finally, the weight of the evidence against Gurry was sufficient, such that the Government's mischaracterization of his title in its closing was unlikely to have tainted the jury's verdict. See, e.g., United States v. Awer, 770 F.3d 83, 98 (1st Cir. 2014) (holding that a prosecutor's comment

during closing, which was "incorrect and improper, to be sure," "was just a slight misstatement of the evidence" that was "swiftly corrected by the court").

5. Sufficiency of the Evidence

Finally, the Defendants individually challenge the sufficiency of the evidence against them. Gurry argues that the case against him depended almost entirely on the testimony of Liz Gurrieri. [ECF No. 1142 at 6]. Multiple witnesses testified that they were told by Gurrieri to lie to insurance companies, [Id.], and Gurrieri testified that Gurry had instructed her to tell employees to lie. See, e.g., [ECF No. 902, 2/22/19 Trial Tr. at 238:22–239:23; ECF No. 903, 2/25/19 Trial Tr. at 7:16–9:5]. Gurry now argues that the testimony was insufficient and accuses Gurrieri of lying because her testimony was too ridiculous to be credited. [ECF No. 1142 at 6]. A new trial based on the weight of the evidence is not warranted "unless it is quite clear that the jury has reached a seriously erroneous result." United States v. Rothrock, 806 F.3d 318, 322 (1st Cir. 1986) (internal quotation marks and citation omitted). As the Court explained in its Order [ECF No. 1028 at 31–34, 42], the evidence was sufficient for a jury to conclude beyond a reasonable doubt that Gurry engaged in a conspiracy to violate RICO. The Court will not disturb that decision simply because Gurry believes that the jury should have made a different decision regarding Gurrieri's credibility. See e.g., United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (explaining that, when considering a motion for acquittal, "[c]redibility determinations are squarely within the jury's province, and [the First Circuit] will not disturb them unless there is no reasonable way a jury could have found the witnesses believable"); United States v. Rivera Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (explaining that, when considering a motion for a new trial, the "judge is not a thirteenth juror who may set aside a verdict merely because [s]he would have reached a different result").

Kapoor argues that there is insufficient evidence to support the mail and wire fraud predicate charges. [ECF No. 1189 at 20]. The Court already considered the argument and determined that Kapoor "approved strategies and funds for the IRC, demanded upwards of a 90% success rate for prior authorizations, and insisted on being kept apprised of what was working." [ECF No. 1028 at 65]. Kapoor was briefed on and approved the fraudulent and misleading strategies that "allowed prior authorization specialists to reach the quotas set for them, including relying on dysphagia, the history of cancer, and the spiel." [Id. at 65–66]. The evidence of his involvement in the conspiracy was not limited to the CSA and HSF charges, as he now argues, but instead demonstrated that he oversaw and coordinated a conspiracy to commit insurance fraud which included both mail and wire fraud. Confronted with this evidence, Kapoor once again attacks the credibility of witnesses, including testimony from Michael Babich and Liz Gurrieri. [ECF No. 1189 at 20–22]. Both of those witnesses were the subject of lengthy cross-examinations and Kapoor raised these same arguments before the jury in his closing argument. But, as the Court has explained, "[t]he jury rejected defense counsels' theory and seemingly accepted at least portions of the testimony of the cooperating witnesses." [ECF No. 1028 at 66].

Lee argues that the Court failed to provide "any reference to any fact, testimony or document in which Lee herself committed a crime or aided and abetted in the commission of a crime." [ECF No. 1217 at 19–20]. The evidence of Lee's guilt was substantial and has been well documented previously. As the Government represented before trial, when the Court was considering Lee's motion to sever, the evidence demonstrated that Lee "dealt extensively with the [IRC] and also supervised others who dealt with the IRC" and that she was "enthusiastically engaged in all aspects of the conspiracy." [ECF No. 1028 at 61–62 (quoting ECF No. 864 at 1–

14

2)]. Lee worked to develop the IRC in its first iteration as a pilot program with cooperating witness Liz Gurrieri. [Id. at 62]. She then supervised employees who coordinated prior approval requests with the IRC, [Id.], and worked with sales representatives and the IRC to ensure coverage for prescriptions written by some of the highest-prescribing doctors discussed at trial, with whom she also worked. [Id. at 36, 62]. After learning that prior authorizations were being denied for prescriptions from Dr. Awerbuch, a particularly prolific prescriber, Lee worked to hire Kourtney Nagy whose role was to "try to get the prescriptions pushed through" and to complete prior authorizations specifically on behalf of Dr. Awerbuch. [Id. at 37]. This is more than sufficient to prove beyond a reasonable doubt that Lee had knowledge of misrepresentations made to insurers sufficient to prove specific intent and agreement. Cf. United States v. De Lutis, 722 F.2d 902, 907 (1st Cir. 1983) (finding that the evidence was insufficient because it was a single isolated act with no independent evidence "tending to show that the defendant had some knowledge of the broader conspiracy"). Though Lee now argues that this is mere "guilt by association and mere presence," [ECF No. 1217 at 20], that argument mischaracterizes the evidence. Lee was not simply associating with other members of the conspiracy, but was actually agreeing and intending that her co-conspirators commit mail and wire fraud.

Rowan challenges the sufficiency of the evidence for both the mail and wire fraud predicates. [ECF No. 1221 at 6]. Specifically, Rowan takes issue with the jury's interpretation of evidence of a taped training in which Gurrieri described how to ensure that insurers would approve payments by reporting a history of cancer pain and tried-and-failed medications. [Id. at 7–14]. Rowan argues that looking at the cumulative effect of the evidence requires stacking

"inference upon inference" to conclude that Rowan specifically intended that a coconspirator violate the mail and wire fraud statutes. [Id. at 16].[3]

Rowan was Insys' Regional Sales Manager for the southeast and managed a team of district managers who, in turn, managed sales representatives. [ECF No. 1028 at 38]. During a breakout session with Liz Gurrieri, Rowan's employees were told of the "importance of having cancer or finding cancer" in a patient's record and were advised to use a "list of tried and failed medications." [Id. at 39]. Gurrieri even told the participants that Insys had its "own list" that Rowan's employees could use "if there's nothing on there." [Id. at 38–39]. Rowan participated in the training generally and specifically explained to his employees that "this is how you get paid." [Id. at 39]. This reflects his knowledge and participation in the fraudulent prior approval process facilitated through the IRC. See [id.].

A rational jury could have concluded that Rowan was therefore endorsing Gurrieri's message. Though Rowan may take issue with the jury's interpretation of the facts, the Court finds that it was more than reasonable given all of the evidence before the jury. See [ECF No. 1167, 1/21/20 Sentencing Tr. at 40:20–23 (explaining that the Court had "never viewed the tapes

---

[3] The Government argues that Rowan has waived his argument pertaining to the mail fraud evidence because he only challenged the sufficiency of the evidence concerning his wire fraud predicate. [ECF No. 1227 at 3–6]. The Court too understood Rowan only to be challenging the sufficiency of the evidence for the wire fraud predicate. See [ECF No. 1028 at 28]. "[W]hen a defendant chooses only to give specific grounds for a Rule 29 motion, all grounds not specified are considered waived and are reviewed under [the] less forgiving 'clear and gross injustice' standard." United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012). Therefore, Rowan's arguments concerning mail fraud will likely be reviewed to determine whether the evidence resulted in a "clear and gross injustice." Rowan argues that his general challenge to the adequacy of the evidence preserved his challenge to the sufficiency of the mail fraud charge. [ECF No. 1231 at 2 (quoting United States v. Tanco-Baez, 942 F.3d 7, 16 (1st Cir. 2019) ("[A] general sufficiency-of-the-evidence objection preserves all possible sufficiency arguments."))]. Because the Court does not rely on anticipating the First Circuit's standard of review in making its decision, it need not decide whether Rowan waived the issue and will instead consider the merits of the argument.

16

to be as exculpatory as [Rowan] viewed them to be, and I think that the jury . . . saw them more in that way, as evidenced by the verdict.")].

Finally, Simon argues that there was insufficient evidence to find that he had actual knowledge of and participated in the insurance fraud. [ECF No. 1209 at 6–7]. The Court has previously considered and rejected this argument. [ECF No. 1028 at 34–35]. Simon participated in 8:30 a.m. management calls "during which the IRC, including strategies for deceiving insurers, was openly discussed." [Id. at 34]. Simon further listened to calls made by prior authorization specialists to learn more about how the fraudulent process worked. [Id. at 34–35]. He then developed a process with Gurrieri and others to develop a report that allowed him to track which prescriptions were in the process of receiving prior authorizations. [Id. at 35]. He therefore knew of the conspiracy to defraud and made purposeful steps to become more involved and facilitate its misrepresentations. In short, the "evidence was sufficient for the jury to conclude that Defendant Simon had knowledge of and approved of the fraud being perpetrated by the IRC, which would have supported both the mail and wire fraud predicate convictions." [Id.].

6. Simon's Counsel's Alleged Conflict of Interest

Simon once again argues that he was entitled to a new trial because his trial counsel had a conflict of interest. [ECF No. 1209 at 3]. To "show an actual conflict of interest, a defendant must demonstrate '(1) the lawyer could have pursued an alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties.'" United States v. Ponzo, 853 F.3d 558, 575 (1st Cir. 2017) (quoting United States v. Colón-Torres, 382 F.3d 76, 88 (1st Cir. 2004)). Although the defendant "need not show that the defense would necessarily have been successful if it had been

used," he must demonstrate that the defense "possessed sufficient substance to be a viable alternative." United States v. Cardona-Vicenty, 842 F.3d 766, 773 (1st Cir. 2016) (quoting Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982)).

As the Court has previously discussed, the law firm that represented Simon, Weil Gotshal & Manges LLP ("Weil"), was engaged to assist Insys with its restructuring and bankruptcy matters. Simon argues that his attorney was therefore precluded from seeking exculpatory materials over which Insys claimed attorney-client privilege to support a defense that Simon relied in good faith on company executives, board members, and outside counsel. [ECF No. 1209 at 4].

For the purposes of considering this argument in its post-trial order, the Court made two assumptions. First, the Court assumed that Weil's representation of Insys posed a potential conflict of interest. [ECF No. 1028 at 72 n.106]. Second, the Court assumed "for purposes of its analysis" that it would have been legally plausible to pierce Insys' corporate veil. [Id. at 77 n.108]. Simon mischaracterizes the Court's opinion in his motion and argues that "having *found* that the dual representation precluded [Simon's attorney] from taking action adverse to Insys, and having also *found* that litigation to pierce Insys' privilege was plausible, the Court's ultimate conclusion that the strategy was not 'viable' misapplied the relevant legal test . . . ." [ECF No. 1209 at 4–5 (emphasis added)]. The Court made no such finding, but merely assumed, for Simon's benefit, that the arguments had merit when deciding the post-trial motion.

Further, even having made those assumptions, the Court found that the alternative defense, that trial counsel could have used evidence that was otherwise privileged to make a good faith defense, was not viable. First, the Court found that piercing the corporate veil would have created the possibility that the resulting testimony "would have strengthened the

18

Government's evidence of wire and mail fraud against all Defendants." [ECF No. 1028 at 77–79]. Second, though not determinative, none of the other Defendants chose to attack Insys' privilege, suggesting that the proposed strategy was not viable. Further, the evidence suggested that the internal investigation actually discovered additional evidence of wrongdoing at Insys, which would have harmed rather than helped Simon. [Id. at 81]. Finally, Simon did "not represent that he ever relied on legal guidance from Insys' attorneys or compliance personal related to the investigation." [Id.].

Simon has failed to demonstrate that the defense strategy that he alleges was precluded by the conflict had sufficient substance to be a viable alternative. "[I]t is speculative that the sought-after documents were exculpatory, it is speculative that Defendant Simon could have presented a more fulsome good faith defense, and it is speculative that presenting a more fulsome good faith defense would have been advantageous to Defendant Simon . . . ." [Id. at 82–83]. Further, given that the Court has vacated the Controlled Substances Act and honest services fraud offenses, the Defendant would have had to show that the advise of counsel defense went to the insurance fraud. Given the implausibility of outside counsel having said that it was acceptable for the IRC to lie to insurance companies, and then Simon relying on such bizarre advice in good faith, it is difficult if not impossible to conclude that any conflict impacted the final outcome

### C. Any Favorable Decision Is Not Likely to Result in an Acquittal, New Trial, or Reduced Sentence

In order for a sentence to be stayed pending appeal under 18 U.S.C. § 3143(b), a defendant must not only demonstrate that the appeal raises a substantial question of law, but also that "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in" acquittal, a new trial, or a reduced sentence. DiMasi, 817 F. Supp. 2d at 13

(quoting Bayko, 774 F.2d at 522). The second requirement "has generally been read to mean that if error is found, it must not be harmless or unprejudicial error." Bayko, 774 F.2d at 522. It should be read to mean "that it is more probable than not that a favorable decision will result in a reversal of the conviction or a new trial." Id. (internal citations and quotation marks omitted).

Though the Court has found that it is unlikely that there would be a favorable decision on appeal, it also notes that, even if there were a favorable decision, many of the issues discussed above would result in, at most, harmless error. The evidence presented during the ten-week trial was substantial. Even if the appellate court were to find that some witness testimony was admitted in error or were to agree with the Court that the Government's statements in its closing rebuttal were improper, it is unlikely that those decisions would result in an acquittal, new trial, or reduced sentence given the weight of the evidence involved in this case.

### III. CONCLUSION

The appeals do not raise a substantial question of law or fact that is likely to result in reversal, an order for a new trial, or a sentence that does not include a term of imprisonment. Accordingly, the motions to stay the Defendants' sentences pending appeal, [ECF Nos. 1142, 1189, 1209, 1217, 1221], are DENIED.

**SO ORDERED.**

March 5, 2020 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE