UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | * | |
| --- | --- | --- |
|  | * | |
| UNITED STATES OF AMERICA, | * | |
|  | * | |
| v. | * | |
|  | * | |
| MICHAEL L. BABICH, ALEC | * | Criminal Action No. 16-cr-10343-ADB |
| BURLAKOFF, MICHAEL J. GURRY, | * | |
| RICHARD M. SIMON, SUNRISE LEE, | * | |
| JOSEPH A. ROWAN, and JOHN KAPOOR | * | |
|  | * | |
| Defendants. | * | |
|  | * | |

## MEMORANDUM AND ORDER ON THE GOVERNMENT'S
## MOTIONS FOR FORFEITURE AND APPORTIONMENT OF RESTITUTION

BURROUGHS, D.J.

On May 2, 2019, a jury convicted Defendants Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and John Kapoor of conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d). [ECF No. 841]. Separately, Defendants Michael Babich and Alec Burlakoff both pled guilty. [ECF Nos. 543, 664].

The Government subsequently filed motions seeking forfeiture from each Defendant. More specifically, the Government sought to impose forfeiture of $43,093,469.29 in compensation and Insys stock option exercises from Babich, [ECF No. 1052 at 2]; $6,839,853.43 in salary and stock liquidation from Burlakoff, [ECF No. 1053 at 3]; $5,102,996.66 in salary and stock liquidation from Gurry, [ECF No. 1049 at 4]; $1,662,063.76 in salary and stock liquidation from Lee, [ECF No. 1051 at 3]; $2,989,157.72 in salary and stock liquidation from Simon, [ECF No. 1050 at 3]; $3,332,742.63 in salary and stock liquidation from Rowan, [ECF No. 1048 at 3];

and $113,312,759.14 from Kapoor, to reflect the value of his Insys stocks at the time that he received them, [ECF No. 1054 at 1, 6].[1]

The Government also moved for mandatory restitution in excess of $306 million to represent damages caused both to individual patients, who were fraudulently prescribed Subsys, and to insurance companies that provided coverage for fraudulent Subsys prescriptions. [ECF No. 1035 at 1–3]. On February 14, 2020, the Court granted the motion in part. [ECF No. 1225]. Though the Court found that, as a matter of law, the victims were entitled to restitution, it found that it could not determine the amount of damages by a preponderance of the evidence beyond the injuries caused by prescriptions from the thirteen conspirator prescribers identified in this case. [Id. at 10]. The Court therefore ordered restitution in the amount of $56,686,731.53. [Id. at 17]. After a private insurer filed a supplemental memorandum providing evidence of its payments based on those thirteen prescribers, [ECF No. 1234], the Court amended that finding and ordered restitution in the amount of $59,755,362.45.[2] See [ECF No. 1244]. The Court then permitted additional briefing from the parties concerning how that total restitution amount should be apportioned. [ECF No. 1225 at 1 n.1, 16; ECF No. 1244].

During each sentencing hearing, the Court explained that it would deduct the amount that each Defendant had paid in taxes from his or her forfeiture amount, as those taxes would not be

---

[1] The Government also moved for forfeiture of all Insys stocks presently held by the Defendants. [ECF No. 1052 at 1; ECF No. 1049 at 1; ECF No. 1054 at 1; ECF No. 1051 at 1; ECF No. 1051 at 1; ECF No. 1048 at 1]. None of the Defendants objected to the Government's request for stock forfeiture. See [ECF No. 1100 at 5, 19; ECF No. 1127 at 1 n.1]; see generally [ECF Nos. 1101, 1102, 1125, 1139]. Defendant Burlakoff did not file any opposition to the Government's motions for forfeiture, though he joined the Defendants' opposition to the Government's motion for restitution. [ECF No. 1121].

[2] Though the parties continue to object to the Court's methodology, all of the parties agreed that $59,755,362.45 accurately represented the amount owed under the Court's reasoning. See [ECF No. 1244].

considered "proceeds" under 18 U.S.C. § 1963. The parties were advised to provide forfeiture amounts based on that methodology and produced tax return documents to the Court and the Government. Though the parties object to the Court's methodology, they provided the Court with agreed-upon figures representing each Defendant's forfeiture liability under the Court's reasoning. The Court has separately ordered forfeiture from each Defendant using those figures. [ECF Nos. 1237, 1238, 1239, 1240, 1241, 1243, 1251]. In order to provide a record of its findings and calculations, the Court supplements its rulings from the bench as follows.

## I.      FORFEITURE

### A.      BACKGROUND

The Second Superseding Indictment included a forfeiture allegation, pursuant to 18 U.S.C. § 1963, which specified that the Government would seek forfeiture of "any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity . . . ." [ECF No. 419 at 21]. The Indictment included the following property as being subject to forfeiture:

> a. any and all shares of the Company (NASDAQ) stock, or options to purchase shares of the Company stock, held by or on behalf of the defendants herein;
>
> b. any and all securities, salaries, bonuses, stock distributions, retirement contributions and accounts, health and life insurance benefits, including premium payments, and any and all other benefits obtained through employment by and association with the entities named in the racketeering enterprise alleged in Count One, from 2012 through December 2015; and
>
> c. an Order of Forfeiture (money judgment) equal to the amount of proceeds each Defendant obtained, directly or indirectly, as a result of the offense alleged in Count One of the Second Superseding Indictment.

[Id.].

On December 17, 2019, the Government filed forfeiture orders against all Defendants seeking money judgments, as well as any presently held Insys stock.  See [ECF Nos. 1048, 1049, 1050, 1051, 1052, 1053, 1054].

**B.      DISCUSSION**

1.   Legal Standard

Under 18 U.S.C. § 1963, a defendant who violates the RICO statute "shall forfeit to the United States, irrespective of any provision of State law . . . (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962."  18 U.S.C. § 1963(a)(3).  The statute's definition of "property" includes, among other things, "tangible and intangible personal property, including rights, privileges, interests, claims, and securities."  Id. § 1963(b)(2).

"A money judgment permits the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant.  Thus, even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order."  United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006).

Proceeds refers to "gross" proceeds, not the net proceeds of the conspiracy.  See, e.g., United States v. Bucci, 582 F.3d 108, 124 (1st Cir. 2009) (holding that "gross" refers to gross proceeds, not "gross profits" under the criminal forfeiture statute).  In assessing what assets constitute forfeitable proceeds under RICO, courts in the First Circuit apply a "but for" test. United States v. Anguilo, 897 F.2d 1169, 1213 (1st Cir. 1990).  Forfeiture is therefore limited to proceeds, including property interests, that "would not have been acquired or maintained but for the defendant's racketeering activities."  Id.

4

2.   The Policy of the Forfeiture Statute

Criminal forfeiture statutes "serve important governmental interests such as 'separating a criminal from his ill-gotten gains,' 'returning property, in full, to those wrongfully deprived or defrauded of it,' and 'lessen[ing] the economic power' of criminal enterprises." Honeycutt v. United States, 137 S.Ct. 1626, 1631 (2017) (quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 629–30 (1989)).

> Every dollar that a racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession.

Hall, 434 F.3d at 59 (quoting United States v. Ginsburg, 773 F.2d 798, 802 (7th Cir. 1985)). "[T]he Supreme Court made clear its desire for generous construction of the RICO forfeiture provisions, in line with Congress' unusual command that RICO (although a criminal statute) be broadly interpreted." United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995) (citing Russello v. United States, 464 U.S. 16, 27 (1983)).

Though the RICO forfeiture statute applies to gross proceeds, not the net proceeds of the conspiracy, only proceeds that a defendant actually "obtains" from the RICO conspiracy may be forfeited. See 18 U.S.C. § 1963. In Honeycutt v. United States, 137 S.Ct. 1626 (2017), the Supreme Court considered whether a defendant could be found jointly and severally liable for forfeiture under the criminal forfeiture statute, 21 U.S.C. § 853. 137 S.Ct. at 1630. The Court found that "obtained," in its ordinary sense, referred to something that was brought into one's personal possession or use, not "property that was acquired by someone else." Honeycutt, 137 S.Ct. at 1632. Moreover, if the statute allowed joint and several liability, then it would render

the "substitute property" provision meaningless.  Id.  Under § 853(p), the government may

confiscate "substitute property," which is untainted by the crime, after the defendant has

dissipated the tainted assets.  Id. at 1634.  Similarly, under Federal Rule of Criminal Procedure

32.2(e), the Court may enter a forfeiture order, or amend a previous order, to include "substitute

property."  Fed. R. Crim. P. 32.2(e).  The Supreme Court found that, if the government could use

joint and several liability to order the forfeiture of any and all assets, then the substitute provision

would be unnecessary surplusage.  Honeycutt, 137 S.Ct. at 1634.

Though Honeycutt concerned 21 U.S.C. § 853, the drug forfeiture statute, the First

Circuit has explained that "RICO forfeiture cases are useful in interpreting the drug forfeiture

statute because the statutes are 'substantially identical'. . . ."  Hall, 434 F.3d at 59–60 (citing

United States v. Nava, 404 F.3d 1119, 1124 n.1 (9th Cir. 2005)); see also United States v. Awad,

598 F.3d 76, 79 (2d Cir. 2010) ("[T]he statutory provisions governing forfeitures under RICO

and criminal forfeiture orders imposed pursuant to [21 U.S.C. § 853] are so similar in legislative

history and plain language as to warrant similar interpretation." (internal quotation marks

omitted)).  Like the RICO forfeiture statute, 21 U.S.C. § 853 limits forfeiture to property that the

defendant "obtained . . . as the result of" the offense.  Compare 18 U.S.C. § 1963(a)(3) (limiting

the statute to "any property constituting, or derived from, any proceeds which the person

obtained, directly or indirectly, from racketeering activity or unlawful debt collection"), with 21

U.S.C. § 853(a)(1) (limiting the statute to "property constituting, or derived from, any proceeds

obtained, directly or indirectly, as a result of" the crime).

Therefore, with the Supreme Court's guidance on the interpretation of the meaning of

"proceeds" in the context of forfeiture statutes, the Defendants' forfeiture liability in this case

will be limited to whatever "proceeds" they actually "obtained" through their role in the conspiracy.

      3.  <u>Kapoor Cannot Be Ordered to Forfeit the Value of His Insys Stocks at the Time That He Received Them</u>

After Insys pled guilty and divested itself of Subsys, it filed for bankruptcy and its stock collapsed to penny levels. Unlike most of the Defendants in this case, Kapoor did not sell the majority of his Insys stock holdings.[3] The Government requested that the Court order Kapoor to forfeit $113,312,759.14, which reflects the value of Kapoor's Insys stock on the date that he obtained that stock. [ECF No. 1054 at 1, 6]. Kapoor never sold his stock and argues that the Government is entitled to forfeit the stock which he still holds, but not to the unrealized, past market value of the stock, despite the fact that the stock is now worthless. [ECF No. 1100 at 6].

In effect, the Court must determine whether Kapoor "obtained" the value of the stocks at the time he received them, or only "obtained" the stocks themselves. With respect to the forfeiture of property, which includes stocks, "[a]ll right, title, and interest in property described in subsection (a) vests in the United States *upon the commission of the act giving rise to forfeiture under this section*." 18 U.S.C. § 1963(c) (emphasis added). In this case, the Government obtained its right to the stock at the time that Kapoor engaged in the RICO conspiracy, irrespective of the fact that it then depreciated in value.

The Government argues that, because interest in the stocks vested when they were worth over $113 million, it can automatically seek a money judgment against Kapoor for that amount, without recourse to substitute assets. [ECF No. 1054 at 6]. The Government quotes <u>United States v. Misla-Alarondo</u>, 478 F.3d 52 (1st Cir. 2007), which explained that,

---

[3] Kapoor did sell a small fraction of his Insys holdings, [ECF No. 1100 at 2 n.1; ECF No. 1159 at 8]. The Court's forfeiture order therefore reflects the amount in proceeds that he obtained from any stock sales.

> *If the government has proven that there was at one point an amount of cash that was directly traceable to the offense*, and that thus would be forfeitable under 18 U.S.C. § 982(a), that is sufficient for a court to issue a money judgment, for which the defendant will be fully liable whether or not he still has the original corpus of tainted funds—indeed, whether or not he has any funds at all. The question of how the government can enforce that judgment is a somewhat different question, however.

478 F.3d 52, 73–74 (1st Cir. 2007) (emphasis added).

The reasoning in Misla-Aldarondo is of little help to the Government in this case, as the Government has not proven that there was "at one point an amount of cash that was directly traceable to the offense." Id. at 73. If Kapoor had sold his stocks, like many of the other Defendants in this case, then the Government could and no doubt would go after the money that was directly traceable to that sale. But Kapoor never sold his stocks and therefore he never had that money. The property was and remains the stocks themselves. See 18 § 1963(b)(2). This is the property to which the Government is entitled, absent recourse to substitute assets.

Under 18 U.S.C. § 1963(m), if any property "has been substantially diminished in value" due to "any act or omission of the defendant," then the Court "shall order forfeiture of any other property of the defendant up to the value of any property" that would have otherwise been forfeited. 18 U.S.C. § 1963(m). In this case, if Kapoor were responsible for the diminished value of his Insys stocks, then the Court could order the forfeiture of substitute assets in an amount equal to the stock's value at the time that it was received by Kapoor.

The Government, however, has not persuasively demonstrated that Kapoor is responsible for the decreased value of his stock. It has argued both that the fraud at issue in this case is responsible for the falsely inflated value of the Insys stock shares and also that Kapoor is responsible for the stock losing its value. [ECF No. 1054 at 5–6]. This dichotomy and the difficulty in discerning proximate causation in stock pricing precludes the Court from

considering substitute assets here, even assuming that the theory was relevant given the availability of the stocks themselves.

    4.   <u>Forfeiture Is Not Limited to Funds That Can Be Directly Traced to the Insys Reimbursement Center</u>

Those Defendants who received salaries and sold their stocks argue that they should not be made to forfeit all proceeds from Insys salary and stock sales because Insys had other non-fraudulent sources of income.[4] <u>See</u> [ECF No. 1125 at 8; ECF No. 1101 at 3; ECF No. 1139 at 3; ECF No. 1127 at 3–4]. The Court finds that any proceeds obtained from Insys during the time of the conspiracy are forfeitable. The RICO forfeiture statute provides that "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity" are subject to forfeiture. 18 U.S.C. § 1963(a)(3). In this case, the Defendants' salaries and exercised stock options constitute "proceeds" that were obtained "directly or indirectly" from the RICO conspiracy.

The Court will not limit the forfeiture amount to reflect only proceeds from specific Subsys prescriptions. Other courts in this Circuit have already considered and rejected such arguments. In <u>United States v. Chin</u>, for example, Judge Stearns rejected the argument that the forfeiture amount should be calculated to reflect only the shipments of drugs that the jury had found were part of the proven mail fraud scheme. No. 14-cr-10363, 2018 U.S. Dist. LEXIS 29513, at *4–5 (D. Mass. Feb. 23, 2018). Judge Stearns found that "the entire salary [the defendant] earned at [New England Compounding Center ("NECC")] during the relevant time period constitutes 'proceeds . . . obtained, directly or *indirectly*' from his participation in the racketeering enterprise. Moreover, as a practical matter, there is no realistic means of calculating

---

[4] Rowan does not raise this argument in his opposition to the Government's forfeiture motion. <u>See generally</u> [ECF No. 1102].

the actual value added by [the defendant] to any specific batch of drugs shipped by NECC." Id. at 5.  Though the forfeiture amount must be limited to those proceeds received during the course of the insurance fraud conspiracy, it will not be limited to specific Subsys prescriptions.[5]

The Defendants argue that the forfeiture amount should be reduced to 73% (or by 27%) to reflect only proceeds that were associated with Subsys prescriptions for non-cancer patients. As the Court explained in its Order regarding the total amount owed in restitution, the fact that a prescription was requested for a cancer patient is insufficient to establish that it was not fraudulent.  [ECF No. 1225 at 9–12].  The Insys Reimbursement Center ("IRC") misled insurers in a number of ways, "including by lying about the medication being prescribed for breakthrough cancer pain, the patient having a history of cancer, the patient having tried-and-failed similar medications, and the patient having difficulty swallowing."  [ECF No. 1028 at 32].  The fraud was not limited to securing approvals for Subsys prescriptions for non-cancer patients. Therefore, any profits, including salaries and stock sales, during the time of the insurance fraud conspiracy were "proceeds" that were obtained from the conspiracy at issue.

5. The Forfeiture Amounts Will Be Reduced to Reflect Defendants' Income Tax Deductions During the Course of the Conspiracy

The Defendants next argue that any forfeiture amount based on their respective salaries and stock liquidations must be reduced to reflect amounts already paid in taxes.[6]  [ECF No. 1101

---

[5] The Court notes that the Government has already limited the proposed forfeiture amounts to those proceeds received during the time of the conspiracy alleged in the indictment, not the entirety of Insys' previous business dealings.  See generally [ECF Nos. 1048, 1049, 1050, 1051, 1052, 1053, 1054].

[6] The forfeiture amount owed by Kapoor is not reduced to reflect the value of any taxes paid by Kapoor as neither party sought such a reduction.  [ECF No. 1243 at 2 n.1].  "Unlike the other defendants, . . . Kapoor obtained Insys's publicly traded stock not as a form of compensation for his work performed at Insys, but because of his personal investment in Insys before the IPO." [ECF No. 1159 at 8 n.3].  The Court notes that the money judgment against Kapoor in this case was not reduced by taxes paid.

at 9–10; ECF No. 1102 at 2–3; ECF No. 1125 at 10 n.9; ECF No. 1127 at 2; ECF No. 1139 at 4–6].  The Government counters that taxes should not be deducted because the RICO forfeiture statute provides that "gross," rather than net, proceeds must be forfeited.  [ECF No. 1144, 1/13/20 Hr'g Tr. at 17:9–14].

The Government is correct that, in the First Circuit, gross, not net, proceeds of racketeering activity are subject to forfeiture.  See United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995) ("Section 1963(a) was added by Congress to other RICO forfeiture provisions in 1984, and its legislative history explains without qualification that 'the term 'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits.'" (quoting S. Rep. No. 255, 98th Cong. 2d Sess. 199 (1984))).  This, however, leaves the question of whether taxes constitute "*proceeds* which the [Defendants] *obtained*, directly or indirectly, from racketeering activity . . . ."  18 U.S.C. § 1963(a)(3) (emphasis added).

As discussed above, in Honeycutt, the Supreme Court rejected the theory that defendants could be held jointly and severally liable for forfeiture amounts in a conspiracy and made clear that "obtain," for purposes of the forfeiture statute, means that the proceeds actually came within the defendant's possession.  137 S.Ct. at 1632.  Courts in the First Circuit, applying the Supreme Court's reasoning in Honeycutt, have found that taxes should be excluded from forfeiture amounts.  See, e.g., Chin, 2018 U.S. Dist. LEXIS 29513, at *7–8 ("[I]t is difficult to see how money paid into the U.S. Treasury can be characterized as proceeds 'obtained' by a defendant.").

In opposing the idea that taxes should be deducted from the Defendants' forfeiture liability, the Government argues that paying taxes is a benefit to the taxpayer.  See [ECF No. 1144, 1/13/20 Hr'g Tr. at 20:22–21:5 ("First of all, payment of taxes is a benefit to you.  We

11

don't necessarily like paying taxes, but if you don't pay taxes bad things happen. So you have to pay taxes, and that's your benefit . . . .")].  The argument "that the federal tax deductions were paid for [the Defendants'] 'benefit' (presumably because in a larger sense [they] and [their] families were recipients of government services), is not one that most taxpayers, however zealous in their filings, would find compelling."  Chin, 2018 U.S. Dist. LEXIS 29513, at *7. Even embracing such an argument, the hypothetical value of benefits that taxpayers may receive in the form of federal government programs, which the Government has not estimated in this case, is easily distinguishable from the value of taxes that are deducted from a taxpayer's income.

The Government next argues that the taxes should not be deducted from the forfeiture amount because taxes and forfeiture funds go to two different government entities.  [ECF No. 1144, 1/13/20 Hr'g Tr. at 21:6–20].  Judge Stearns likewise considered and rejected this argument.  See Chin, 2018 U.S. Dist. LEXIS 29513, at *7–8 (finding "a double counting issue arising from the fact that forfeited proceeds escheat to the Treasury, meaning that [the defendant] is being asked, in effect, to pay his taxes twice").  The Government asserts that it is a slippery slope to find that payments made to the government, such as taxes, should be deducted from forfeiture amounts and offers an analogy of a defendant claiming that payments made to the National Parks Department to visit a National Park should be deducted because the defendant similarly made payments to the government.  [ECF No. 1145, 1/13/20 Sentencing Tr. at 12:8–21].  In that instance, however, the defendant would have received the funds and then made a decision to spend the money to visit a National Park.  As the Court explained at Gurry's sentencing hearing, the amount paid in taxes "wasn't money that ever ended up in [the Defendants'] pockets for [them] to spend in the way in which [they] wanted."  [Id. at 13:10–12].

Taxes therefore are not something that was "obtained" or brought into the Defendants' personal possession, as contemplated by the statute. See Honeycutt, 137 S.Ct. at 1632.

Because the Defendants never received the tax money as income, it is not "proceeds" that were "obtained" from the racketeering activity. Since the taxes are not "proceeds" that were obtained directly or indirectly from the racketeering activity within the plain meaning of the RICO forfeiture statute, the Court will subtract the Defendants' tax payments from the total forfeiture amount by deducting the amount of the tax withheld from their incomes during the time of the conspiracy.

### 6. Defendants Must Forfeit Profits from Liquidated Stock Options

Unlike Kapoor, Defendants Babich, Burlakoff, Gurry, Simon, Lee, and Rowan sold their Insys stock. See [ECF No. 1101 at 5; ECF No. 1102 at 3; ECF No. 1125 at 18; ECF No. 1127 at 3]. Those Defendants must therefore forfeit the proceeds of their stock sales, as those funds were "proceeds" that were obtained "directly or indirectly" from their racketeering activity. See 18 U.S.C. § 1963(a)(3). The Defendants argue that the value of their respective stock sales must be further reduced to take account of the costs the Defendants had to pay in order to exercise their stock options. [ECF No. 1101 at 5; ECF No. 1127 at 3].

Though the Court will credit the Defendants for the taxes that they paid on their respective incomes, the Court will not further reduce the forfeiture order to incorporate the amount Defendants paid to exercise their stock options. First, the Defendants were able to pay the costs of exercising their stock options by paying from the overall value of those sold stocks. Therefore, Defendants effectively enjoyed the total value of their sold stocks. Second, by selling their stocks, the values of which were inflated based on the insurance fraud at issue in this case,

Defendants made the affirmative choice to further benefit from their fraudulent activity. Defendants made no such affirmative decision in paying their taxes.[7]

<blockquote>7.    The Forfeiture Amounts Do Not Otherwise Violate the Eighth Amendment</blockquote>

Lastly, the Defendants argue that the forfeiture amounts requested by the Government would violate their rights under the Eighth Amendment as excessive fines. See [ECF No. 1101 at 6–8; ECF No. 1102 at 3–4; ECF No. 1125 at 15–19; ECF No. 1127 at 5–6; ECF No. 1139 at 7–9]. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "[A] court should consider a defendant's argument that a forfeiture is excessive under the Eighth Amendment when it effectively would deprive the defendant of his or her livelihood. Such ruinous monetary punishments are exactly the sort that motivated the . . . Excessive Fines Clause." United States v. Levesque, 546 F.3d 78, 84 (1st Cir. 2008). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." United States v. Bajakajian, 524 U.S. 321, 334 (1998).

In the First Circuit, courts are required to consider two tests to determine if the forfeiture is grossly disproportionate, such that it would violate the Eighth Amendment. Levesque, 546 F.3d at 83. First, the Court must consider (1) whether the defendants fall into the class of persons at whom the criminal statute was directed, (2) whether there are other penalties that are permitted, and (3) the harm caused by the defendant. Id. Second, even if the forfeiture amount is justified under those factors, the Court must next consider whether the amount would deprive a defendant of his livelihood. Id. at 83–85. The burden is on the defendant to prove by a

---

[7] Had the Defendants elected not to pay their taxes, or to pay a lesser amount, they would now be ordered to forfeit that value.

preponderance of the evidence that the forfeiture is grossly disproportionate. See United States v. Fogg, 666 F.3d 13, 18–19 (1st Cir. 2011) ("It is the defendant's burden to show unconstitutionality." (citing United States v. Jose, 499 F.3d 105, 111 (1st Cir. 2007)).

The Defendants first argue that they are not the kind of defendant at whom the statute was directed, because they are not part of an organized crime syndicate. [ECF No. 1101 at 7–8; ECF No. 1127 at 5; ECF No. 1139 at 5 n.4]. The RICO statute, however, is intended to be construed broadly. Hurley, 63 F.3d at 21. In Chin, for example, the court found that the defendant, who had worked at NECC, was the kind of defendant anticipated by the RICO statute. 2018 U.S. Dist. LEXIS 29513, at *9.

Second, the Defendants argue that the forfeiture amount will deprive them of their livelihood, as many of the Defendants have been unable to secure employment since being charged in this case and the proposed forfeiture amounts likely exceed the Defendants' assets.[8] [ECF No. 1101 at 8; ECF No. 1102 at 4; ECF No. 1125 at 18; ECF No. 1127 at 5; ECF No. 1139 at 9]. A defendant's inability to satisfy a forfeiture order at the time of conviction is "not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry." Levesque, 546 F.3d at 85. "[E]ven if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order." Hall, 434 F.3d at 59.

In this case, forfeiture is limited to the profits that the Defendants received from their participation in a RICO conspiracy and is "not more than the greater of twice the gross gain or twice the gross loss" under the maximum fine provision. See 18 U.S.C. § 3571(d). The

---

[8] The Court notes that the forfeiture amount is considerably less than the forfeiture and restitution amount that Defendant Gurry anticipated in his briefing, which concerned the original total amount sought in restitution and forfeiture, $311 million. See [ECF No. 1101 at 8].

Defendants have failed to demonstrate that a forfeiture amount based on their respective salaries from the scheme is an excessive fine in light of the fraud giving rise to conviction. Therefore, the respective forfeiture amounts do not violate the Defendants' rights under the Eighth Amendment.

## II.     ALLOCATION OF RESTITUTION

### A.     Legal Standard

The purpose of the Mandatory Victim Restitution Act is to make the victim whole. See United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018). "In each order of restitution, the [C]ourt shall order restitution to each victim in the full amount of each victim's losses as determined by the [C]ourt and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). "Restitution must be ordered regardless of the defendant's present ability to pay." United States v. Lazar, 770 F. Supp. 2d 447, 450 (D. Mass. 2011) (citing United States v. Cheal, 389 F.3d 35, 53 (1st Cir. 2004) ("The court may take a defendant's financial resources into account only insofar as they affect the manner in which, and the schedule according to which, the restitution is to be paid . . . ." (internal quotation marks omitted))).

The Court has discretion to hold the Defendant jointly and severally liable or base their restitution liability on relative culpability. "If the [C]ourt finds that more than [one] defendant has contributed to the loss of a victim, the [C]ourt may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The Court "is not required to use any particular formula for apportionment or, indeed, to apportion the loss at all." United States v. Salas-Fernandez, 620 F.3d 45, 49 (1st Cir.

2010). "It is well established, however, that 'the victim may recover no more than the total loss, the implication [being] that each defendant's liability ends when the victim is made whole.'" United States v. Wall, 349 F.3d 18, 26 (1st Cir. 2003) (alteration in original) (quoting United States v. Scott, 270 F.3d 30, 52 (1st Cir. 2001)).

**B.     Discussion**

The Court, in its discretion, elects to apportion restitution liability among the Defendants according to each Defendant's level of culpability and the extent to which each Defendant profited from the scheme.  See Scott, 270 F.3d at 52 ("When more than one defendant causes a loss to a victim, the district court may within its discretion 'make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.'" (quoting 18 U.S.C. § 3664(h)); United States v. Chin, No. 14-cr-10363, 2018 WL 1399297, at *2 (D. Mass. Mar. 20, 2018) (noting that the statute "affords the district court considerable discretion in apportioning a restitution award among co-defendants"), appeal docketed, No. 18-1500 (1st Cir. May 29, 2018).

Defendant Rowan argues that the losses to insurers and individual patients outside of his sales territory are not a proper subject of restitution.  [ECF No. 1123 at 3].  In determining whether a defendant is liable for restitution, the question is whether the damages to the victim are "reasonably foreseeable."  United States v. Corey, 77 F. App'x 7, 10 (1st Cir. 2003).  "In the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators.  No court has ever held to the contrary." United States v. Collins, 209 F.3d 1, 4 (1st Cir. 1999).  Because the Court finds that it was foreseeable to Rowan that the insurance fraud was not limited to his sales district, the Court

declines to apportion restitution to account only for those claims that were processed in his sales district.

Both Defendants Babich and Kapoor filed memoranda regarding the Court's apportionment of liability requesting that the Court reserve a portion of restitution liability for Insys. See [ECF No. 1228 at 3; ECF No. 1232 at 3]. The Government, on the other hand, requested that "[r]estitution should . . . be joint and several with any restitution entered against defendants in United States v. Insys Therapeutics, et al., 1:19-cr-10191-RWZ, and United States v. Elizabeth Gurrieri, 1:17-cr-10083-MLW." [ECF No. 1035 at 2 n.1]. Both Kapoor and Babich concede that most of the remaining restitution amount should be apportioned among Kapoor, Babich, and Burlakoff, reflecting the Court's finding that those Defendants acted as the three principally responsible for the scheme. [ECF No. 1228 at 5 (quoting ECF No. 1181 ("I view Mr. [K]apoor, Mr. Babich[,] and Mr. Burlakoff as the three most responsible for the conduct here . . . .")); ECF No. 1232 at 8–9].

The Court declines to reserve liability solely for Insys in its restitution order. As a preliminary matter, the case against Insys is not before the Court. In the case that is before this Court, the Court has found that the restitution in the amount of almost $60 million is owed for the harm caused to victims through the fraudulent scheme which involved bribing the prescribers identified in this case and committing insurance fraud to ensure coverage for those fraudulent prescriptions. The Court has made no finding concerning Insys' liability as a corporate defendant for the fraudulent scheme advanced by these Defendants. Further, the purpose of the MVRA is to make victims whole, with any consideration of the Defendants' circumstances being secondary. See Cheal, 389 F.3d at 53. The Court therefore will not set aside a portion of the restitution owed in order to benefit these parties where the Court has no control over the

obligations of the corporate defendant.  If, at a later date, the court considering the Insys criminal matter decides that liability for restitution should be apportioned to include Insys as jointly and severally liable for the restitution order in this case, it may do so.  See Naphaeng, 906 F.3d at 179 ("[A]n order for restitution ought not to confer a windfall upon a victim.").

The Court orders that the liability for the total restitution amount of $59,755,362.45 be ordered as follows: Defendants Kapoor, Babich, and Burlakoff shall be held jointly and severally liable for the total restitution order, $59,755,362.45.  Though the Court sentenced Babich and Burlakoff to shorter periods of incarceration than Kapoor, that was largely based on their cooperation with the Government.  Because the MVRA prioritizes that victims be made whole, however, it does not instruct that the Court consider cooperation in ordering restitution. Defendants Simon, Gurry, Rowan, and Lee shall be jointly and severally liable as well, but their liability for the total restitution order shall be capped at $5,000,000 for them as a group.

"If the [C]ourt finds that more than [one] victim has sustained a loss requiring restitution by a defendant, the [C]ourt may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.  In any case in which the United States is a victim, the [C]ourt shall ensure that all other victims receive full restitution before the United States receives any restitution."  18 U.S.C. § 3664(i).  The Government has requested that the individual patients receive restitution before the private insurers and Medicare.  [ECF No. 1219, 2/4/20 Hr'g Tr. at 25:1–17].  The Defendants do not object.  [Id. at 26:21–27:2 (noting that Kapoor did not object to the sequence of restitution proposed by the Government and that "if any of [Kapoor's] colleagues have any additional points, obviously, they will let [the Court] know")].  The Court therefore orders that those individual patients identified in its previous order, see [ECF No. 1225 at 5–9], receive restitution

before private insurers, [id. at 13–16; ECF No. 1244 (discussing Anthem's updated memo regarding restitution and ordering total restitution of $59,755,362.45)], followed by Medicare, [ECF No. 1225 at 12–13].

## III.    CONCLUSION

Accordingly, the Government's motions for forfeiture, [ECF Nos. 1048, 1049, 1050, 1051, 1052, 1053, 1054], and motion for restitution, [ECF No. 1035], are all <u>GRANTED</u> in part and <u>DENIED</u> in part.  The Defendants are hereby found to be liable for the following amounts in forfeiture and restitution:

Kapoor: $1,914,771.20 in forfeiture, [ECF No. 1243], and jointly and severally liable for the entire restitution amount, $59,755,362.45;

Babich: $14,780,455 in forfeiture, [ECF No. 1251], and jointly and severally liable for the entire restitution amount, $59,755,362.45;

Burlakoff: $4,286,044.36 in forfeiture, [ECF No. 1241], and jointly and severally liable for the entire restitution amount, $59,755,362.45;

Gurry: $3,390,472.89 in forfeiture, [ECF No. 1239], and jointly and severally liable for $5,000,000 of the total restitution order;

Simon: $2,338,078.72 in forfeiture, [ECF No. 1240], and jointly and severally liable for $5,000,000 of the total restitution order;

Rowan: $2,078,217.66 in forfeiture, [ECF No. 1238], and jointly and severally liable for $5,000,000 of the total restitution order;

Lee: $1,170,274 in forfeiture, [ECF No. 1237], and jointly and severally liable for $5,000,000 of the total restitution order.

**SO ORDERED.**

March 13, 2020                                      /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE