UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL J. GURRY, RICHARD M. SIMON, JOSEPH A. ROWAN, and JOHN KAPOOR,<br><br>Defendants. | Criminal Action No. 16-cr-10343-ADB |

### MEMORANDUM AND ORDER ON THE GOVERNMENT'S POST-MANDATE MOTION FOR RESTITUTION

BURROUGHS, D.J.

Currently before the Court is the Government's post-mandate motion for restitution. [ECF No. 1500]. For the reasons that follow, the motion is GRANTED, and restitution is awarded in the amount of $48,344,036.16.

### I. BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural background of this case and will therefore provide only a cursory summary to reflect the current posture.

In May 2019, a jury convicted Defendants Michael Gurry, Richard Simon, Joseph Rowan, and John Kapoor (collectively, "Defendants") of conspiring to violate the Racketeer Influenced and Corruption Organizations statute. [ECF No. 841]. In sum, Defendants, who were executives at a pharmaceutical company called Insys Therapeutics, Inc. ("Insys"), were convicted for criminal conduct concerning the marketing and sale of Subsys—a fentanyl-laced medication approved by the United States Food and Drug Administration for treating breakthrough cancer pain—and related insurance fraud. In the course of sentencing Defendants,

the Court entered a restitution order in the amount of $59,755,362.45. [ECF No. 1225 (original restitution Order)]; see [ECF No. 1244 (docket entry for hearing at which Court amended the restitution amount); ECF No. 1248 (transcript from that hearing); ECF No. 1308 at 6 (Mr. Kapoor's judgment reflecting revised restitution amount)]. Of the total restitution amount, $10,198.64 was earmarked to compensate six individual victims, and the remainder, $59,745,163.81, was allocated to eight insurers. [ECF No. 1225 at 17; ECF No. 1244 (hearing at which Anthem was added as the eighth insurer); ECF No. 1248 (transcript from hearing)]. As relevant here, Defendants appealed the restitution award but only as to the insurers. See Principal Brief of John Kapoor at 84, United States v. Simon, No. 20-1368 (1st Cir. Sept. 10, 2020) ("Kapoor only challenges one of these [restitution] rulings: the decision to award insurers 100 percent of paid claims for Subsys prescriptions written by the 13 implicated practitioners"); United States v. Simon, 12 F.4th 1, 64 (1st Cir. 2021) (noting that "[t]he central restitution-related issue on appeal revolves around the district court's decision to award insurers 100 percent of paid claims for Subsys prescriptions written by the thirteen coconspirator-prescribers."); see also [ECF No. 1225 at 5 (noting that during original restitution proceedings, Defendants did not contest Government's request for individual victim restitution)].

In its August 25, 2021 opinion resolving the appeal, the First Circuit stated the following with respect to restitution:

> In the wake of the jury verdicts, the government sought $306,000,000 in restitution. This figure reflected the value of all Subsys prescriptions written during the racketeering period (2012-2015). The defendants objected, challenging the government's method of computation and asserting that the government's suggested price tag was exorbitant. The district court found a middle ground, ordering restitution in lesser amounts.
>
> En route the court made five specific rulings. First, the court awarded restitution to six patient victims. Second, the court declined the government's invitation to base restitution on the totality of Subsys prescriptions written during the life of the conspiracy. Even so, the court acknowledged that sifting the legitimate

prescriptions from the fraudulent ones would be too complicated and unduly prolong and burden the sentencing process. With that in mind, the court made its third ruling, limiting restitution to losses traceable to prescriptions written solely by thirteen bribed coconspirator doctors identified by the government.

Fourth, the court awarded as restitution 100 percent of the insurers' paid claims for Subsys prescriptions written by those thirteen coconspirator-prescribers. In making these awards, the court refused to apply two reductions urged by the defendants. One requested reduction was to account for only those claims that passed through the [Insys reimbursement center ("IRC")]. The other was to account for only those prescriptions made for non-cancer patients. Figures reported by the government for these two categories, the defendants argued, should be deemed a cap for permissible restitution.[1]  The district court rejected this two-pronged argument, stating that [a]lthough the Court finds the amount of restitution owed beyond the thirteen co-conspirator doctors to be too complicated to calculate, it is clear that the amount that would be owed is at least equal to the total value of prescriptions written by the bribed doctors.

Fifth, the court apportioned restitution. It held Kapoor fully responsible for the total amount of restitution owed—$59,755,362.45—and capped the restitution obligations of the other defendants at lesser levels.[2]

The central restitution-related issue on appeal revolves around the district court's decision to award insurers 100 percent of paid claims for Subsys prescriptions written by the thirteen coconspirator-prescribers. . . .

. . . .

. . . [W]e conclude that the district court's determination to award as restitution 100 percent of Subsys claims linked to the thirteen coconspirator-prescribers is insupportable.  To be specific, the court's determination that all of the claims traceable to the thirteen coconspirator-prescribers constituted actual losses caused by the defendants' fraudulent conduct was not borne out by the preponderance of the evidence. For one thing, no party offered evidence that supported the 100-percent figure. In fact, a government expert opined, without contradiction, that approximately 80.9%

---

[1] According to a government expert, approximately 80.9% of all Subsys prescriptions were processed by the IRC. Additionally, according to a second government expert, prescriptions written for non-cancer patients accounted for approximately 73 percent of Subsys prescriptions written by the thirteen coconspirator-prescribers.

[2] Of course, liability for restitution under federal law may be joint and several and may be apportioned by the court among the responsible parties. In this instance, the court apportioned that liability among the defendants who went to trial and those that pleaded guilty before trial (Burlakoff and Babich).

> percent of all Subsys prescriptions passed through the IRC. 80.9 percent is not 100 percent, and the government represented to the court that the expert's figure was a fair and consistent, reasonable approach for the court to use. According this figure due weight, it is evident that the government did not establish but-for causation for all of the claims traceable to the thirteen coconspirator-prescribers. Indeed, the government's steadfast reliance on the expert's calculations is functionally equivalent to an admission that not every Subsys prescription written by these doctors received prior authorization as a result of IRC fraud.
>
> For another thing, the district court appears to have taken a shortcut to compensate for the difficulty of calculating restitution with respect to Subsys prescriptions written by unbribed physicians. In justifying its finding of actual loss generated through coconspirator-prescribers, the district court pointedly referred to the incalculable losses caused by non-bribed doctors. This reference, though, was out of step with the court's earlier determination that restitution would take account only of the losses caused by the coconspirator-prescribers. To this extent, then, the court's award was internally inconsistent: on the one hand, the court appears to have found that the losses generated by non-bribed doctors were incalculable but, on the other hand, to have found that those losses nonetheless justified more munificent restitution awards.
>
> These infirmities doom the restitution orders. Every loss that factors into the restitutionary amount must have an adequate causal link to the defendant[s'] criminal conduct. The blending of two distinct sets of losses, one of which was incalculable, fails to satisfy the causality requirement. Consequently, the challenged restitution orders must be vacated. On remand, the district court should recalculate the amounts of restitution consistent with its earlier determination that restitution should be limited to prescriptions written by the coconspirator-prescribers. What remains is for the court to tak[e] into account the extent (if at all) to which the [coconspirator-prescribers'] claims encompassed legitimate losses not processed through the IRC and to refashion the restitution orders accordingly. Although the court's reasoning and the calculations leading to the amounts ordered must be clear its bottom-line determination need only amount to a reasonable response to reliable evidence in the record.

Simon, 12 F.4th at 63–66 (some alterations in original) (citations and internal quotation marks omitted).

On October 7, 2021, the Government filed the instant motion. [ECF No. 1500].

Defendants responded on October 14, 2021, [ECF Nos. 1507 (Mr. Kapoor), 1508 (Mr. Rowan),

1509 (Mr. Gurry), and 1510 (Mr. Simon)],[3] and the Government replied on October 20, 2021, [ECF No. 1514]. The Court then held a hearing. [ECF No. 1521 (docket entry for hearing); ECF No. 1531 (transcript from hearing)].

## II.   LEGAL STANDARD

As articulated by the First Circuit in this case,

> [a] defendant convicted of certain federal crimes (including, as relevant here, crimes committed by fraud or deceit[)] must make restitution to victims commensurate with the victims' actual losses. [R]estitution is designed to compensate the victim, not to punish the offender. In awarding restitution, the court's goal is to make the victim whole again. Thus, a restitution order should not confer a windfall upon [the] victim.
>
> For the purpose of calculating restitution, actual loss is the beacon by which federal courts must steer. In this context, actual loss is limited to [the] pecuniary harm that would not have occurred but for the defendant's criminal activity. This standard obligates the government to show both that the particular loss would not have occurred but for the conduct undergirding the offense of conviction and that a causal nexus exists between the loss and the conduct—a nexus that is neither too remote factually nor too remote temporally.
>
> Restitution is serious business, but hearings to quantify restitution amounts should not be allowed to spawn mini-trials. As we previously have explained, we do not expect a sentencing court to undertake a full-blown trial in order to arrive at an appropriate restitution amount. Nor do we hold a sentencing court to a standard of absolute precision when fashioning restitution orders. In the end, we will uphold a sentencing court's restitution award [a]s long as the court's order reasonably responds to some reliable evidence.
>
> Although this standard is relatively modest in application, it has some teeth. A sentencing court's [m]ere guesswork will not suffice. Similarly, rough approximation[s] that do not sufficiently reflect[ ] . . . the losses of the victims are not appropriate grist for the restitution mill. The court must resolve any genuine and material disputes about the fact, cause, or amount of the loss by a preponderance of the evidence.

---

[3] Mr. Kapoor took the laboring oar, and Messrs. Rowan, Gurry, and Simon filed short supporting briefs. Compare [ECF No. 1507], with [ECF No. 1508], [ECF No. 1509], and [ECF No. 1510].

Simon, 12 F.4th at 64–65 (some alterations in original) (citations and internal quotation marks omitted).

### III. DISCUSSION

#### A. Restitution Amount

The Government now seeks $48,342,088.22 in restitution. [ECF No. 1500 at 3]. That sum represents the original total restitution amount, $59,755,362.45, multiplied by .809 to account for the fact that 80.9% of Subsys claims went through the IRC. [Id. at 2–3]. Defendants advocate for a significantly lower amount: $35,293,900.03. [ECF No. 1507 at 13]. That sum represents the $10,198.64 in restitution for individual victims, which was unaffected by the appeal, plus $35,283,701.39 in insurer restitution. [Id.]. Defendants arrived at this $35,283,701.39 figure by multiplying the original insurer restitution amount, $59,745,163.81, by: (1) .809 to account for the fact that only 80.9% of the thirteen co-conspirators' Subsys claims went through the IRC; and then (2) .73 to account for the fact that 73% of those co-conspirators' prescriptions were written off-label to patients who did not have an active cancer diagnosis. [Id. at 2, 5–8]. Defendants urge the Court to use the .73 multiplier—even though not all claims for on-label prescriptions for patients with active cancer were necessarily compensable—because they view the .73 figure as a reasonable and reliable proxy for the number of illegitimate, non-compensable claims (i.e., claims that would not have been paid but for Defendants' criminal activity). [Id. at 9–12]. Thus, the parties' dispute boils down to whether the restitution amount should reflect the insurers' paid claims for *all* prescriptions written by the thirteen co-conspirators that went through the IRC or a lesser amount to reflect the fact that a subset of claims that went through the IRC would have been paid irrespective of Defendants' criminal activity (and even if they had they not gone through the IRC). For the reasons that follow, in line

6

with what it views to be the First Circuit's instruction, the Court sides with the Government and awards restitution in the amount of $48,344,036.16.

### 1. Individual Victim Restitution

As an initial matter, because Defendants did not appeal the individual victim restitution amount (and acknowledge now that that sum is unaffected by the First Circuit's decision), the Court will not alter that portion of the restitution award.[4]  Accordingly, $10,198.64 is awarded to the six individual victims as follows:

- $1,140.00 for Victim No. 5632738;
- $1,231.41 for Victim No. 6002801;
- $965.00 for Victim No. 6002802;
- $2,006.00 for Victim No. 5431216;
- $3,041.23 for Victim No. 5431207; and
- $1,815.00 for Victim No. 5431212.

See [ECF No. 1225 at 17 (initial restitution Order)].

### 2. Insurer Restitution

With respect to the insurer portion of the restitution amount, the First Circuit provided the following instruction:

> On remand, the district court should recalculate the amounts of restitution consistent with its earlier determination that restitution should be limited to prescriptions written by the coconspirator-prescribers. What remains is for the court to "tak[e] into account the extent (if at all) to which the [coconspirator-prescribers'] claims encompassed legitimate losses" not processed through the IRC and to refashion the restitution orders accordingly.

---

[4] The Government does not appear to distinguish between insurer restitution and individual victim restitution. See [ECF No. 1500 (advocating for 80.9% of the total original restitution amount)]. The Court views this as an oversight rather than an assertion that the individual victims are entitled to only 80.9% of their losses.

Simon, 12 F.4th at 65–66 (alterations in original) (citations omitted) (quoting United States v. Alphas, 785 F.3d 775, 786 (1st Cir. 2015)).  The parties offer differing interpretations of this instruction.

The Government asserts that the overt reference to claims for prescriptions "*not processed through the IRC*," Simon, 12 F.4th at 66 (emphasis added), means that the First Circuit assumed that all prescriptions written by the thirteen co-conspirators and processed through the IRC are subject to restitution.  [ECF No. 1500 at 3].  In the Government's view, rather than contemplating a reduction in restitution to account for compensable claims for prescriptions processed through the IRC, the First Circuit is actually inviting the Court to (1) consider what portion, if any, of the 19.1% of the insurers' paid claims for the thirteen co-conspirators' prescriptions that did *not* pass through the IRC were illegitimate (i.e., would not have been paid but for Defendants' criminal activity) and (2) upwardly adjust the restitution amount accordingly.  [Id.].

Defendants, on the other hand, argue that when considered in the context of the entire restitution discussion, the First Circuit's statement is an instruction to consider whether the restitution amount should be reduced to account for any paid claims for prescriptions written by the thirteen co-conspirators and processed via the IRC that were legitimate (i.e., would have been paid by the insurers notwithstanding Defendants' criminal activity).  [ECF No. 1507 at 5–7].  To quantify this, Defendants assert that 27% of those paid claims (i.e., the percentage of claims for on-label prescriptions for patients with active cancer) would have been paid regardless of Defendants' fraud (and even if they had not been processed through the IRC).  [Id.].

The Court sees the error in the initial restitution Order and must, of course, follow the First Circuit's mandate, but has wrestled with how to implement that mandate.  Ultimately,

8

although the parties' competing interpretations of the First Circuit's instruction are both plausible, the Court concludes that the Government's view more closely reflects the intent of the appellate court.

First, the First Circuit's clear directive to account for legitimate losses "*not* processed through the IRC," Simon, 12 F.4th at 66 (emphasis added), is difficult to square with Defendants' position that the restitution amount should be further reduced based on purportedly legitimate prescriptions that *were* processed through the IRC. There is no explicit indication in the First Circuit's opinion that it wanted this Court to account for legitimate prescriptions from the thirteen co-conspirators that passed through the IRC. Thus, the Court believes that the better reading of the First Circuit's statement is that it viewed 80.9% of the insurers' paid claims for the thirteen co-conspirators' prescriptions as a baseline restitution amount and was actually contemplating a *higher* award if there were claims that were processed outside the IRC that would not have been paid but for Defendants' fraud. In other words, the First Circuit was accounting for the possibility that the Government might introduce evidence demonstrating that some portion of the 19.1% of the claims paid by the insurers for the thirteen co-conspirators' prescriptions that did *not* pass through the IRC were also illegitimate (i.e., would not have been paid but for Defendants' criminal activity) and should therefore *increase* the restitution amount. Although the First Circuit seemingly contemplated the possibility of increasing the restitution amount to reflect paid claims for illegitimate prescriptions processed outside of the IRC, the Government has neither sought such an increase nor offered any evidence on that topic.

Second, the 73% figure that Defendants advance does not actually speak to whether a paid claim would still have been paid absent Defendants' fraud. As the First Circuit noted, the 73% figure reflects the portion of the thirteen co-conspirators' prescriptions that were for

9

patients without cancer. See Simon, 12 F.4th at 63 n.18 ("And according to a second government expert, prescriptions written for non-cancer patients accounted for approximately 73 percent of Subsys prescriptions written by the thirteen coconspirator-prescribers."). The fact that 27% of the prescriptions were for patients with reported cancer, however, does not mean that those prescriptions were legitimate (i.e., would have been paid notwithstanding Defendants' fraud), a finding which the First Circuit endorsed later in its opinion. Id. at 68.[5] For example, even if a patient had cancer, a claim for a Subsys prescription would not have been paid if there were no breakthrough cancer pain or if the patient had not tried and failed other medications. Accordingly, Defendants' reliance on the cancer vs. non-cancer distinction is misplaced. Given this, coupled with the First Circuit's finding that this Court's "determination that each prescription processed by the IRC during the racketeering period was tainted by fraud is grounded upon reasonable inferences drawn from adequately established facts,"[6] id., the Court declines to apply the additional reduction that Defendants seek.

The Court acknowledges that this tack leaves open the possibility that restitution will be awarded for a small number of claims that would have been paid regardless of Defendants' fraud because they were for prescriptions for patients with active cancer who were experiencing

---

[5] See also Simon, 12 F.4th at 68 ("Gurry is barking up the wrong tree, however, when he tries to convince us that 'the IRC did not lie about every prescription it processed.' The defendants agreed below that 73 percent of the IRC's authorizations involved prescriptions for non-cancer patients and the district court found that the IRC 'misled insurers in a number of ways,' even when the patients had cancer. The IRC's deceptions included dissembling about patients experiencing breakthrough cancer pain, having a history of cancer, having tried-and-failed other medications, and having difficulty swallowing. These tactics were systematically employed by the IRC and did not become honest or accurate by virtue of a patient having cancer." (citations omitted)).

[6] The Court acknowledges that restitution and forfeiture are not identical remedies but nonetheless finds the First Circuit's statement on this point instructive even though it appears in the forfeiture section of the opinion.

breakthrough pain. Although the Court could conduct an evidentiary hearing to wade through each and every prescription written by the thirteen co-conspirators and processed through the IRC to determine whether it was legitimate, it need not do so and does not understand the First Circuit to endorse that. See Simon, 12 F.4th. at 64 (noting that courts need not conduct "mini-trials" in service of fashioning restitution awards).

The Court is therefore left with three options. It can: (1) accept the Government's approach and conclude that each claim for a prescription written by one of the thirteen co-conspirators that passed through the IRC would not have been paid but for Defendants' criminal activity (even though some small subset of those claims may have been paid anyway); (2) accept Defendants' approach notwithstanding the fact that it is confident that claims for many of the prescriptions for cancer patients would not have been paid but for Defendants' criminal activity; or (3) come up with its own approach and apply a percentage multiplier to reflect the fact that some portion of the claims for prescriptions written by the thirteen co-conspirators that went through the IRC were actually for patients with active cancer experiencing breakthrough pain and would have been paid regardless of Defendants' criminal activity. Given the flaws with the 73% figure discussed above and the First Circuit's warning that a restitution calculation must be rooted in evidence, see Simon, 12 F.4th at 64–65, the Court chooses the first option. Although that option is not "absolute[ly] precis[e]," it is a "reasonabl[e] respon[se] to some reliable evidence." Id. at 64–65 (first quoting United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018); then quoting United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013)). Specifically, the same reliable evidence that supports the conclusion that every prescription processed through the IRC was tainted by Defendants' fraud, Simon, 12 F.4th at 68, also supports the conclusion that all of the claims paid by the insurers for prescriptions written by

11

the thirteen co-conspirators that passed through the IRC would not have been paid but for Defendants' criminal activity.

Accordingly, the Court will award restitution for the insurers in the amount of $48,333,837.52, which is 80.9% of the original insurer restitution amount.  Because neither party has suggested that different insurers had different IRC vs. non-IRC rates, the Court will apply the same 80.9% multiplier across the board and award restitution as follows:

- $24,458,412.06 for Medicare;
- $965,524.51 for Aetna;
- $12,193,687.57 for Caremark;
- $1,487,563.37 for Cigna;
- $84,696.91 for Horizon;
- $2,686,530.49 for Silverscript;
- $3,974,900.20 for United; and
- $2,482,522.41 for Anthem.

See [ECF No. 1225 at 17; ECF No. 1244 (hearing at which Court amended restitution figure to account for Anthem's claim); ECF No. 1248 at 14 (transcript from hearing)].

### B. Apportionment Among Defendants

In crafting its original restitution award, the Court ordered that Defendants would be jointly and severally liable for the restitution amount but that the liability for Messrs. Gurry, Simon, and Rowan would be capped at $5 million.  [ECF No. 1272 at 19–20].  The First Circuit did not address this apportionment structure (other than to note that apportionment is permissible), see Simon, 12 F.4th at 64 n.19, and, notwithstanding Mr. Rowan's argument to the contrary, [ECF No. 1508 at 1–2], the Court sees no reason to disturb it.

### IV. CONCLUSION

Accordingly, for the reasons set forth above, the Government's motion for post-mandate restitution, [ECF No. 1500], is GRANTED.  Total restitution in the amount of $48,344,036.16 is hereby awarded.  Defendants are jointly and severally liable, but the liability of Messrs. Gurry,

Simon, and Rowan will be capped at $5 million. The total restitution amount breaks down as follows:

- $1,140.00 for Victim No. 5632738;
- $1,231.41 for Victim No. 6002801;
- $965.00 for Victim No. 6002802;
- $2,006.00 for Victim No. 5431216;
- $3,041.23 for Victim No. 5431207;
- $1,815.00 for Victim No. 5431212;
- $24,458,412.06 for Medicare;
- $965,524.51 for Aetna;
- $12,193,687.57 for Caremark;
- $1,487,563.37 for Cigna;
- $84,696.91 for Horizon;
- $2,686,530.49 for Silverscript;
- $3,974,900.20 for United; and
- $2,482,522.41 for Anthem.

**SO ORDERED.**

November 23, 2021

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE